0001
 1
 1
 2   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 3   - - - - - - - - - - - - - - - - - - - X
 4   ADONNA FROMETA,
 5                    Plaintiff,
 6                 -against-
                                    07 CIV. 6372
 7   MARIO E. DIAZ-DIAZ, ALL AMERICAN
     HAULERS RECYCLING,
 8
                    Defendants.
 9
     - - - - - - - - - - - - - - - - - - - X
10
     HELD AT:        Wilson, Elser, Moskowitz,
11                   Edelman & Dicker, LLP
                     3 Gannett Drive
12                   White Plains, New York  10604
                     May 9th, 2008
13                   8:00 a.m.
14
15               Deposition of ANDREW M. G. DAVY,
16   M.D., a non-party witness, pursuant to
17   Subpoena, held at the above time and place
18   before a Notary Public of the State of New
19   York.
20
21
22
23
24                           Lisa M. Prentice,
25                            Shorthand Reporter

```
0002
 1
 2
 2    A P P E A R A N C E S:
 3
 4
 5         SLAWEK W. PLATTA, PLLC
           Attorneys for the Plaintiff
 6         Office & Post Office Address
           42 Broadway, Suite 1927
 7         New York, New York  10004
           BY:  SLAWEK W. PLATTA, LL.M., ESQUIRE
 8
 9
10         WILSON, ELSER, MOSKOWITZ, EDELMAN
           & DICKER, LLP
11         Attorneys for the Defendants
           Office & Post Office Address
12         3 Gannett Drive
           White Plains, New York  10604
13         BY:  MICHAEL COFFEY, ESQUIRE
14              STUART MILLER, ESQUIRE
15              JOHN HSU, ESQUIRE
16
17
18
19
20         THWAITES & LUNDGREN, ESQUIRE
21         Attorneys for the non-party witness
22         Office & Post Office Address
23         5 West Main Street, Suite 211
24         Elmsford, New York  10523
25         BY:  KURT E. LUNDGREN, ESQUIRE
```

```
0003
 1
3
 2
 3
 4
 5
 6
 7                    IT IS HEREBY STIPULATED AND
 8    AGREED, by and between the attorneys for the
 9    respective parties herein, that the sealing
and
10    filing of the within deposition be waived;
that
11    such deposition may be signed and sworn to
12    before any officer authorized to administer an
13    oath, with the same force and effect as if
14
15    signed and sworn to before the officer before
16
17    whom said deposition is taken.
18
19
20
21                    IT IS FURTHER STIPULATED AND
22
23    AGREED, that all objections, except as to
form,
24
25    are reserved to the time of trial.
```

```
0004
 1
4
 2                    ANDREW M. G. DAVY, M.D.,
 3                    stating his business address
as
 4                    1513 Voorhies Avenue,
Brooklyn,
 5                    New York, 11235, having been
 6                    duly sworn by Notary Public,
 7                    Lisa M. Prentice, testified as
 8                    follows:
 9              MR. PLATTA:  It's 8:00.
10              MR. MILLER:  8:02 to be exact.
11    EXAMINATION BY
12    MR. COFFEY:
13          Q.    Good morning, Doctor.
14          A.    Good morning.
15          Q.    And what's your name?
16          A.    Andrew M. G. Davy.
17          Q.    What's your present home address?
18          A.    Home address?  246 South
Ridgewood
19    Road, South Orange, New Jersey, 07079.
20          Q.    And are you employed?
21          A.    Yes.
22          Q.    By whom?
23          A.    By me.
24          Q.    And where is your office?
25          A.    My main office is in Brooklyn,
New
```

```
0005
 1                    ANDREW M.G. DAVY, M.D.
5
 2    York.
 3           Q.      Do you have any other offices?
 4           A.      Yes, I have offices in Staten
 5    Island, the Bronx and two other offices in
 6    Brooklyn.
 7           Q.      Let's go through them, where is
 8    your Staten Island office?
 9           A.      1163 Forest Avenue, Staten
Island,
10    New York, 10310.
11           Q.      And then in the Bronx?
12           A.      3262 Westchester Avenue, I don't
13    remember the zip code for that office.
14           Q.      And who do you share that space
15    with, if anyone?
16           A.      I rent space from Dr. Krishna,
and
17    there's a chiropractor there.
18           Q.      What's his name?
19           A.      Dr. Oshidar.
20           Q.      How long have you been in the
21    Bronx office?
22           A.      Maybe six years.
23           Q.      And then how about out in Staten
24    Island, is that your own space or you rent?
25           A.      Rent.
```

0006
 1                    ANDREW M.G. DAVY, M.D.
6
 2          Q.     Who do you rent it from?
 3          A.     I rent that from Drs. Abrams and
 4    Piazza.
 5          Q.     Now, in Brooklyn you have three
 6    offices?
 7          A.     Yes.
 8          Q.     Where are the three of them?
 9          A.     Main one is at 1513 Voorhies
10    Avenue, Lower Level, Brooklyn, New York,
11235,
11    next one is at 81 Willoughby Street, Fourth
12    Floor, Brooklyn, 11201, and then the third one
13    is on 476 Bay Ridge Parkway, I don't remember
14    the zip code there.
15          Q.     And do you rent the 1513 Voorhies
16    property?
17          A.     From Total Neuro Care upstairs
and
18    Downstate Medical, P.C. downstairs.
19          Q.     Total Neuro Care and Downstate
20    what?
21          A.     Medical.
22          Q.     How about the 81 Willoughby
23    Street?
24          A.     That's Oceanview Realty.
25          Q.     And then 476 Bay Ridge?

```
0007
 1                  ANDREW M.G. DAVY, M.D.
7
 2          A.      That's Bay Ridge Orthopedics.
 3          Q.      And what doctors in Bay Ridge
 4   Orthopedics?
 5          A.      Dr. Howard Baum.
 6          Q.      Tell us a little bit about your
 7   education, where did you get your
undergraduate
 8   degree?
 9          A.      Columbia University School of
10   Engineering and Applied Science, 1986,
11   Bachelor's in Chemical Engineering.
12          Q.      And your med degree?
13          A.      Columbia University College of
14   Physicians and Surgeons, 1990.
15          Q.      And currently where do you have
16   privileges at?
17          A.      The Brooklyn Hospital Center.
18          Q.      And who are they affiliated with?
19          A.      New York Presbyterian Health Care
20   Network.
21          Q.      How long have you had privileges
22   there?
23          A.      Since 1998.
24          Q.      Other than in your medical
career,
25   other than the Brooklyn Hospital Center, have
```

```
0008
 1                ANDREW M.G. DAVY, M.D.
8
 2   you had privileges at any other hospitals?
 3         A.    Yes.  Strong Memorial Hospital,
 4   University of Rochester, Rochester, New York,
 5   Albany Medical Center, Albany, New York,
 6   Providence Medical Center in Anchorage,
Alaska,
 7   Interfaith Medical Center in Brooklyn,
Catholic
 8   Medical Center, Brooklyn and Queens.
 9         Q.    Now, what years did you have
10   privileges at Interfaith?
11         A.    Probably from '99 to maybe 2001
or
12   2002.
13         Q.    And what happened there, what
14   happened with the privileges?
15         A.    I was a per diem
anesthesiologist,
16   so I really don't know what happened to the
17   privilege, they probably just expired.
18         Q.    And then at Catholic Medical
19   Center what years were you there?
20         A.    I was there from, I think, '99 to
21   about 2002 or 2003 as the director of pain
22   management outpatient and I resigned that post
23   in about 2002.
24         Q.    And do you have a delineation of
25   privileges?
```

0009
 1                    ANDREW M.G. DAVY, M.D.
9
 2            A.      Yes.
 3            Q.      What does that entail?
 4            A.      I have admitting privileges
 5    through the department of surgery at the
 6    Brooklyn Hospital Center and I, also, have
 7    privileges through the Department of
 8    Anesthesiology that gives me freedom to do
 9    operative anesthesia on kids up to
10    octogenarians.  I, also, have pain management
11    privileges to do routine injections, such as
12    epidural steroids and advanced therapy such as
13    intrathecal drug delivery systems, spinal cord
14    stimulators and percutaneous discectomies.
15            Q.      That's under which delineation,
16    under the pain management?
17            A.      Yeah.
18            Q.      Now, how many beds are at this
19    hospital?
20            A.      I don't know.
21            Q.      And is it a private hospital?
22            A.      I think so, yes.
23            Q.      Now, under the pain management
the
24    percutaneous discectomy procedures, do you own
25    the Stryker device that you use?

```
0010
 1                  ANDREW M.G. DAVY, M.D.
10
 2          A.    No.
 3          Q.    Who does, does the hospital?
 4          A.    The hospital.
 5                MR. PLATTA:  Objection.  You can
 6     answer.
 7          Q.    What year did you first use a
 8     Stryker device to do any procedures?
 9                MR. PLATTA:  Objection.  You can
10     answer.
11          A.    Well, maybe 2003 or 2002.
12          Q.    Now, are you a shareholder in the
13     hospital?
14          A.    No.
15                MR. PLATTA:  Objection.
16          Q.    As to 2002 or 2003 how did you
17     first learn about the Stryker device?
18          A.    The Stryker rep came by --
19                MR. PLATTA:  Note my objection.
20          A.    -- and asked if I did
discography,
21     and he had a device that would allow me to do
22     percutaneous discectomies or disc
decompression
23     for contained disk herniations that would help
24     patients.
25          Q.    And that was for contained disc
```

0011
 1                  ANDREW M.G. DAVY, M.D.
11
 2   herniations?
 3          A.     Yes.
 4          Q.     What is a contained disc
 5   herniation?
 6                  MR. PLATTA:  Objection.  You can
 7          answer.
 8          A.     Contained disc herniation is sort
 9   of like a disc bulge or a small disc
herniation
10   that on discography does not allow dye that's
11   injected in to the center of the disc to seep
12   out.
13          Q.     So, this procedure and this
device
14   is used typically for disc bulges and small
15   disc herniations?
16          A.     Yes.
17                  MR. PLATTA:  Objection.  You can
18          answer.
19          Q.     What would be a small disc
20   herniation?
21                  MR. PLATTA:  Objection.  You can
22          answer.
23          A.     In the lower back usually it's
24   disc herniation that's between six millimeter
25   to nine millimeter in size, and in the neck

0012
 1                    ANDREW M.G. DAVY, M.D.
12
 2    there's no fixed dimension.  There are some
 3    other clinical criterias.  There should be no
 4    ongoing neurologic changes or deficits.
 5            Q.     So, what's an ongoing change or
 6    deficit?
 7            A.     Bowel or bladder dysfunction.
 8                   MR. PLATTA:  Objection.
 9            A.     Motor loss.
10            Q.     What is no motor loss?
11                   MR. PLATTA:  Over objection.
12            A.     No wasting of muscles, no loss of
13    motor strength that's -- that's motor strength
14    from zero to five out of five, so if it's two
15    out of five or less, then there's significant
16    motor dysfunction and you're not a candidate
17    for that.
18            Q.     So, what is the criteria for a
19    candidate for that procedure?
20            A.     Someone who has --
21                   MR. PLATTA:  Again, over
22            objection.
23            A.     -- contained disc herniation with
24    most often radiating pain down an extremity
25    without any ongoing neurologic deficits.

0013
 1                  ANDREW M.G. DAVY, M.D.
13
 2          Q.     And, so, what did you do after
 3    meeting the Stryker representative, did he ask
 4    you to try it out, did you go for a training
 5    seminar, how did you become more familiar with
 6    that practice?
 7          A.     Yeah, I did go for training
 8    seminar where I was then certified to do the
 9    device -- to use the device, and then I
started
10    using the device.
11          Q.     When you went to the training
12    seminar, where was that?
13          A.     One was in Boston and one was in
14    -- I don't remember the first one, I don't
15    remember where the first one was.
16          Q.     When you went to the one in
17    Boston, how long was that training seminar?
18          A.     About a day.
19          Q.     When you went to the one day
20    thing, was it a doctor who taught you or a
21    representative?
22          A.     Yes, it was a doctor.
23          Q.     Was it at a hospital or at a
24    seminar conference center?
25          A.     One of the Harvard affiliated

0014
 1                ANDREW M.G. DAVY, M.D.
14
 2   hospitals.
 3          Q.     And what did they do, did you do a
 4   hands on part of it?
 5          A.     Yeah, they had lectures and then
 6   they had a cadaver workshop.
 7          Q.     How many of you were in that
 8   class?
 9          A.     Maybe ten.
10          Q.     Now, this is when you were at your
11   current hospital was when you were first
12   approached, the Brooklyn Hospital Center?
13          A.     Yes.
14          Q.     Were there any other doctors on
15   staff who were doing that procedure at the
16   time?
17          A.     No.
18          Q.     Now, currently at your hospital
19   are there any other doctors on staff doing that
20   procedure?
21          A.     I hear there's someone who started
22   doing them recently.
23          Q.     Now, at your current hospital do
24   you have any position other than admitting
25   privilege, like are you chief of any

0015
 1                    ANDREW M.G. DAVY, M.D.
15
 2   department?
 3           A.     No.
 4           Q.     So, for this percutaneous
 5   procedure which department does that fall
 6   under, anesthesia or the surgical?
 7           A.     Anesthesia.
 8           Q.     Do you know why it would fall
 9   under anesthesia and not surgery?
10                  MR. PLATTA:  Objection.  You can
11           answer.
12           A.     Actually, the chairman of surgery
13   signed off on it and they describe it as disc
14   aspiration so as not to interfere with the
15   orthopedic or neuro spine surgeon and their
16   designation.
17           Q.     So, what's aspiration?
18           A.     Taking out some of the disc.
19                  MR. PLATTA:  Objection.
20           A.     Removal of some of the disc.
21           Q.     What happened after you went to
22   the training, did you then say you liked this
23   and you decided to ask the hospital to start
24   doing these procedures or what was the
process?
25           A.     Yes, I booked some cases, started

```
0016
 1                    ANDREW M.G. DAVY, M.D.
16
 2     doing them, and then they added it to my
 3     privileges.
 4          Q.     And did you work on getting that
 5     equipment at the hospital, how did that
Stryker
 6     device get to the hospital?
 7                    MR. PLATTA:  Objection.
 8          A.     The Stryker rep was introduced to
 9     the person who buys equipment and the
equipment
10     is bought by the hospital.
11          Q.     Do you know how much that
12     equipment cost?
13          A.     I think --
14                    MR. PLATTA:  Objection, but you
15          can answer.
16          A.     $2,000.
17          Q.     So, it's a $2,000 machine?
18          A.     Yes.
19          Q.     And did they give you medical
20     literature on those procedures?
21          A.     Oh, yeah.
22          Q.     What did they give you, did they
23     give you any books?
24          A.     Case reports, they did give me a
25     few textbooks, research studies.
```

0017
 1                ANDREW M.G. DAVY, M.D.
17
 2        Q.    Do you still have any of the case
 3   reports, textbooks or research studies?
 4        A.    Yeah, yes.
 5        Q.    Now, after you finished the
 6   seminar and you went to the cadaver workshop,
 7   you said you went to a second workshop at some
 8   point?
 9        A.    Yes.
10        Q.    What was done at the second
11   workshop?
12        A.    We did -- the second workshop was
13   focussed on cervical discectomies, and the
14   first one was lumbar and cervical.
15        Q.    And after that did you have to
16   write any reports to the hospital or any type
17   of memos asking to be able to participate in
18   this type of procedure?
19        A.    No.
20        Q.    Did you have any meetings?
21             MR. PLATTA:  Objection.  With
22        whom?
23        Q.    Did you ever meet with anyone
from
24   the hospital to talk about that you were going
25   to start doing these procedures?

0018
 1                    ANDREW M.G. DAVY, M.D.
18
 2          A.      I don't think so, I don't
 3    remember.
 4          Q.      Did you have to write any type of
 5    formal proposal asking to put this on to your
 6    privileges?
 7          A.      No.
 8          Q.      How did that occur then, the head
 9    of what department approved it?
10          A.      Anesthesiology and surgery.
11          Q.      Did you have to meet with the
head
12    of anesthesiology surgery or no?
13          A.      No.
14          Q.      What doctors currently is the
head
15    of anesthesiology?
16          A.      Dr. Spencer Lubin.
17          Q.      Lubin, L-U-B-I-N?
18          A.      Yes.
19          Q.      Who is the head of surgery?
20          A.      Steven Carryl, C-A-R-R-Y-L.
21          Q.      And the percutaneous procedure,
is
22    it typically an ambulatory procedure?
23          A.      Yes.
24          Q.      And approximately how many of
25    these procedures have you done since you've

0019
 1                    ANDREW M.G. DAVY, M.D.
19
 2    started these procedures in 2002 or 2003?
 3           A.     Maybe between two and three
 4    hundred.
 5           Q.     What is the cost for these
 6    procedures?
 7           A.     There are several different
costs,
 8    there's physician fees, I told you about the
 9    equipment fees and, of course, there's a
10    hospital ambulatory surgery fee and the
11    anesthesiologist fees.  My fees that I charge
12    is about -- for each level is about $7,000 and
13    I get about -- about $7,000.
14           Q.     $7,000 --
15           A.     That's my charges, that's what I
16    charge.  Different insurances will pay
17    differently.
18           Q.     So, typically what insurances do
19    you deal most with would you say?
20                  MR. PLATTA:  Objection.
21           A.     Workers' Comp.
22           Q.     What is the Workers' Comp
23    reimbursement typically?
24           A.     About --
25                  MR. PLATTA:  Objection.

0020
 1                    ANDREW M.G. DAVY, M.D.
20
 2          A.     About $2,500 per level -- for the
 3     first level I should say, the second level
it's
 4     cut in half.
 5          Q.     Which other carriers are you
 6     familiar with their rates of reimbursement?
 7          A.     The no fault is the same as
 8     Workers' Comp in New York State and Medicare.
 9                 MR. PLATTA:  Again, over
10                 objection.
11          A.     Medicare pays, I think, about
$400
12     to $600 a level, I don't remember the exact
13     number.
14          Q.     Typically what are the equipment
15     fees that are charged?
16          A.     About $2,000 for each equipment.
17          Q.     And when you say for each
18     equipment, what is that?
19          A.     Because for -- if I do more than
20     one level, I use different equipment --
21     different device.
22          Q.     When you say different device, if
23     memory serves me from what I read on the
24     Stryker website, there's three different sizes
25     that they recommend; is that correct?

0021
 1                    ANDREW M.G. DAVY, M.D.
21
 2          A.      Yes.
 3                  MR. PLATTA:  Objection.
 4          A.      There's a short cervical, the
 5     regular size, which I think is six inch, 1.5
 6     millimeter, and then there's a nine inch, so
 7     that's depending on what level you're doing
and
 8     the patient's body habitus, but for each level
 9     that I do because sterility is very important
10     when dealing with the disc because it's very
11     poorly vascularized, I use a brand new
12     decompressor for each level.
13          Q.      Now, what is the cost from
Stryker
14     for each decompressor?
15                  MR. PLATTA:  Objection.
16          A.      I don't know what they sell the
17     hospital.
18          Q.      But the charge is typically about
19     $2,000?
20          A.      Yes.
21          Q.      How much is the Workers' Comp
22     reimbursement for each piece of equipment?
23          A.      I don't know.
24                  MR. PLATTA:  Objection.
25          Q.      But it would be fair to say if

0022
 1                    ANDREW M.G. DAVY, M.D.
22
 2     there's a reduction of what your fee charged
 3     is, the rate of reimbursement is typically
 4     lower?
 5                    MR. PLATTA:  Objection.
 6                    MR. LUNDGREN:  Objection.
 7          A.    I don't know.  You'd have to ask
 8     the hospital.  I don't know.
 9          Q.    What is typically the hospital
10     fees?
11          A.    I don't know.
12          Q.    What is the anesthesiologist fee?
13          A.    I don't know.
14          Q.    As you understand from the
Stryker
15     representative or based upon your experience
16     what are the advantages of this procedure?
17          A.    It avoids any major trauma to the
18     skin or bony tissue surrounding the disc.  It
19     speeds up the healing process.  It's less
20     invasive.  It decreases the recurrence of
21     herniations that noted, documented on open
22     discectomies.  Those are the advantages.
23          Q.    And it does it have a high
success
24     rate?
25          A.    If applied properly, yes.

0023
 1                    ANDREW M.G. DAVY, M.D.
23
 2          Q.      And based on what the Stryker
site
 3    says, the success rate is over ninety percent?
 4                  MR. PLATTA:  Note my objection to
 5          the prior question and, also, to this
 6          one, as well.
 7          A.      Correct.
 8          Q.      In the two to three hundred that
 9    you've done has the success rate mirrored what
10    the Stryker materials talk as the success
rate?
11          A.      It's a little bit higher.
12                  MR. PLATTA:  Objection.
13          Q.      About ten percent higher than
what
14    they say on their website?
15          A.      Yes.
16          Q.      As a procedure is it indicated
for
17    people who have degenerative changes?
18          A.       Yes, if the degeneration or the
19    disc height is at least fifty percent
20    maintained, that's a consequence of
21    degeneration, then the patient is a candidate
22    for it as long as the other criterias hold
that
23    I mentioned earlier.
24          Q.      That would, also, mean that there
25    was no compression essentially on the disc?

```
0024
 1                    ANDREW M.G. DAVY, M.D.
24
 2                    MR. PLATTA:  Objection.
 3          A.     No, no ongoing neurologic
deficit,
 4   in other words, the pathology is stable,
that's
 5   why it's done, for compression and impingement
 6   but the pathology has to be stable.
 7          Q.     Now, have you ever testified in
 8   Federal Court before?
 9          A.     Federal Court?
10                 MR. PLATTA:  Again, over
11          objection.
12          A.     I don't think so.  I don't
13   remember.
14          Q.     Have you testified in State Court
15   before?
16                 MR. PLATTA:  Over objection.
17          A.     Probably, yes.
18          Q.     Approximately how many times?
19                 MR. PLATTA:  Over objection.
20          A.     Three to five times, not much.
21          Q.     Have they been for your patients?
22                 MR. PLATTA:  Objection.
23          A.     Would State Court be like
Workers'
24   Comp?
25          Q.     No.  They are different, but I'll
```

```
0025
 1                    ANDREW M.G. DAVY, M.D.
25
 2   get to Workers' Comp.
 3                    MR. PLATTA:  Since there is
 4             ambiguity can you explain to the Doctor
 5             what it means State Court versus
Workers'
 6             Comp so we are clear on the record?
 7                    MR. COFFEY:  I'll ask them
 8             separately.
 9             Q.     State Court is the Supreme Court
10   and Workers' Comp Board is different.
11                    MR. PLATTA:  State Court, also,
12             means Civil Court, for example?
13                    MR. LUNDGREN:  New York State
14             Civil Courts?
15                    MR. COFFEY:  Yeah, New York Civil
16             Court.
17             A.     Is it okay to make a distinction
18   personal injury cases versus Workers' Comp
19   cases?
20             Q.     You can make that, if that makes
21   more sense to you, that's fine.
22             A.     Yeah, about three I've done and
23   three personal injury.
24             Q.     Three times?
25             A.     Yes.
```

0026
 1                    ANDREW M.G. DAVY, M.D.
26
 2         Q.     And who have they been for, for
 3    patients of yours or for other people who have
 4    retained you to testify as an expert?
 5                    MR. PLATTA:  Over objection.
 6         A.     Patients.
 7         Q.     How many times --
 8         A.     Actually, both because patients
of
 9    mine but I was retained as an expert witness
10    for the patient.
11         Q.     You were retained by your patient
12    as an expert witness?
13                    MR. PLATTA:  Over objection.
14         A.     Patient's attorney.  I saw the
15    patient -- usually the scenario is I see the
16    patients under Workers' Comp and they have a
17    separate Workers' Comp attorney, and then at
18    some point near the end of their treatment I
19    get contacted by a separate attorney to
testify
20    in the third party.
21                    MR. PLATTA:  Please let the
record
22            reflect since there was no information
23            given to the witness in the very
24            beginning of this deposition I would
like
25            to remind the witness that he is
supposed

0027
 1                    ANDREW M.G. DAVY, M.D.
27
 2          to respond to the questions that are
 3          being asked and only to the questions
 4          that are being asked.
 5          Q.    How many times have you testified
 6    in front of the Workers' Comp Board?
 7                  MR. PLATTA:  Objection.
 8          A.    I lost count.
 9          Q.    More than fifty?
10          A.    Yeah.
11                  MR. PLATTA:  Over objection.
12          Q.    More than a hundred?
13          A.    Yes.
14                  MR. PLATTA:  Objection to the
last
15          question, as well.
16          Q.    Your testimony has been through
17    report and depositions and both over the phone
18    and in the Workers' Comp Board, all different
19    ways?
20                  MR. PLATTA:  Objection.
21          A.    What do you mean by report?
22          Q.    Have you given people permanency
23    reports and ratings when you've given reports
24    to the Workers' Comp Board?
25          A.    Yes.

0028
 1                    ANDREW M.G. DAVY, M.D.
28
 2          Q.     And you've, also, given live
 3     testimony?
 4          A.     Yes.
 5          Q.     Typically when we're talking
about
 6     other procedures that you do, other than the
 7     percutaneous discectomy what other procedures
 8     do you do?
 9          A.     Epidural steroid injections,
10     diagnostic facet joint and facet nerve
11     injections, radio frequency lesioning of facet
12     nerves, spinal cord stimulator trials and
13     implantation of the permanent device if the
14     trial is successful, intrathecal drug trials
15     and implantation of intrathecal drug delivery
16     system if the trial is successful.
17          Q.     So, let's just finish up the
18     Stryker procedure, approximately how many have
19     you done, you said you did about two to three
20     hundred procedures of those, how many have you
21     done in 2007 approximately?
22          A.     Maybe sixty.
23          Q.     Approximately sixty in 2007, how
24     many so far this year approximately?
25          A.     I'm doing about twenty a month

0029
 1                    ANDREW M.G. DAVY, M.D.
29
 2     now.
 3            Q.     So, if you've done two to three
 4     hundred, it's starting to increase if you're
 5     doing about twenty a month now?
 6            A.     Yes.
 7            Q.     How long does that procedure
 8     typically take?
 9            A.     About fifteen minutes per level.
10            Q.     And are your patients under local
11     or general anesthesia?
12            A.     In the lower back they are under
13     what's called monitored anesthesia care which
14     involves a local anesthetic at the site in
15     addition to IV sedation.  In the neck they do
16     get sedated, but they are more awake and I do
17     use local in the neck, also.
18            Q.     When you say sedate, is that with
19     general?
20            A.     No.
21            Q.     With local?
22            A.     Yes, monitored anesthesia care.
23            Q.     When you say you do epidural
24     injections, approximately how many of those
25     procedures do you do per year or per week?

0030
 1                  ANDREW M.G. DAVY, M.D.
30
 2        A.    About forty a week, forty
 3    procedures with the thirty epidurals and maybe
 4    ten facet.
 5        Q.    The facet injections, how many of
 6    those, about ten a week you said?
 7        A.    Yeah.
 8        Q.    Where are the epidural injections
 9    done, in your office or in the hospital?
10        A.    In my office.
11        Q.    How long do those take?
12        A.    Three to six minutes.
13        Q.    And you say you do radio
frequency
14    lesion testing?
15        A.    Not testing, radio frequency
16    lesioning of facet nerves, yeah.
17        Q.    And how many of those do you do?
18        A.    I do about ten a month.
19        Q.    And the spinal cord stimulator,
20    how often are you doing those?
21              MR. PLATTA:  You mean for the
neck
22        or back?
23        Q.    I'll go through the both, I'll
ask
24    you about the neck and then the back, if
that's
25    how you break them down.

0031
 1                    ANDREW M.G. DAVY, M.D.
31
 2          A.     I would break it down between
 3    trial and implant.
 4          Q.     What's the difference between a
 5    trial and implant?
 6          A.      Trial is temporary wires are
 7    placed in the back or in the neck and secured
 8    to the skin with sutures and the patient has
an
 9    external device that's used to control the
10    stimulator, they keep it in for three to five
11    days, that's then removed.  If the trial is
12    successful, then they go through a permanent
13    implant.  So, I'm doing about between four to
14    six trials a month and implanting about --
15    success rate is about seventy-five percent so
a
16    quarter of those -- three quarters of those go
17    to implant, permanent implant.
18          Q.      Why are some successful and some
19    not, is it based upon whether their spine
20    responds to it?  I'm a little confused about
21    the difference.
22          A.      Some patients -- most of the time
23    the patients don't like the tingling that's
24    created from the stimulator, the stimulation,
25    that's what I think most of the patients who

```
0032
 1                    ANDREW M.G. DAVY, M.D.
32
 2     fail, and then there are those who the
 3     stimulation increases their pain for some
 4     reason.
 5            Q.     So, you, also, do the intrathecal
 6     drug delivery?
 7            A.     Yes, that's very rare, I have not
 8     done any trials this year.  Last year I think
 9     -- I don't think I did any trials last year
10     either, that's much less, maybe do one to two
a
11     year.
12                   MR. PLATTA:  Before 2007?
13                   THE WITNESS:  Yes.
14            Q.     What is the purpose of the spinal
15     cord stimulators, what do they do?
16            A.     They block pain by creating a
17     gentle paresthesia or tingle over the area
that
18     hurts, they do that by stimulating the spinal
19     cord, the dorsal column in the spinal cord and
20     stimulating beta fibers that in turn through
21     the gated system of the nervous system shuts
22     off transmission and painful fibers, A Delta
23     and C fibers, and they, also, cause the
release
24     of endogenous opiates that block pain.
25            Q.     On the stimulators, what are your
```

```
0033
 1                  ANDREW M.G. DAVY, M.D.
33
 2   doctor's fees for the temporary implants?
 3           A.     Per lead I think I charge about
 4   $6,000.
 5                  MR. PLATTA:  What do you mean by
 6           lead?
 7                  THE WITNESS:  Electrode, each
lead
 8           has -- actually, that's confusing, each
 9           lead can have between four to eight
10           electrodes.
11                  MR. PLATTA:  Three to four?
12                  THE WITNESS:  Four to eight.
13           Q.     Typically how many leads do
people
14   have in?
15           A.     For lower back it's three leads,
16   and typically for the neck it's two leads but
17   sometimes -- there's now new technology where
18   the three lead system is preferred in both
19   areas, but typically it's two in the neck and
20   three in the lower back.
21           Q.     So, your fee on a low back is
22   typically about $18,000?
23           A.     Remember, each successive lead is
24   cut in half because of what they call the
25   multiple surgery rule, so it would be --
```

0034
 1                    ANDREW M.G. DAVY, M.D.
34
 2          Q.     Then in half each successive
 3   level?
 4          A.     Yes.
 5          Q.     What does the no fault and
 6   Workers' Comp pay for those?
 7                 MR. PLATTA:  Objection.
 8          A.     $3,000 for the first lead and
half
 9   for successive leads.
10                 MR. LUNDGREN:  That's for the
11                 service, correct?
12                 THE WITNESS:  Physician's fees,
13                 yes, these are physician's fees.
14          Q.     It goes $3,000, $1,500, $750?
15          A.     No, $3,000, $1,500, $1,500.
16                 MR. PLATTA:  That's no fault?
17                 THE WITNESS:  Workers' Comp.
18          Q.     And when you do the difference
19   between the trial temporary implant, then they
20   go back for a permanent one?
21          A.     Yes.
22          Q.     And, now, is that a different
23   procedure?
24          A.     It's a different procedure.  That
25   procedure is typically done in the hospital
and

0035
 1                  ANDREW M.G. DAVY, M.D.
35
 2   requires an incision in the back, upper or
 3   lower back as well as in one of the butt
cheeks
 4   and three or two news leads are implanted in
 5   addition to what's called a pulse generator,
 6   which is the power source and the brain that
 7   controls the stimulator leads.
 8          Q.     So, if someone comes back and the
 9   trial is successful, say, on the seventy-five
10   percent success rate and they go back again,
11   they are paying again the whole fees?
12          A.     Because the trial leads are
13   removed.
14          Q.     You need to answer verbally, yes,
15   that's a second fee?
16          A.     Repeat the question.
17          Q.     When you go back and do the
18   permanent one, they have to pay again?
19          A.     Yes.
20          Q.     What is your fee for a pulse
21   generator, is that different than the per lead
22   price?
23          A.     That I don't know offhand, but I
24   think my charges are about $2,500, but that's,
25   also, cut in half because it's considered

0036
 1                    ANDREW M.G. DAVY, M.D.
36
 2    multiple procedures.
 3            Q.    So, a pulse generator could be
 4    $2,500 but it's cut in half?
 5            A.    Yes, physician's fees, yes.
 6            Q.    Do you know what any of the other
 7    charges are or you have no idea what the
 8    hospital charges, anesthesiologist or
equipment
 9    fees are for this procedure?
10                    MR. PLATTA:  Over objection.
11            A.    The equipment fees I don't know
12    the exact numbers, but the leads can run from
13    $4,000 per lead to $7,000 per lead, and the
14    pulse generator can run as high as $50,000.
15                    MR. PLATTA:  How much, the last
16            one?
17                    THE WITNESS:  $50,000.
18            Q.    Approximately what's your annual
19    income each year from the spinal cord
20    stimulator procedures and the percutaneous
21    discectomies?
22                    MR. LUNDGREN:  Objection.
23                    MR. PLATTA:  Objection.
24            A.    Not enough, I don't know.
25            Q.    Would it be more than a million?

```
0037
 1                    ANDREW M.G. DAVY, M.D.
37
 2                    MR. PLATTA:  Objection.
 3         A.    I don't know.
 4         Q.    In your practice are there any
 5   other doctors who practice with you?
 6         A.    No, five percent of my patients
 7   get these implants, it's not a lot.
 8         Q.    But you're doing about six a
 9   month?
10         A.    I have a good practice.
11         Q.    That's seventy-two people a year?
12              MR. PLATTA:  Objection.
13         Counselor, his testimony speaks for
14         itself.
15              MR. COFFEY:  You're running in to
16         my two hours now.  Do you want to pay
for
17         the transcript?  You can pay for the
18         transcript.  Don't talk.  If you want
to
19         place an objection, there's no talking
20         objections in Federal Court.
21              MR. PLATTA:  That's fair enough.
22              MR. COFFEY:  You've objected to
23         many questions that are meant to throw
me
24         off my game on stuff that you're just
25         objecting.
```

0038
```
 1                    ANDREW M.G. DAVY, M.D.
38
 2                    MR. PLATTA:  I would appreciate
it
 3          if you look at the transcript before
for
 4          your own office practice.
 5                    MR. COFFEY:  Thank you.
 6                    MR. LUNDGREN:  He's not being
 7          evasive when he tells you how much,
 8          there's a reason why he can't tell you
 9          how much.  How much is actually
10          reimbursed is an issue.  He's not
trying
11          to be evasive to your questions.
12          Q.    Would you know how much your
13    income is after you've been reimbursed?
14          A.    For these devices?
15                    MR. PLATTA:  Objection.
16          Q.    Overall for the procedures you do
17    each year?
18          A.    You mean as a pain physician?
19          Q.    Yes.
20                    MR. PLATTA:  Over objection.
21          A.    My salaried income or gross
22    income?
23          Q.    Well, depends, I guess we could
24    talk about what income is.  If income is just
25    income or if income adds up being a
```

```
0039
 1                    ANDREW M.G. DAVY, M.D.
39
 2     distribution, I don't know what we're talking.
 3     Are you set up yourself or do you practice
 4     under a corporation?
 5            A.      Yeah, I'm a corporation.
 6                    MR. PLATTA:  Over objection.
 7            Q.      What's the corporation?
 8                    MR. PLATTA:  Over objection.
 9            A.      Andrew M. G. Davy, M.D., P.C.
10            Q.      So, you then give yourself an
11     income and then a distribution?
12            A.      Yes.
13                    MR. PLATTA:  Over objection.
14            Q.      Is your income over a million
15     dollars a year?
16                    MR. PLATTA:  Over objection.
17            A.      No.
18            Q.      Is your income over a half a
19     million dollars a year?
20                    MR. PLATTA:  Over objection.
21            A.      No.
22                    MR. LUNDGREN:  Not to be
23            obstructive, but just because he bills
24            for something doesn't mean the
insurance
25            company doesn't fee code it down, it's
```

0040
```
 1                ANDREW M.G. DAVY, M.D.
40
 2          Medicare, that's why.
 3          Q.    Your total income, if we call it
 4     salary, distribution, investment in medical
 5     centers or any other way that you want
 6     categorize income, is it more than a million
 7     dollars?
 8                MR. PLATTA:  Over objection.
 9          A.    Me as an entity or the P.C.?
10          Q.    We will add them both together
11     because here we are talking about different
12     things.  I don't want to get in to taxes and
13     stuff like that, income from all sources
14     depending if it's invested or how it's
15     structured is it over a half a million dollars
16     a year?
17                MR. PLATTA:  Over objection.
18                THE WITNESS:  Do I have to answer
19          that?
20          Q.    Yes.
21                MR. LUNDGREN:  He can answer with
22          respect to if you're asking what's the
23          size of his business on a yearly volume
24          with respect to income to the P.C.,
I'll
25          let him answer that question.
```

0041
 1                    ANDREW M.G. DAVY, M.D.
41
 2           Q.      Answer that one.
 3                   MR. PLATTA:  Over objection.
 4           A.      How much the P.C. made last year?
 5   I don't know.  The year before maybe little
 6   over a million dollars gross P.C. income, not
 7   my personal income.
 8           Q.      Who else is part of your P.C.?
 9                   MR. PLATTA:  Over objection.
10           A.      My overhead, my staff, my
11   equipment leasing, I have expenses.
12           Q.      How many people are on your
staff?
13                   MR. PLATTA:  Over objection.
14           A.      I have four full time staff,
three
15   part time and three independent contractors.
16           Q.      What do the three independent
17   contractors do?
18                   MR. PLATTA:  Over objection.
19           A.      Two are X ray technicians and one
20   is an administrative consultant.
21           Q.      Do the X ray techs bill out
22   themselves or do they get paid out of their
23   gross?
24                   MR. PLATTA:  Over objection.
25           A.      They get paid out of the gross.

0042
 1                    ANDREW M.G. DAVY, M.D.
42
 2          Q.     When we talk about the epidural
 3     injections, what is the no fault and Workers'
 4     Comp reimbursement rate typically for epidural
 5     injections?
 6                    MR. PLATTA:  Over objection.
 7          A.     About $350.
 8          Q.     What do you charge for that?
 9          A.     About $900.
10          Q.     Now, when we go to a cervical
11     pump, when you charge for that there's
12     typically two leads?
13          A.     Cervical stimulator?
14          Q.     Cervical stimulator?
15          A.     Typically two leads.
16          Q.     And those leads are the same
17     pricing structure?
18          A.     Same.
19          Q.     That would be $6,000 for the
20     first, then half in the successive levels?
21          A.     Charges, yes.
22          Q.     And the pulse generators, are
23     those the same prices?
24          A.     Yes.
25          Q.     Now, are the success rates the

0043
1                  ANDREW M.G. DAVY, M.D.
43
2    same percentage for cervical versus low back
or
3    are you seeing a difference in your success
4    rates on the trials?
5          A.     With the stimulator the success
6    rate is based on the pathology.  If it's
7    complex regional pain syndrome, it's usually
8    what we call a home run, there's ninety-nine
9    success rate.  For axial back pain most likely
10   secondary to post back surgery syndrome, then
11   the trial success rate is about seventy-five
12   percent.
13         Q.     What percent of people have had
14   percutaneous discectomies and have stimulators
15   put in afterwards?
16               MR. PLATTA:  Objection.  Are you
17          asking about in general or specialists?
18               MR. COFFEY:  In general.
19         A.     I don't know.
20         Q.     In your practice based upon your
21   experience, less than one or two percent?
22               MR. PLATTA:  On success rates,
23          right?
24         A.     That's actually -- of patients
who
25   receive the disc decompression end up getting
a

0044
 1                    ANDREW M.G. DAVY, M.D.
44
 2    spinal cord stimulator trial.
 3           Q.    In that one to two percent what
 4    has been the causation for that?
 5           A.    That's the ten percent of
failures
 6    from the disc decompression in my practice.
 7           Q.    When one has a failure, what is
 8    the result of a failure?
 9                    MR. PLATTA:  Of the disc
10              decompression?
11                    MR. COFFEY:  Yes.
12           A.    Less than a fifty percent
13    reduction in their pain.
14           Q.    Now, that finding, do you
consider
15    that to be a subjective or objective finding?
16           A.    The pain?
17           Q.    Yes.
18           A.    Purely subjective.
19           Q.    How much time goes by before you
20    determine that the procedure would be a
21    failure?
22           A.    In the neck about between three
23    and six weeks, in the lower back about six to
24    eight weeks.
25           Q.    The Stryker website talks about

```
0045
 1                    ANDREW M.G. DAVY, M.D.
45
 2    six months, do you disagree with what they
say?
 3                    MR. LUNDGREN:  Objection.
 4                    MR. PLATTA:  Objection, as well.
 5                    MR. COFFEY:  I can cross him as
 6           you know under the federal deposition.
 7           Q.     I want to know why would you
 8    differ then with the Stryker material that
says
 9    you should wait longer to monitor, are you
10    seeing the patient you can determine within
11    certain weeks as opposed to several months?
12                    MR. PLATTA:  Over objection.
13                    MR. LUNDGREN:  Objection.
14                    MR. PLATTA:  Since we have no
15           directions to the witness as to his
16           testimony, he's allowed to say I don't
17           know if he doesn't know.
18                    MR. COFFEY:  If he doesn't know,
19           but I think he does know.
20                    MR. PLATTA:  Could you voir dire
21           him because it wasn't done in the
22           beginning.
23                    MR. COFFEY:  I'm not voir diring
24           him.  I have two hours, I'm not voir
25           diring him.
```

0046
 1                    ANDREW M.G. DAVY, M.D.
46
 2                    MR. LUNDGREN:  I would suggest
has
 3          he read it.
 4          Q.    Are you familiar with Stryker's
 5   literature?
 6          A.    What do you mean by familiar?
 7                MR. PLATTA:  Over objection.
 8          Q.    Are you aware that they say on
 9   their website that you should look out about
10   six months to determine whether there's a
11   success or failure of the procedure?
12          A.    I'm aware that it can take that
13   long for patients to get full recovery, but
14   it's difficult when the patient is complaining
15   of pain.
16          Q.    That's a subjective complaint?
17          A.    Right.
18                MR. PLATTA:  Over objection.
19          Q.    So, there's no objective test
20   you're able to employ on that, it's only the
21   subjective complaint of a patient, correct?
22                MR. PLATTA:  Objection.
23          A.    Correct, with regard to the
24   success of the response, yes.
25          Q.    And did your bring your entire

0047
 1                    ANDREW M.G. DAVY, M.D.
47
 2    file with you today?
 3           A.    Yes.
 4           Q.    Can I see that?
 5                 (Document submitted.)
 6           Q.    Thanks.  This is the entire file
 7    that you have for the plaintiff in this
 8    lawsuit, Adonna Frometa?
 9           A.    Yes.
10                 MR. LUNDGREN:  That's the
original
11           copy, right?
12                 THE WITNESS:  Yes.
13           Q.    Now, when did you first learn
14    about that you were going to be needed to come
15    here to testify, when you received a subpoena
16    from our office?
17           A.    Yes.
18           Q.    Since you received that subpoena
19    and not to ask about your discussions with
your
20    counsel because those are privileged and I
21    don't want to know about those, have you ever
22    spoken with the attorney sitting next to you?
23           A.    Yes.
24           Q.    When is the first time you spoke
25    with him?

```
0048
 1                    ANDREW M.G. DAVY, M.D.
48
 2            A.     Regarding this case or in
general?
 3            Q.     Well, we will go in general and
 4    then regarding this case.
 5            A.     I met him at a Christmas party.
 6                   MR. PLATTA:  Over objection.
 7            Q.     At whose Christmas party?
 8                   MR. PLATTA:  Over objection.
 9            A.     Total Neuro Care, P.C.
10            Q.     What year was that?
11            A.     Last year, '07.
12                   MR. PLATTA:  Again, over
13            objection.
14            Q.     So the, Total New York Christmas
15    party, where was that?
16            A.     Total Neuro Care.
17                   MR. PLATTA:  Over objection.
18            A.     In New York, Queens.
19            Q.     Where did they have their
20    Christmas party?
21                   MR. PLATTA:  Over objection you
22            can answer.
23            A.     Where?
24            Q.     Where?
25            A.     It's called Terrace on the Park.
```

```
0049
 1                    ANDREW M.G. DAVY, M.D.
49
 2           Q.     At Total Neuro Care who are the
 3    doctors that are involved?
 4                    MR. PLATTA:  Objection.
 5                    MR. COFFEY:  Off the record.
 6                    (Whereupon, a discussion was held
 7           off the record.)
 8           Q.     Where was the Christmas party?
 9                    MR. PLATTA:  Objection.
10           A.     Queens, Terrace on the Park.
11           Q.     Who are the doctors involved in
12    Total Neuro Care?
13                    MR. PLATTA:  Objection.
14           A.     I think Dr. Krishna.
15           Q.     And this attorney was at the
16    Christmas party?
17                    MR. PLATTA:  Objection.
18           A.     Yes.
19           Q.     Did he speak to you?
20                    MR. PLATTA:  Objection.
21           A.     We met, hi, how are you.
22           Q.     What did he say other than hi,
how
23    are you?
24                    MR. PLATTA:  Objection.
25           A.     That's it.
```

```
0050
 1                    ANDREW M.G. DAVY, M.D.
50
 2          Q.     Who introduced you to him?
 3                 MR. PLATTA:  Objection.
 4          A.     I don't remember.
 5          Q.     Was it another attorney?
 6                 MR. PLATTA:  Objection.
 7          A.     I don't remember.
 8          Q.     Was it Dr. Krishna?
 9                 MR. PLATTA:  Objection.
10          A.     Probably Dr. Krishna.
11          Q.     And how did he introduce you,
what
12   did he say about him?
13                 MR. PLATTA:  Objection.
14          A.     This is Mr. Platta, he recently
15   started his own law practice.
16          Q.     And when did Ms. Frometa first go
17   to your office?
18          A.     I don't remember, it's in there.
19          Q.     It would be in the record?
20          A.     Yes.
21          Q.     Since meeting him at the
Christmas
22   party at the Terrace on the Park did you meet
23   him ever again?
24                 MR. PLATTA:  Objection.
25          A.     No.
```

0051
1                    ANDREW M.G. DAVY, M.D.
51
2           Q.      Did you ever speak to him again?
3           A.      Yeah, over the phone.
4           Q.      How many times?
5                   MR. PLATTA:  Over objection.
6           A.      Maybe two or three.
7           Q.      When was the first time out of
the
8     two or three times?
9           A.      I think -- I don't remember.
10          Q.      Was it in 2007 right after the
11    Christmas party?
12          A.      No, I think it was when I got
your
13    subpoena.
14                  MR. PLATTA:  Objection.
15          Q.      What did he say, what did he cal
16    you up for?
17          A.      I think I called him up and told
18    him to get in touch with my attorney.
19          Q.      How did you know he was involved
20    in this, was his name on the subpoena, also,
21    that you read?
22                  MR. PLATTA:  Over objection.
23          A.      I don't know, I don't remember
24    seeing the subpoena.
25          Q.      Do you get many referrals from
Dr.

```
0052
 1                    ANDREW M.G. DAVY, M.D.
52
 2     Krishna?
 3                    MR. PLATTA:  Over objection.
 4          A.    Yes.
 5          Q.    How many referrals approximately
 6     per year do you get from Dr. Krishna?
 7                    MR. PLATTA:  Over objection.
 8          A.    I don't know.
 9          Q.    More than fifty?
10                    MR. PLATTA:  Over objection.
11          A.    Yes.
12          Q.    More than a hundred?
13                    MR. PLATTA:  Over objection.
14          A.    Probably more than a hundred,
yes.
15          Q.    About a hundred?
16          A.    Probably more than a hundred.
17                    MR. PLATTA:  Objection.
18          Q.    What kind of doctor is Dr.
19     Krishna?
20          A.    A neurologist.
21          Q.    How did you meet Dr. Krishna,
were
22     you guys on the same hospital staff or how did
23     you meet Dr. Krishna?
24          A.    We met in jail.
25                    MR. PLATTA:  It's a joke.
```

0053
 1                    ANDREW M.G. DAVY, M.D.
53
 2               MR. LUNDGREN:  No, it's true.
 3          A.    As a resident I was working in the
 4     Manhattan house of detention as a hospital
 5     doctor, every person who gets arrested has the
 6     right to have a physical exam, so I was a house
 7     doctor in the Manhattan house of detention and
 8     so was Dr. Krishna so that's where we met.
 9          Q.    What year was that?
10          A.    Let's see, probably 1992 or '93.
11          Q.    In a few of these papers in here,
12     we'll probably finish before the 10:00 time,
13     but there's a few papers in here that we don't
14     have so we are going to make copies of them and
15     your attorney can oversee it so we're not going
16     anywhere with them, but we have want to make
17     photocopies.
18               MR. PLATTA:  I will object to
19          that.  The doctor can make a copy for you
20          and provide you with a copy.
21               MR. COFFEY:  He can use our
22          photocopier to make a copy.  If you would
23          like him to do that, that's fine, too.
24               MR. LUNDGREN:  You can distribute
25          it to everyone.

0054
 1                    ANDREW M.G. DAVY, M.D.
54
 2                    MR. COFFEY:  Absolutely, the
trial
 3           is coming up, we would just like to
have
 4           the copy today and we will make it.
 5                    THE WITNESS:  Off the record?
 6                    MR. COFFEY:  Off the record.
 7                    (Whereupon, a discussion was held
 8           off the record.)
 9           Q.    This is your entire file?
10           A.    Yeah.
11           Q.    Any film, anything else that you
12    have?
13           A.    There's a procedure note that I
14    did a procedure yesterday, I haven't done the
15    note yet, that's the stimulator trial.
16           Q.    There was a procedure you did
17    yesterday, what procedure did you do
yesterday?
18           A.    Lumbar spinal cord stimulator
19    trial.
20           Q.    And how many leads did you use on
21    that?
22           A.    Three.
23           Q.    Did any discussion come up with
24    Mr. Platta about the procedure that you were
25    going to do or procedures that you had done on

0055
1                    ANDREW M.G. DAVY, M.D.
55
2    his client?
3                    MR. PLATTA:  Over objection.  Can
4         you be more specific as to what you're
5         asking him?
6         A.    I don't remember.  I don't
7    remember.
8         Q.    Did he know you were going to be
9    doing the lumbar spinal cord stimulator
10   yesterday?
11        A.    Yeah, I think he did, yeah.
12        Q.    What did you say to him, what did
13   he say to you about it?
14                   MR. PLATTA:  What was the
15        question?
16                   (Whereupon, the reporter read
back
17        the requested material.)
18        Q.    That is correct, you did a lumbar
19   one, correct?
20        A.    Correct.
21        Q.    Not cervical?
22        A.    Not cervical.
23        Q.    What was the discussion that you
24   had with the attorney?
25        A.    Well, we spoke about today and --

0056
 1                    ANDREW M.G. DAVY, M.D.
56
 2                    MR. PLATTA:  Again, over
 3         objection.
 4              A.    And then there was some
discussion
 5    regarding coverage, her no fault coverage for
 6    the procedure.  My staff spoke to Mr. Platta
 7    because the no fault company said he would
know
 8    how much is left in the no fault account to
see
 9    if she had coverage for the procedure.
10              Q.    Was there any discussion about
11    whether the procedure would be done if there
12    was or wasn't any no fault coverage?
13                    MR. PLATTA:  Over objection.
14              A.    No.
15              Q.    Do you have any other clients of
16    Mr. Platta's as your patients?
17                    MR. PLATTA:  Over objection.
18              A.    I don't know.
19              Q.    Have you ever spoken with him
20    about any of his other clients?
21                    MR. PLATTA:  Over objection.
22              A.    No.
23              Q.    The first procedure you did on
Ms.
24    Frometa, what procedure was that?
25              A.    I think it was a lumbar epidural

0057
 1                     ANDREW M.G. DAVY, M.D.
57
 2    steroid injection.
 3            Q.    I will give you this back if it
 4    will refresh your recollection.
 5            A.    It was a cervical epidural
steroid
 6    injection.
 7            Q.    So, it would only be what you
have
 8    in that file?
 9            A.    Yes.
10            Q.    Any films that you reviewed would
11    have been reports of films?
12            A.    Reports of the MRI's are in here.
13            Q.    Did you ever see the MRI's
14    themselves or you reviewed the reports?
15            A.    The reports, I reviewed the
16    reports.
17                  MR. PLATTA:  Note my objection to
18            the question.
19            Q.    Back when you had your residency,
20    what was your surgical training prior to doing
21    any of the Stryker procedures?  Do you
consider
22    them surgery or a procedure or is it a
23    distinction without difference?
24            A.    I think you're talking about my
25    pain fellowship.

0058
 1                    ANDREW M.G. DAVY, M.D.
58
 2          Q.      What did you do in your pain
 3     fellowship?
 4          A.      That's where I learned how to
make
 5     the wound suture, manage the wound, which is
 6     the surgery part of what I do.
 7          Q.      What is your board certification?
 8          A.      Anesthesiology and pain medicine.
 9          Q.      So, you're not board certified in
10     surgery?
11          A.      No.
12          Q.      Did you ever take your surgical
13     boards?
14          A.      I'm not eligible, no.
15          Q.      Now, when you did your pain
16     management fellowship, what procedures did you
17     do?
18          A.      Epidural steroid, stellate
19     ganglion blocks, lumbar sympathetic blocks,
20     spinal cord stimulator and spinal cord
21     stimulator implantation, intrathecal drug
22     delivery trials and intrathecal drug delivery
23     system implantation and management of these
24     systems, I had said facet joint injections,
25     sacroiliac joint injections.

0059
1                    ANDREW M.G. DAVY, M.D.
59
2         Q.    Do you consider the percutaneous
3    discectomy to be a procedure or a surgery?
4         A.    It has a surgical code, so it's
5    treated as surgery but --
6         Q.    Would the chair of the surgery
7    department agree with that at the hospital?
8              MR. PLATTA:  Over objection.
9         A.    I don't know.
10        Q.    Do you consider it a surgery?
11        A.    Yes.
12        Q.    You were talking about when you
13   had your fellowship that you would do some of
14   the implants of the stimulators, so that would
15   be considered a procedure or a surgery?
16        A.    Surgery.
17        Q.    Epidural injections, do you
18   consider them surgeries or a procedure?
19        A.    Procedure.
20        Q.    Do you know how the Stryker
21   company in their FDA application if they
talked
22   about the percutaneous discectomy as a surgery
23   or a procedure?
24             MR. PLATTA:  Over objection.
25        A.    I don't remember anything

0060
 1                    ANDREW M.G. DAVY, M.D.
60
 2    specific.
 3          Q.     Well, what would you say in the
 4    medical literature that's out there on the
 5    percutaneous discectomy, is it considered more
 6    of a surgery or a procedure?
 7                    MR. PLATTA:  Over objection.
 8          A.     All procedures that I do start
off
 9    -- most of them start off with a six code and
10    those are all considered surgical procedures,
11    they are surgical codes.
12          Q.     But based on the literature, not
13    about the billing codes, what do you think the
14    literature talks about?
15                    MR. PLATTA:  Over my objection.
16                    MR. LUNDGREN:  Note my objection.
17          A.     I think any time you go inside
the
18    body it's surgery, they are surgical
19    procedures.
20          Q.     Now, when you do the epidural
21    injections, you do those in your office?
22          A.     Most of the time.
23          Q.     And sometimes you do them in the
24    hospital?
25          A.     Very rarely.

```
0061
 1                  ANDREW M.G. DAVY, M.D.
61
 2          Q.    What would be the indication what
 3   will be done in the hospital as opposed to the
 4   office?
 5          A.    When the patient insists they are
 6   totally asleep for the procedure.
 7          Q.    Looking at your records when did
 8   you first see Ms. Frometa?
 9          A.    April 20th, 2007.
10          Q.    Did she tell you she was
employed?
11          A.    Yes, she was working as a
12   waitress.
13          Q.    Had she been working since the
14   accident up until then or not?
15          A.    She was working two jobs.  She
16   was, also, a flight attendant.  She was not
17   able to work as a flight attendant.
18          Q.    Do you know if she had been
19   working as a flight attendant in the couple
20   days before she came to see you?
21          A.    I don't know for sure but I think
22   so.
23          Q.    Did she tell you ever that she
had
24   been involved --
25          A.    I'm sorry, before she came to see
```

0062
1                    ANDREW M.G. DAVY, M.D.
62
2    me?
3            Q.    Yes.
4            A.    No, she said she was only working
5    as a waitress.  I think she stopped working as
6    a flight attendant because of her injuries.
7            Q.    So, she had stopped working as a
8    flight attendant?
9            A.    Yes.
10           Q.    Do you know how long she had
11   worked as a flight attendant for?
12           A.    No.
13           Q.    But it had been for some period
of
14   time you believe?
15           A.    I think so.
16           Q.    Now, had she told you that she
had
17   been involved in two motor vehicle accidents
18   before this accident?
19           A.    She did not.
20           Q.    Were histories important?
21           A.    Yes.
22           Q.    Why is a history important?
23           A.    It's ninety to ninety-five
percent
24   of your diagnostic information.
25           Q.    So, if a history is not given to

0063
 1                    ANDREW M.G. DAVY, M.D.
63
 2    you correctly, can that affect causation?
 3                    MR. PLATTA:  Objection.
 4         A.    It can affect your diagnosis.
 5         Q.    If certain factors are given or
 6    not given, if is there any omissions in a
 7    history, can they affect the causation?
 8                    MR. PLATTA:  Objection.  Asked
and
 9         answered.
10         A.    Yes.
11         Q.    So, you're not aware that she had
12    been involved in two motor vehicle accidents
13    before this accident?
14                    MR. LUNDGREN:  Objection.
15                    MR. PLATTA:  Over objection.
16         A.    No.
17         Q.    Did you give her a form when she
18    came to your office to fill out asking if she
19    had been involved in any other accident?
20         A.    I have it written down here and
21    it's probably in my typed report.
22                    MR. PLATTA:  Again, over
23         objection.
24         A.    That she has no prior injuries to
25    her neck and lower back.

0064
 1                    ANDREW M.G. DAVY, M.D.
64
 2          Q.     Did you ask if she had any prior
 3   auto accidents?
 4          A.     I'm not sure if I specifically
 5   asked about motor vehicle accidents.
 6          Q.     Now, do you give a questionnaire
 7   to the patient to fill out when they come in
to
 8   your office?
 9          A.     Insurance questionnaire.
10          Q.     What pain did she talk to you
that
11   she was having when she first came to see you?
12          A.     Neck and low back pain.
13          Q.     What date was this on?
14          A.     4/20/07.
15          Q.     That was her first visit to you?
16          A.     Yes.
17          Q.     And what films did you review at
18   that time, if any, or did you send her for
19   MRI's or something else?
20          A.     I reviewed MRI reports, not
films.
21          Q.     Which reports did you review?
22                 MR. PLATTA:  Just to clarify,
23          reports or films?
24                 MR. COFFEY:  Reports.
25          A.     I reviewed an MRI report of the

0065
 1                    ANDREW M.G. DAVY, M.D.
65
 2   lower back done on March 13th, 2007 and an MRI
 3   of the neck done on the same day.
 4           Q.     Now, based upon looking at those
 5   MRI reports did she have any underlying
 6   degenerative disc disease that preexisted this
 7   accident?
 8           A.     There's mention of a spur in the
 9   lower back MRI, that could be consistent with
10   degeneration.
11           Q.     Now, Doctor, this spur that's
12   shown on an MRI report that's taken
13   approximately one month after the accident,
14   that would be consistent with degenerative
15   changes that would have been existing before
16   this accident?
17           A.     Yes.
18           MR. PLATTA:  Over objection.
Neck
19          or back, which MRI?
20          MR. LUNDGREN:  Objection.
21          MR. COFFEY:  The spur that he
just
22          spoke about.
23          MR. PLATTA:  Cervical or lumbar?
24          MR. COFFEY:  I have no idea.
25          MR. PLATTA:  Can you specify that

0066
  1                    ANDREW M.G. DAVY, M.D.
66
  2          first?
  3                    MR. COFFEY:  I will move on.
  4          Don't waste my time.
  5                    MR. PLATTA:  Fine.  Note my
  6          objection.
  7          Q.    Where was the spur?
  8          A.    In the lower back.
  9          Q.    So, is it fair to say that the
10     spur would be consistent with degeneration that
11     was present when the accident occurred?
12                    MR. PLATTA:  Over objection.
13          A.    Yes.
14          Q.    Is there anything else you note in
15     the reports that talk to degeneration?
16                    MR. PLATTA:  Again, over
17          objection.
18          A.    No.
19          Q.    Is it possible that the spur could
20     have been caused by the two prior motor vehicle
21     accidents that she had been involved in?
22                    MR. LUNDGREN:  Objection.
23                    MR. PLATTA:  Objection.
24          A.    Yes.
25          Q.    Is it possible that the herniation

0067
 1                    ANDREW M.G. DAVY, M.D.
67
 2    could have been caused by the two prior motor
 3    vehicle accidents that she had been involved
 4    in?
 5                    MR. PLATTA:  Objection.
 6                    MR. LUNDGREN:  Objection.
 7         A.    I don't know.
 8         Q.    So, which other physicians had she
 9    seen, if any, other than you that you are aware
10    of?
11         A.    Dr. Krishna referred her to me,
12    just Dr. Krishna, and she was doing therapy.
13         Q.    What was your recommendation to
14    her when she first came to you?
15         A.    Lumbar epidural steroid injection
16    times three, cervical epidural steroid
17    injections, facet nerve injections to the neck
18    and lower back, radio frequency lesioning of
19    the facet nerves if the diagnostic injections
20    decrease the pain by fifty percent or more and
21    percutaneous disc decompression if the
22    epidurals failed to decrease her pain.
23         Q.    So, how many times did she come to
24    you for epidural injections approximately?
25         A.    About six times.

0068
 1                    ANDREW M.G. DAVY, M.D.
68
 2          Q.     And that's six times for the
 3     lumbar and six times for the cervical?
 4          A.     Three.
 5          Q.     So, it's three for the cervical,
 6     three for the lumbar?
 7          A.     Yes.
 8          Q.     What dates were they, you would
do
 9     the cervical and lumbar on the same date,
10     correct?
11          A.     No, different dates, cervical
12     number one, 4/26/07, cervical number two
13     5/3/07, cervical number three 5/10/07, lumbar
14     number three 10/24/07, lumbar epidural steroid
15     injection number two 10/17/07 and lumbar
16     epidural steroid injection number one
10/10/07.
17          Q.     So, then you, also, did something
18     on the lesions?
19          A.     Yeah, I did facet blocks I think
20     in the neck and then radio frequency lesions
in
21     the neck.
22                    MR. PLATTA:  Do you want the
23          dates?
24                    MR. COFFEY:  Yes, sure.
25          Q.     What's a facet block?

```
0069
 1                    ANDREW M.G. DAVY, M.D.
69
 2                    MR. PLATTA:  Do you want him to
 3          give you the dates or move on?
 4                    MR. COFFEY:  I'll get the date
and
 5          then I'll ask him that.
 6          A.     Lumbar -- there's an error here,
 7   cervical radio frequency lesioning number two
 8   on the right neck 10/4/07, diagnostic facet
 9   nerve injection on the left neck 10/3/07.
10          Q.     Diagnostic what?
11          A.     Facet nerve injection.
12          Q.     That's the left neck and what day
13   was that?
14          A.     10/3/07, there's a lot of errors
15   here, I think 9/27/07 it should be on the
right
16   neck, diagnostic injections on the right neck
17   but it says left.
18          Q.     That's 9 what?
19          A.     9/27/07, that's all I have here.
20          Q.     So, it was on the cervical radio
21   frequency and a diagnostic facet nerve
22   injection to the left neck, so there was no
23   lumbar facet blocks?
24          A.     Correct.
25          Q.     What is your charge on the
```

0070
1                    ANDREW M.G. DAVY, M.D.
70
2     diagnostic facet nerve injections for the left
3     neck, what is your billing for that and what
do
4     you get reimbursed by no fault?
5          A.    The no fault reimbursement, I
6     don't remember what we billed.
7               MR. PLATTA:  Objection.
8          Q.    What is that?
9          A.    No fault the first level is $130
10    for the first level and half for each
11    successive level.
12         Q.    Are the diagnostic different from
13    the other one if you have a week apart on the
14    two?
15         A.    Yes, the diagnostic, I think, is
16    reimbursed less than the radio frequency.  I
17    don't know the numbers.
18         Q.    Do you know what the radio
19    frequency reimbursement is?
20         A.    I don't remember.
21         Q.    What you did in total for her was
22    the three times cervical epidurals, three
times
23    lumbar epidurals, the cervical injections, the
24    diagnostic facet nerve injections, the pain
25    stimulator, so there was no lesioning or am I

0071
```
 1                  ANDREW M.G. DAVY, M.D.
71
 2      --
 3           A.    Yes, I did do -- here I have
 4  lesioning of the --
 5           Q.    Is that the right neck?
 6           A.    I think it's the left neck.  I
 7  don't see the procedure for the other side.
 8           Q.    Now, how long does that radio
 9  frequency procedure take?
10           A.    About a half an hour for five
11  levels.
12           Q.    And you did five levels here?
13           A.    Yeah.
14           Q.    The nerve injections are about
15  three minutes you said?
16           A.    The diagnostic facets, about ten
17  minutes.
18           Q.    Ten minutes total?
19           A.    For five levels, yeah.
20           Q.    When they did the cervical and
the
21  lumbar epidurals, those were --
22           A.    About three to six minutes each.
23                 MR. PLATTA:  Epidurals, right?
24                 THE WITNESS:  Yes.
25           Q.    And the stimulator, the trial,
how
```

0072
```
 1                    ANDREW M.G. DAVY, M.D.
72
 2    long did that take, that procedure?
 3           A.      About two hours.
 4           Q.      You did that yesterday?
 5           A.      Yes.
 6           Q.      Where did you do that, in the
 7    hospital?
 8           A.      In my office.
 9           Q.      In your office?
10           A.      Yes.
11           Q.      And did you do any of those
12    yesterday or only one of them?
13           A.      One patient?
14           Q.      Yes.
15           A.      I did two patients.
16           Q.      Two patients with this procedure?
17           A.      Yes.
18           Q.      Now, in the April 25th of 2007
19    report in your summary you talk about that
20    there is no preexisting condition exists that
21    affects causality, if there had been other
22    motor vehicle accidents that you don't know
23    about, could that affect the causality?
24                    MR. PLATTA:  Objection.
25                    MR. LUNDGREN:  Objection.
```

0073
1                    ANDREW M.G. DAVY, M.D.
73
2                    MR. PLATTA:  You're talking about
3          motor vehicle accidents or injuries?
4                    MR. COFFEY:  Motor vehicle
5          accidents, we don't know if there's
6          injuries.
7                    MR. PLATTA:  If you don't know,
8          you don't know but, again, over
9          objection.
10         A.    Motor vehicle accidents, if she
11   had neck or low back pain from them, it would
12   affect the causality.
13         Q.    Now, did you ever review the
14   records from any other physicians that she had
15   been treated by?
16         A.    No.
17         Q.    Did you ever see any of the
18   surgical reports from Dr. Baboo?
19         A.    I don't have any in the chart,
no.
20         Q.    So, you've never reviewed the
21   records of Dr. Baboo?
22         A.    No.
23         Q.    Did you ever speak to Dr. Baboo
24   about Ms. Frometa?
25         A.    No.

0074
 1                    ANDREW M.G. DAVY, M.D.
74
 2          Q.    Were you ever told about Dr.
 3    Baboo's opinion from counsel?
 4          A.    No.
 5                MR. PLATTA:  Over objection.
 6          Q.    Did you ever review Dr. Krishna's
 7    records of Ms. Frometa?
 8          A.    No.
 9          Q.    Did you ever speak to Dr. Krishna
10    about Ms. Frometa?
11          A.    No.
12          Q.    As we sit here today are you
aware
13    if any other doctor had operated on Ms.
14    Frometa's back?
15          A.    Dr. Baboo operated on her.
16          Q.    What did he do?
17          A.    I think he did a discectomy or
18    laminectomy.
19          Q.    Do you know what level he did
that
20    on?
21          A.    No.
22          Q.    Do you know if it was in the
23    cervical or the lumbar?
24          A.    Lumbar.
25          Q.    Do you know what level it was on

0075
 1                  ANDREW M.G. DAVY, M.D.
75
 2    the lumbar?
 3          A.    No.
 4          Q.    Prior to doing the procedure when
 5    was the last time prior to that that Ms.
 6    Frometa had been to your office?
 7                MR. PLATTA:  Which procedure?
 8                MR. COFFEY:  Yesterday's.
 9          A.    April 23rd, 2008.
10          Q.    April what?
11          A.    23rd, 2008.
12          Q.    What was discussed at that
13    appointment?
14          A.    She decided to do the spinal cord
15    stim trial for the neck and lower back.
16          Q.    Is there any reason why it was
17    only done for the lower back?
18          A.    We plan to do the neck.
19          Q.    Is that indicated in your notes?
20          A.    Yes.
21          Q.    Now, were you aware that she had
a
22    trial coming up?
23                MR. PLATTA:  Besides being
24          notified by you?
25                MR. COFFEY:  Right.

0076
 1                    ANDREW M.G. DAVY, M.D.
76
 2          A.     On the 23rd?
 3          Q.     Yes.
 4          A.     I don't think we spoke about
that.
 5    I don't think we spoke about that.  We spoke
 6    about her giving me a copy of an IME for
review
 7    and, yes, that visit was specifically to
 8    discuss the stimulator because at her last
 9    visit a month earlier it was brought up and
she
10    was thinking about it.
11          Q.     And she wanted to give you what
12    IME for review?
13          A.     One she had since the last time I
14    saw her, insurance company IME.
15          Q.     What's the last MRI that you were
16    able to see of her, if any, other than the --
17          A.     The initial ones, I haven't seen
18    any since then.
19          Q.     Did you not believe that she
20    needed any further MRI's to take a look at how
21    the back was doing?
22                 MR. PLATTA:  Over objection.
23          A.     No, I didn't think she needed
any.
24          Q.     And you've never seen the MRI's
25    themselves?

```
0077
 1                    ANDREW M.G. DAVY, M.D.
77
 2          A.    The films, no.
 3          Q.    Did you believe they would be
 4    important to see or not necessarily?
 5                 MR. LUNDGREN:  Objection.
 6          A.    No.
 7                 MR. PLATTA:  Over objection.
 8          A.    Not important.
 9          Q.    Why are they not important for
10    you?
11                 MR. PLATTA:  Over objection.
12          A.    Because I'm treating her pain
13    based on her history and physical examination
14    and the pain generator, she has no neurologic
15    deficits, so I don't think a repeat MRI was
16    indicated.
17          Q.    When you say no neurological
18    deficits, what does that mean?
19          A.    Motor loss, bowel or bladder
20    dysfunction.
21          Q.    Any of the things that she is
22    talking about are all subjective and there's
no
23    objective clinical findings; is that correct?
24                 MR. PLATTA:  Objection.
25                 MR. LUNDGREN:  Objection.
```

0078
1                    ANDREW M.G. DAVY, M.D.
78
2          A.    That's not correct, there are
3     objective clinical findings, physical exam,
the
4     MRI.
5          Q.    After the procedures if she had
6     had the percutaneous discectomy, wouldn't
there
7     have been a need to see a subsequent MRI
8     several months out to see how that has
9     progressed in that portion of the back or you
10    don't believe so?
11                    MR. PLATTA:  The nerve
stimulator?
12                    MR. COFFEY:  Yes.
13         A.    No, that wouldn't be necessary.
14         Q.    Why?
15         A.    Because she did not want to have
16    anymore disc decompression, and I didn't think
17    that she needed anymore.  In addition,
18    specifically to the lower back she's not a
19    candidate for disk decompression at the levels
20    where she had open surgery, that's a
21    contraindication.
22         Q.    And when you did the percutaneous
23    discectomy itself, how much did you excise?
24         A.    About half to one cc of disc.
25         Q.    When you did the procedure, there

0079
 1                    ANDREW M.G. DAVY, M.D.
79
 2    was no protrusions or extrusions or were
there?
 3          A.     I'm sorry?
 4          Q.     When you went in there, let's
talk
 5    about that procedure.
 6          A.     There was no extravasation of dye
 7    beyond the confines of the anulus fibrosis.
 8          Q.     It was self-contained?
 9          A.     Yes.
10          Q.     So, that would be, also,
11    consistent with a bulge then and not a
12    herniation?
13                 MR. PLATTA:  Objection.
14          A.     No, not necessarily, either one
15    can create the same picture.
16          Q.     But it's possible?
17                 MR. PLATTA:  Objection.
18          A.     What's possible?
19          Q.     Is it possible it was a bulge and
20    not a herniation?
21                 MR. PLATTA:  Objection.
22          A.     Is it possible?
23                 MR. PLATTA:  Objection.
24          A.     It's possible.
25          Q.     But the finding of a herniation

0080
 1                    ANDREW M.G. DAVY, M.D.
80
 2   was, also, found by a radiologist who reviewed
 3   the films, you didn't review the film
yourself,
 4   correct?
 5            A.     Of the MRI?
 6            Q.     The MRI?
 7            A.     Correct.
 8            Q.     So, if that radiologist had been
 9   wrong in his interpretation of the film, you
10   have no other basis to either know that or not
11   know to that?
12                   MR. PLATTA:  Objection.
13                   MR. LUNDGREN:   Objection.
14            Q.     Correct?
15                   MR. PLATTA:  Over objection.
16            A.     Whether it's a herniation or a
17   bulge, right, I didn't see the film, I relied
18   on the report.
19            Q.     And the dye test doesn't show
20   whether it's a bulge or herniation; is that,
21   also, correct?
22                   MR. PLATTA:  Over objection.
23            A.     That's correct.
24            Q.     But then if you take a look at
the
25   operative report, the surgical pathology
report

0081
 1                    ANDREW M.G. DAVY, M.D.
81
 2    it talks about the specimen being .1 by .1
 3    centimeters in the aggregate, so was that
 4    different than one half to one?
 5                    MR. LUNDGREN:  What report?
 6                    MR. COFFEY:  The surgical
 7           pathology report.
 8                    MR. LUNDGREN:  That's part of his
 9           records?
10                    MR. COFFEY:  Yes.
11           A.   I don't know what that means.  I
12    always ask them to quantify and they never do.
13           Q.   But the aggregate, which would be
14    the total that they saw, was different than
one
15    half to one cc, right?
16                    MR. PLATTA:  Over objection.
17           A.   No, they are describing the disc
18    as it's presented to them on the decompressor
19    probe, which is lengthwise, they have
described
20    the width of the decompressors about .1
21    centimeter, I don't know what that other .1
is.
22    Is it .1 up the shaft?  I don't know.
23           Q.   But now the final pathology, the
24    diagnosis on the cervical disc they call it
25    degenerated cartilagineus material, do you

0082
1                    ANDREW M.G. DAVY, M.D.
82
2    agree with that, that there was degeneration in
3    that disc?
4            A.    Yeah.
5            Q.    And that would have been the
6    degeneration that was preexisting this
7    accident?
8            A.    I don't know.  It could have been
9    as a result of the accident.
10           Q.    And it could have, also, been
11   there before the accident?
12                 MR. PLATTA:  Over objection.
13           A.    Yeah.
14           Q.    But wouldn't that be consistent
15   with the MRI that has a bony spur, wouldn't
16   that all be consistent with degeneration that
17   would have been preexisting?
18                 MR. PLATTA:  Over objection.
19           A.    The bony spur is for lower back
20   MRI, not the neck.
21           Q.    Degeneration is a process that
22   goes on throughout the body, so it would, also,
23   occur in the lumbar and the cervical spine?
24           A.    Yes, pointing out that this
25   procedure was done several months after her

0083
 1                    ANDREW M.G. DAVY, M.D.
83
 2   accident, so it's difficult to say.
 3           Q.    Now, when she came back for the
 4   procedure that she underwent yesterday, had
she
 5   been going for physical therapy?
 6           A.    I think so, yes, she had started
 7   therapy.
 8           Q.    Had she been going to therapy
 9   before she had the procedure?
10           A.    Which one, which procedure,
11   yesterday's procedure?
12           Q.    Yes.
13           A.    Yes.
14           Q.    Do you know where she was going
15   for physical therapy?
16           A.    No.
17           Q.    Did you ever review her physical
18   therapy records?
19           A.    No.
20           Q.    As Ms. Frometa in your opinion
21   moves forward you had recommended to her that
22   she undergoes another procedure, another pain
23   stimulator?
24                 MR. PLATTA:  Besides the one --
25           A.    For the neck, yes, planning on

0084
 1                    ANDREW M.G. DAVY, M.D.
84
 2    doing the neck.
 3          Q.    Why is that, why are you planning
 4    to do the neck?
 5          A.    She hasn't had any significant
 6    relief of her neck pain.
 7          Q.    And in any of the records that
you
 8    took a look at did she have any nerve root
 9    compression?
10                    MR. PLATTA:  In her neck and
beck?
11                    MR. COFFEY:  In her neck and
back.
12          A.    No, not on the records that I
13    reviewed.
14          Q.    Did you see anything about any
15    weakness in any of the records you reviewed?
16          A.    No.
17          Q.    Anything about radicular pain in
18    the records that you reviewed?
19          A.    No.
20          Q.    Were there any dire symptoms?
21          A.    Let me just say that I didn't
22    review the records, I've only seen the MRI.
23                    MR. LUNDGREN:  Off the record.
24                    (Whereupon, a discussion was held
25             off the record.)

0085
```
 1                ANDREW M.G. DAVY, M.D.
85
 2         Q.    And the records you reviewed of
 3    the MRIs were only the reports, correct?
 4         A.    Correct.
 5         Q.    Now, did you ever talk to a Dr.
 6    Kinkade?
 7         A.    No.
 8                MR. PLATTA:  Are you referring to
 9          the life care specialist?
10                MR. COFFEY:  Yes.
11         A.    I spoke to a woman regarding the
12    life care stuff.
13         Q.    Who was the woman, what was her
14    name?
15         A.    It hasn't made it to the chart
16    yet, a HIPAA compliant release authorizing me
17    to speak to this person was faxed to me and I
18    spoke to her.
19         Q.    What you talked about in that
20    discussion is not part of the chart yet, did
21    you keep notes on it?
22         A.    No.
23         Q.    What did she ask you?
24         A.    She basically asked me the
pricing
25    and long term care for Ms. Frometa.
```

0086
 1                    ANDREW M.G. DAVY, M.D.
86
 2          Q.     What did you tell her?
 3          A.     I told her about the stimulator,
I
 4    think -- I'm not sure if we spoke about the
 5    pump if the stimulator didn't work, but I know
 6    specifically we spoke about pricing for the
 7    stimulator.
 8          Q.     Did you tell her about how many
 9    times she would have to come to evaluate her
10    pain management needs?
11          A.     Yeah, I think I did.
12          Q.     What did you recommend, how many
13    times per year?
14          A.     Depending on how she did with the
15    stimulator.  If the stimulator did not work
and
16    we were maintaining her on medicines, at least
17    every four to six weeks.  If the stimulators
18    worked, then she would only need to see me if
19    there was a problem with the stimulator or
when
20    the battery -- the power sources needed
21    changing.
22          Q.     Did you give her costs about your
23    pain management consultation, how much it
would
24    be per year?
25          A.     Yeah, I think I did, yeah.

0087
 1                    ANDREW M.G. DAVY, M.D.
87
 2          Q.    Do you remember how much you told
 3    her it would cost?
 4          A.    No.
 5          Q.    Did you keep any notes?
 6          A.    No.
 7          Q.    There's a report that says you
 8    told her or it seems to say you recommended
 9    it's $416.66?
10                MR. PLATTA:  Over objection.
11          A.    For what?
12          Q.    For an annual one time yearly
13    annual visit, did you give her those numbers?
14          A.    Maybe she asked how much the
visit
15    per month would cost, I receive $71 most of
16    time so maybe --
17          Q.    If there's a $71 charge, you
18    didn't expect to receive $416.66?
19                MR. PLATTA:  Over objection.
20          A.    I don't know where that number
21    came from.
22          Q.    But it didn't come from you?
23                MR. PLATTA:  Over objection.
24          A.    I'm not sure, I didn't keep any
25    records.

0088
 1                    ANDREW M.G. DAVY, M.D.
88
 2          Q.    Well, when we talk about the
 3   physical therapy evaluations, did you
recommend
 4   that?
 5          A.    Physical therapy?
 6          Q.    Yes.
 7          A.    Yeah, usually after her pain is
 8   minimized she would need physical therapy.
 9          Q.    Would it be for life, for a
period
10   of time or something else?
11                MR. PLATTA:  Over objection.  You
12          want to rephrase the question?
13          Q.    The physical therapy, did you
tell
14   her in the conversation --
15          A.    In my practice, probably not for
16   life, that's not cost effective.
17          Q.    Did you tell her how much it
would
18   have cost?
19          A.    For physical therapy?
20          Q.    What's your experience on that?
21          A.    I'm not a physical therapist so I
22   --
23          Q.    You didn't give her any costs on
24   physical therapy?
25          A.    No.

0089
1                    ANDREW M.G. DAVY, M.D.
89
2          Q.     Talking about medications and the
3     cost of medication, are you familiar with the
4     cost of medication?
5          A.     Somewhat.
6          Q.     When you say somewhat, how much
7     does that come down to?
8          A.     I don't have the numbers offhand,
9     estimates.
10          Q.     Who would have those?
11          A.     I guess drug companies,
12     pharmacists.
13          Q.     Talking about the cost for neuro
14     stimulator implantation, what is the cost
15     approximately per unit on those?
16                    MR. PLATTA:  Which one, permanent
17          or trial?
18                    MR. COFFEY:  The neuro stimulator
19          trial.
20          A.     Cost to who, cost of the
21     equipment, the physician?
22          Q.     Cost for the instrument itself?
23          A.     For the trial?
24          Q.     Yes.
25          A.     Maybe $25,000 to $30,000.

0090
 1                    ANDREW M.G. DAVY, M.D.
90
 2          Q.      For the neuro stimulator
 3    implantation, what's the cost for that unit?
 4          A.      That cost again plus the pulse
 5    generator?
 6          Q.      What is that about?
 7          A.      Which is between $30,000 to
 8    $50,000.
 9          Q.      And then is that what they get
10    reimbursed for it or is that the cost?
11          A.      I think that's the charges.
12          Q.      What typically is paid by Comp?
13                  MR. PLATTA:   Objection.
14          A.      Don't know about the equipment.
15          Q.      You don't know?
16          A.      No, not for the pulse generator,
17    no.
18          Q.      For the battery replacement for
19    neuro stimulator, is that a different cost?
20          A.      That's the same cost of the pulse
21    generator plus the physician's fees for putting
22    it in plus the hospital and anesthesia fee.
23          Q.      How much is that approximately?
24          A.      Maybe about $60,000.
25          Q.      Each time it's done or would that

```
0091
 1                  ANDREW M.G. DAVY, M.D.
91
 2    be for life?
 3           A.     Each time -- it has to be
replaced
 4    every seven to nine years.
 5           Q.     So, putting in a new battery for
 6    the neuro stimulator would be $60,000?
 7           A.     Yes.
 8           Q.     When people go in for routine
 9    follow-ups for pain management, do you know
10    what you charge per visit?
11           A.     Yeah, $400.
12           Q.     What do you get reimbursed
13    typically?
14                  MR. PLATTA:  Over objection.
15           A.     Between $38 and $71.
16           Q.     Is there a separate schedule for
17    people who don't have insurance coverage?
18                  MR. PLATTA:  Over objection.
19           A.     I don't understand the question.
20           Q.     If someone doesn't have insurance
21    coverage, what are they paying for a visit?
22           A.     Usually --
23                  MR. PLATTA:  Over objection.
24           A.     If they are paying cash, I will
25    cut my fee -- my charges in half usually.
```

```
0092
 1                    ANDREW M.G. DAVY, M.D.
92
 2          Q.      Is it cut in half from what the
no
 3      fault pays?
 4          A.      No, my charges.
 5          Q.      If it was $400, if they paid
cash,
 6      it would be $200?
 7          A.      Yes.
 8                  MR. PLATTA:  Approximately,
 9              everything is approximately.
10          A.      Yeah, approximately, I mean, if
11      they can afford.
12          Q.      Are you involved currently in any
13      litigation that's ongoing?
14                  MR. PLATTA:  Objection.  What
kind
15              of litigation?
16                  MR. COFFEY:  Any kind.
17                  MR. PLATTA:  Against the doctor?
18          A.      Malpractice, testifying?  I don't
19      understand the question.
20          Q.      Are you currently a defendant in
21      any lawsuit of any kind?
22                  MR. PLATTA:  Over objection.
23          Q.      Civil, criminal?
24                  MR. LUNDGREN:  Objection.
25                  MR. PLATTA:  Over objection.
```

```
0093
 1                    ANDREW M.G. DAVY, M.D.
93
 2                    MR. LUNDGREN:  If you're going to
 3           go there, I'm going to get a ruling and
 4           call the judge.  I'll talk to you on
the
 5           side.
 6           Q.    Are you involved in --
 7                    MR. LUNDGREN:  Do you want me to
 8           talk to you on the side?
 9           Q.    Have you been sued for
malpractice
10   before?
11                    MR. PLATTA:  Over objection.
12           A.    No.
13           Q.    Have you ever had your privileges
14   suspended?
15           A.    No.
16                    MR. PLATTA:  Over objection.
17           Q.    Have you ever been disciplined
18   internally by a hospital?
19                    MR. PLATTA:  Over objection.
20           A.    No.
21           Q.    Have you ever been convicted of a
22   crime?
23                    MR. PLATTA:  Over objection.
24           A.    No.
25                    MR. PLATTA:  I'll ask the witness
```

0094
 1                    ANDREW M.G. DAVY, M.D.
94
 2          to wait until the attorneys have a
chance
 3          to make objections.
 4          Q.    Are you involved in a litigation
 5     with Monica Paul?
 6                    MR. PLATTA:  Over objection.
 7          A.    Yes.
 8          Q.    What kind of case is that?
 9                    MR. PLATTA:  Over objection.
10                    MR. LUNDGREN:  Objection.
11                    MR. PLATTA:  Counselor, I'm going
12          to leave that to you.
13                    MR. COFFEY:  Is that what you
want
14          to talk to me about?
15                    MR. LUNDGREN:  Yes.
16                    (Whereupon, a recess was taken
17          from 9:48 a.m. to 9:54 a.m.)
18                    MR. LUNDGREN:  There was a
19          question regarding a lawsuit involving
a
20          Monica Paul and I objected with regard
to
21          that.  There was discussions outside,
and
22          I would tell counselor it's a public
23          lawsuit, I can state on the record that
24          at this point there's a pleading and
25          that's it.

0095
 1                    ANDREW M.G. DAVY, M.D.
95
 2                    MR. COFFEY:  Okay, and if you can
 3          give us a copy of that pleading.
 4                    MR. PLATTA:  I'm objecting to the
 5          request.  It's a public record.  You
can
 6          obtain it from the court system.
 7                    MR. COFFEY:  I'm just saying as
 8          courtesy.  We are going to move on.
 9                    MR. LUNDGREN:  Take it under
10          advisement.
11          Q.    Definitively based upon the
12    reports you reviewed of the MRI's you can't
13    tell if the herniations preceded the accident?
14                    MR. PLATTA:  Objection to the
form
15          of the question unless you want to ask
16          rephrase it.
17          Q.    Do you understand what I asked?
18          A.    Rephrase it.
19          Q.    Can you tell if the herniations
20    preceded the accident?
21          A.    No.
22                    MR. PLATTA:  No, meaning it
didn't
23          precede or you cannot.
24                    THE WITNESS:  I cannot tell.
25          Q.    So, that could potentially, also,

0096
 1                    ANDREW M.G. DAVY, M.D.
96
 2    affect the causation; is that correct?
 3                    MR. PLATTA:  Over objection.
 4         A.     What could affect the causality?
 5         Q.     That if the herniations preceded
 6    the accident, there could be a causation issue
 7    whether this motor vehicle accident caused the
 8    herniations or not?
 9         A.    Yes.
10                    MR. PLATTA:  We are talking about
11              imaginary situation, purely
hypothetical,
12              counselor, correct?
13                    MR. COFFEY:  It's not a
14              hypothetical.  It's based on what we
were
15              talking about.
16                    MR. PLATTA:  I understand, but
17              he's talking about an accident that has
18              no treatment.
19                    MR. COFFEY:  If there were other
20              accidents, we will ask your client that
21              at trial.
22                    MR. PLATTA:  This is right now
for
23              purposes of this deposition, it's a
24              hypothetical.
25                    MR. COFFEY:  It's not a

```
0097
 1                  ANDREW M.G. DAVY, M.D.
97
 2           hypothetical.  It's talking about
 3           causation.  Do you have information
about
 4           prior accidents where she had injuries?
 5                  MR. COFFEY:  We know your client
 6           was involved in prior accidents.
 7                  MR. PLATTA:  And injuries?
 8                  MR. COFFEY:  That's not my
 9           question.
10                  MR. PLATTA:  That's why I'm
saying
11           it's a hypothetical.
12           Q.    Now, when a herniation is
13     sustained from the onset, is there significant
14     pain typically?
15           A.    Typically there is.
16           Q.    Do typically patients go
17     immediately back to work for several days
18     afterwards if they had that much pain right
19     away?
20           A.    Because pain is subjective I
21     cannot answer that, some patients are able to,
22     some patients are not able to.
23           Q.    You have no records of knowing
24     whether in the several days after the accident
25     if Mr. Frometa went to work as a flight
```

0098
 1                    ANDREW M.G. DAVY, M.D.
98
 2    attendant?
 3          A.    Don't know.
 4          Q.    Could that be important?
 5                MR. PLATTA:  Over objection.
 6          A.    It could.
 7          Q.    And why could it be important?
 8                MR. PLATTA:  Over objection.
 9          A.    It could indicate that she is
able
10    to work through pain.
11          Q.    If pain is subjective, it could,
12    also, indicate that there was the absence of
13    pain?
14                MR. PLATTA:  Objection.  You're
15                using hypothetical.
16          Q.    Hypothetically, someone not able
17    to do something could, also, say there is some
18    subjectivity --
19                MR. LUNDGREN:  Objection.
20                MR. PLATTA:  Over objection.
21          A.    Right.
22          Q.    Did she have any weakness in the
23    C-4 area that radiated in to her shoulders?
24          A.    I didn't note any weakness.
25          Q.    Did you notice any tingling in
the

0099
 1                    ANDREW M.G. DAVY, M.D.
99
 2    hands?
 3            A.    Decreased sensation on the right
 4    at C6 to C8.
 5            Q.    And what was that?
 6            A.    Light touch on physical exam.
 7            Q.    Now, when you did a discogram,
did
 8    that show the disc was beyond the normal
 9    margins on her discogram or not, was she
within
10    the normal margins?
11            A.    It was contained, the herniation
12    was contained.
13            Q.    Typically in your patients is
most
14    degeneration in the L5, S1 area?
15                  MR. PLATTA:  Objection.
16            Q.    Is that the most common area to
17    have lumbar degeneration?
18            A.    To have herniation but not
19    necessarily degeneration.
20            Q.    Typically what causes
21    degeneration?
22                  MR. PLATTA:  Over objection.
23            A.    The body's response to injury and
24    healing, the release of inflammatory
mediators.
25            Q.    Now, if there was an L5, S1

0100
1                    ANDREW M.G. DAVY, M.D.
100
2     compression, she would have had radiating pain
3     on the left or right side in to the legs, did
4     you see that at all?
5                    MR. PLATTA:  Over objection.
6          A.    Yes, as evidenced by positive
7     straight leg raises on both sides sitting and
8     supine.
9          Q.    Now, are you familiar with the
New
10    England Journal of Medicine?
11         A.    Yes.
12         Q.    Have you read any of the studies
13    about herniations and that certain percentages
14    of them shrink and in ninety-five percent of
15    them they are reabsorbed?
16                   MR. PLATTA:  Over objection.
17                   MR. LUNDGREN:  Objection.
18         Q.    Are you familiar with that study?
19         A.    I'm familiar that ninety to
20    ninety-five percent of acute low back pain
21    resolves on its own.
22         Q.    So, in that percent, the ninety
to
23    ninety-five percent of the time they would do
24    just as well without the surgery typically?
25                   MR. PLATTA:  Over objection.

0101
 1                    ANDREW M.G. DAVY, M.D.
101
 2                    MR. LUNDGREN:  Objection.
 3         A.    That I don't know.
 4         Q.    Now, did you read any of the
 5    Dartmouth studies recently about spine
surgery?
 6         A.    No.
 7         Q.    Did you ever read the SPORT
study,
 8    the spine patient outcome research trial,
also,
 9    known as SPORT?
10         A.    No.
11         Q.    At no point in time you saw any
12    records from Dr. Baboo, correct?
13         A.    Correct.
14         Q.    And your review of the films,
15    also, showed no extrusion?
16         A.    What films?
17         Q.    Your review of the reports showed
18    no extrusions, correct?
19         A.    In the true sense of the word
20    extrusion in my interpretation extrusion means
21    that the disc has separated from its source so
22    no, no extrusion.
23                    MR. PLATTA:  Over objection to
24         that question.  Again, no extrusion as
to
25         which, neck or back, if you can clarify

0102
 1                    ANDREW M.G. DAVY, M.D.
102
 2           that?
 3           Q.    In your review of the MRI reports
 4    what did you see on the films that would have
 5    precipitated surgery?
 6                    MR. PLATTA:  Can you repeat the
 7           question?
 8                    (Whereupon, the reporter read
back
 9           the requested material.)
10                    MR. PLATTA:  What did you see on
11           the films?
12           Q.    On the reports?
13           A.    Disc herniations the back and
14    neck.
15                    MR. LUNDGREN:  Counselor, it's
16           10:04, you have three more minutes for
17           the five-minute break.
18                    MR. COFFEY:  Yes.
19           Q.    Did you ever speak with Mr.
Platta
20    about when you would be doing the procedures?
21           A.    No.
22           Q.    Did Ms. Frometa ever talk to you
23    about the timing of the surgical procedures?
24                    MR. PLATTA:  Over objection.
25           A.    I don't understand.

```
0103
 1                    ANDREW M.G. DAVY, M.D.
103
 2            Q.     Did she talk to you about when you
 3   would do them?
 4            A.     Yes.
 5            Q.     When did she want them done, as
 6   soon as possible or what was her --
 7            A.     No, she's always been reluctant to
 8   have procedures, she's afraid of needles. This
 9   last procedure took her four weeks to decide.
10   Usually it's several visits and discussions and
11   then she comes for the procedure so in terms of
12   -- I don't know what the question is, in terms
13   of that, yes, we spoke about when to do it.
14            Q.     Are you being paid for your time
15   here today?
16            A.     No.
17            Q.     Do you plan on being paid for your
18   time here today?
19            A.     Do I plan?  I had hoped.
20            Q.     How much do you hope to be paid
21   for your time?
22            A.     I'm not being paid.
23                   MR. PLATTA:  Counselor, it's
24            10:07.
25                   MR. COFFEY:  You just stopped.
```

```
0104
 1                    ANDREW M.G. DAVY, M.D.
104
 2          Q.     Are you being paid to testify at
 3    trial?
 4                  MR. LUNDGREN:  You're in the
 5          middle of a question, just let him
 6          finish.
 7          A.     You mean today or in the future?
 8          Q.     Both?
 9          A.     We have not made any arrangements
10    for any trial or testimony, me and Mr. Platta.
11                  MR. PLATTA:  Thank you.
12          Q.     Do you anticipate being paid --
13                  MR. PLATTA:  For the record, it's
14          10:07, we established we were stopping
at
15          10:07.
16                  MR. COFFEY:  It's 10:06 on my
17          Blackberry, 10:05 on my watch, so first
18          of all --
19                  MR. PLATTA:  It's 10:07 on my
20          watch.
21                  MR. COFFEY:  You wasted forty-
five
22          seconds.
23                  MR. LUNDGREN:  Let him just
24          finish.
25                  MR. PLATTA:  No, the judge was
```

0105
 1                  ANDREW M.G. DAVY, M.D.
105
 2          very clear.
 3                  MR. COFFEY:  Then go call the
 4          judge while I have this question.  You
 5          just wasted two minutes of my time.
 6                  MR. PLATTA:  If you're going to
 7          raise your voice --
 8                  MR. LUNDGREN:  Counselor, you can
 9          take your position, I want the doctor
out
10          of here.  You've asked your question.
11          It's an innocent question.
12                  MR. PLATTA:  Right now we have an
13          order.  Counselor, you're going against
14          the judge's hour, it's two hours
15          deposition limit.  We are done with
16          questioning right now.  That's all.
17                  MR. COFFEY:  I had an open
18          question and you started talking with
an
19          objection before the time.
20                  MR. LUNDGREN:  You're fighting
21          over nothing.
22                  MR. COFFEY:  There's something
23          he's making a big deal about.
24          Q.     Have you talked about being paid
25     for your trial testimony with Mr. Platta, yes

0106
 1                    ANDREW M.G. DAVY, M.D.
106
 2   or no?
 3           A.    No.
 4                 MR. COFFEY:  That's it, we're
 5           done.
 6                 MR. PLATTA:  Thank you.
 7
 8                 (Time noted:  10:07 a.m.)
 9
10                         _____
11                         ANDREW M.G. DAVY, M.D.
12
13   Subscribed and sworn to
14   before me this_____day
15   of_____, 2008.
16
17   _____
18        Notary Public
19
20
21
22
23
24
25

0107
1
107
2
3                    C E R T I F I C A T E
4
5    STATE OF NEW YORK     )
                            )ss.:
6    COUNTY OF WESTCHESTER)
7
8                     I, LISA M. PRENTICE, a Shorthand
     Reporter and Notary Public within and for the
9    State of New York, do hereby certify:
10
                      That ANDREW M.G. DAVY, M.D., the
11   witness whose deposition is hereinbefore set
     forth, was duly sworn by me, and that such
12   deposition is a true record of the testimony
     given by the witness.
13
14                    I further certify that I am not
     related to any of the parties to this action
by
15   blood or marriage, and that I am in no way
     interested in the outcome of this matter.
16
17                    IN WITNESS WHEREOF, I have
     hereunto set my hand this 9th day of May,
2008.
18
19
20
21
22                    _____
23
24                       LISA M. PRENTICE
25                       SHORTHAND REPORTER

```
0108
 1
108
 2                    ERRATA SHEET
 3    The following corrections, additions
      or deletions were noted on the transcript of
 4    the testimony which I gave in the
      above-captioned matter held on 5/9/08:
 5
 6    Page_____Line_____SHOULD READ:_____
 7    REASON FOR CHANGE:_____
 8    Page_____Line_____SHOULD READ:_____
 9    REASON FOR CHANGE:_____
10    Page_____Line_____SHOULD READ:_____
11    REASON FOR CHANGE:_____
12    Page_____Line_____SHOULD READ:_____
13    REASON FOR CHANGE:_____
14    Page_____Line_____SHOULD READ:_____
15    REASON FOR CHANGE:_____
16    Page_____Line_____SHOULD READ:_____
17    Page_____Line_____SHOULD READ:_____
18    REASON FOR CHANGE:_____
19    Page_____Line_____SHOULD READ:_____
20    REASON FOR CHANGE:_____
21                          _____
22                          ANDREW M.G. DAVY,
M.D.
      Subscribed and sworn to
23    before me this_____day
      of_____, 2008.
24    _____
25         Notary Public
```