0512from.txt

```
0001
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 3    ---------------------------------------------X
      ADONNA FROMETA,
 4
                                     PLAINTIFF,
 5
                     -against-
 6
      MARIO E. DIAZ-DIAZ,
 7    and ALL AMERICAN HAULERS RECYCLING
 8                                   DEFENDANTS.
      ---------------------------------------------X
 9
10                    DATE: May 12, 2008
11                    TIME: 9:35 a.m.
12
13         EXAMINATION BEFORE TRIAL of an expert
14    witness, CHARLES KINCAID, PhD, taken by the
15    Defendants, pursuant to a subpoena, held at the
16    offices of WILSON, ELSER, MOSKOWITZ, EDELMAN &
17    DICKER, L.L.P., before Cassandra Phifer, a Notary
18    Public of the State of New York.
19
20
21
22
23
24
25
0002
 1
 2    A P P E A R A N C E S:
 3
 4         SLAWEK PLATTA, ESQ.
                Attorney for the Plaintiff
 5              42 Broadway, Suite 1927
                New York, New York 10004
 6
 7
           WILSON, ELSER, MOSKOWITZ,
 8         EDELMAN & DICKER, L.L.P.
                Attorneys for the Defendant
 9              150 East 42nd Street, 23rd Floor
                New York, New York 10017
10         BY:  STUART A. MILLER, ESQ.
                FILE #: 01502.00009
11
12              *           *           *
13
14
15
16
17
18
19
20
21
22
23
24
```

0512from.txt

```
25
0003
 1
 2
 3               F E D E R A L   S T I P U L A T I O N S
 4
 5
 6           IT IS HEREBY STIPULATED AND AGREED
 7   by and between the counsel for the respective
 8   parties hereto, that the filing, sealing, and
 9   certification of the within deposition shall
10   be and the same are hereby waived;
11
12           IT IS FURTHER STIPULATED AND AGREED
13   that all objections, except as to the form
14   of the question, shall be reserved to the times
15   of the trial.
16
17           IT IS FURTHER STIPULATED AND AGREED
18   that the within deposition may be signed before
19   any Notary Public with the same force and effect
20   as if signed and sworn to before this court.
21
22
23           *       *       *       *
24
25
0004
 1
 2   C H A R L E S   K I N C A I D, PH.D, called as a
 3   witness, having been first duly sworn by a Notary
 4   Public of the State of New York, was examined and
 5   testified as follows:
 6   EXAMINATION BY
 7   MR. COFFEY:
 8        Q.      Please state your name for the record.
 9        A.      Charles Kincaid, Ph.d.
10        Q.      Where do you reside?
11        A.      One University Plaza, Hackensack, New
12   Jersey, 07601.
13        Q.      Good morning, Doctor.
14        A.      Good morning.
15        Q.      Are you going to testify in another
16   matter after this today?
17           MR. PLATTA:  Objection.
18        A.      No.
19           MR. PLATTA:  You can answer.
20        A.      No.
21        Q.      Do you have another case coming up this
22   week that you'll be testifying on in the matter of
23   Djuric (phonetic)?
24        A.      I haven't heard yet if I'm going to be
25   asked to be testifying.
0005
 1                   C. KINCAID, PH.D
 2           MR. PLATTA:  Objection.
 3        Q.      You're aware that that matter is on for
 4   trial?
 5           MR. PLATTA:  Objection.
 6           You can answer.
 7        A.      I heard that it's possible; but I
 8   hadn't heard anything more than that.
 9        Q.      Because we had noticed your deposition,
                   Page 2
```

0512from.txt

```
10  and we were told that you were going be out of the
11  country; but I have happen to be the trial counsel
12  on that other matter, so I just didn't know if you
13  were going to be available or not.
14            MR. PLATTA:  Over objection.
15            You can answer.
16       A.     Not if it's during next week.
17       Q.     Going through a Life Care Plan, please
18  tell me what's a Life Care Plan?
19       A.     A Life Care Plan is a document that
20  lays out a plan for an individual's future medical
21  services, equipment needs, supplies over the course
22  of their lifetime.
23       Q.     And how does that differ from a doctor
24  who might say you need surgery for X, Y or Z?
25       A.     In collecting all of the individual
0006
1                   C. KINCAID, PH.D
2  treating physicians, their opinions.  So one doctor
3  may have opinions about specific sets of services;
4  but it's a combination of all of their treating
5  physicians and their suggestions for future needs.
6       Q.     Are you being paid for your time here
7  today?
8       A.     Yes, I am.
9       Q.     How much?
10       A.     The total is --
11            MR. PLATTA:  Over objection.
12            You can answer.
13       A.     It's $325 per hour, plus $1,000
14  surcharge; because of the expedited time.  So a
15  total of $1,650.
16       Q.     Now, talking about Mr. Platta for a
17  matter; have you worked with Mr. Platta before?
18       A.     No.
19       Q.     Have you ever worked for a prior firm,
20  such as Dinkes & Schwitzer?
21       A.     No, I have not.
22            MR. PLATTA:  Over objection.
23       Q.     Have you ever worked Napoli, Burn &
24  Kieser (phonetic)?
25            MR. PLATTA:  Over my objection.
0007
1                   C. KINCAID, PH.D
2            You can answer.
3       A.     Not that particular name.
4       Q.     Which of their names, subsequent or
5  before that did you ever deal with?
6            MR. PLATTA:  Over Objection.
7            You can answer.
8       A.     I think that it's Napoli, Burn &
9  Ribcano (phonetic).
10       Q.     Did you deal with them?
11       A.     Yes, a couple of their clients.
12       Q.     How did you first come to handle the
13  Frometa case, who contacted?
14       A.     Mr. Platta.
15       Q.     When did he first contact you?
16       A.     He contacted me on April 25th.
17       Q.     Of what year?
18       A.     Of 2008.
19       Q.     And what did he do; did he send you a
20  letter; did he call you or something else?
```

Page 3

0512from.txt

21      A.      He called me.  And then he follow it up
22  with a letter.
23      Q.      And what did he say when you first
24  spoke?
25              MR. PLATTA:  Over objection.
0008
1                   C. KINCAID, PH.D
2           I believe that would be privileged.
3               MR. COFFEY:  I don't think so.
4       Q.      Go ahead; you can answer.
5               MR. PLATTA:  I don't think so; because
6           it's privilege information between expert and
7           attorney.
8       Q.      Did you bring your file here today?
9       A.      Yes, I did.
10      Q.      Do you have a correspondence between
11  him and you in that file?
12      A.      I don't believe so.
13      Q.      Did he send you any letters, ever?
14              MR. PLATTA:  You mean --
15      Q.      Did he ever sent you any letters?
16      A.      Not a letter, no.
17      Q.      Did he send anything that gave you the
18  information, a fax or anything such as that?
19              MR. PLATTA:  By Counsel, I'm just
20          responding that I sent a contract; which is a
21          copy, which I seen in the file?
22      A.      He sent the contract along with medical
23  records.
24      Q.      Whose contract was that; was that your
25  contract?
0009
1                   C. KINCAID, PH.D
2       A.      My contract.
3       Q.      And then he sent you the medical
4  records?
5       A.      Medical and some legal documents as
6  well.
7       Q.      Now, did you meet with Ms. Frometa?
8       A.      Yes, I did.
9       Q.      When did you meet with her?
10      A.      I met with her on Saturday,
11  April 26, 2008.
12      Q.      Where did you meet with her?
13      A.      In my offices.
14      Q.      And where were your offices?
15      A.      In Hackensack, New Jersey.
16      Q.      Who else, if anyone, accompanied Ms.
17  Frometa?
18      A.      No one.
19      Q.      How long did you met?
20      A.      It was approximately two hours.
21      Q.      And what did you do in those
22  approximately two hours?
23      A.      I interviewed Ms. Frometa to gain
24  information about her background or medical
25  condition and living situation.
0010
1                   C. KINCAID, PH.D
2       Q.      Did she talk to you about the accident?
3       A.      She mentioned that she had been struck,
4  yes.  She didn't go into great detail.
5       Q.      Did she talk to you about her employer?
                            Page 4

0512from.txt
```
 6      A.      Um, --
 7              MR. PLATTA:  Over Objection.
 8              You can answer.
 9      A.      I only briefly covered that; because my
10  understanding is there was no wage loss.  So I
11  didn't ask her any extensive details about that.
12      Q.      What medical records did you have to
13  review when you wrote up your report; are they all
14  included in your report?
15      A.      Yes.  If you look at pages five through
16  seven, you'll see all of the records listed that I
17  had a chance to review.
18      Q.      You're not a medical doctor in any way;
19  is that correct?
20              MR. PLATTA:  Over objection.
21      A.      That's correct.
22      Q.      And you didn't review any of her
23  employment records; did you?
24      A.      No, I did not.
25      Q.      Do you know when she first went back to
0011
 1              C. KINCAID, PH.D
 2  work after the accident?
 3      A.      Let me look in my notes.  She might
 4  have gone back for a short while afterwards.  I
 5  don't have any note to that effect.
 6      Q.      Did you ask her about her work history?
 7      A.      Just the type of work that she had
 8  done.
 9      Q.      Just the type?
10      A.      Yes.
11      Q.      So you didn't talk about whether she
12  did or didn't go back to work, and if so, for how
13  long?
14      A.      No, I did not.
15      Q.      When did you prepare this report?
16      A.      The report was prepared on May 1, 2008.
17      Q.      Did you prepare that then on the first?
18      A.      Well, I was preparing it during parts
19  of it, throughout that period, and the final
20  document was prepared on May 1st.
21      Q.      Now, you said that it says in your
22  thing that you spoke to some of the doctors?
23      A.      Yes, that's correct.
24      Q.      Let's go through each of the doctors.
25              Talking about which doctors did you
0012
 1              C. KINCAID, PH.D
 2  speak with?
 3      A.      I spoke with Dr. Krisna.
 4      Q.      When did you speak with Dr. Krisna?
 5      A.      That was on May 1st.
 6      Q.      Now, what time did you speak with him
 7  on May 1st?
 8      A.      I believe that it was -- you know, I
 9  don't recall the exact time.  I didn't write it
10  down.  I believe though, because I was trying to
11  prepare, it was probably early afternoon; because I
12  could get in.
13      Q.      And how long did you speak to him for?
14      A.      Um, approximately 15 to 20 minutes.
15      Q.      And what did you talk about in your
16  conversation?
```
Page 5

0512from.txt

17      A.      We talked about Ms. Frometa's future
18  medical needs, services along with frequencies of
19  services.
20      Q.      Your future medical needs, what else?
21      A.      The frequency of services, whether he
22  agreed with the services and the frequency of those
23  services.
24      Q.      So, future medical needs, frequency of
25  services and duration of services?
0013
1                   C. KINCAID, PH.D
2       A.      Yes.
3       Q.      Did you have recommendation for him or
4   did he give you recommendations.  Um, I -- he gave
5   me recommendations.  I also told him about the
6   results of my interview with Ms. Frometa, and he
7   agreed that she would need -- would benefit from
8   some psychotherapy?
9               MR. COFFEY:  Move to strike that
10      portion that is nonresponsive.
11      Q.      She has not been treated by any
12  psychotherapist or psychiatrist or anything in that
13  way; are you aware of that so far?
14      A.      Not that I'm aware of.
15      Q.      But you're not a doctor, you're not a
16  medical doctor, you're not a psychiatrist, you have
17  no credentials, whatsoever in the field the
18  psychiatry?
19      A.      Not in the field of psychiatry.
20      Q.      And none of the related fields of
21  psychiatry?
22      A.      That's correct.
23      Q.      So your recommendation is just a lay
24  recommendation?
25      A.      No, that's incorrect.  I'm a
0014
1                   C. KINCAID, PH.D
2   rehabilitation counselor.  I'm trained to interview
3   people, to counsel them, to identify conditions
4   that I then can refer to professional for clinical
5   documentation.
6       Q.      But you have no training in psychiatry?
7       A.      Not in psychiatry, no.
8       Q.      You have no medical degree?
9       A.      No.
10              MR. PLATTA:  Over Objection.
11              You can answer.
12      Q.      You have no psychiatric training to
13  PSY, no medical or psychiatric designation?
14              MR. PLATTA:  Over objection; asked and
15      answered.
16      A.      (No response.)
17      Q.      And you're not a CSW, correct?
18      A.      That's correct.
19      Q.      What is a CSW?
20      A.      That would be a certified social
21  worker.
22      Q.      So, what's does a certified social
23  worker do?
24      A.      They would do counseling with
25  individuals.
0015
1                   C. KINCAID, PH.D
                        Page 6

0512from.txt

```
2        Q.      So, which of yours certifies you to
3   counsel individuals?
4        A.      My certified rehabilitation counselor
5   designation.
6        Q.      But still you could make any referral
7   that you would like or have any recommendations;
8   but that has no more impact as I would as an
9   attorney recommending someone?
10       MR. PLATTA:  Objection?
11       A.      I disagree totally.  I work in
12  psychiatric hospitals, I worked with individuals
13  with psychiatric disabilities.
14       Q.      Doesn't that differ from a nurse that
15  worked in orthopedics, she would not be qualified
16  to tell you whether you need a surgical procedure
17  in orthopedics; would you agree or disagree with
18  that?
19       MR. PLATTA:  Over objection.
20       A.      In working in the psychiatric field,
21  would you be aware of symptoms, symptomatology of
22  dangerous signals what to refer onto
23  professionals?
24       Q.      Also as a social worker or someone who
25  has the ability to refer people, if you believe
0016
1                C. KINCAID, PH.D
2   that there was some serious condition, you have the
3   right to call 911 or the police or a psychiatric
4   facility if you saw something that serious, right;
5   wouldn't that be your obligation?
6        A.      If you thought that it was imminent,
7   yes.
8        Q.      Did you see anything that you thought
9   imminent with Ms. Frometa?
10       A.      Not than date.  I saw signs of
11  depressed mood.  I also had take depression
12  inventory, which the score would indicate severe
13  depression.
14       Q.      So, if you saw something imminent, you
15  have an obligation to notify someone; is that
16  correct?
17       A.      If I thought that the person was a
18  danger to themselves or others, yes.
19       Q.      You didn't see that?
20       A.      Not on that day, no.
21       Q.      So, when we talk about the future
22  medical needs and some of the things that you
23  talked about, did you have preliminary workup that
24  you shared with Dr. Krisna?
25       A.      Yes, I did have stop tables that I had
0017
1                C. KINCAID, PH.D
2   started.
3        Q.      Had you shared those were the doctor
4   before you spoke with him?
5        A.      Yes, I did.
6        Q.      Which tables were they?
7                Could I see those?
8        A.      They're in my plan.
9        Q.      So the tables that are in your plan you
10  had prepared and sent to Dr. Krisna for his
11  approval, for his review and comments?
12       A.      Yes.
```
                              Page 7

0512from.txt
```
13      Q.      What comments did he make?
14      A.      Um, he agreed with a number of where
15 his name appears, in areas where he agreed with the
16 recommendations.
17      Q.      I'll get over to the table in a while.
18              You spoke to Dr. Krisna for about 15,
19 20 minutes, had you reviewed his billing records in
20 this matter?
21      A.      No, I have not.  Some bills were sent
22 to me, but these came later; but no, I did not
23 review.
24      Q.      So, when you prepared this you hadn't
25 reviewed the medical bills?
0018
1                       C. KINCAID, PH.D
2               MR. PLATTA:  For Dr. Krisna you mean?
3       Q.      For Dr. Krisna, you didn't review?
4       A.      Now.
5       Q.      Did you think that was important, to
6  review the medical records of Dr. Krisna when you
7  prepared the report?
8               MR. PLATTA:  Medical records or bills?
9               MR. COFFEY:  Bills.
10              MR. PLATTA:  Over objection.
11              You can answer.
12      A.      If they were available to me I would
13 have reviewed them.
14      Q.      Would they have been important to
15 review when preparing a Life Care Plan?
16      A.      It's a factor to consider; but not
17 critical.
18      Q.      You were unable to consider it?
19      A.      That's right.
20      Q.      Had you asked for those bills?
21      A.      I asked for anything that was available
22 pertaining to treatment.
23      Q.      Would the bills have been something
24 pertaining to her treatment?
25      A.      Yes, it would have shown the various
0019
1                       C. KINCAID, PH.D
2  treatments and different costs.
3       Q.      When we talk about the costs of
4  something, are you aware that there is a difference
5  between what a doctor charges and what the
6  reimbursement rates are?
7       A.      Yes.
8       Q.      And there are some things that could be
9  a big difference between what was charged and
10 what's reimbursed in the Workers' Comp. or No
11 Fault; is that correct?
12              MR. PLATTA:  Over my objection; you can
13     answer.
14      A.      It depends on the insurance that your
15 charging; whether its Worker's Comp., Medicaid or
16 private insurance.
17      Q.      Or direct cash payment could differ as
18 well?
19              MR. PLATTA:  Over objection.
20      A.      Yes, that's true.
21      Q.      You spoke to which other doctors?
22      A.      Dr. Davy.
23      Q.      How long did you speak to Dr. Davy?
                        Page 8
```

0512from.txt

```
24        A.      That was probably another 15 minutes to
25   25.  Twenty, 25.
0020
1                       C. KINCAID, PH.D
2         Q.      So, 15 to 25 or 20?
3         A.      In that range yeah. It was a chart
4    conversation.
5         Q.      And what day did you speak with
6    Dr. Davy?
7         A.      That would have been the 28th.
8         Q.      So April 28th?
9         A.      Yes.
10        Q.      And when did you speak with him; in the
11   morning, afternoon, night or something else?
12        A.      It was later in the day.
13        Q.      And did you have Dr. Davy's records to
14   review?
15        A.      Yes, I did.  At that time you reviewed
16   every record that had been up-to-date, that had
17   been provided to me and is listed in the Life Care
18   Plan, the one that I have.
19        Q.      Did you review any of his bills?
20        A.      No, I didn't.  I did not have his
21   bills.
22        Q.      So, at no time did you review
23   Dr. Davy's bills?
24        A.      No, they were not available.
25        Q.      Now, would those have being important
0021
1                       C. KINCAID, PH.D
2    to have reviewed his bills?
3                 MR. PLATTA:  Over objection,
4         Counselor.
5         A.      It would have been another factor.
6         Q.      And you were unable to consider that
7    factor?
8         A.      Um, I did not have the available to me,
9    that's be correct.
10        Q.      Wouldn't that have been an important
11   factor to consider, how much had been billed and
12   how much as reimbursed?
13                MR. PLATTA:  Note my objection.
14                You can answer again.
15        A.      It would have been one factor to
16   consider.
17        Q.      Which other factors are considered?
18        A.      In what aspects of the plan?
19        Q.      Let's talk about factors, delineate
20   factors?
21                MR. PLATTA:  Counselor, could you
22        please answer the question, if you can?
23        A.      You want me to go delineate the factors
24   that I used in every aspect of the Life Care Plan?
25                MR. PLATTA:  Which aspect are you
0022
1                       C. KINCAID, PH.D
2         asking about?
3                 MR. COFFEY:  Every factor.  You tell
4         me.
5                 MR. PLATTA:  Do you understand the
6         question?
7                 MR. PLATTA:  You have to be more
8         specific.
```

0512from.txt

```
 9        Q.       Delineate the factors that you used on
10   the Life Care Plan A through whatever?
11        A.       Where do you want to start?
12        Q.       I would like to start in the beginning
13   and get to the end?
14        A.       I would have considered the medical
15   records, diagnoses, any treatment that the person
16   had received, prognosis.
17        Q.       What else?
18        A.       Any limitations that would have been
19   noted to the medical record.
20        Q.       Limitations noted.
21             What else?
22        A.       If there was information about any
23   specific treatment recommendation, medication
24   recommendation.
25        Q.       So, treatment recommendations?
0023
 1                   C. KINCAID, PH.D
 2        A.       Any future surgical needs.
 3        Q.       Treatment recommendation, medication
 4   recommendation, future surgical needs.
 5             What else?
 6        A.       That's all that I can think of right
 7   now from the medical record.
 8        Q.       How about from bills records?
 9        A.       If they were available I would have
10   looked at them to see what services the person had
11   received already.
12        Q.       What's else did you look at from the
13   billing records?
14        A.       I could have looked at costs.
15        Q.       And the cost of both billed and what
16   actually was reimbursed?
17        A.       That's correct.
18        Q.       There is some type of table that talked
19   about the difference of what is actually reimbursed
20   dips on what carriers and stuff like that?
21        A.       You can contact carriers to find out.
22   I don't have such table.
23        Q.       Do you keep records of that?
24        A.       No, I don't.
25        Q.       Isn't that relevant though of coming up
0024
 1                   C. KINCAID, PH.D
 2   with what a cost is?
 3             MR. PLATTA:  Over objection.
 4             You can answer.
 5        A.       No.
 6        Q.       So you don't think that's relevant
 7   though the different between what's actually built
 8   and that's actually reimbursed?
 9             MR. PLATTA:  Over objection.
10             Asked and answered.
11        A.       No, I didn't prepare it at this point.
12   That would have to be something for Nicomus
13   (phonetic) to figure out.
14        Q.       You haven't spoken to Nicomus this
15   matter?
16        A.       No, I have not.
17        Q.       Now, in your thing it says a growth
18   rate to be determined by a economist.  Is there a
19   standard factor that I'm not reading here or is
```

Page 10

0512from.txt

```
20        that thing for charting?
21            A.      That would be standard, because have
22        you to project out the cost overtime any economist.
23            Q.      So, how were you able to testify as to
24        the cost without an economist; because the two
25        seems to be interconnected?
0025
1                          C. KINCAID, PH.D
2                 MR. PLATTA:  Over objection,
3        Counselor.
4            A.      I could testify as to the cost because
5        I researched an average cost in Ms. Frometa's area.
6            Q.      So, we talked your research, the
7        average cost; what did you research; what book did
8        you use?
9            A.      I contacted the providers first in the
10       area.
11           Q.      Let's go through that which
12       specifically for Ms. Frometa.  What carriers did
13       you contact?
14           A.      Where would you like to chart?
15           Q.      At the beginning.
16                   Who you did call, when?  Who did you
17       talk, the names that you spoke to?
18           A.      Dr. Davy for pain management,
19       Dr. Steward Khan, his receptionist.
20           Q.      And that's what?
21           A.      That's the pain management specialist.
22           Q.      Where is Dr. Davy's office?
23           A.      He's located in New York.
24           Q.      And what's his address?
25           A.      Ten Union Square, East 59th.  That must
0026
1                          C. KINCAID, PH.D
2        be Plaza, New York, New York.
3            Q.      What's the zip?
4            A.      I don't have the zip.
5            Q.      What's the phone number?
6            A.      212-844-8756.
7            Q.      And what why did you call him?
8            A.      I was looking for other pain management
9        specialists to determine what they charge for the
10       same service.
11           Q.      Have you ever worked with Stewart Khan
12       before?
13           A.      No.
14                   MR. PLATTA:  Over objection.
15           A.      No, I have not.
16           Q.      How did you find his name?
17           A.      In a list of pain management
18       specialists.
19           Q.      What list?
20           A.      I would have gotten that from the
21       internet.
22           Q.      Do you have a copy of that list?
23           A.      No, I do not.
24           Q.      When did you do that search on the
25       Internet?
0027
1                          C. KINCAID, PH.D
2            A.      That would have been during the week
3        that I was preparing the Court.
4            Q.      So, how many other doctors were on that
```

Page 11

0512from.txt

```
 5   list?
 6        A.    There is one other.
 7        Q.    How many doctors were on your Internet
 8   search list?
 9             MR. PLATTA:  Over objection.
10        A.    I didn't count them.
11        Q.    Was it more than five?
12             MR. PLATTA:  Over objection.
13        A.    I'm sure that there were.
14        Q.    More than ten?
15             MR. PLATTA:  Over objection.
16        A.    I don't remember.
17        Q.    Did you destroy that list?
18             MR. PLATTA:  Over objection.
19        Q.    Can you describe that.  It was actually
20   printed?
21             MR. COFFEY:  I don't know what it is?
22        A.    No, I did not print it.
23        Q.    But it's in your hard drive somewhere?
24        A.    On the Internet at the time.
25        Q.    As you're aware, doctor, under the
0028
 1                    C. KINCAID, PH.D
 2   Federal rules of civil procedure we have a right to
 3   every piece of information that you use in
 4   formulating your opinion including the
 5   methodologies if anything that you reviewed.
 6             A lot of things are on the internet.
 7   What I'm trying to find out is what is this?
 8        A.    I would have to find the website again;
 9   but I don't recall it.
10        Q.    Did put it anywhere in your report?
11        A.    No.
12        Q.    You didn't mention it?
13        A.    No, I didn't.
14        Q.    Would that have been relevant?
15             MR. PLATTA:  Over objection.
16        A.    Not that I thought it was.  I just
17   thought that the places that I looked for sources
18   of cost would be the important factor.
19        Q.    So, you spoke to Dr. Steward Khan; how
20   long did you speak to him?
21        A.    I spoke with the receptionist.  And it
22   would have been probably a five-minute conversation
23   at the most.
24        Q.    You spoke with the receptionist about
25   what?
0029
 1                    C. KINCAID, PH.D
 2        A.    About costs.
 3        Q.    And the receptionist told you the cost?
 4        A.    Yes.
 5        Q.    And what was the receptionist's name?
 6        A.    I didn't get her name.
 7             What costs did I ask her about?
 8        Q.    What costs did you ask her about?
 9        A.    Initial consultations, follow ups and
10   epidural injections.
11        Q.    Did you ask if these were reimbursable
12   costs or what the costs were?
13             MR. PLATTA:  Over objection.
14        A.    I just asked what the costs were.
15        Q.    And do you know how long this person,
```

Page 12

0512from.txt

```
16   this receptionist had worked in that office?
17        A.    No, I do not.
18        Q.    Do you know what her credentials are?
19              MR. PLATTA:  Over objection.
20        A.    No, I do not.
21        Q.    We don't know her name?
22        A.    No, I didn't get her name.
23        Q.    You didn't speak with the doctor?
24        A.    That's correct.
25        Q.    You believe based upon speaking with a
0030
1                     C. KINCAID, PH.D
2    receptionist is the same with speaking with the
3    doctor to talk about the costs?
4              MR. PLATTA:  Over objection.
5         A.    I think that she's a source of
6    information about the costs.
7         Q.    But it's not a real firm source; it's a
8    receptionist at a doctor's office; is that correct?
9              MR. PLATTA:  Over objection; asked and
10   answered.
11        A.    I wouldn't say it's correct.
12        Q.    Did she send you any literature, any
13   materials that had them in writing?
14        A.    No, she did not.
15        Q.    Let's go to the next doctor that you
16   spoke with?
17        A.    Okay.  This was a pain center,
18   University Pain Center.
19        Q.    And what's their address?
20        A.    95 University Place, 8th floor,
21   New York, New York.
22        Q.    Who did you speak with there?
23        A.    Marie.
24        Q.    And when it you speak with them, what
25   day?
0031
1                     C. KINCAID, PH.D
2         A.    It would have been during that week, I
3    believe.
4         Q.    And also on Dr. Steward Kahn's office
5    what day of the week did you speak with help them?
6         A.    Within that time period when I was
7    writing the report.  I'm not sure.
8         Q.    So you're unsure of the date?
9         A.    Not sure of the date.
10        Q.    Unsure of the time?
11        A.    Yes.
12        Q.    And this name also, University Pain
13   Management, were they also on your list, your
14   internet list?
15        A.    Yes.
16        Q.    Have you ever worked with them in the
17   past?
18        A.    Not that I can recall, no.
19        Q.    And you spoke with Marie, who is Marie?
20        A.    She was in their billing department.
21        Q.    How long did you speak with her?
22        A.    That would have been five minutes or
23   less.
24        Q.    And what did she speak to you about?
25        A.    Initial consultation and follow up
0032
```

Page 13

0512from.txt

1          C. KINCAID, PH.D
2    costs.
3         Q.    What's her consult fee there?
4         A.    It's $500.
5         Q.    And what's the other fees that they
6    gave you?
7         A.    Follow up is $110 to $125.
8         Q.    And what else, what other fees?
9         A.    Those were the only fees that she had
10   available.
11        Q.    How about Dr. Stewart Khan, what fees
12   did they give for which things?
13        A.    Initial consultation.
14        Q.    How much?
15        A.    $350.
16        Q.    What else?
17        A.    Follow-ups.
18        Q.    How much?
19        A.    $150 to $250.
20        Q.    For what else?
21              The epidural?
22        A.    Yes, that was $650 and up.
23        Q.    If they do multiple levels of epidurals
24   did they talk about what the costs would be?
25        A.    They said $650 and going up.
0033
1          C. KINCAID, PH.D
2         Q.    I want you to assume we got Dr. Davy in
3    here the other day and he talked the epidurals and
4    talked about the way that the consecutive levels,
5    it started go down; do you disagree with Dr. Davy?
6         MR. PLATTA:  Over objection.
7         A.    The costs would go up depends to the
8    extent it starts at $650 and going up from there.
9         Q.    Are you familiar with the concept of
10   the cost multiple levels start to go down in
11   subsequent level?
12        A.    Costs, because it's the same subsequent
13   procedure.
14        Q.    How does that typically work in cost
15   structure?
16        A.    Depends on the extent of the
17   epidurals. You have you cost cough for the
18   surgeon, the anesthesia, injections.
19        Q.    And also the rate of half he was
20   talking about that there is a concept of each level
21   goes down by half; are you familiar with that?
22        A.    I didn't talk about that with him;, but
23   I'm aware that there is a difference.
24        Q.    So would it have been important to talk
25   with her only treating physician about what the
0034
1          C. KINCAID, PH.D
2    costs were?
3         MR. PLATTA:  Over objection.
4         A.    I did talk it him about the costs that
5    I was suggesting and he commented on it.
6         Q.    What did he comment on?
7         A.    I don't have the comment because it
8    wasn't in my plans as one of the costs.
9         Q.    Now, we'll go back to University Pain
10   Center.
11              You spoke to them about five minutes?
                    Page 14

0512from.txt

```
12      A.      Yes, that's about right.
13      Q.      And the woman at Stewart Khan's office
14 you speak to her for about how long?
15      A.      Probably the same amount of time.  Just
16 to get the costs.
17      Q.      Who did you say you were?
18              Did you identify who you were, who you
19 were looking for?
20      A.      Yes, I said my name.  I was preparing a
21 Life Care Plan, and I was trying to determine costs
22 in the area.
23      Q.      And who else did you speak to?
24      A.      In terms of in pain specialists, these
25 were the three that I spoke with, yes.
0035
1                   C. KINCAID, PH.D
2       Q.      Who is the third?
3       A.      Dr. Davy.
4       Q.      Dr. Davy, you spoke to him; how long
5 did you say that was?
6       A.      During the course of our conversations,
7 so that was about 15 to 20 minutes.
8       Q.      So you spoke to Dr. Davy on that Monday
9 you said then?
10      A.      Yes.
11      Q.      Had you already spoken with Dr. Khan's
12 office and University Pain Center?
13      A.      No, that would have been probably right
14 after that.
15      Q.      How were you able to confirm the costs
16 then with Dr. Davy and ask him what he thought if
17 you hadn't already spoken with Dr. Khan and
18 University Pain Center?
19              MR. PLATTA:  Over objection.
20      A.      I asked him what his costs were.
21      Q.      You asked him his costs; but you spoke
22 to him about the other costs University Pain Center
23 and Dr. Kahn's costs?
24              MR. PLATTA:  Over objection.
25      A.      That's correct.  Where he was,
0036
1                   C. KINCAID, PH.D
2 Ms. Frometa received most of her treatment. She
3 receives most of her treatment from dr. Davy and
4 Dr. Krisna.
5       Q.      Where are they located?
6       A.      Dr. Davy is located in Brooklyn at 1513
7 Voorhees Avenue.  I believe that these in Brooklyn
8 as well.
9       Q.      Did you speak with any Brooklyn
10 doctors, pain management doctors?
11      A.      Just the one that I mentioned.
12      Q.      Doing a survey of two physicians, why
13 didn't you speak to any pain management specialists
14 located in Brooklyn?
15              MR. PLATTA:  Over objection?
16      A.      I didn't speak to Dr. Davy.
17      Q.      Other than Dr. Davy, why didn't you
18 speak to any others?
19      A.      I want to get three sources, and those
20 three sources was representative of the
21 New York City area.
22      Q.      Well, the prices could be different if
```

Page 15

0512from.txt
23    we enter into Brooklyn, Queens Staten Island or
24    Bronx; is that correct?
25              MR. PLATTA:  Over objection.
0037
1                   C. KINCAID, PH.D
2         A.      They do vary from a little bit from the
3    people that I interviewed, yes.
4         Q.      Is it fair to say that the costs in
5    Brooklyn are a little cheaper?
6              MR. PLATTA:  Over objection.
7         A.      I think that you're actually wrong.
8    I believe that it was initial $400 with Dr. Davy
9    and Dr. Khan had $350. And $500 University Pain.
10   So there is a range.
11        Q.      Which other people did you speak to
12   when you took a survey number that you were looking
13   to?
14        A.      Are you still talking about pain
15   management.
16        Q.      I think I that we're done with pain
17   management.
18        Q.      Did you talk to anyone else?  Is there
19   anyone else?
20        A.      Not in pain management.
21        Q.      Let get to the other ones.
22        A.      Neurologist.
23        Q.      These sheets that you're reading, I
24   didn't see them in my disclosure.  Are they in
25   there.  I didn't see these.
0038
1                   C. KINCAID, PH.D
2         A.      I don't think that they was sent to
3    you.  This my work.
4         Q.      In the Federal rules we have a right to
5    look at those.  I request that we get that.  It's
6    methodology.
7                 Who else did you speak to?
8         A.      Dr. Weinberg.
9         Q.      Have you ever dealt with Dr. Weinberg
10   in the past?
11        A.      No, I haven't.
12        Q.      What's his address?
13        A.      51st Avenue, NYU medical center,
14   New York, New York.
15        Q.      Did you speak with Dr. Weinberg?
16        A.      No, I spoke with a receptionist.
17        Q.      What was the receptionist's name?
18        A.      I don't have it down.
19        Q.      Now, did any of these doctors send you
20   anything in writing, any faxes, any letters or
21   anything that corroborates all of this information
22   that you're saying that they gave you?
23        A.      No, I did not receive a fax.
24              MR. PLATTA:  Over objection.
25        Q.      Did you receive any letters?
0039
1                   C. KINCAID, PH.D
2              MR. PLATTA:  Over objection.
3         A.      From.
4         Q.      E-mails?
5              MR. PLATTA:  Over objection.
6         A.      No.
7         Q.      Other than you saying that you see to
                        Page 16

0512from.txt

8   him, there is nothing in writing or nothing
9   anywhere that shows this?
10              MR. PLATTA:  Over objection.
11       A.     There is nothing in my file other than
12  my notes as to who I spoke with and the cost that
13  they provided.
14       Q.     The receptionist, you don't know her
15  name?
16       A.     No, I don't.
17       Q.     How long did you speak to her?
18       A.     That would have been approximately five
19  minutes or less.
20       Q.     And what did you ask her?
21       A.     What the fee is or initial consultation
22  and follow-up visits and follow-ups.
23       Q.     And how much was the initial consult?
24       A.     $450.
25       Q.     And follow-ups?
0040
1                    C. KINCAID, PH.D
2        A.     $200.
3        Q.     And then what else, if any other costs?
4        A.     These were the only two costs.
5        Q.     Which other neurologists did you speak
6   to.
7        A.     Roosevelt Hospital Center or the
8   department of neurology.
9        Q.     Who did you speak to there?
10       A.     The receptionist.
11       Q.     What is his name or her name?
12       A.     I didn't write it down.
13       Q.     You didn't know who they were?
14       A.     I didn't ask.
15       Q.     Did you think that it was relevant to
16  find out the name of the person?
17       A.     Sometimes I ask if it's possible.
18  Sometimes they don't want to give their name.
19       Q.     Did this person give their name?
20              MR. PLATTA:  Over objection.
21       A.     I don't recall.
22       Q.     Do you know if any of the people other
23  than the one Marie, did anyone else give you their
24  name?
25              MR. PLATTA:  Over objection.
0041
1                    C. KINCAID, PH.D
2        A.     I have to look through my records.
3   Yes, other people did.
4        Q.     Well, we'll get to those.
5               So talking about the Roosevelt
6   Hospital, what did they give you fees for.
7        A.     Initial consultation and follow-ups.
8        Q.     Over the -- I was just looking in your
9   disclosure.  In the last four years it appears that
10  you testified about 55 times in court?
11       A.     If sounds about right.
12              MR. PLATTA:  You said five years.
13              MR. COFFEY:  Yes, the last four years
14  essentially.
15       Q.     So, that's about only a month a little
16  but more than that.
17       A.     Probably a little bit more.
18       Q.     How many Life Care plans do you prepare
                        Page 17

0512from.txt
```
19        a year?
20            A.      A year.  I probably prepare anywhere
21        from 20 to 25.
22            Q.      So, 20 10 25 life care plans?
23            A.      Yes.
24            Q.      What else do you prepare?
25            A.      Vocational evaluation.
0042
 1                   C. KINCAID, PH.D
 2            Q.      How many vocational evaluations do you
 3        do a yes?
 4            A.      At least twice that number.
 5            Q.      So, that's about forty to 50?
 6            A.      Probably more like 50 to 60.
 7            Q.      And how much do you charge for Life
 8        Care Plan?
 9            A.      It varies. Depends on the amount of
10        hours.  I charge $200 per hour for my services.
11            Q.      How much did you charge for this Life
12        Care Plan?
13            A.      This was $5,000.
14            Q.      So, you spent 25 hours approximately?
15            A.      Yes.
16            Q.      And approximately how much do you earn
17        per year from your testifying or preparation of
18        reports?
19                   MR. PLATTA:  Over objection.
20            A.      How much is my annual salary; is that
21        that what you're asking?
22                   MR. PLATTA:  Personal salary.
23            Q.      The company that you're with, what
24        company?
25            A.      Kincaid Vocational and rehabilitation
0043
 1                   C. KINCAID, PH.D
 2        services.
 3            Q.      Are you owner of that?
 4            A.      Yes.
 5            Q.      Are you shareholder of that?
 6            A.      Yes.
 7            Q.      Are you an officer of that?
 8            A.      Yes, am.
 9            Q.      How would you like be give the income
10        salary?
11                   MR. PLATTA:  Again over objection.
12            A.      Is it something that we could do off
13        the record.
14                   MR. COFFEY:  Off the record.
15                   (Whereupon, an off-the-record
16        discussion was held.)
17            Q.      So, it's fair to say, doctor, that you
18        testify and you prepare these things; is that your
19        main business?
20            A.      No, I can also do career counseling.
21            Q.      How many people do you control counsel?
22            A.      I usually have a case load of half
23        dozen people.
24            Q.      So it's about six?
25            A.      At anyone time.
0044
 1                   C. KINCAID, PH.D
 2            Q.      What else do you have?
 3            A.      Assistant technology evaluation.
                        Page 18
```

0512from.txt

```
 4      Q.      What are they?
 5      A.      That's evaluating people's notes for
 6  technology, either in the work place or in the
 7  home.
 8      Q.      How long have you been doing that for?
 9      A.      A couple of those a month.
10      Q.      A couple of those a month?
11      A.      Yes.
12      Q.      What else?
13      A.      Just primary service.
14      Q.      And then you still though between the
15  vocational evaluations, the life care plans, you're
16  doing about seven of those a month?
17      A.      That's about right, yeah.
18      Q.      In testifying in court is about maybe
19  twice a month?
20              MR. PLATTA: Objection.
21              You already asked. He answered 12 to
22      15 times.
23      Q.      And let's go back to the neurologist.
24  You spoke with a receptionist but you don't know
25  her name.
0045
 1              C. KINCAID, PH.D
 2              Let's go to the next place
 3  Dr. Maymoncol (phonetic).
 4      Q.      Did you speak to Dr. Maymoncol?
 5      A.      No, I spoke with his receptionist.
 6      Q.      On any of these, did you speak with any
 7  of the doctors?
 8      A.      No, I did not. I would have it.
 9  Though don't think that they were available to
10  speak with me.
11      Q.      Other than Dr. Davy, which doctors did
12  you speak to?
13      A.      A psychologist, I spoke with Dr.
14  Stanley Hoffman, PHD. That would be the only.
15      Q.      So, when you speak with Dr. Davy.
16              How did you find him to be? Was he
17  forthcoming with information that you needed?
18      A.      Yes, he was he was very helpful.
19      Q.      Was he a pleasant individual?
20      A.      We had an good converstation.
21      Q.      Dr. Call, what did he charge
22  consultation?
23      A.      $575.
24      Q.      What else?
25      A.      Follow-ups $250.
0046
 1              C. KINCAID, PH.D
 2      Q.      And this is for neurologist, right?
 3      A.      That's right.
 4      Q.      Two hundred and what?
 5      A.      $285.
 6      Q.      And what neurologist is she currently
 7  seeing?
 8      A.      That would be Dr. Krisna.
 9      Q.      How often does she go to Dr. Krisna?
10      A.      Um let's look and see if I made a note
11  of that.
12      Q.      Did you speak with Dr. Krisna?
13      A.      Yes, I did Krisna is every three
14  months.
```

0512from.txt

```
15      Q.      Every three months?
16      A.      Yes, that's right.
17      Q.      And that's for life he recommended?
18              MR. PLATTA:  Off the record.
19              (Whereupon, an off-the-record
20      discussion was held.)
21      A.      Yes, that's through life expectancy.
22      Q.      We went past Dr. Call and then we went
23  to internal medicine?
24      A.      Yes.
25      Q.      Who is she currently seeing
0047
1                   C. KINCAID, PH.D
2   for internal medicine?
3       A.      She not seeing anyone for internal
4   medicine that I'm aware of.
5       Q.      She not see anyone right now?
6               MR. PLATTA:  For internal medicine
7       only, right?
8               MR. COFFEY:  Right.
9       A.      For internal medicine.
10      Q.      Who did you talk to for their costs?
11      A.      Manhattan Internal Medicine Associates.
12      Q.      You spoke to a receptionist?
13      A.      Yes, that's right.
14      Q.      What who else?
15      A.      That's all.
16      Q.      What did they give a cost for?
17      A.      Inital consultation and follow ups.
18      Q.      How much was theirs?
19      A.      $250 for initial consultation and $100
20  for follow-ups.
21      Q.      So every one of these, tis is what they
22  tell you right off of the phone if you call up, it
23  has nothing to do what what the reimbursment would
24  be?
25      A.      Right this is their cost.
0048
1                   C. KINCAID, PH.D
2       Q.      That's their charge, that's not their
3   cost?
4               MR. PLATTA:  Over objection.
5       Q.      It's another suggested retail price?
6               MR. PLATTA:  Over objection to the
7       question or statement.
8       Q.      Is that they're suggested cost?
9               MR. PLATTA:  Over objection.
10      Q.      Their suggested charge; because the
11  charge is different than the cost?
12      A.      Yes, suggested charged.
13      Q.      And suggested charged is changed based
14  upon many factors, correct?
15              MR. PLATTA:  Over objection.
16      A.      It could very well, if people have
17  health care, health insurance typically then that
18  comes down, Medicaid reimbursments is not these.
19              MR. PLATTA:  Over objection.
20      A.      If this is your final reimbursement it
21  would vary, depending on the person's insurance.
22              MR. PLATTA:  If there is one, right.
23              MR. COFFEY: Right if there is one.
24      Q.      And also for cash, it could, if someone
25  wanted to pay cash?
```

0512from.txt
```
0049
 1                    C. KINCAID, PH.D
 2              MR. PLATTA:  Over objection.
 3        Q.    Dr. Davy talked about there is a
 4   different price for cash?
 5              MR. PLATTA:  Over objection.
 6        A.    Yes.
 7        Q.    Did Dr. Davy tell you that there was a
 8   different price for cash?
 9              MR. PLATTA:  Over objection.
10        A.    We didn't discuss that.
11        Q.    So, would that have been a factor if
12   Dr. Davy also has a cash discount?  Would that be a
13   factor in lowering the costs?
14              MR. PLATTA:  Over my objection.
15        A.    It might provide average costs based on
16   the cost centers.
17        Q.    You're talking about what the most cost
18   could be?
19              MR. PLATTA:  Over objection.
20        A.    The average cost.
21        Q.    But if assuming I'm an allowed to ask
22   an expert assumption assume that there is health
23   insurance, would the cose be lower?
24        A.    If we'll be personally reimbursed if
25   the person has either insurance.
0050
 1                    C. KINCAID, PH.D
 2        Q.    To take the cost down?
 3              MR. PLATTA:  Objection.
 4        Q.    So let's take mr. Call has a $575
 5   consult.  You're saying that any insurance carrier
 6   will pay him $575?
 7              MR. PLATTA:  Over objection.
 8        A.    I'm saying that that is the charge that
 9   he indicates for that service.
10        Q.    It's like putting a manufacturers
11   suggested retail price?
12              MR. PLATTA:  Over objection.
13        A.    That's why I refer to the economists to
14   determine any offsets in the charge or the service.
15        Q.    So a economist would be important to
16   getting a final number, yes.
17        Q.    So, in order to get a final number or
18   conclusion you would need an economist?
19        A.    My consult is based on the average
20   average charge for these services, the economist
21   would have to give you the present value with all
22   of the offsets sit.
23        Q.    So all the present values with offsets
24   could be significantly lower than you're doing?
25        A.    I don't know.  That would needs an
0051
 1                    C. KINCAID, PH.D
 2   economist.
 3        Q.    Would you need an economicist to come
 4   up with a final number?
 5              MR. PLATTA:  Over objection.
 6        Q.    You can answer again?
 7        A.    When it reflects all of factors that we
 8   just discussed.
 9        Q.    So, without the economists what
10   conclusion, based upon your numbers in and of
```

0512from.txt

11   itself can one get to?
12         A.     You could get to this is the charge for
13   the services at this frequency and this duration
14   over the person's life time.
15         Q.     If we assume that Dr. Davy testified
16   that Workers Comp., No Fault comes in at an average
17   at half on a lot of these procedures, you're saying
18   that you don't know of that out in the field.  I'm
19   finding that had?
20               MR. PLATTA:  What is the question
21         sorry.
22         Q.     You're saying when you are cost or
23   charges let's say you call in a cost it's not a
24   cost, it's really what a doctor is charging; is
25   that fair to say?
0052
1                     C. KINCAID, PH.D
2               MR. PLATTA:  Over objection.
3         A.     Right, in that sense it with be their
4   charge.
5         Q.     So, when you have a table that that
6   says cost, it's really a charge?
7         A.     It's chared by the physician's but cost
8   to the individual.
9         Q.     What I'm sayinging, let's take
10   Ms. Frometa, if she had No Fault, which I know you
11   know she had No Fault here, the No Fault
12   reimbursement schedule is the same as the charges,
13   you're saying?
14               MR. PLATTA:  You know that No-Fault
15         ends at $50,000.
16               MR. COFFEY:  I know but I'm trying to
17         get to the cost.
18         Q.     Let me ask you this:  When you spoke to
19   any of these providers, did you is ask them what
20   the different rate of reimbursement could be for
21   initial consults?
22               MR. PLATTA:  Over objection.
23         A.     No, I did not.
24         Q.     So that could differ?
25               MR. PLATTA:  Over objection.
0053
1                     C. KINCAID, PH.D
2               Depends on the insurance carrier, if
3         this was there.
4         Q.     And also differ from with someone pays
5   cash over a credit card?
6               MR. PLATTA:  He over objection.
7               You can answer.
8         A.     That's possible.
9         Q.     So is it fair to say doctor, that you
10   could come to a conclusion of ultimate evaluations
11   of an economist?
12               MR. PLATTA:  Over objection.
13         A.     The economist would be important to get
14   it back to present value and take in account all
15   offsets, insurance, no fault and other wise.
16         Q.     So, in addition to just being a factor,
17   it would be necessary to have an economist?
18               MR. PLATTA:  Over my objection.
19         A.     Not to my preparation of live care
20   plan, my part.  I'm providing the services an,
21   average costs in the area.  That's the next step

0512from.txt

22    this bigger picture and to be refined.
23          Q.      So in order for the jury to come up
24    with conclusion, they would need a economist?
25          A.      I think that an economist would help
0054
1                   C. KINCAID, PH.D
2     clarify.
3           Q.      So not only would it help, but it would
4     be necessary to clarify?
5                   MR. PLATTA:  Over objection.
6                   You can answer?
7           A.      It would be someone else that would be
8     able provide to put other factors, that I explained
9     to you.
10          Q.      Or the significant value would be
11    significantly less?
12                  MR. PLATTA:  Or higher.
13          Q.      Or higher?
14          A.      You have to talk to the economist.
15          Q.      So, the goal standard is we need an
16    economist?
17          A.      You needed.
18                  MR. PLATTA:  Over objection.
19          A.      You need the life care manner to
20    prepare the plane for the economist so that they
21    know what the average costs are.
22                  MR. PLATTA:  Counsel, if you want to
23          stipulate to an economist in this case, let me
24          know.
25                  MR. COFFEY:  Okay.
0055
1                   C. KINCAID, PH.D
2                   We'll move on.
3           Q.      Which other doctors did you speak to
4     when say say internal medicine.  Who were the other
5     one?
6           A.      West Side Internal medicines.
7           Q.      Who did you speak to there?
8           A.      Receptionist.
9           Q.      What did he tell you was the charge at
10    the initial consultation, $250?
11          A.      Follow-ups $150, $125.
12          Q.      So, again it was the receptionist?
13          A.      Yes.
14          Q.      Then who is the next one?
15          A.      Dr. Steffon Siegel.
16          Q.      And did you speak to Dr. Siegel or the
17    receptionist?
18          A.      Receptionist.
19          Q.      And what did they get?
20          A.      Initial consultation $250.  Follow up
21    $150.
22          Q.      You're aware of the Federal standards
23    we have the term culmative, where you differ what
24    your term is.  You're opining differs from the
25    treating doctor that actually went in there and did
0056
1                   C. KINCAID, PH.D
2     all of this stuff, where do you differ?
3                   MR. PLATTA:  Are you talking about
4           costs.
5                   MR. COFFY:  Cost anD future life plans.
6           Q.      You're not a physician, correct?
                    Page 23

0512from.txt

```
 7      A.    Yes.
 8      Q.    Where do you say that you have
 9 training, that you're able to opine differently
10 than a treating physician?
11      A.    I'm not opining different than a
12 treating physician.  I'm trained in life care
13 manner.  I'm incorporating a plan, a future plan
14 for Ms. Frometa's needs.
15      Q.    Did you speak to a chiropractor; is she
16 currently going it a chiropractor?
17      A.    No, she's not.
18      Q.    Why would you go to a chiropractor
19 then?  Who says that see needs as chiropractor for
20 life?  You know that the chiropractor was covered
21 by No Fault?
22            He has a chiropractor on his charges?
23      A.    Right.
24      Q.    Does she need a chiropractor.
25            Did anyone say that she needed to go
0057
 1            C. KINCAID, PH.D
 2 see a chiropractor.
 3            Did Dr. Davy say that?
 4      A.    No, see did.  No, he did not recommend
 5 that.
 6      Q.    Did Dr. Krisna recommend that?
 7      A.    No, he it not.
 8      Q.    So which of you her treatments, if any?
 9      A.    They didn't.
10      Q.    So then the chiropractor, she didn't
11 really needs the chiropractor?
12            MR. PLATTA:  Over objection.
13      A.    It was not recommended.
14      Q.    Did you ever speak to Dr. Babu?
15      A.    He was not available to speak to.  He
16 responded by mail.
17      Q.    Is there a letter from Dr. Babu?
18      A.    There is a questionnaire that he filled
19 out.
20      Q.    You have that with you?
21      A.    Yes.
22      Q.    Could I see that.
23            Dr. Babu seems to disagree with some of
24 the Life Care Plan conclusions.
25            Would that be fair to say.
0058
 1            C. KINCAID, PH.D
 2            MR. PLATTA:  Over objection.
 3      Q.    You would have to be more specific?
 4      A.    Dr. Babu only calls for follow up
 5 medical treatment for one year.
 6            MR. PLATTA:  Over objection, within his
 7      field.  Within his report what he signed.
 8      Q.    Neurosurgical report that's what he's
 9 referring to. He's not calling for future
10 surgeries?
11      A.    That's correct.
12      Q.    He's calling for any treatment outside
13 of one another?
14            MR. PLATTA:  You're talking about
15      neurosurgery treatment, not any treatment at
16      all.
17      Q.    Dr. Babu fees, I'm not going into
```

0512from.txt
```
18   specialties?
19              MR. PLATTA:  He's responding.
20        Q.    Dr. Babu sent you back a questionnaire
21   signed?
22              MR. PLATTA:  From him within his
23        specialty.
24        Q.    Is there a coverletter with that?
25        A.    This was what was sent to him.
0059
1               C. KINCAID, PH.D
2         Q.    Did he send you a coverletter with it?
3         A.    No, there is a paragraph that describes
4    the purpose.
5         Q.    Did you incorporate what Dr. Babu said,
6    put it into your final report?
7         A.    Yes I did.  He recommends four
8    follow-up visits for one year.  He recommends
9    physical therapy for one year.  He recommends that
10   she be treated by a pain management specialist.
11   And it says that she's likely to have a normal life
12   expectancy.
13        Q.    So, if he's saying medical treatment
14   for one year, doesn't that differ from her life
15   expectancy?
16              MR. PLATTA:  Over objection.
17              That's his services.  He's talking
18        about what that he provided.
19        Q.    What kind of doctor is he?
20        A.    Neuro surgeon.
21        Q.    Wouldn't it be important to see what a
22   neuro surgeon thinks about pain management?
23        A.    No, they have different specialities.
24   They have different needs.
25        Q.    So, if I could.  Just so we're clear,
0060
1               C. KINCAID, PH.D
2    it says he says follow-up visits four times a year
3    for one year?
4         A.    Yes.
5         Q.    And your thing does say regarding
6    future treatment needs?
7         A.    Yes.
8         Q.    So that would be dr. Babu's opinion as
9    to her future treatment; is that correct?
10              MR. PLATTA:  And Dr. Krisna.
11        Q.    Just talking about Dr. Babu.
12              MR. PLATTA:  Are you talking about the
13        response that he received?
14              MR. COFFEY:  About what's in this
15        document.  This is a three page thing that
16        went over May 1st, the fax says May 1st 101.
17        So he says that see needs only one year in his
18        medical opinion.  It could differ.  She's not
19        limited to his speciality.  That's just
20        something for what his opinion is correct.
21              MR. PLATTA:  What is the yeah, right.
22        Q.    Dr. Babu was sent this questionnaire
23   and he responded to it?
24        A.    Yes.
25        Q.    And he has responded when you asked him
0061
1               C. KINCAID, PH.D
2    questions, you need to obtain updated information
```

```
                          0512from.txt
 3   regarding future treatment needs?
 4        A.     That's right.
 5        Q.     And you were asking how many follow up
 6   visits and he said four times per year for one
 7   year;.
 8               Is that correct?
 9        A.     That's correct.
10        Q.     And you said diagnostic procedure that
11   he recommends, he says none?
12        A.     That's correct.
13               MR. PLATTA:  Within his specialty.
14               MR. COFFEY:  He's a neurosurgeon.  I
15   mean neurosurgery.
16               MR. PLATTA:  Maybe you could establish
17   whether is for surgery.
18        A.     Dr. Davy is a neurosurgeon, that's.
19        Q.     Do you know what Dr. Davy's specialty
20   is?
21        A.     Pain management.
22        Q.     What is his board certification?
23        A.     I think that it would be pain
24   management.  I'm not sure.
25        Q.     What if I say anesthesiologist?
0062
 1               C. KINCAID, PH.D
 2        A.     That makes sense; because pain
 3   management specialists are anesthesiologists.
 4        Q.     They're not spine specialists?
 5        A.     Not usually.
 6        Q.     Here is someone that has a back injury,
 7   that is essentially what we're dealing with in this
 8   case?
 9        A.     Back and neck.
10        Q.     But now if we're going to talk about
11   that.  Dr. Babu is a board certified neuro surgeon
12   correct?
13        A.     Yes.
14        Q.     And he is able to opine on what he
15   believess the future medical needs are?
16               MR. PLATTA:  Over objection.
17               In the field of neuro surgery.
18               MR. COFFEY:  It does say that.
19               MR. PLATTA:  Every doctor would answer
20   the question.
21               MR. COFFEY:  That's your opinion.  I'm
22   saying what I got in questionnaire.
23               MR. PLATTA:  If you want to establish
24   that with the witness.
25        Q.     Did you ask him what type of diagnostic
0063
 1               C. KINCAID, PH.D
 2   procedure did he recommend?
 3        A.     Yes, I did.
 4        Q.     What did he say?
 5        A.     None.
 6        Q.     Did you ask him his thoughts about
 7   follow-up visits?
 8        A.     Yes.
 9        Q.     What did he say in response?
10        A.     He said four visits for one year.
11        Q.     Did you ask him about physical therapy?
12        A.     Yes.
13        Q.     And what did he say?
                                      Page 26
```

0512from.txt

```
14      A.      Three times a month for one year.
15      Q.      Did he recommend occupational therapy?
16      A.      No.
17      Q.      Did he recommend massage therapy.
18      A.      No.
19      Q.      Did he recommend chiropractic
20 treatment?
21      A.      No.
22      Q.      Did he recommend exercise at a local
23 health club?
24      A.      It says no answer.
25      Q.      Not applicable?
0064
1                   C. KINCAID, PH.D
2       A.      Could be, yeah.
3       Q.      Did he talk about any gym that he
4 recommended?
5       A.      He said none.
6       Q.      Medications; did he talk about any
7 medications?
8       A.      He said none.
9       Q.      Did he recommend any future surgical
10 procedures?
11      A.      He said none.
12      Q.      Did he recommend health assistance?
13      A.      No.
14      Q.      Did he recommend that she go to a pain
15 management specialist; correct?
16      A.      That's true, yes.
17      Q.      Did he talk about what complications
18 may develop in the future?
19      A.      He said not none.
20      Q.      Did he anticipate that she would have a
21 normal life expectancy?
22      A.      That's correct.
23      Q.      Then he signed it?
24      A.      Yes.
25      Q.      That's all that we know that he talked
0065
1                   C. KINCAID, PH.D
2 about, right?
3       A.      Yes.
4       Q.      Did you get any other questionaires
5 like that from anyone else?
6       A.      No, I spoke to with them personally.
7 There wasn't time to get the questionaires.
8       Q.      Did those same questions that you asked
9 of all of other doctors?
10      A.      Um, yes, I would have gone through the
11 list with them.
12      Q.      Could I see that?
13      A.      These are my notes.
14      Q.      Let me have this one again?
15      A.      Sure.
16      Q.      When you spoke to Dr. Davy and ask him
17 how many follow up visits, the times per year what
18 did he say?
19      A.      Every six weeks.
20      Q.      For how many years?
21      A.      Six weeks for one year approximately
22 eight times.  And then one time every three months
23 thereafter.
24      Q.      And then every three months for life?
```

0512from.txt

```
25        A.    Yes.
0066
1                    C. KINCAID, PH.D
2        Q.    What type of diagnostic procedure did
3   he recommended?
4        A.    Um, he didn't recommend any.
5        Q.    Did he recommend physical therapy?
6        A.    He did not, no.
7        Q.    I'm going to double check though before
8   I sign-off on that.
9              Actually, he did, as well as Dr. Babu.
10       Q.    Well, Dr. Babu said physical therapy
11  for one year three times a month?
12       A.    Right.
13       Q.    And between the two doctors?
14       A.    Between the two Dr. Davy was one year
15  of physical therapy for one year with three times a
16  month at least.
17       Q.    Did he talk about occupational therapy?
18       A.    Were not recommended.
19       Q.    Massage therapy?
20       A.    Not recommended.
21       Q.    Chiropractic treatment?
22       A.    Did not recommend that.
23       Q.    What equipment did he recommend; any
24  equipment?
25       A.    No, he did not.
0067
1                    C. KINCAID, PH.D
2        Q.    And what medication did he talk about
3   that he was currently prescribing?
4        A.    He talked about four.
5        Q.    She's currently on five medications?
6              MR. PLATTA:  Over objection.
7              Could you tell him?
8        A.    Just let me check my records here.
9   Yes, she's on five, Lyrica, Baclofen, Opana,
10  Amitriptyline and Esgic plus.
11       Q.    When you came up the costs of computing
12  the meds sheet, how did you come up with the meds?
13       A.    Also different sources for those.
14       Q.    Are we done with the doctors or do you
15  still have more that you spoke to?
16       A.    More.
17       Q.    Which other ones that you spoke to?
18       A.    That relate to Life Care Plan there are
19  psychiatrist, psychologist.
20       Q.    I see a pediatrist.
21       A.    But it wasn't used.
22       Q.    What would you have read that would
23  have been useful for pediatrist?
24       A.    She indicate difficulties during her
25  own self care, bending to take care of her feet or
0068
1                    C. KINCAID, PH.D
2   nails; but that wasn't something that I included in
3   the report.
4        Q.    Which other doctors?
5        A.    Psychologist, psychiatrists.
6        Q.    But there is no claim for psychiatric
7   if this matter; are you aware of that?
8        A.    Um, no, I wasn't.
9        Q.    So I'm saying who speak to you about
```

Page 28

0512from.txt
```
10  getting psychologist or psychiatrists involved?
11       A.    Dr. Krisna.
12       Q.    Had he recommended or referred her to
13  one?
14       A.    No.
15       Q.    So it's not in the records anywhere.
16       How did this come out?
17       A.    Sure.  It came out in my interview with
18  her.  The tests that I did, her expressions of
19  depression.
20       Q.    But now are those subjective or ob
21  objective findings?
22       A.    Well, the objective part would be the
23  need to be clarified through clinical tests.
24       Q.    It's a subjective almost to someone,
25  something to questions in a test; that true?
0069
1              C. KINCAID, PH.D
2              MR. PLATTA:  Note my objection.
3       Q.    The person is asked to answer
4  corrective to the test and in the course of probing
5  with their symptoms and following some depression.
6  I'm trying to verify it during the process. She's
7  going to you, her attorney setting up an interview
8  with you.  She's knows that you're there, you're
9  disclosed for trial for damages; but there is a
10  subjectiveness to that; is that correct?
11             MR. PLATTA:  Over objection.
12             What is your question.
13       Q.    Isn't there a subjectiveness to the
14  tests?
15             MR. PLATTA:  Over objection.
16       Q.    What you call a psychiatry screening?
17       A.    The person is asked to answer
18  corrective, that's why it's only an indication.  It
19  would have been verified through a clinician for
20  their tests.
21       Q.    Where are her tests and where are the
22  results?
23       A.    She hasn't been.
24       Q.    From the test that you administered.
25       A.    It probably took about five to ten
0070
1              C. KINCAID, PH.D
2  minutes.
3       Q.    Who said that she needed to get MRIs
4  done of lumbar and cervical spine?
5       A.    That would have been Dr. Krisna.
6       Q.    Ancd what kind of Doctor?
7       A.    A neurologist.
8       Q.    Did you speak to him and come up with
9  these?
10       A.    Yes, that's correct.
11       Q.    Did you factor in that Dr. Babu said
12  zero?
13       A.    Yes.
14       Q.    Where does that come in; because it has
15  recommended by Dr. Krisna and has to recommended
16  that Dr. Babu says zero.  So, it would seem those
17  numbes would be cut in half?
18       A.    I say who recommends the service so
19  that the reader would know where it's coming.
20       Q.    Where does it say not recommended by
              Page 29
```

```
                            0512from.txt
21  Dr. Babu?
22                  MR. PLATTA:  Over objection.
23      Q.      Does it say that anywhere?
24      A.      It says who it's recommended by.
25      Q.      Why is there no notation?
0071
1                    C. KINCAID, PH.D
2                   MR. PLATTA:  Over objection?
3       A.      The table that you're referring to has
4   only names of doctors that you actually
5   recommended, if someone didn't recommended that
6   they won't be there.
7       Q.      You gave a report, it's a complete
8   report, correct?
9       A.      It's a report used to prepare the Life
10  Care Plan.
11      Q.      You said that you factor it in, how did
12  you factor it in?
13                  MR. PLATTA:  Over objection.
14      Q.      Did you believe Dr. Krisna over Dr.
15  Babui?
16      A.      I represented who is recommending it
17  and the factor.
18      Q.      You said you factored it in, what
19  factor and, where does to show you that you
20  factored in that Dr. Babu said zero for future
21  diagnostic film and I didn't see it here.
22                  MR. PLATTA:  Over objection?
23      A.      Maybe the word factor I looked at all
24  of the machines what's in the plan are the services
25  that are recommended, not one that are not
0072
1                    C. KINCAID, PH.D
2   recommended.
3       Q.      If someone disagrees with
4   recommendations, it's not included?
5                   MR. PLATTA:  Over objection?
6       A.      If he had recommended I would have his
7   name as well.  Whoever recommended the services is
8   indicated as recommended by.
9       Q.      So one doesn't recommend it's not
10  relevant for your Life Care Plan?
11                  MR. PLATTA:  Over objection?
12      A.      That's not included in the column.
13      Q.      It's not noted any where unless there
14  is something that I missed.
15              Is there something that I missed in the
16  disclosure.
17                  MR. PLATTA:  It actually states who
18      recommended, diagnosed by.
19      Q.      That wasn't provided in the disclosure,
20  nothing that someone doesn't agree with.  I receive
21  a Life Care Plan that talks about what's
22  recommended and read Dr. Babu, and you can say he
23  is a specialist but Dr. Babu happens to have a
24  totally different opinion of what your Life Care
25  Plan is.  And I have to cross examine to find this
0073
1                    C. KINCAID, PH.D
2   out.  That's where I have a right to find out under
3   Federal rules.
4       Q.      Where does it get factred in?
5                   MR. PLATTA:  Over objection.
                            Page 30
```

0512from.txt
```
 6      A.      I've asked all of the physicians what
 7   they're recommending, the services that they're
 8   recommending.  Go to the Life Care Plan my file is
 9   open.
10      Q.      Your file is open.  It should have been
11   disclosed.  This is not in your disclosure?
12      MR. COFFEY:  I have a right to anything
13   relied upon this within.
14      MR. PLATTA:  Of course you have to.
15      MR. COFFEY:  Not the deposition at the
16   disclosure they're totally different.  I have
17   a right in the Federal court under the rules
18   to have anything included in the disclosure.
19      Q.      Is it fair to say that Dr. Babu does
20   not agree with your Life Care Plan?
21      MR. PLATTA:  Over objection?
22      A.      The life care take into account all of
23   the treating physicians, some of their
24   recommendations.
25      Q.      You disregard some of them.
0074
 1              C. KINCAID, PH.D
 2      A.      His recommendations are include, as
 3   well as the other physicians.
 4      Q.      Where are his recommendatoins included
 5   in the Life Care Plan specifically?
 6      A.      Let me get those tables.
 7      Q.      Where it says four times for one year?
 8      A.      Yes.  Yes, on Page 8 of the tables.
 9   Neurosurgeon.
10      Q.      Where is it included?
11      A.      Under physical therapy three times
12   monthly for one year.
13      Q.      Does it say anywhere that he says said
14   that there is no need for future surgical
15   procedure?
16      MR. PLATTA:  Over objection.
17      Could I see this piece of paper.
18      (Witness complying.)
19      MR. PLATTA:  Read back the question.
20      (Whereupon, the referred to testimony
21   was read back by the Reporter.)
22      MR. PLATTA:  Over objection.
23      You can answer.
24      MR. PLATTA:  Again, we're taking about
25   Life Care Plan.
0075
 1              C. KINCAID, PH.D
 2      MR. COFFEY:  You can call it Life Care
 3   Plan, whatever you like.  It's not this big
 4   mythical thing I'm asking about you
 5   incorporated it when you did your report.
 6      Q.      Were you aware that Dr. Babu said there
 7   is no need or future surgical procedures; yes or
 8   no?
 9      A.      Yes.
10      MR. PLATTA:  Over objection.
11      Q.      So, he has a opinion different than
12   Dr. Davy and Dr. Krisna; is that correct?
13      MR. PLATTA:  Over objection.
14      A.      Yes, they each in their own specialties
15   have different recommendations.
16      Q.      He's a neurosurgeon, spinal
```
Page 31

0512from.txt

```
17      neurosurgeon; is that correct?
18          A.      That's correct.
19          Q.      So he didn't agree that there was a
20      need for a neuro stimulator; you didn't see that in
21      his response; did you?
22                  MR. PLATTA: Over objection.
23          A.      I saw Dr. Davy who is pain management
24      specialist, who recommended that type of services.
25          Q.      You have medical experience now?
0076
1                       C. KINCAID, PH.D
2                   MR. PLATTA: Over objection.
3           A.      (No response.)
4           Q.      Are you qualified as a doctor?
5                   MR. PLATTA:  Over objection;.
6                   Asked and answer?
7           A.      No, I'm not.  I've reviewed many pain
8       management specialist reports.
9           Q.      But that doesn't make you an expert
10      with pain management; does it?
11                  MR. PLATTA: Over objection.
12          A.      No, I'm not an expert in pain
13      management.
14          Q.      You're not an expert in treating the
15      spine, correct?
16          A.      That's correct.
17          Q.      So Dr. Babu is a board certified
18      neurosurgeon, you don't disagree with that correct?
19          A.      No, I don't disagree.
20          Q.      So, a spine surgeon does opine about
21      the spine and treatment of the spine; is that
22      correct?
23                  MR. PLATTA:  Over objection?
24          A.      That's correct.
25          Q.      So if Dr. Babu, if there was a need for
0077
1                       C. KINCAID, PH.D
2       surgery or procedure or anything like that, he was
3       asked that question and said no?
4           A.      That's correct.  He said not to future
5       surgical.
6                   MR. PLATTA:  Within his field.
7           A.      Within his field, right.
8           Q.      You're saying that neurostimulator is
9       not surgery?
10                  MR. PLATTA: Over objection.
11          Q.      I'm asking what he's trying to say.
12                  MR. PLATTA:  He's listing every
13      procedure that he has.
14          Q.      What are saying?
15          A.      Surgery to plant a device which stops
16      pain signals an giving hopefully relieve to the
17      individual.
18          Q.      That's not spine surgery according to
19      you?
20                  MR. PLATTA:  Over objection.
21          Q.      Are you saying it's a spine surgery.
22                  MR. PLATTA:  Over objection.
23          A.      It is a surgery.
24          Q.      So, are you're saying that Dr. Babu as
25      a spine surgeon cannot, with any certainty opine
0078
1                       C. KINCAID, PH.D
                            Page 32
```

0512from.txt

```
 2    with someone's spine?
 3                  MR. PLATTA:  Over objection.
 4         Q.      Have you ever been involved in Aubart
 5    A-U-B-A-R-T (phonetic)?
 6         A.      No.
 7         Q.      Has anyone made any claims to you
 8    testifying on a Aubart basis?
 9         A.      No, they have not.
10         Q.      Never seen one motion that was filed by
11    our firm against any matters that you've been on?
12         A.      No, never.
13                 MR. PLATTA:  Over objection.
14         Q.      Okay.
15                 Would you be surprised if I were to
16    have any motions regarding Aubart challenges that
17    have been against us.
18                 MR. PLATTA:  Over objection.
19         A.      Never seen one.
20         Q.      Has anyone ever told you about any?
21                 MR. PLATTA:  Over objection.
22         A.      Never.
23         Q.      When we talk about Dr. Krisna?
24                 MR. PLATTA:  Counselor, are you saying
25          that there is something that was not disclosed
0079
 1                      C. KINCAID, PH.D
 2          from the Plaintiff's counsel; is that what
 3          you're referring to.
 4                 MR. PLATTA:  No.
 5         Q.      My question is with regard to
 6    Dr. Krisna, how long did you speak with him?
 7         A.      About 15 to 20 minutes.
 8         Q.      What did you go over with him.
 9                 Do you have notes of what you talked
10    about?
11         A.      Yes.
12         Q.      Where are they?
13         A.      Davy or Krisna.
14         Q.      I'm talking both of them; because I
15    haven't seen either of them.
16         A.      (indicating).
17         Q.      So you have the Aides For Independence,
18    none of doctors recommended that?
19         A.      No, I recommended them.
20         Q.      So you would disagree with the doctors?
21         A.      No, I won't.  It's not a disagree, part
22    of my expertise in assistive technology.  A
23    certified assistant technology practitioner.  So I
24    understand that specialty.  I have the expertise to
25    recommend those kinds of devices.
0080
 1                      C. KINCAID, PH.D
 2                 MR. PLATTA:  Over my objection.
 3         Q.      But none of the physicians recommended
 4    them?
 5                 MR. PLATTA:  Over my objection.
 6         A.      No, they did not indicate them.
 7         Q.      Now, I'm reading your notes about the
 8    home health aide, and almost one million, if you
 9    start figuring out 1.5 million dollars where you're
10    adding is home health?
11         A.      Yes we.
12         Q.      It says that indicated in the
```

0512from.txt
13  assistance home health aide, now I don't see
14  anywhere where it says full-time.  You have down
15  almost $38,000, $37,830 a year?
16        A.     Yes.  It's four to eight hours a day,
17  seven days a week.
18        Q.     Now, with Dr. Davy he says he was not
19  sure if she needed home health care at this type
20  and Dr. Babu does not agree with that.  So is it
21  fair to say that is a different range of opinions
22  on this?
23        MR. PLATTA:  Over objection.
24        A.     I do not.  Who agrees with that
25  recommendation and who recommends it.
0081
1               C. KINCAID, PH.D
2        Q.     And stop people disagree with it?
3        MR. PLATTA:  Note my objection.  He
4  didn't express that opinion, just Dr. Krisna.
5        Q.     Not express that opinion, meaning that
6  you don't agree with it?
7        MR. PLATTA:  Over objection.
8        Q.     I mean, yes or no, there was not total
9  agreement within that; is that correct?
10        MR. PLATTA:  Over objection?
11        A.     I asked ask them what they recommended
12  and they did not recommend two.  Dr. Krisna said it
13  would be necessary.
14        Q.     He didn't say it would be necessary, he
15  say that --  he said that the assistance of a home
16  health aid if she don't continue to receive help
17  from family.  That does not say that she should
18  have four to eight hours a day, seven days a week
19  on a ongoing basis; did he say that?
20        A.     We discussed a range it.  It's my notes
21  are there; but I would have told him given him
22  ranges.  And we have agreed to this range.
23        Q.     Your notes say something a little
24  different.
25        MR. PLATTA:  Over objection.
0082
1               C. KINCAID, PH.D
2        MR. COFFEY: Off the record.
3        (Whereupon, an off-the-record
4  discussion was held.)
5        Q.     Did you talk that him about that?
6        A.     I talked to him about the need of home
7  health aide.
8        Q.     Does she still have a driver's license?
9        A.     Yes, she does.
10        Q.     Does she still drive a motor vehicle?
11        A.     I think that she said she very rarely
12  drives.  She still does drive on occassion.
13        Q.     Does is she leave her home?
14        MR. PLATTA:  What do you mean?
15        Q.     Does she leave her house?
16        How does she get to see you?
17        A.     Various appoints she has to go to,
18  sure.
19        Q.     Does is go to them?
20        A.     Medical appointments.
21        Q.     And she's able to go there on her own.
22        MR. PLATTA:  You're asking something
23  that would be within the knowledge of my
               Page 34

0512from.txt
```
24        client not an expert.
25        Q.      You said earlier that see came to your
0083
1                         C. KINCAID, PH.D
2    office by herself; is that your testimony?
3         A.      She walked into the office by herself,
4    apparently she was transported by someone else.
5         Q.      How do you show she was transported by
6    someone elsewhere?  Do you know that?
7         A.      She didn't say who transported her.
8         Q.      What did she say?
9         A.      She said she very rarely drives and
10   needed someone to drive her.
11        Q.      Did she say that someone transported
12   her there on that day?
13        A.      On that day, yes.
14        Q.      Does it note that in your report?
15        A.      I don't believe that I did.
16        Q.      So, you're saying that she needs this
17   home health care four to eight hours a day seven
18   days a week on an ongoing basis for the rest of her
19   life?
20        A.      That's the opinion.
21        MR. PLATTA:  Okay; asked and answered.
22        Q.      That opinion. Is that the opinion of
23   Dr. Krisna?
24        A.      That's the opinon of Dr. Krisna but not
25   in my notes.
0084
1                         C. KINCAID, PH.D
2         Q.      It's different than what your notes
3    say?
4         MR. PLATTA:  Over objection.
5         A.      It doesn't say the exact number of
6    hours, but just that he agrees with the service,
7    but I recall the conversation that it was
8    reasonable.
9         Q.      What did you write down in your notes
10   the important part of conversation?
11        A.      Those are the things that I noted down.
12        Q.      Well, the thing that would be the one
13   point, what you're recommending.  There is no
14   clarity in your notes about that.
15        MR. PLATTA:  Counselor you can ask
16   Dr. Krisna.  You would have a chance to
17   cross-examine him.
18        Q.      I'm asking the doctor.  He's making his
19   conclusion on that.
20               Is there some other note that I'm not
21   seeing or is that it?
22        A.      This is the sum of my notes.
23        Q.      What percentage of people in your life
24   care plans do you recommend home health care for?
25        A.      Percent.
0085
1                         C. KINCAID, PH.D
2         Q.      More than 90 percent of them?
3         A.      I wouldn't say that.
4         Q.      More than 80 percent?
5         A.      I really never looked at percentages.
6         Q.      Let's go back in some of these case.
7    Just you just testified two weeks also three weeks
8    also Adams verses Verizon lines; do you remember
```
Page 35

0512from.txt
```
 9    that case?
10         A.     Yes.
11         Q.     Did you recommend a health aide there?
12         A.     I would have to look at the cause.
13         Q.     Bromore versus Lanwards (phonetic).
14                Did you recommend health care there?
15         A.     I don't believe.
16         Q.     So.
17         Q.     Marion verses United States of America;
18    do you remember that case?
19         A.     Yes.
20         Q.     Did you recommend home health aide
21    there?
22         A.     I don't believe there is as life care
23    there.
24         Q.     Code ^ inaudible.
25                Do you remember that matter?
0086
 1                  C. KINCAID, PH.D
 2         A.     Yes.
 3         Q.     Did you recommend a health aide in that
 4    matter?
 5         A.     No.
 6         Q.     Biner verses New York stock Exchange
 7    (phonetic)?
 8         A.     I don't recall.
 9         Q.     That was with my office with Matt Ross?
10         A.     Yes.
11                That case I don't remember if I
12    recommended home health aide or not.
13         Q.     Again Dinkser (phonetic); divorce case?
14         A.     Divorce case.
15         Q.     Reinvak verses Florida?
16         A.     Divorce.
17         Q.     Anonymous?
18         A.     Same, says a mistrail.
19         Q.     Harrington verse J.A. Jones?
20         A.     I don't recall.
21         Q.     Webster verses 711 out in New Jersey?
22         A.     I believe so.  There was some T B I.
23         Q.     Now, were you aware of that she weapon
24    back to work /T-R a period of time as both as you
25    /STPAOU ward discuss at Rick and Rick /-S calf have
0087
 1                  C. KINCAID, PH.D
 2    describe after this accident.  I would /STKR to
 3    look at the would be.
 4         Q.     I /WAP you /AOUPL that she did would
 5    that beep me /AOS capable the takes care herself?
 6                MR. PLATTA:  Before the accident.
 7         Q.     After the accident?
 8         A.     No /EURPL a look the individual as they
 9    are presently.
10         Q.     When -- are you going to meet with her
11    again?
12         A.     I have no plan to.
13         Q.     So, then there was really just prepared
14    for this litigation your report?
15                MR. PLATTA:  Over objection much
16         obviously Counsel he's he expert it was
17         retained./PO are purpose.
18         Q.     You were retained as an expert?
19         A.     I was retain today Life Care Plan in
                          Page 36
```

0512from.txt
20   for for /PH-T that.
21          Q.     As a litigation to /TPEF.Court /-PB
22   over objection there a privilege conversation.
23          Q.     When you /SPAO /EB to Mr. Pat at.
24          Q.     Did you knee you were going to be
25   called a X /SPER in matter /-RPLT I know that it
0088
1                C. KINCAID, PH.D
2    was a litigation platter that would be presented to
3    in court.
4           Q.     Okay.
5           Q.     Did you speak to some psychologists /-S
6    an psychiatrists.  Let's go back to that.
7           Q.     Do you they she ever ^ ~'s ^ ~s'
8    psychiatric /TKREUFRT or sky /KOLG gist.  Not
9    /THAEUP ^ ~'s ^ ~s' wear?
10          A.     Lynn /TPHARDZ /HOLS man and I speak
11   with the ^ figure ^ if anything /-S refer tall /-S
12   ^ sister ^ center /SEUPBDZ vernacular end /TKPWHR-S
13   you ever spoken any of that's doctors offs before
14   in preparation of any Life Care Plan?
15          A.     /H-P often F F /PHRAFPL.  N.
16          Q.     Which other doctors?
17          A.     Rosa /SREPT hospital ^ sister ^ center
18   autopsy spoke with Diane -- last one is H A U.S. M
19   A N /-P a spoke Diane.
20          Q.     And who else?
21          A.     Stanley Hoffman person eel Lee about
22   his services.
23          Q.     And then psychiatrist.  Dr. Mill ton S
24   I'm R O TA, Sol cities psychiatric consume /-S Dr.
25   V A TS A L, TH A K K A R, Dr. ^ Rose ^ rose than R
0089
1                C. KINCAID, PH.D
2    O N E N last name H /*FPL Z A M I.
3           Q.     That's fine /-P we are going back
4    through let's talk about your /TROUGS on vocation
5    ago an Rehabilitation services a Life Care Plan is
6    I dynamic document based upon ^ pub ^ public
7    standard of practice what are the public standard
8    of practice?
9           A.     Those would be through the life care
10   plans /OERB action.  What are they, what
11   documents.  I might have have to provide a list for
12   you ^ there ^ in could you provide that list for me
13   it's part of disclosure /SWUR ^ ~'s ^ ~s' supposed
14   to give me all of the document that you re lieu
15   upon citizen /TEUF I can data and everything that
16   you reviewed on so if is a published standard of
17   practice if I could get that I would /PROERB either
18   ^ there ^ in /PWHRO makes that ^ pub ^ public
19   standard of practice?
20          A.     That's the life care plans
21   associations.
22          Q.     That's a document. Yes,
23   ^ they're ^ their avail cable ^ threw ^ through the
24   association there is also standard as available
25   ^ threw ^ through the enter national /SOERBG action
0090
1                C. KINCAID, PH.D
2    of Rehabilitation professionals.
3           Q.     If you could?
4           A.     Which I could provide.
                        Page 37

0512from.txt
```
 5       Q.       If you could that would be great un the
 6   Federal standard we have a right to everything if
 7   we could get that published standard of practice
 8   would pee excellent.  The data a /TPHAL sigh which
 9   data did you and lies?
10       A.       Medical records.
11       Q.       What else.  I used the inform retained
12   during the tip ter view I also Yoo laced the I'm
13   put from the physicians treats
14   ^ figure ^ if anything /-GS and I also utilize the
15   research that I did into the cough /TPH-S the local
16   area.
17       Q.       Would you have a chronic health care
18   need have you a foot note cop pain /-DZ definition
19   of /AOUPB verses tear of nor that at American act
20   relife care plan nurse?
21       A.       Yes.
22       Q.       Could you give eye company over that
23   other than the foot number neither what the did he
24   ever /TPHEURB un is?
25       A.       Yes.
0091
 1                 C. KINCAID, PH.D
 2       Q.       It doesn't have that what data
 3   specifically is.  Know, you say that the cost
 4   figures are based upon current Ray if the New York
 5   east coast region it's really you're specifically
 6   spoke to people in Manhattan isn't that correct
 7   /-BT Manhattan and Brooklyn.
 8       Q.       Well, other than Dr. Chris that an
 9   Dr. Davy did you speak to any provide I outside of
10   Manhattan.
11       Q.       If you're talking about physicians stop
12   of the other services though were in the Brooklyn
13   area?
14            MR. COFFEY:  I don't care about the
15   psychiatrist.  I care about the physicians.
16            MR. PLATTA:  Psychiatrist are MDs.
17            MR. COFFEY:  Some are MDs or
18   psychologists, right.
19       Q.       Stanley Hoffman, that's a psychiatrist
20   in Brooklyn?
21       A.       I don't see anything else.
22       Q.       It also says Dr. Turail, figures to be
23   determined by economist.  So we go back to that.
24   Also you said that you need an economist in this?
25       A.       To bring it back to present value and
0092
 1                 C. KINCAID, PH.D
 2   factor in the other future value and any oversets.
 3       Q.       What are offsets?
 4       A.       That would be other means of paying for
 5   the services.
 6       Q.       Do you know whether she applied for
 7   Social Security disability, no, she hasn't, that
 8   I'm aware.
 9       Q.       What is Social Security disable?
10       A.       That's a Federal program through the
11   Social Security administration that provides income
12   for individuals if it's Social Security disability
13   they would have to, I believe it's 20 credits
14   credit to quality.  And they're provided with
15   income based upon their amount of money
                                  Page 38
```

0512from.txt
```
16     contributed.
17         Q.      Do you know if she is eligible for
18     that?
19         A.      A person with her type of disbility she
20     could definately apply.
21         Q.      Do you know if she has applied?
22         A.      Not that I'm aware of.
23         Q.      That would be an offset?
24             MR. PLATTA:  Over objection.
25         A.      If she's accepted, there is medical
0093
1                   C. KINCAID, PH.D
2      insurance through special disability.
3          Q.      Does she have Medicare or Medicaid as
4      insurance?
5          A.      Not that I aware if she applied for any
6      other insurance.
7          Q.      Does she have any other health
8      insurance that she told you.
9          A.      Not that she told me about.
10         Q.      Did she tell you at any time that she
11     had been involved in a subsequent motor vehicle
12     accident in March of last year?
13         A.      No.
14         Q.      Did you review her employment records
15     in any way that shows a motor vehicle accident?
16         A.      No, I did not review her employment
17     records.
18             MR. PLATTA:  Again, Counselor, just a
19         reminder he's a vocational expert, Life Care
20         Plan expert, that's why there is no subsequent
21         in the report.
22             MR. COFFEY:  That's your opinion.
23             Off the record.
24             (Whereupon, an off-the-record
25         discussion was held.)
0094
1                   C. KINCAID, PH.D
2          Q.      Physical limitations, was this part of
3      her questionnaire.
4          A.      It was part of the interview process
5      questionnaire about her.
6          Q.      Able to lift, sit, climb?
7          A.      Yes.
8          Q.      This is based upon these questions?
9          A.      Yes, and some would be from the medical
10     record, but primarily.
11         Q.      But also said she has difficulty
12     driving more than one hour.  So she's able to
13     drive, if it's less than one hour?
14         A.      She drives up to one hour and then it
15     becomes more pain?
16         A.      She said that she has difficulty
17     driving at all, but one hour is her max.
18         Q.      Now, it she had migraines headache,
19     there is no one in the medical record that talks
20     about migraines.
21             Did you review anything any medical
22     records that said migraine are related to this?
23         A.      That was in complaints, which I need to
24     record; but didn't provide for that in the Life
25     Care Plan.
0095
```
                          Page 39

0512from.txt

```
                          C. KINCAID, PH.D
 1
 2        Q.      You didn't see anything, not one bit of
 3   medical records talking about migraine headaches
 4   being related to the accident?
 5        A.      No, I would have referred to physicians
 6   for that.
 7        Q.      Now, talking about --
 8        A.      She says she has pain; but she is
 9   performing her home making duties.  She does do
10   things.  She does have limits and she requires
11   extensive help.
12        Q.      Now, it says that you say it the
13   pertinent medical history.  She has no previous
14   medical history prior to the motor vehicle
15   accident.  Did she tell you of subsequent motor
16   vehicle accidents?
17        A.      No, she did not.
18        Q.      Now, did you ever review her
19   pharmaceutical records from the pharmacy where she
20   goes?
21        A.      I have physical therapy, chiropractor.
22   No, I did not get those.
23        Q.      Wouldn't they be important?
24        A.      They would be another factor, if they
25   were available.
0096
                          C. KINCAID, PH.D
 1
 2        Q.      But they weren't available?
 3        A.      No, they did not happen.
 4        Q.      Now, let's talk about provider
 5   comments.
 6                In the report you don't have anything
 7   from Dr. Babu; why is that?
 8                You have provided comments men from
 9   Dr. Davy and Dr. Krisna, how come there is no
10   provider comment from Dr. Babu?
11        A.      I do say that it was provide --
12   information was provided, but right here I have at
13   the last paragraph, middle, Dr. Babu recommended
14   four follow up visits at his office for the next
15   year and physical therapy three times a month for
16   one year.
17        Q.      Is it fair to say that under "provider
18   comments" you're really only writing down what they
19   recommend, not that what contraindicate?
20                MR. PLATTA:  Over objection.
21                That's correct.
22        Q.      Now when we talk about Option B in your
23   home health care assistance?
24        A.      Yes.
25        Q.      It talks about starting at age 55.
0097
                          C. KINCAID, PH.D
 1
 2   What doctor talked about it should change at age
 3   55.  That was with Dr. Krisna.  And it's also in
 4   terms of Life Care Plan itself.  It's provided
 5   another option if she didn't need it or had
 6   continued to get assistance.
 7        Q.      Well, is there a thought that put a
 8   neurostimulator in this and all of this stuff makes
 9   her better?
10                MR. PLATTA:  Objection.
11        A.      I don't know, but it could happen.
                          Page 40
```

0512from.txt
```
12              MR. PLATTA:  Over objection.
13              I would have to refer to the physician
14       for that.
15          Q.     So, if you differ to the physicians and
16  the treatment is successful, there would be no need
17  for health care?
18              MR. PLATTA:  Note my objection.
19          A.     It can be a wide range in successful, I
20  don't know.
21          Q.     So, a week after a neurostimulator
22  would be put in it would be too soon?
23              MR. PLATTA:  Note my objection?
24          A.     You said that based on that the
25  neurostimulator is good, it provided success in
0098
1                    C. KINCAID, PH.D
2   pain reduction and improving functions in -- sorry,
3   what is the question right now?
4          Q.     I want you to assume that you
5   neurostimulator in successful in providing pain
6   reduction and improving function, could we assume
7   that?
8          A.     Yes.
9          Q.     If we assume that, why do you say that
10  there City is the need for health care aid?
11          A.     It would be starting at a later age.
12          Q.     Which doctor said that if there was a
13  need, if it was successful for future home health
14  care aid?
15          A.     I discussed it with Dr. Krisna.
16          Q.     And he said that age 55?
17          A.     He said that's an age that would likely
18  to occur.
19          Q.     Is it reflected in your notes anywhere
20  age 55?
21          A.     No, it's not.
22          Q.     But you remember now that he said that?
23          A.     I remember, that's why I put it in the
24  plan.  If it's not successful -- she would need to
25  immediately start at her current age.  If the
0099
1                    C. KINCAID, PH.D
2   condition still could deteriorate and she could
3   take it later.  That was the extent of the
4   discussion.
5          Q.     Or it could be Option C that it was?
6              MR. PLATTA:  Are you talking about
7       something that is in the report?
8              MR. COFFEY:  That's noticed.
9          Q.     Could be successful and won't need it?
10          A.     You would have to talk to the
11  physicians about that.
12          Q.     Now, your conclusions about
13  significantly or permenantly successful, that is
14  based upon your review of the medical records, you
15  can't conclude that?
16              MR. PLATTA:  Over objection.
17          A.     It's based upon my review of the
18  medical records.
19          Q.     So, that's really something that is
20  best left to the physicians that are going to
21  testify?
22          A.     That's correct. That would be their
                        Page 41
```

0512from.txt
```
23   decision.
24        Q.     You're not going to opine?
25        MR. PLATTA:  Over objection.
0100
 1                 C. KINCAID, PH.D
 2        Q.     In the same with the updated that at
 3   the medical services are a direct result of
 4   injuries to the cervical spine and lumbar spine,
 5   you're not reflecting causation; that's left for
 6   the doctors to opine?
 7              MR. PLATTA:  Over objection.
 8        A.     Yes, the doctor would decide causation
 9   and it will reflect whatever is read in the medical
10   records.  That they would be the ultimate deciders.
11        Q.     Just the decision of it requires
12   continued follow-up care from treating physicians,
13   therapists and other medical providers.
14              They'll ultimately opine that
15   themselves at trial you are not able to conclude
16   what she does on doesn't.  You're assuming saying
17   what you essentially put together, you marked all
18   of this, and that's what you are saying your
19   conclusion is?
20        A.     In a discussion with the doctor.
21        Q.     Based upon your discussion with the
22   doctor.  Not that you're saying she needs this, you
23   can only say based upon your discussion with the
24   doctors?
25        A.     That's correct.
0101
 1                 C. KINCAID, PH.D
 2        Q.     Now, her future life expectancy, where
 3   did you get that from, which table?
 4        A.     It National Vitals Statistics Center
 5   For Disease Control.
 6        Q.     Now, your cost when you came up, these
 7   costs on the different things on the Life Care
 8   Plan, let's take the cost of $416 per year of the
 9   life care?
10        A.     Page 1.
11        Q.     When you came to the average area
12   costs, are those the costs of three medical
13   providers?
14        A.     Yes, averaged.
15        Q.     So you average those, and these other
16   tables that talk about averages?
17        A.     Are there other bodies that come up
18   with average costs, like the Federal Government
19   does the state costs.
20        Q.     Isn't there tables of average costs?
21        MR. PLATTA:  Over objection.
22        A.     Yes, there is reflexes within her local
23   area.
24        Q.     But now you're saying that the other
25   costs were regionalized?
0102
 1                 C. KINCAID, PH.D
 2        A.     Yes.
 3        Q.     What company comes up with the
 4   regionalized costs?
 5        A.     There were American Medical
 6   Associations.
 7        Q.     American Medical Associations?
```

0512from.txt

```
 8       A.    Yes.
 9       Q.    And so your cost could differ from the
10  American Medical Association?
11             MR. PLATTA:  Over objection.
12       A.    Without reviewing, I couldn't say yes
13  or no.
14       Q.    So, would it be fair to say that there
15  is also a data at the American Association that we
16  could look at?
17             MR. PLATTA:  That's not what the expert
18       says.
19       Q.    Would some of these different items of
20  service be covered in the American Association
21  rates?
22             MR. PLATTA:  If you know.
23       A.    I would have to look at the tables
24  again.
25             MR. COFFEY:  Thank you.  We're done.
```