1

8988FRO1

1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   ADONNA FROMETA,

4
                    Plaintiff,
5
            v.                              07 CV 6372 (HB)
6
    MARIO E. DIAZ-DIAZ and
7   ALL AMERICAN HAULERS RECYCLING,

8                   Defendants.

9   ------------------------------x

10                                          New York, N.Y.
                                            September 8, 2008
11                                          10:30 a.m.

12
    Before:
13
                            HON. HAROLD BAER
14
                                            District Judge
15                                          - and a jury -

16
                            APPEARANCES
17
    SLAWEK W. PLATTA, PLLC
18          Attorneys for Plaintiff
    BY:   SLAWEK W. PLATTA
19
    WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
20          Attorneys for Defendants
    BY:   STUART A. MILLER
21          MICHAEL W. COFFEY

22

23

24

25

8988FRO1

1          (Case called)

2          THE DEPUTY CLERK:  Counsel for the plaintiff please

3     state your name for the record.

4          MR. PLATTA:  Slawek W. Platta for plaintiff Adonna

5     Frometa.

6          THE DEPUTY CLERK:  Counsel for defendants.

7          MR. COFFEY:  Good morning, your Honor.  Michael Coffey

8     and Stuart Miller of the law firm Wilson Elser.

9          THE COURT:  I ordered a jury because I saw they came

10    in.  In fact, a gigantic jury was going out so I wanted to be

11    sure that we had some people.

12          The first order of business, I think, is a letter that

13    I got from Wilson Elser, which seems to ask for exactly what I

14    denied, which was I have no interest in an expert, but I have

15    no desire to preclude the plaintiff from testifying about her

16    psychological injuries.  So you could do something with this

17    letter, but I have one idea for you, but I will not share it at

18    the moment.

19          Let's look at the others.  I see that there is a new

20    request from the plaintiff regarding a criminal record.  I

21    haven't seen the criminal record, but I have heard about it,

22    and so far as I am concerned, it's totally irrelevant.  So it

23    will not be admitted.

24          There was another request intending on using stripper.

25    We could have a good discussion about whether stripper or

8988FRO1

1    dancer or exotic dancer or stripper is appropriate.  I am

2    really perfectly happy with dancer and that's my decision on

3    that position.

4         With respect to the other motions in limine, although

5    I have some writing in an exercise of efficient trials, I am

6    going to just read you my decisions.  If you care to see the

7    decision, I may actually share it with you on paper in the near

8    future, but not right now.

9         The motion to preclude plaintiff's employment records

10   is denied with redactions.  If you show me the employment

11   records, I will be glad to help you do the redactions.  Again,

12   it has to do with the stripper and the dancer and the legs on

13   the table.

14        In any event, I am denying the Daubert hearing because

15   I think the life care plan from Dr. Kincaid and his credentials

16   are sufficient to avoid Daubert, and I am admitting it.  So the

17   motion is denied.

18        The next motion is for reimbursement of Dr. Kincaid's

19   surcharge.  I have no problem about that so I am denying the

20   defendants' motion on that score.

21        Defendants' motion to preclude diagnostic film by Dr.

22   Babu I am also denying.

23        Defendants' motion to preclude testimony of Defendant

24   Diaz-Diaz I am denying, but we can talk about that some more if

25   necessary, but it's not a big deal, and as you know and have

4

8988FRO1

1   heard three or four times from my clerk, if not from me, I

2   really much prefer, not because I care, but the jury, it seems

3   to me, much prefers live testimony.  So if the witness is

4   available and within 100 miles, that's my preference.

5        The motion to preclude testimony of representatives

6   from Geico Insurance and Carolina Casualty, I am denying the

7   Geico motion.  Therefore, that witness may testify.  I am

8   granting the Carolina motions.  So the Carolina adjuster may

9   not testify.

10       Finally, there is a defendants' motion to preclude

11  testimony of a representative from State Farm, and I am

12  granting the defendants' motion on that score.

13       I think my clerk may have told you that I am perfectly

14  happy to have a voucher or bill or list of whatever was done to

15  the car introduced in some fashion, but I don't need another

16  insurance adjuster.  When I was in the Supreme Court and seemed

17  to be trying these cases every day, we hardly let the word

18  insurance cross the mouth of a witness, but things have

19  changed.  In any event, that's my decision.

20       With respect to the various trial exhibits, in order

21  to avoid the problems that emerge when I let the people argue

22  in front of the jury about admissibility, I have taken that

23  project over myself.  So I sure hope you have a piece of paper

24  because here we go.

25       Plaintiff's 1 is admissible.

8988FRO1

1           Plaintiff's 2, 3, and 4 is admissible.

2           With respect to 5, the surgical film, I think is

3      admissible, but I will show you my decision which I have just

4      given you on that issue.

5           P-6 is admissible.

6           The deposition transcript of Frometa, which is P7, may

7      be used only during cross-examination for impeachment, etc.,

8      etc.

9           P-8 is admissible.

10          P-9, which is a deposition transcript of Dr. Davy, the

11     transcript may be used only during cross, again, for

12     impeachment purposes.

13          P-10 is the deposition transcript of Dr. Ranga

14     Krishna.  The transcript, again, may be used only during cross

15     and only those portions used during cross will be admitted in

16     evidence.

17          P-11 is Ramesh Babu, and again, the transcript may be

18     used but only during cross.

19          P-12 is Charles Kincaid's with a similar ruling.

20          P-13 are eight photographs of plaintiff's vehicle.  I

21     am going to let that in, although, I must say, it goes to the

22     serious injury, but it doesn't go very far, but under the

23     federal rules it would be admissible so I am certainly not

24     going to argue with the federal rules.

25          The police report is very -- well, I am going to let

6

8988FRO1

1    it in because I don't think it's prejudicial.  I don't think it

2    shows very much, but maybe it helps the force and site and

3    impact and damage.  It certainly is admissible under 403.

4            Keep in mind, gentlemen, that we are only trying

5    damages here.  So P-15 through P-24 are all admissible.

6            P-25 is admissible.

7            I guess P-26 I have a question mark about, but I will

8    resolve it as we go along.

9            P-27 is inadmissible.

10           P-28 is inadmissible.

11           P-29 is admissible.

12           P-30 is admissible.

13           Defendants' Exhibits A, B, C and D are admissible.

14           E is admissible, but again, the transcript can be used

15   only during cross.

16           Similar ruling with respect to Defendants' F, the

17   deposition of Andrew Davy.

18           Similar ruling with respect to D-G, which is a

19   deposition transcript of Krishna.

20           D-H there is no objection.

21           D-I is admissible with certain redactions.

22           J is admissible.

23           K is admissible.

24           Then there is a variety of stipulated trial exhibits.

25   I have no desire to waste my breath on them, but I hope you

8988FRO1

1  know what they are because, in fact, if you don't, the other

2  side obviously will bring you to task if you object to the

3  stipulated trial exhibits.

4       That takes care of the housekeeping matters except for

5  jury selection, which you should know in advance I provide each

6  lawyer with about 10 or 15 minutes, preferably 10, to see if he

7  can bond with the jury in that length of time, and it also

8  protects me because if I have left anything important out, you

9  will undoubtedly cover it, one side or the other.

10      I am ready to go.  What about any of your concerns

11  that remain, if any do?

12      OK.  Bring in the jury.

13      MR. COFFEY:  One question.  You admitted the Geico

14  no-fault records.  What is the purpose of the admission of the

15  Geico no-fault records?

16      THE COURT:  There is no real feeling that I think it

17  has to happen.  I thought it was a new statute.  But if it's

18  not, certainly don't do it on my account.

19      MR. MILLER:  The issue on the Geico records is that

20  they subpoenaed the Geico representative to show that no-fault

21  medical records were paid.  The position is that we don't doubt

22  that the records were made, the medical bills were paid and the

23  treatment occurred, but they are trying to use that as a basis

24  that the injuries are causally related and it would be highly

25  prejudicial to allow a no-fault adjuster --

8

8988FRO1

1          THE COURT:  As long as we agree that this is serious

2     injury, I don't need any of that.

3          MR. MILLER:  It's not a serious injury.  That's the

4     major issue of the case.

5          THE COURT:  I didn't offer it.

6          MR. MILLER:  OK.  The doctors that are here,

7     plaintiff's counsel brought the treating doctors, so an

8     adjuster who has to pay a bill in 30 days or deny a bill in 30

9     days, who makes no determination of causation, will certainly

10    not be in any better place to determine whether or not these

11    injuries were sustained by the motor vehicle accident.

12          MR. PLATTA:  The testimony of the Geico representative

13    will actually go to the issue of basic economic loss that was

14    met in this case.  My client exhausted her no-fault policy

15    limits and therefore she will be entitled to any constant

16    future economic damages resulting from this case.  Without the

17    testimony of the Geico representative, I will not be able to

18    prove this.

19          THE COURT:  Well, I will think about it.  He is not

20    first on your list.

21          MR. PLATTA:  That's correct.

22          MR. SCAHILL:  Francis Scahill.  I represent State

23    Farm.  We had a conference call the other day on this case and

24    you asked me to bring down a representative of State Farm.

25    This had to do with an insurance dispute regarding additional

9

8988FRO1

1    insurance coverage.  I have the representative from State Farm.

2    You precluded the testimony from that witness.  I would ask

3    that we be excused at this point.

4            THE COURT:  Anybody have a feeling that we need to

5    keep the State Farm people here?

6            State Farm, you're the people who insured -- that may

7    be Carolina, that insured the individual defendant?

8            MR. SCAHILL:  We had the driver's personal automobile

9    policy.  There was a disclaimer issued on that point.

10           THE COURT:  Gone.  Go.   Thanks.

11           MR. COFFEY:  We have no objection.

12           MR. PLATTA:  Actually, I have objection regarding

13   this.

14           THE COURT:  Fine.  It's so noted.

15           I am going to dress for the occasion, but bring them

16   in, please.

17           MR. PLATTA:  There was one more issue.  I would like

18   to request that the subpoenaed records be delivered to the

19   court, unless you would like me to bring them myself.  They are

20   in Room 270.

21           THE COURT:  I am not getting them.

22           MR. PLATTA:  I would like to do that myself.

23           THE COURT:  You can do it at lunchtime.

24           MR. PLATTA:  Your Honor, I didn't realize they would

25   not be delivered automatically to the courtroom, and I will

8988FRO1

1      need them for the presentation and for the witness testimony in

2      the morning.

3              THE COURT:  Here is the jury.  You decide.  If you

4      want to go down there, go ahead.  We will all wait for you.

5              Maybe you can get Dennis to go.

6              (Jury selection commences off the record)

7              (Continued on next page)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

898AFRO2ps

```
 1          (Jury not present)

 2          MR. COFFEY:  Your Honor, we have one quick scheduling

 3    matter with the Court?

 4          THE COURT:  Yes.

 5          MR. COFFEY:  Plaintiff has his first two expert

 6    physicians waiting outside right now.  He has two more coming

 7    tomorrow morning, and we have three expert physicians.  And

 8    your Honor wanted -- we're trying to get the case done within

 9    the three days.  So I was just wondering, would you want the

10    defendants to schedule two experts for tomorrow afternoon?

11          THE COURT:  I want to get finished with this case by

12    tomorrow afternoon.

13          MR. COFFEY:  OK.

14          THE COURT:  Do anything you can to expedite this

15    operation.  I don't care what it is.  It doesn't matter to me

16    the way in which they come or they don't come.  I don't care if

17    they're out of turn.  I'm glad to accommodate experts if they

18    have a problem in terms of scheduling, but I'm glad to take

19    them out of turn if in fact it will move the case along.

20    You're the only one who knows...

21          MR. COFFEY:  We will finish them tomorrow.  My only

22    question, and I guess the Court is -- I will have all three

23    experts here tomorrow in addition to the plaintiff's two more

24    that he's bringing.  But since I'm the defendant, I am just

25    asking the Court, will we be able to accommodate those doctors
```

898AFRO2ps

1   and get them in in the one day, then?

2           THE COURT:  Fine with me.  It has to do both with

3   cross and direct.  As far as I'm concerned, I really am -- I

4   can't remember a case in which an expert took more than an hour

5   and a half.  And I'm glad to go as late as we need to go.  So I

6   don't think you have a problem on that score.

7           MR. COFFEY:  That's fantastic.  Thank you, your Honor.

8           MR. PLATTA:  Your Honor, just one more question.

9           THE COURT:  Yes.

10          MR. PLATTA:  Can my expert be present in the courtroom

11  right now or should they be excused?

12          THE COURT:  No, keep them out.  Didn't you hear my

13  Bible story?

14          MR. PLATTA:  I did, your Honor.

15          THE COURT:  Less true with experts, but it's-- it just

16  makes it easier for everybody to feel comfortable, I think.

17          (Jury present)

18          THE CLERK:  Is the jury satisfactory to the

19  plaintiffs?

20          MR. PLATTA:  Yes, your Honor.

21          THE CLERK:  Is the jury satisfactory to the

22  defendants?

23          MR. COFFEY:  Yes.

24          THE CLERK:  Will the jurors please rise for a moment.

25          (Jury of 8 sworn)

898AFRO2ps

```
 1              THE COURT:  All right.  We're going to try and do both
 2     this preliminary charge and opening before lunch.  And we have
 3     an hour to do that.  So I hope it will work.  Or almost an
 4     hour.  But the preliminary charge is fairly important, so
 5     please listen carefully, as I expect you will, to everything
 6     that's said in this courtroom -- well, maybe not everything.
 7              In any event, do not discuss this case with anybody
 8     from here on in, and in fact not even amongst yourselves.  The
 9     time will come when you can talk to one another to your heart's
10     content about this case, but you can't talk about the case
11     while it's going on.  And in fact you can't talk to anybody
12     else about it either.  So that includes husbands, family of any
13     sort or description.  And if at any time during the course of
14     this trial any person attempts to talk to you about the case,
15     please let me or my deputy clerk know.  And that means in the
16     courtroom or out of the courtroom.
17              Let me explain on that score that the attorneys and
18     the parties are not supposed to talk to the jurors, not even to
19     offer a friendly greeting.  And indeed, you are to stay away
20     from them, too.  My guess is that if you're outside at the same
21     time as one of the lawyers and you're looking for an elevator,
22     that they will, if they're smart, let you go first.  If they're
23     not smart, wait till the next elevator.
24              In this connection, we try and move this case quite
25     quickly.  So in my view, when we do take a recess, there may be
```

898AFRO2ps

```
 1    questions of law that are really for me and not for you.  So at
 2    recess time, since we don't have sidebar conferences unless
 3    there's an emergency, go out with some expedition so we have
 4    the time to talk to the lawyers if in fact they need it.  I
 5    think, in addition, even if there is a conference at the
 6    sidebar, which, as I say, I can't remember the last one, it
 7    will take no more than a couple of minutes.  So we will keep
 8    moving right along.  And indeed, even with respect to
 9    objections, the lawyers will simply give a ground in a word and
10    I will rule and we will keep going.
11           On that score -- well, not exactly -- if you see or
12    hear anything about this case outside the courtroom -- and I
13    doubt that this will generate any immediate publicity, but if
14    it should, just put it down or turn it off, because in fact
15    you're supposed to make your decision solely on the basis of
16    the evidence in this case that you hear in this courtroom and
17    nowhere else.
18           Let me tell you a little bit about how this operation
19    works when it works, and it seems to work pretty well or has
20    for a few hundred years.  I told you at the outset that you are
21    the exclusive judges of the facts.  And that continues to be
22    something of great significance.  Essentially, it means that
23    both with respect to the credibility and the facts themselves,
24    you have to make a determination as to who's telling you the
25    truth.  We'll talk more about that at the charge.  But let me
```

898AFRO2ps

1    tell you how this goes from the beginning.

2            The plaintiff has the burden of proof.  The burden of

3    proof in a civil case is very different than on TV.  It is not

4    proof beyond a reasonable doubt.  It's simply a preponderance

5    of the evidence.  And that means that if you were to put the

6    plaintiff's proof and the defendant's proof on a scale and the

7    scale on the plaintiff's side weighed heavier by the slightest

8    amount, that would mean that the plaintiff has shouldered its

9    burden of proof -- not if it's even, but if the plaintiff has

10   got just a smidgen more, then he has essentially carried his

11   burden of proof.

12           The trial begins with openings, and the plaintiff, who

13   has the burden of proof, opens first.  And then the defendant

14   opens.  He need not open, because he has no burden.  But it's a

15   rare day indeed, I have found, where you give a lawyer a chance

16   to speak and he turns you down.  So the likelihood is you will

17   hear from both sides.

18           Thereafter, the plaintiff will examine his witnesses,

19   and the defendant, after the plaintiff concludes his direct,

20   will have the opportunity to cross.  And that will go on until

21   the plaintiff finishes its case.  And then the plaintiff will

22   rest and the defendant, if it chooses, will mount a defense,

23   and there will be the same kind of cross and direct, only

24   starting with the defendant.

25           Then, when both sides have rested, there will be

898AFRO2ps

1    summations.  Opening statements are really usually quite brief.

2    They are really like a map of what each side is going to prove.

3    They are not argument.  They are not rhetoric.  They are simply

4    like a map to show you where you're going and hopefully where

5    the party who's talking to you is going, or goes.

6            I think probably you should know that opening

7    statements and closing statements are not evidence, so that

8    while you can ask for almost anything when you go in the jury

9    room, you can't ask for openings or closings, getting the

10   transcripts, because in fact they are not evidence.

11           I think we should talk a little about direct versus

12   circumstantial evidence.  We'll talk more about it in the

13   charge portion.  But direct evidence is evidence of something

14   that the witness sees or hears or smells, something that your

15   senses get a chance to recognize.  Circumstantial evidence is

16   inferential.  That is, there's an old story that judges used to

17   tell me when I was in both their seats.  And it goes like this.

18   It's not a very good story, but anyhow:  If you get on the

19   subway at 86th Street and you go down to 59th Street and you

20   see people coming on the subway with raincoats and umbrellas

21   and water dripping off of those raincoats and umbrellas, and

22   you go down to 42nd Street and you see more of the same, you

23   can draw the inference that in fact it was raining if you were

24   on the sidewalk.  And that is essentially what circumstantial

25   evidence is.  And it's as good and as valuable as any other

898AFRO2ps

1        kind of evidence, including direct evidence.

2                I told you about the importance of credibility.  And I

3        can't emphasize it enough.  And I want you to consider only the

4        evidence, and nothing you may have learned elsewhere when you

5        consider this case.  But that doesn't mean you should leave

6        your common sense at the door, or your life experience.  That's

7        why we have different kinds of jurors from different places, so

8        in fact we get a potpourri of thoughts and views.

9                All right.  Keep an open mind until all the evidence

10       is in.  Do not make up your mind after you hear opening

11       statements or the first witness.  It never works.

12               All right.  I think that's enough, at least for now.

13       If the plaintiff is ready, you may open.

14               MR. PLATTA:  Thank you, your Honor.

15               Your Honor, counselors, ladies and gentlemen, members

16       of the jury:  This is a motor vehicle accident, as your Honor

17       described to you before.  It happened on February 14th of last

18       year, more than a year and a half ago right now.  But the

19       injuries to my client were severe enough to bring this lawsuit.

20               What happened that night, when she was driving back

21       home, she was rear-ended, with huge force of impact, by a

22       sanitation truck.  She was driving a Toyota 4 Runner, pretty

23       neat car.  You will see the damage to this car, how it looked

24       after the accident.  You will see and will be able to decide

25       whether it substantiates what happened to her afterwards, what

898AFRO2ps                    Opening - Mr. Platta

1   kind of treatment she had to undergo.

2        She was immediately taken from the scene of the

3   accident by ambulance to the Cabrini Hospital.  At that time

4   the defendant, who created the accident, was still at the

5   scene.  Right before that, the gentleman drove his sanitation

6   truck, lost control, and hit my client.  He did not pay

7   attention to the way he was driving in bad weather conditions.

8   And Honorable Judge Baer already decided that this defendant is

9   100 percent negligent.  You don't even have to think about it

10  anymore.  My client is absolutely nothing wrong.  She was

11  stopped at the red light.  She was just at the wrong place at

12  the wrong time.  It could happen to anyone or people present

13  here.

14       Unfortunately, this happened to my client.  And this

15  is the only chance where she can bring her action.  And she can

16  show you what kind of injuries she sustained as a result of

17  this accident, how serious the injuries were.  And you will

18  hear the testimony of almost all her treating doctors.  You

19  will hear the testimony of the surgeons that operated on her.

20  You will hear the testimony of the neurological doctor, who

21  will also testify about her neurological damages.  And you will

22  also hear testimony of the defendant as to the way the accident

23  happened, and at the very end you will also hear the testimony

24  of my client, who will tell you in her own way what is she

25  going through in her own life.

898AFRO2ps                    Opening - Mr. Platta

1          A person's life is not about a story, where you can
2     break something or not.  Once you get injured, once you have
3     surgery, it's serious.  You can no longer work if you have to
4     have surgery, after which you're not coming back to normal.  My
5     client did not come back to her usual life after she had the
6     surgeries.  She has tried.  She tried to come back to her work
7     after the accident.  And you will hear this from her, that she
8     was working two jobs at the time of the accident and she was
9     trying to maintain her normal lifestyle.  Even though there was
10    pain, there was suffering, she still was trying to go forward,
11    not sue anyone, just go forward with her life.  At some point,
12    when the pain became unbearable -- and you will hear this from
13    her testimony -- she sought medical attention.  She had to
14    undergo massive treatment to her spine.  She had several
15    surgeries to her spine.  And even though if you look at her
16    today, she seems pretty normal, what she had done to her body
17    to make her look like this today, you will decide yourself what
18    kind of treatment it was and what kind of injury it was.
19         And I will ask you to pay very careful attention to
20    the testimony of doctors, of doctors who treated her for over a
21    year, who saw her many, many, many times, and who decided that
22    she needs surgeries, who decided that she needs further
23    treatment.
24         At the end of her case you will also hear testimony of
25    the doctor who was retained by her, an expert, an expert who

898AFRO2ps                    Opening - Mr. Platta

1    will basically tell you what is the life plan for Ms. Frometa,

2    and you will hear from his testimony that because of the

3    attempts that she had to go forward with her life and the

4    surgeries she went through and the treatment that wasn't

5    successful until today, she requires further treatment, and he

6    will tell you exactly how much it's going to cost her.

7              I can tell you only this, that she has exhausted any

8    possible way to pay for her treatment, and you will hear this

9    from the testimony of the witnesses here.  You will also see

10   the exhibits that I have prepared for this trial, exhibits

11   presenting to you the surgeries that she went through.  I want

12   to make sure that even though I know that some of you have

13   medical background, that you will still pay attention to the

14   doctors who will be testifying and you will use your own common

15   sense to come up with your conclusions.

16             At any point, I don't want you to forget, why are we

17   here.  And there is just one reason:  One person, the

18   defendant, did not pay attention.  For a moment of time, he

19   disregarded everything, was driving too fast.  He was driving

20   recklessly.  And he created an accident.  And Judge Baer

21   already decided that it was, again, absolutely his fault?  You

22   don't have anything about liability.  The only question is the

23   damages that he created with the injury, and can you give a

24   fair compensation to the client of mine, to Ms. Frometa, who

25   came here today and went through all this pain and suffering as

898AFRO2ps                    Opening - Mr. Platta

1    a result of her serious injury, and please ask yourself if you

2    can give her a fair day of trial.  That's all she is asking

3    for.  As I said before, she is not going to come back here.  It

4    is her only chance to present the case.  And there is nothing

5    more than a person who cannot really speak otherwise but

6    through the system.  And she is one of them.  And she had a

7    very difficult life.  She was doing whatever she can to support

8    her and her family.  And she didn't ask for this accident.

9    Believe it or not, people do have accidents that are created by

10   others.  And even though we might think that the system

11   sometimes doesn't work -- and I agree that -- it still doesn't

12   mean that Ms. Frometa is not entitled to fair compensation at

13   the end of the case.

14        You will hear during the trial that once she was taken

15   by ambulance to Cabrini Hospital, she spend there pretty much a

16   couple of hours.  She had had an x-ray of her head, which

17   turned out to be negative.  There were no injuries to her head,

18   thank God.  Then the doctor, and you will hear this from her

19   testimony, told her that she should watch herself, but she

20   should try to come back to her life.  She did.  She got back to

21   work.  She went back to, actually, both occupations.  She was

22   also a flight attendant at that time.  She started, she was

23   called as a flight attendant after the accident.  She was

24   trying to do whatever she can to support herself and not become

25   a burden to the system.

898AFRO2ps                    Opening - Mr. Platta

1          She was like that for another couple of months, up

2     until the time when she couldn't take the pain anymore.  She

3     was missing time from work.  She couldn't work her normal week.

4     And she has to have a surgery done to her lower back.  And you

5     will hear from testimony of Ramesh Babu -- he is a neurosurgeon

6     from NYU Hospital -- what kind of surgery she went through.

7     You will also see exhibits and pictures that depict the

8     procedure.  And you can only think how much painful this can

9     be.

10          After that, she had additional treatment.  She was

11     going for physical therapy from chiropractors pretty much all

12     the time.  She had seen pain management doctor, who was trying

13     to help her with her pain.  He actually did another surgery to

14     her neck.  And he will explain, and you will see this also in

15     the chart, what kind of surgery was it.  And at the end I will

16     ask you to think, how much pain has the person gone through in

17     order to go through such treatment.  Not only that, after she

18     had this second surgery, she still feels pain.  Those surgeries

19     did not help her significantly enough to go forward with her

20     life.

21          The next thing she has, there is what's called a

22     neurostimulator implant.  It's an implant of a neurostimulator

23     that goes into your spine.  You actually get specific equipment

24     implanted into your body that goes deep into your spine from

25     her lower back and up to your neck.  The doctors will explain

898AFRO2ps                    Opening - Mr. Platta

 1    how does it work and how painful it can be.  This was supposed

 2    to help her.  And you will hear from her testimony how much she

 3    feel today.  You will also hear from the doctors that will be

 4    testifying today and tomorrow what kind of injections to

 5    alleviate the pain she had.  And you will find out that the

 6    treatment that she went through was, first, very painful, had

 7    some results, but it didn't bring her back to the time she was

 8    prior to the accident.  And all she is asking for today is for

 9    you to make it even.  It's the only day for you, jurors, to

10    make sure that if someone does something wrong, it doesn't go

11    without punishment.

12         THE COURT:  You're going to have an opportunity to sum

13    up.

14         MR. PLATTA:  Sure.

15         THE COURT:  But this isn't it.

16         MR. PLATTA:  Thank you, your Honor.

17         Ladies and gentlemen, I will ask you to pay close

18    attention to the doctors who treated her.  You will also hear

19    the testimony of defendant experts, who were hired for this

20    case, who saw my client once.  And you will hear from their

21    testimony.  And you can justify then, based on what you hear,

22    on the testimony of the defense witnesses, whether there were

23    doctors who treated her for a continuous period of time, in

24    surgeries on her, operated, what you do to someone who suffered

25    for a long time and was hired to come here and tell what you he

898AFRO2ps                    Opening - Mr. Coffey

1    was supposed to say.

2              Thank you very much.

3              THE COURT:  I presume it's true that this sanitation

4    truck was not a city truck.  Is this a private hauler.  Is that

5    right?

6              MR. PLATTA:  Yes, that's correct, your Honor.

7              THE COURT:  Very well.  You may open if you chose.  I

8    gather you choose.

9              MR. COFFEY:  I'll choose.  I think it's hard for any

10   attorney not to speak when they have an opportunity to speak,

11   so...

12             THE COURT:  Yes, that's certainly my experience.

13             MR. COFFEY:  Forgive me.  I have a Brooklyn accent, so

14   I apologize if that accent at times comes through.

15             But this case is about what you're going to see and

16   what you're not going to see.  We don't have some fancy

17   diagrams to come in and dazzle you.  But I do tell you, look at

18   that blank screen right now.  There's a couple of things that

19   you have to understand you're not going to see.  You're not

20   going to see any records about the motor vehicle accident that

21   plaintiff was involved in in Los Angeles before this accident.

22   You're not going to see any records or any testimony about the

23   motor vehicle accident that she was in within one month after

24   this accident.  You're also not going to see any records about

25   a third motor vehicle accident that she was in, in August of

898AFRO2ps                    Opening - Mr. Coffey

1    2007, four months after this accident, in New Jersey.

2            So what's important is, like I say, it's not what you

3    see, it's what you're not going to see.  So when you listen to

4    all the doctors, when you listen to Dr. Babu, Dr. Krishna, and

5    the third one, you listen to all three of plaintiffs's doctors,

6    concentrate on the histories.  Think what Ms. Frometa told them

7    when the history came up.  Was she truthful about her Los

8    Angeles accident?  Was she truthful about her March accident?

9    Was she truthful about her New Jersey accident?

10           So it's not only, like I said, it's what you hear, and

11   what you don't hear.

12           Also, the other thing is, our client conceded

13   liability, so that we didn't --

14           MR. PLATTA:  Objection, your Honor.

15           MR. COFFEY:  The Judge ruled on it.

16           THE COURT:  It's going to come out the same way as you

17   put it.

18           MR. PLATTA:  But the defense never conceded liability,

19   your Honor.

20           MR. COFFEY:  We conceded it.  There was no finding.

21   We conceded liability.

22           MR. PLATTA:  Your Honor, there was a decision of your

23   Honor --

24           THE COURT:  Overruled.

25           MR. PLATTA:  -- deciding summary judgment.

898AFRO2ps                    Opening - Mr. Coffey

1          THE COURT:  When I say Overruled, that means you sit

2     down.

3          MR. PLATTA:  Thank you.

4          MR. COFFEY:  We're not here because we're trying to

5     fight about liability.  There's a police report.  So just to

6     disagree with the opening, you have police-report evidence you

7     can look at.  The police report is going to show what our

8     client said, that Ms. Frometa pulled out in traffic in front of

9     him.  He had a 60,000-pound truck.  He slid on the brakes -- it

10    was snowing -- slid on ice and hit her in the rear.

11         MR. PLATTA:  Objection, your Honor.

12         THE COURT:  Please don't do the liability part now

13    that you've conceded it.

14         MR. COFFEY:  Yes, your Honor.

15         So you can look at that.  But now what you're going to

16    see, and what our position is, what we disagree with is,

17    there's going to be questions posed to you about, were we a

18    proximate cause or the proximate cause of the accident.  Our

19    answer to that is, no, we are not.  That's what we object to.

20    We believe that the proximate cause of the injuries they're

21    complaining about, there's three other potential causes: the

22    motor vehicle accident in California, the March accident, and

23    the August accident.  But we're not.

24         We're going to present testimony.  You're going to

25    hear from Dr. Rothman, Lewis Rothman, a radiologist.  We're

898AFRO2ps                    Opening - Mr. Coffey

 1    bringing him in.  He looked at the films.  He's

 2    board-certified.  He's going to tell what you he looked at and

 3    what his opinions are.  You're going to hear from Steven Crane,

 4    a board-certified orthopedic surgeon.  He's going to tell you

 5    what he looked at.  He's going to tell you his conclusion.

 6    What I'm telling you is not evidence.  I'm just telling you

 7    what you're going to hear and marshaling it for you.  You're

 8    also going to hear from Dr. Robert April, a board-certified

 9    neurologist.  He's going to tell you about his position on a

10    life care plan; he doesn't think that a lot of these things are

11    necessary.

12         So that's where we really disagree here about the

13    proximate causation.  That's what we need you for.  It's not

14    about punishing or doing anything other than deciding proximate

15    causation and, if we are responsible, how much are we

16    responsible for.  That's where we can't agree.  And that's what

17    we think is going to come out.  Dr. Rothman is going to tell

18    you he doesn't believe there's a causal relationship between

19    the motor vehicle accident and these injuries that she had.

20    Dr. Crane is also going to say there's no causal relationship

21    between her lower back problems.

22         So, again, what we're asking you to do, we didn't ask

23    you to check your common sense at the door.  Bring your common

24    sense in here.  And, you know, you've got to determine

25    truthfulness, credibility, if people were telling the truth, if

898AFRO2ps                    Opening - Mr. Coffey

1    people were hiding the truth, and if they were hiding the

2    truth, what's the motivation for that.  And that's really where

3    we need your help.  And like I say, I don't want to belabor it,

4    but I thank you very much.  My clients thank you.  And thank

5    you.

6            THE COURT:  I should tell you that there are three

7    things that constitute evidence, since both lawyers alluded to

8    evidence that they were going to produce.  One of them is the

9    testimony that you hear from the witness stand, coupled with

10   questions that are put to the witnesses.  The second are the

11   exhibits.  And to make things flow, I have already ruled on all

12   the exhibits.  Otherwise you can sit here for hours listening

13   to them argue -- as you can tell, they're not bad arguers --

14   about what was admissible and what wasn't.  And the third are

15   stipulations, which in this case are significant, at least in

16   number.  I have no idea what they are about.

17           So keep your eye on those three balls.  Because those

18   are the only balls that you're going to be seeing, at least in

19   this courtroom.

20           All right.  Let's go to lunch.  We'll see you all at 2

21   o'clock.  Remember, do not discuss the case amongst yourselves

22   or with anybody else.

23           (The jury left the courtroom)

24           THE COURT:  I think it's very difficult in these cases

25   to distinguish between liability and damages in terms of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

898AFRO2ps                    Opening - Mr. Coffey

1    testimony, but you fellows better learn how over lunch,

2    especially the defendant.  I don't want to hear a word about

3    that accident.  Got it?

4            MR. COFFEY:  Yes, your Honor.  I was, just so -- I was

5    rebutting plaintiff, who brought that up.

6            THE COURT:  It doesn't seem to me that he's likely to

7    bring it up again.

8            MR. COFFEY:  Thank you, your Honor.

9            THE COURT:  Have a good lunch.  See you all.

10           (Luncheon recess)

11           (Continued on next page)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

8988FRO3

```
 1                    A F T E R N O O N   S E S S I O N
 2                              2:10 p.m.
 3              (Jury not present)
 4              THE COURT:  Mr. Platta, I wasn't sure you understood
 5      what I said to the jury, which was meant to counsel as well,
 6      and that is, in case you missed it, that we don't have
 7      objections telling me in detail what your problem is.  We have
 8      a one-word objection, like hearsay, of which there should be
 9      very few since I have already ruled on all the exhibits.  Keep
10      it in mind.
11              Bring them in.
12              (Jury present)
13              THE COURT:  You can call your first witness, Mr.
14      Platta.
15              MR. PLATTA:  Thank you, your Honor.
16              I would like to call Mr. Diaz-Diaz as my first
17      witness.
18              THE COURT:  The jury wanted to know if they could take
19      notes.  My only concern about taking notes is that I can't let
20      one of you take them.  So the government is springing for eight
21      pads.  It doesn't mean you have to use them.  It just means
22      that it makes me feel better that somebody doesn't go back in
23      the jury room and say, It happened like this, I have got it
24      right here in black and white, and then the other six or seven
25      of you look askance.
```

8988FRO3

```
 1   MARIO DIAZ-DIAZ,

 2        called as a witness by the plaintiff,

 3        having been duly sworn, testified as follows:

 4            MR. COFFEY:  He needs a translator.

 5            THE COURT:  It's a little late.  You better find

 6   another witness.  I thought that was fairly clear.  If he needs

 7   a translator, we are not waiting.

 8            So call your next witness.

 9            Thank you.  We will try to find a translator, but it's

10   a little late to let us in on it.

11            What language is it?

12            MR. PLATTA:  Spanish.

13            Is it possible that we can start with the defense

14   witness after finding the translator?

15            THE COURT:  If you have got a witness, bring him in.

16            MR. PLATTA:  I would like to call my second witness,

17   Dr. Ramesh Babu.

18   RAMESH BABU,

19        called as a witness by the plaintiff,

20        having been duly sworn, testified as follows:

21            THE DEPUTY CLERK:  State your full name and spell your

22   full name for the record.

23            THE WITNESS:  My full name is Ramesh Babu,

24   R-A-M-E-S-H, B-A-B-U.

25            THE COURT:  You may inquire.
```

8988FRO3

1    DIRECT EXAMINATION

2    BY MR. PLATTA:

3    Q.  Good afternoon Dr. Babu.

4         Dr. Babu, can you tell us a little bit about your

5    education and credentials?

6    A.  I am a neurosurgeon practicing neurosurgery.  I am an

7    associate clinical professor of neurosurgery at NYU Medical

8    Center.

9         I did my residency in neurosurgery both in India as

10   well as in NYU Medical Center.  Then I became an attending in

11   neurosurgery.

12   Q.  Can you tell me if you have any hospital privileges?

13   A.  Yes, I do.  I have attending and admitting privileges in

14   NYU Medical Center, Lenox Hill Hospital, Hospital for Joint

15   Diseases, NYU Downtown Hospital, Methodist Hospital, and

16   Brooklyn Hospital, besides having privileges in Bellevue and VA

17   Hospital.

18   Q.  Doctor, can you explain for the jurors what does it mean

19   that you have privileges?

20   A.  Privileges are when you can admit and treat the patients.

21   Q.  Doctor, are you board certified?

22   A.  Yes, I am.

23        THE COURT:  Don't we have his CV somewhere in your

24   exhibit?

25        MR. COFFEY:  We have no objection to his

8988FRO3                    Babu - direct

1   qualifications.

2          THE COURT:  My problem is this.  Almost always experts

3   have a CV somewhere and we can just mark them as exhibits and

4   the jury can look at them at their heart's content, but there

5   isn't any reason why we should listen to it twice, read it and

6   listen to it.  So let's just put them in as exhibits, both

7   sides, from now on.

8          Go ahead.

9   Q.  Doctor, when you said you were board certified, you were

10  board certified in what?

11  A.  Neurosurgery.

12  Q.  Doctor, can you tell me if you know Ms. Frometa?

13  A.  Yes, I do.

14  Q.  How did you come to know her?

15  A.  She is a patient of mine.  I saw her in 2007 April.

16         MR. PLATTA:  Your Honor, I would like to request at

17  this point that Dr. Babu will be qualified as an expert in

18  neurosurgery.

19         THE COURT:  Without objection.

20  Q.  Dr. Babu, can you tell me who referred this patient to you?

21  A.  She was referred to me by a pain management specialist Dr.

22  Kaisman.

23  Q.  Do you know whether Dr. Kaisman was treating Ms. Frometa

24  prior to your treatment?

25  A.  Correct.

8988FRO3                    Babu - direct

1   Q.  Doctor, when was the first time that you treated

2   Ms. Frometa?

3   A.  The first time I saw Ms. Frometa was on April 9, 2007.

4   Q.  Did you prepare a report as a result of this visit?

5   A.  Yes, I did.

6   Q.  Can you tell me what were your findings regarding your

7   physical examination of the plaintiff?

8   A.  When I examined her on April 9, 2007, she had restricted

9   neck movements and bilateral straight leg raising test positive

10  at 40 degrees.

11  Q.  What does it mean that she had a positive straight leg

12  raising test?

13  A.  She had stretch on the nerves going to the lower

14  extremities.

15  Q.  Did you have any other findings?

16  A.  Those were the positive findings I had.

17  Q.  Did you recommend any treatment for Ms. Frometa?

18  A.  I did.

19  Q.  What kind of treatment?

20  A.  I advised her she should have lumbar as well as cervical

21  spine surgery at the time.

22  Q.  Did you also review the MRI films that were taken of

23  Ms. Frometa's spine?

24  A.  Yes, I did.

25  Q.  What MRI films were there?

8988FRO3                    Babu - direct

1   A.  I reviewed the MRI of the cervical as well as the lumbar

2   spine.

3   Q.  Doctor, can you tell me what were your findings after

4   reviewing those MRI films?

5   A.  The MRI of the lumbar spine showed she had a herniated disc

6   at L5-S1.  The cervical spine MRI showed she had herniated disc

7   in the cervical spine at C3-C4.

8           THE COURT:  Maybe if you stay a little further back

9   from the microphone the speech will be clearer for the reporter

10  and for us.  Let's see.

11  Q.  Doctor, can you tell me if you could have a look at the MRI

12  films and describe for the jury what you exactly saw on the

13  films?

14          MR. PLATTA:  With permission of the Court.

15          THE COURT:  Go right ahead.

16          MR. PLATTA:  Your Honor, can we use the shadow box?

17          THE COURT:  Sure.  Why don't you put it on the witness

18  stand rather than on the jury box.

19          Go right ahead and tell us everything.

20  A.  This is the MRI of the lumbar spine.  The pictures I put up

21  are taken from the side called sagittal image.  If you see the

22  spine picture here, you have these blocks of vertebrae which

23  with are gray in color.

24          In the back you see there is a white structure going

25  down, which we call the thecal sac, which contains spinal fluid

36

8988FRO3                    Babu - direct

1    as well as the nerve roots.  In between those blocks at each

2    level, you can see a slightly whitish color pancake-like

3    looking structure, called the disc.  Normally, the disc should

4    stop short of this white structure which contains the nerve

5    roots.  Normally, the disc has to be that white color.

6    Anything other than that, it is considered as pathological,

7    which is not normal.

8         If you draw your attention to the bottom most disc,

9    which is between the sacrum, which is your tailbone, and the

10   fifth lumbar vertebrae, that disc which should be in white

11   color now has become black in color, and you also see that is

12   not respecting its border and it's encroaching on this white

13   structure which is the nerve root.

14        So at this level, she had a herniated disc that is

15   going and compressing the nerve root between the 5 and 1.  This

16   is one of the images I chose for you to see.

17   Q.  Doctor, I would like you to use the presentation that was

18   prepared for this trial and in more detail, with permission of

19   the Court, explain to the jury in greater detail as to what did

20   you see exactly.  You can use either this presentation or you

21   can use the screen over there.  It has the same presentation.

22   A.  This is exactly what I just described.  This is the nerve

23   root with the spinal fluid in the back.  These are the discs

24   which are supposed to white in color.  When you see this and

25   this, there is a difference in the color, there is a difference

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8988FRO3                    Babu - direct

1    in the height of the disc, and you also see it is going back

2    into that, which is the herniation of this material into the

3    nerve root.  This is exactly what I just showed you in this

4    image.

5            If you see, in this cut, which is the cut taken of

6    this level, this is where the disc should start.  However, it

7    went back like a small peanut, and this one is not completely

8    round, which is the thecal sac; it has been truncated.  That

9    means if you take a ball and you push the disc, the round ball

10   becomes elliptical.  This is what happened in this area.  This

11   is an axial cut looking from the top.  This is the right side;

12   that is the left side.

13   Q.  Doctor, can you also show to the jury how the normal disc

14   should look like that is also depicted?

15   A.  The normal disc should look like this, where it is not

16   pushing into this area of the white structure.  This is the

17   artistic rendition of what we are seeing in this MRI.  You can

18   see this disc is stopping here, this is the disc which is the

19   pancake stopping here.  However, at the bottom, it went back

20   further than it should be.

21   Q.  Doctor, can you tell me, based on these findings, based on

22   the pictures that you just described, is this depiction the

23   actual depiction of the MRI film that you have on the shadow

24   box?

25   A.  This is the accurate depiction of what we saw on the MRI

8988FRO3                        Babu - direct

1    with artistic representation.

2    Q.  Doctor, based on the review of the MRI, did you do any kind

3    of procedure for Ms. Frometa?

4    A.  Yes, I did perform surgery on her.

5    Q.  What kind of surgery was it?

6    A.  I did lumbar spine surgery on her, where at this level what

7    I did was a hemilaminotomy and a microdiscectomy.  In other

8    words, what I did was make a small opening in the spinal canal

9    in the back and then remove part of the disc that did not

10   belong in there.

11   Q.  Doctor, during this visit, did you also review any other

12   MRIs?

13   A.  I did see the MRI of the cervical spine.

14   Q.  Can you please find the film depicting the MRI for the

15   cervical spine?

16   A.  This is the MRI of the cervical spine.  Once I got looking

17   from the side, called the sagittal image, this is the front,

18   this is the back.  You see again the same anatomy of the discs,

19   and this is the spinal cord as opposed to the spinal fluid with

20   the nerve root called the thecal sac.  There are seven cervical

21   vertebrae.  Between the third and fourth cervical vertebrae,

22   the disc being in its normal position, it is coming back again

23   compressing the white structure, which is the spinal fluid

24   area, at the level of C3-4.  So she has a herniated disc at

25   C3-4 as well in the neck.

8988FRO3                      Babu - direct

1    Q.  Doctor, could you use the presentation model for explaining

2    that too?

3    A.  I don't have everything, but this is similar to what we

4    have.  This is the same thing like here, except that this is

5    the MRI where these are the discs.  You see all these discs are

6    stopping short here, except at this level between 3 and 4 it

7    went back.  That is what is showing in this picture where the

8    disc is herniated back into the spinal canal.

9    Q.  Doctor, was it the findings that you had by reading the

10   MRIs that created the situation where you recommended surgery

11   for this patient?

12   A.  I beg your pardon?

13   Q.  What was exactly the reason for your recommendation for

14   surgery?

15   A.  She has two findings.  One is the lumbar spine and the

16   cervical spine where there is herniated disc both areas.  I

17   recommended surgery for that.

18   Q.  Can you tell me if these findings could be cured in any

19   other way besides surgery?

20   A.  She has tried conservative management, which is the first

21   step of treatment that failed.  That's why Dr. Kaisman wanted

22   me to do the surgery as the other resort.

23   Q.  Doctor, regarding the surgery that you did, I would like to

24   present to the jury a film that was actually taken during the

25   surgery, an X-ray film.  I will show you that.

8988FRO3                    Babu - direct

1    A.  I don't have the name of the patient on this.

2    Q.  This record was brought by Cabrini Medical Center and

3    certified as records of Ms. Frometa.

4    A.  OK.  This is an intraoperative X-ray to see exactly where I

5    am in relation to the levels.

6            So we put all these markers and take an X-ray so I

7    would not be operating on a different level.  So this is just

8    the intraoperative X-ray conforming that I was at the right

9    level.

10   Q.  Doctor, in showing you certain stages of the surgery, can

11   you explain to the jurors what exactly do they see?

12   A.  Once again, this is an artistic rendition of what the

13   surgery would be like.  This is the lower back area.  The skin

14   has already been cut.  Once you cut the skin, you have the

15   muscles.  The muscles have been already pushed to the side.

16   The yellow structures, which you see after the muscles have

17   been cut, are the lamina which covers the spinal canal.  So now

18   I have to make a small opening so that I can approach the disc

19   space.

20           So this is the normal laminal in this area, and in

21   order to get into that space to see the disc, I have to make a

22   small hole called laminotomy.  That's what I am going to do.

23           So the laminotomy has been done, that means you have

24   created a window into the spinal canal, and then you see the

25   fragment of the disc, which is not supposed to be there, and

8988FRO3                     Babu - direct

1   that has been removed.  And we do the opening in the spinal

2   canal with a drill.

3   Q.  Doctor, does it mean you have to drill in the spine?

4   A.  Right.

5   Q.  Does it also mean you have to remove a portion of the

6   vertebrae of the spine?

7   A.  The spine of the vertebrae, correct.

8   Q.  How were you able to do that?

9   A.  With a drill.

10          This is the axial view.  Now we are not looking from

11  the side, but I am looking as if I am doing the surgery.  So if

12  you see the laminal on this side, which is kept intact, the one

13  on the left side -- actually, this is the reverse, but the

14  other side where I did the surgery, part of it has been cut

15  out, and then you have the herniated disc that has been

16  compressing in this area would be removed.

17  Q.  Doctor, the compressing disc, what kind of impact does it

18  have on a person's pain?

19  A.  A patient can manifest with symptoms.  In Ms. Frometa's

20  case, it is the pain down the leg.

21          This is more or less what we are removing.  Once it is

22  removed, you can see a small hole that is in the main disc

23  space where the disc fragment has come out.  Once you remove

24  that fragment, you see a small hole there.  This is what you

25  see.

42

8988FRO3                        Babu - direct

1   Q.  Doctor, can you tell us where the surgery was performed?

2   A.  In Cabrini Hospital.

3   Q.  How long did the procedure take?

4   A.  I am not too sure.  Probably an hour or two hours from

5   incision, anesthesia and everything.

6   Q.  You can have a seat.

7            Doctor, can you tell me how many times did you see Ms.

8   Frometa before surgery?

9   A.  I saw her twice before the surgery.

10  Q.  When was the second time?

11  A.  The day after surgery.

12  Q.  Did you see her following that surgery later?

13  A.  I did see her during the follow-up.

14  Q.  Can you tell me on which dates did you see her?

15  A.  I saw her on June 12, 2007, October 1, 2007, February 19,

16  2008, and 5th of September 2008.

17  Q.  Doctor, throughout these visits, what were Ms. Frometa's

18  complaints regarding her pain and conditions?

19  A.  Her incision was healed well.  She was complaining of back

20  pain.  She started having symptoms in the left leg which were

21  there even before, which has become sharp shooting according to

22  her, and she was not back to work.

23  Q.  Doctor, were you aware of the occupation of Ms. Frometa at

24  the time you were treating her?

25  A.  Yes.

8988FRO3                    Babu - direct

1    Q.  What was her occupation?

2    A.  She was a part-time flight attendant and also a dancer.

3    Q.  Following the surgery, are you aware of whether she was

4    able to come back to work?

5    A.  Excuse me?

6    Q.  Following your surgery, was she able to come back to work?

7    A.  No, she didn't go back to work.

8    Q.  Doctor, can you tell me how many days did she stay at

9    Cabrini Hospital following the surgery?

10   A.  I am not too sure, probably overnight.  Generally, all

11   these operations are an overnight stay.

12   Q.  What was the treatment that she had to go undergo following

13   that in order to recuperate from the surgery?

14   A.  She continues to take pain medications, and she is being

15   managed by her pain management doctor.

16   Q.  Doctor, all the depictions of the surgical procedure as

17   well as MRI films, can you tell me with a reasonable degree of

18   medical certainty whether they are accurate depictions of the

19   procedure as well as MRIs that you saw?

20   A.  I lost you.  I am sorry.

21   Q.  I will repeat that.

22           With a reasonable degree of medical certainty, can you

23   tell us whether the depictions of the surgery as well as the

24   cervical and lumbar spine MRIs were accurate depictions?

25   A.  Yes.

44

8988FRO3                      Babu - direct

1    Q.  Doctor, what was your finding regarding the cause of this

2    injury?

3    A.  I beg your pardon?

4    Q.  Can you tell us what was your finding as to the cause of

5    Ms. Frometa's injuries?

6    A.  According to her, all symptoms started after a motor

7    vehicle accident.

8    Q.  Can you tell me what was the date of the accident?

9    A.  February 14, 2007.

10   Q.  Did she tell you that -- I will withdraw this question.

11          Are you aware of the fact that she had any prior

12   accidents; not injuries, but accidents?

13   A.  No.

14   Q.  Are you aware of any prior injuries?

15   A.  No.

16   Q.  Were you provided with any kind of medical records by

17   anyone indicating that she had any kind of medical treatment

18   prior to this accident?

19   A.  I don't have any records.

20   Q.  Did she tell you that she had any medical treatment related

21   to any other accident besides February 14?

22   A.  She didn't tell me.

23   Q.  Doctor, with a reasonable degree of medical certainty, was

24   the accident of February 14 of 2007 a direct cause of these

25   injuries?

8988FRO3                    Babu - direct

1    A.   Yes.

2    Q.   Doctor, can you tell me what was the condition of

3    Ms. Frometa at her last visit with you?

4    A.   She still had shooting pain down both lower extremities.

5    She was complaining of neck pain.  She was complaining of left

6    upper extremity pain.  She told me that she was being followed

7    by the pain management doctors.

8    Q.   Doctor, can you tell me if the surgery was successful or it

9    wasn't, in your opinion?

10   A.   To some extent it was, but it is not a great outcome.

11   Q.   Can you tell me what could be a course of her future

12   treatment; not currently, presently, but in the future, what

13   she might need?

14   A.   She has to be reassessed and then she continues to be

15   followed up by her doctors.  Since she has a degenerative

16   condition, as depicted in the MRI, she may need, even though I

17   have removed the herniated disc, if she continues to have the

18   back pain for a period of time, she may need surgery in the

19   future.  It depends on her complaints.

20   Q.   Regarding the herniated disc and pain resulting from the

21   removal of the disc, can you tell me what were her complaints

22   throughout your treatment following the surgery?

23   A.   She continues to have the back pain and she has symptoms on

24   the other leg.  She also had symptoms in the upper extremities.

25   Q.   Doctor, in your practice, do you review MRIs?

8988FRO3                          Babu - direct

1    A.  I do.

2    Q.  Is this something common for neurosurgeons?

3    A.  That's true.

4    Q.  How many MRIs do you review, let's say, a month?

5    A.  A lot.

6    Q.  Over 10?

7    A.  Maybe over 50.

8    Q.  Doctor, how many surgeries have you performed, surgeries

9    like this one that you did for Ms. Frometa?

10   A.  Probably 1500 to 2,000.

11   Q.  Doctor, did you perform all of them at NYU?

12   A.  No, at various hospitals.  The majority of them at NYU.

13   Q.  Doctor, are you being paid for today's day in court?

14   A.  Yes.

15   Q.  What is your compensation today?

16   A.  I can't tell for today, but I have given a pretrial

17   deposition before and today and a few consultations with you.

18   The total amount was $12,000 for two days and a few times we

19   have spoken, review of the charts and so on.

20   Q.  Doctor, can you tell the jury what was the conversation

21   between the two of us prior to today?

22   A.  Prior to today we discussed the case.

23   Q.  Did I ask you anything specific about the case injuries?

24   A.  We talked about the case, the injury, and we also talked

25   about what she is doing at this point in time because some of

8988FRO3                    Babu - direct

1    her records I did not have.

2    Q.  Doctor, can you tell me how much were your charges for

3    treatment of Ms. Frometa up until today, approximately?

4    A.  I can't give you the competent figure, but there was a

5    payment of $18,927.

6    Q.  That payment was for the surgery?

7    A.  I am not too sure if it's the surgery or all my

8    consultations.  I can't tell.

9    Q.  Do you remember a time when Dr. Charles Kincaid's office

10   contacted you regarding her future need for medical care?

11   A.  Yes.

12   Q.  Do you remember sending him a fax with responses to your

13   opinion on her future medical care?

14   A.  Yes.

15   Q.  Can you tell me what was your response?

16   A.  We recommended follow-up visits four times per year for one

17   year, physical therapy three times per month for one year, and

18   we also said that she should be followed by the pain management

19   specialist.

20   Q.  That was your recommendation within your field of practice

21   or your specialty, correct?

22   A.  Correct.

23   Q.  Doctor, when you mentioned before that you would recommend

24   possibly in the future any kind of surgical procedure, what

25   kind of procedures would you recommend?

8988FRO3                        Babu - direct

1    A.   When I last saw her on September 5, she continues to have a

2    lot of back pain.  So she may have to be reinvestigated.  She

3    may require spinal fusion if her pain with the conservative

4    management or pain management specialist do not change in

5    intensity.

6    Q.   Can you tell me the cost of the spinal fusion surgery?

7    A.   I can't tell.  I don't know.  My fees, probably more

8    than -- depends on the acts of the no-fault insurance company.

9    So whatever they will pay we will take.  I think it will run

10   between 20 and $30,000.

11   Q.   Doctor, you mentioned before that Ms. Frometa has some

12   degenerative changes in her spine.  Can you tell me if these

13   degenerative changes were resulting in her injuries, in her

14   need for surgery, or was it the accident?

15   A.   This is a one-level degeneration.  It's very unusual for

16   somebody of her age to have degeneration at one level.  I am

17   not a hundred percent certain whether the trauma has made that

18   disc degenerate giving her the herniated disc.  Since we don't

19   have pictures prior to her accident, I have to call what it

20   looks like a degenerative change but with the herniated disc at

21   that level.

22   Q.   Could degeneration be asymptomatic?

23   A.   It could be asymptomatic.

24   Q.   Can you explain to the jury what that means?

25   A.   Degeneration is an aging phenomenon people tend to have in

8988FRO3                          Babu - direct

1    their spine and you live and die with degenerative spines

2    without having any symptoms referable to that particular area.

3    Q.  Doctor, could a motor vehicle accident with a very high

4    force of impact create an injury in which degeneration will

5    become symptomatic?

6    A.  Correct.

7    Q.  Doctor, in your opinion, would Ms. Frometa be able to go

8    back to her usual occupation as a dancer and as a flight

9    attendant in the future with her condition being as it is right

10   now?

11   A.  Not the way she presented in my office the other day.

12   Q.  You saw her just a few days ago?

13   A.  Correct.

14   Q.  Doctor, do you recall that you were testifying before in

15   this case on May 16th of '08?

16   A.  Do I remember?

17   Q.  Yes.  Do you remember testifying in this case on May 16th

18   of '08?

19   A.  Yes.

20   Q.  Were you paid for this testimony?

21   A.  No, I was not.

22   Q.  At the time of this testimony, you indicated that she might

23   not need further treatment.  When you testified today, you

24   explained to us that fusion might be the way to proceed

25   regarding this treatment.  Can you explain to us the

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

8988FRO3                         Babu - direct

1    difference?

2    A.  Sure.

3            MR. COFFEY:  Objection.

4            THE COURT:  Overruled.

5    A.  When I gave the deposition, I saw her at the time, she was

6    not complaining -- she was complaining of some back pain and

7    she was being managed by the pain management doctors.  When I

8    last saw her, even though they had been managing her pain, she

9    still continues to have the pain.  So I keep an option open in

10   the future if that does not work.  Nobody wants to do an

11   invasive surgery.  I may have to keep that option.  That's why

12   I said she might need.

13   Q.  I understand.  For present time, besides follow-up with

14   you, would you recommend any kind of other treatment for her

15   with any other doctors?

16   A.  She needs to see a physical therapist.  She needs to see

17   the pain management doctors to control her pain.  She also has

18   problems in her neck for which she is being attended to.  So I

19   will follow and concert with them.

20           MR. PLATTA:  At this time, I would like to request

21   that the records regarding this case be admitted into evidence

22   based on the statement from Dr. Babu that this is an accurate

23   depiction of his procedure as well as an accurate depiction of

24   the MRI films.

25           THE COURT:  You can pick one of the three, the

8988FRO3                    Babu - direct

1   testimony, that picture, the X-ray, but we don't need them all.

2            MR. PLATTA:  I would prefer then if I could pick the

3   surgical procedure.

4            THE COURT:  Very well.

5            MR. PLATTA:  Thank you, Doctor.

6            THE COURT:  Any cross?

7            MR. COFFEY:  Yes, your Honor.

8   CROSS-EXAMINATION

9   BY MR. COFFEY:

10  Q.  Can I see your chart, Doctor?

11  A.  Sure.

12  Q.  Doctor, is a history important?

13  A.  Yes.

14  Q.  Why is a history important?

15  A.  The goal by what the patient tells us.

16  Q.  A history, is that something you provide or does your

17  patient provide you with the history?

18  A.  The patient gives the history to us.

19  Q.  So it's only as accurate as the information you receive, is

20  that correct?

21  A.  Correct.

22  Q.  Now, you were asked to fill out some forms for Dr. Kincaid.

23  Do you recall filling out those forms?

24  A.  My secretaries did that on my instructions.

25  Q.  At that time, do you recall the question being, Do you

8988FRO3                         Babu - cross

1   anticipate recommending any future surgical procedures, and

2   answering none?

3   A.  Correct.

4   Q.  Also, you were asked if there was any specific type of

5   equipment that you recommended for her, such as a shower chair,

6   a bed or neck brace and said none?

7   A.  Yes.

8   Q.  Also saying you prescribed no medications for her, is that

9   correct?

10  A.  Correct.

11  Q.  Would that indicate that she was not in pain because you

12  didn't believe any medication was necessary?

13  A.  That is not true.  I don't manage the pain because she has

14  a pain management doctor.  So as far as I am concerned, I was

15  not prescribing medications.

16  Q.  Have you ever worked with Dr. Davy before?

17  A.  No.

18  Q.  Have you ever worked with Dr. Kaisman before?

19  A.  Doctor who?

20  Q.  Kaisman.

21  A.  Dr. Kaisman referred me some patients, but I don't work

22  with him; managing patients in concert.

23  Q.  So you have a business relationship?

24  A.  Not a business relationship.  I have stopped going to his

25  office, but I used to see patients.  When they have a case

8988FRO3                        Babu - cross

1    which requires surgery, I used to give consultation.

2    Q.  So you would do office hours out of his office?

3    A.  I did a few times, yes; not as a routine.

4    Q.  What would you do?  You would go there and examine patients

5    in his office?

6    A.  That's true.

7    Q.  How often would you go there, how routinely?

8    A.  The total number of times I went to his office, probably

9    less than six times.  That was more than a year ago or so.

10   Q.  Were you also asked how many follow-up visits by Dr.

11   Kincaid you recommended?  Did you recommend four visits for one

12   year?

13   A.  I don't know.  I have got to see it.  I don't remember.

14          This is the follow-up visits with me, not with Dr.

15   Kincaid.

16   Q.  OK.  You recommended four follow-up visits?

17   A.  Per year.

18   Q.  In one year, for one year.  You were asked how many years

19   you recommended it for, and you said one year, is that correct?

20   A.  That's correct.

21   Q.  You were also asked what type of diagnostic procedures you

22   recommended, including MRIs, CAT scans, X-rays, EMGs, were you

23   asked that question?

24   A.  What number is that?

25   Q.  Number 2.

8988FRO3                    Babu - cross

 1    A.  Yes.  I said none.

 2    Q.  OK.  This was what, April 29th of this year, April of 2008?

 3    A.  Correct.

 4    Q.  Were you asked if you recommended occupational therapy,

 5    massage therapy, chiropractic treatment?

 6    A.  Yes.

 7    Q.  You said she did not need that at that time, is that

 8    correct?

 9    A.  Correct.

10    Q.  You said she could have three times of physical therapy per

11    month for one year?

12    A.  Correct.

13    Q.  Did you also anticipate that she will have a normal life

14    expectancy?

15    A.  I don't do that, sir.

16    Q.  It's question number 10.

17    A.  I don't do that.  But based on her injury, do you

18    anticipate normal life expectancy?  So based on the injury, she

19    should not be dying.  Just like anybody else, she will have the

20    normal expectancy.

21    Q.  Were you also asked if you recommended that she have home

22    health assistance?  That would be number 7.

23    A.  I said no.

24    Q.  How many times did you meet with Mr. Platta in person to

25    talk about testifying in court here?

8988FRO3                    Babu - cross

1    A.  Maybe two times.

2    Q.  When would that have been, recently?

3    A.  No.  The day -- that morning when we came to your office,

4    and the other day I just saw him in my office, we didn't talk.

5    I may have seen him one more before that.

6    Q.  Did you talk to him on the telephone?

7    A.  He called me to tell me where I am meeting him today.

8    Q.  That was this past week Ms. Frometa came to see you?

9    A.  Yes, 9/5.

10   Q.  Before that, when was the last time she came to see you?

11   A.  She saw me in February.

12   Q.  So about half a year, six months went by since you saw her

13   last?

14   A.  Yes.

15   Q.  She didn't come to you until right before the eve of trial,

16   is that correct?

17   A.  Yes.

18   Q.  Did she come to you any time in those preceding six months

19   to ask you about surgery from you?

20   A.  Before that she came in October 2007.

21   Q.  So about a year ago, 11 months?

22   A.  11 months from what?

23   Q.  That was the time before that.  She had been to see you in

24   the past year two times?

25   A.  I can tell you when she saw me.  She saw me following the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8988FRO3                        Babu - cross

1    surgery in June 2007, October 2007, and then February 2008, and

2    September 2008.  So four visits following the surgery.

3    Q.  When she came to see you the first time, how long was that

4    visit?

5    A.  How long?

6    Q.  Yes.

7    A.  I can't tell.  10, 15, 20 minutes.  I can't tell how long I

8    saw a patient.

9    Q.  Specifically, what records did you review when she came to

10   see you?

11   A.  I don't review any more records when they come to see me in

12   the follow-up.  I have done the surgery.  So I will see her

13   wound.  I will talk to her, ask her who she may be following.

14   I am a surgeon so she has her doctor, Dr. Davy, who is

15   following her, so I tell her to follow with the private

16   doctors.

17   Q.  When you saw her the first visit to your office, what

18   records did you specifically review, what did your chart show

19   that you reviewed?

20   A.  This is the following surgery?

21           (Continued on next page)

22

23

24

25

898AFRO4ps                      Babu - cross

1    Q.  No.  The first time she went to see you, in Dr. Kaisman's

2    office.

3    A.  OK, so that's not my office.  In Kaisman's office, I don't

4    have any list of the records I have seen, because Dr. Kaisman

5    maintains his own records.  When I am there, they give me the

6    records to see, so I would have seen what have they gave me.  I

7    don't know what I saw.

8    Q.  Under New York State law, aren't you required to keep the

9    records of your patients for a certain amount of years?

10   A.  No.  I can -- I keep the records of my handwriting and my

11   own maintaining.  If somebody else records, I don't have reason

12   to keep their records in my chart.

13   Q.  OK.  So specifically, what MRIs did you review?

14   A.  The MRI of the cervical and lumbar spine.

15   Q.  Do you have a copy of that?

16   A.  I don't have to have a copy of the MRIs.  The MRIs are

17   provided by the doctor.  The patient takes them back.  I don't

18   keep a copy of the MRIs.

19   Q.  Now, when we talk about, you reviewed that, how many pages?

20   What do you have?  Is that a one-page handwritten note?

21   A.  This is the one you have, the one I gave you the last time

22   I saw you.  This is the same note.

23   Q.  The same note.  Now, where is your intake form, that you

24   asked about prior history?

25   A.  What is the intake form?

898AFRO4ps                    Babu - cross

1   Q.  How did you ask Ms. Frometa if she had any prior history?

2   A.  If the patient has a prior history, they will tell you.

3   They will document it.

4   Q.  Did Ms. Frometa tell you she was involved in a motor

5   vehicle accident in California?

6   A.  She did not tell me.

7   Q.  Did she tell you she was involved in March, before your

8   surgery, in a motor vehicle accident?

9   A.  I don't have the records, so I don't know.

10  Q.  Could that be important to causation and history?

11  A.  If she tells me, I'll take it.  If she did not, I do not

12  take it.  If she had an injury and she has no symptom, it's

13  irrelevant.  Her symptoms started with her car accident, so

14  that is relevant.

15  Q.  But what if her symptom, what if someone doesn't tell you

16  the symptom?  Does that make it irrelevant or is someone not

17  telling you the truth?

18          MR. PLATTA:  Objection.

19  A.  If patient comes and tell me, I have this car accident and

20  I have the pain, I believe her.  If she did not think that she

21  had pain before that she didn't tell me, I'm not going to

22  question, because I believe the patient.

23  Q.  Were you aware that, immediately after this accident, she

24  went on a flight, she was engaged as a flight attendant and the

25  next day flew to Colorado Springs?

898AFRO4ps                    Babu - cross

1   A.  I have no idea.

2   Q.  And she also then, in the next week, flew to --

3           THE COURT:  How would he know that?

4           MR. COFFEY:  I'm asking, your Honor.

5           THE COURT:  Don't ask.

6   Q.  Were you aware if she was also working as a dancer up to

7   the time she came to see you for treatment?

8   A.  I have no idea, sir.

9   Q.  Would that be relevant to knowing how much impingement

10  there is in the L5-S1 if someone's working or not?

11  A.  I can't go into her brain.  It all depends on what she

12  need.  Obviously she needed money to do that.  I don't know.

13  All I ask is questions.  If somebody has pain, what to treat

14  them.  I don't go into personal lives, what they did

15  afterwards.

16  Q.  Now, are you familiar with some of the -- with back

17  injuries, the New England Journal of Medicine, any of the

18  studies that they've done on herniations?

19  A.  I don't know which journal has this you are talking about.

20  I don't know what you're referring to.

21  Q.  Are you familiar at all that 95 percent of herniations

22  resolve on their own within one year?

23  A.  I know that I don't have the New England Journal of

24  Medicine.  So I don't know whether I read it or not.  But most

25  herniated disks do subside with conservative management.

898AFRO4ps                    Babu - cross

1    Q.  So is there any reason you didn't wait for one year to go

2    by and operated within two months of the onset of symptoms?

3    A.  Well, that's a very wrong way, because two things.  They

4    are very important.  It all depends on the pain threshold.  It

5    all depends on the herniated disks.  I am a very conservative

6    surgeon.  I take care of the patients when they don't improve.

7    Studies, they put everything in one big part and then study.

8    They study the very small herniated disk, very large herniated

9    disk, disk herniations without any kind of compression.  Then

10   they study, they come out with all this kind of inference, oh,

11   90 percent of the patients will improve.  If a patient has a

12   herniated disk, like what Ms. Frometa has, and she's been

13   managed with pain management doctors, and then they say that

14   she's not going anyplace and the patient is complaining of

15   pain, and I see MRI, I don't believe some reason, I don't

16   believe anything, because I got to treat what I have to my

17   hand.  Sometimes we put them on conservative management, she

18   improve.  Sometimes they don't.  Sometimes I give them

19   steroids, they come back in a week they want to get on

20   operating table, because it all depends on what their pain

21   threshold at a given point in time.  So every case is

22   different.  Studies are not so important.  Patient's history,

23   their tolerance, and their clinical examination at a given

24   point of time is more important.  Not the New England Journal

25   article.

898AFRO4ps                    Babu - cross

1   Q.  Now, also, you talk about, you believe you treated her

2   conservatively.

3   A.  I did not.  The doctors who refer her, she was treated by

4   Dr. Kaisman.  He's a pain management doctor.  If he thought he

5   could manage her pain and treat her, he would not take the pain

6   of calling me and asking me to help her out, because his job is

7   to treat the patient.  So I'm a final -- I'm the final guy.

8   I'm in another role.  If none of these doctors can help, I have

9   to pitch in and help these people.

10  Q.  And you thought that determination was probably made within

11  two months after the motor vehicle accident.

12          MR. PLATTA:  Objection.

13  A.  Once again --

14          THE COURT:  Sustained.  Don't answer the question.

15  Q.  Now, you're board-certified as a neurologist.  Is that

16  correct?

17  A.  Wrong.  I'm board-certified as a neurosurgeon.

18  Q.  And, now, is radiology a different specialty?

19  A.  Correct.

20  Q.  How do you differ from a radiologist?

21  A.  It's a completely different branch.

22          MR. PLATTA:  Objection.

23          THE COURT:  Well, if he doesn't know the difference,

24  I'm interested to know what he knows, but that's really

25  farfetched, Mr. Coffey.  If you want to analogize a radiologist

898AFRO4ps                    Babu - cross

1     or a neurosurgeon, you go right ahead.

2     Q.  Who do you believe is in a better position to interpret

3     radiological films, yourself or a radiologist?

4              MR. PLATTA:  Objection.

5              THE COURT:  Overruled.

6     A.  Every patient I operate, they come to my office with the

7     films.  And I have been a neurosurgeon for so long, I make the

8     decision what patient needs the surgery.  And I am expert in

9     reading my films, because radiologists, good number of them are

10    good, some of them, if they're not board-certified in the

11    neuroradiology, they can give you very wrong and false

12    information.  But I am confident with all my training that I

13    can read the film, make a judgment for my own patient to read

14    those films.  So I am damn good at reading those films.

15    Q.  Do your records indicate that you had the films and read

16    them, and could you show me where the remarks are in your

17    records?

18    A.  On the page 1, my handwritten note says "MRI of the L

19    spine, L5-S1 herniated disk.  MRI C spine C3 herniated disk."

20    So I did see them.  That's why I wrote them in the paper.

21    Q.  Do you recommend at any time another surgical opinion?

22    A.  No, sir.

23    Q.  And why is that?

24    A.  Well, I'm the -- I'm of the opinion because if somebody

25    comes to me I don't tell them unless I'm -- I don't know what

898AFRO4ps                    Babu - cross

1    I'm dealing with, I don't send them to orthopedist.  Sometimes

2    the insurance companies do send them, but it's my practice, if

3    I think I can handle the situation, I am not going to send.

4    Sometimes there are cases I cannot handle, I tell them, go and

5    see another surgeon.  If I am not full, I tell them, go see

6    another surgeon, not when I think I can handle.

7    Q.  Was part of the reason for the procedure to help her pain

8    and to stabilize her?

9    A.  Not stabilize her.  Help her pain.  Stabilize the pain, you

10   mean.

11   Q.  Since you performed the surgery, did the level of pain she

12   has decrease, increase, or stay the same?

13   A.  It decreased somewhat, but not hundred percent.

14   Q.  So it was a successful surgery.

15   A.  Some, to some extent it was a successful surgery, because

16   she continues to have the same -- not the same -- the degree is

17   different but still has the pain.

18   Q.  And you also said, at your deposition, that she was too --

19   or you said today, she was too young to have degenerative

20   change in that area.  Is that correct?

21   A.  Yeah, but less it's not like one sentence.  One-level --

22   degeneration is a diffuse process.  One-level degeneration is

23   very unusual.  Young people, one-level degeneration, you've got

24   to think something other than degeneration, even though

25   "degeneration" is a broad term which is akin to "AIDS in

898AFRO4ps                    Babu - cross

1   process."

2   Q.  Now, isn't it also fair to say that the L5-S1 is the most

3   commonplace to see degeneration in the spine?

4   A.  I don't know that.  L5-S1 is the common to have herniated

5   disk because at the bottommost level.  I don't remember I

6   have -- remember any study that degeneration is common at that

7   level.  I don't know.

8   Q.  And why -- is it fair to say, Doctor, that more herniations

9   occur at that level because that's where the spine absorbs much

10  of the activities of daily living and working?

11  A.  That is the bottommost thrust, correct.

12  Q.  So that's also the part of the spine that works the most?

13  A.  Actually, it is the -- if you imagine a tall building, it

14  is between the first and second floors that takes the brunt.

15  Q.  Now, you removed a fragment from there, the L5-S1?

16  A.  Yes.

17  Q.  Did you take any pictures or videos of the fragment?

18  A.  No, sir.

19  Q.  What size was the fragment that was removed?

20  A.  I didn't draw -- if I note, I can check my operating note

21  if I said the size.  Generally I don't.

22          No, I didn't say that.

23  Q.  And did Ms. Frometa ever tell you about being involved in a

24  motor vehicle accident in New Jersey?

25  A.  No, sir.

898AFRO4ps                    Babu - cross

1           MR. COFFEY:  I have no further questions.  Thank you.

2    A.  Thank you.

3           THE COURT:  You're excused -- do you have any

4    redirect?

5           MR. PLATTA:  Very short, your Honor.

6    REDIRECT EXAMINATION

7    BY MR. PLATTA:

8    Q.  Doctor, defense counsel mentioned many times the word

9    "herniation."  Could you please explain to the jurors what it

10   means, based on this photograph.

11   A.  Herniation is a phenomenon.  A disk has got a ring, and

12   inside that you have a jelly.  If there is any trauma to the

13   ring, the ring breaks, so the jelly has to, jelly comes out.

14   So this is the herniation through that ring, that's called a

15   herniated disk.

16   Q.  And, Doctor, what does a herniated disk, what kind of

17   impact it has on nerves on Ms. Frometa?

18   A.  The nerves are in close proximity, so when the herniated

19   fragment compresses, then it will give rise to the symptoms

20   corresponding to the nerve.

21   Q.  Without surgery, would her conditions worsen?

22   A.  (Pause)

23   Q.  Let me rephrase that.  Without surgical procedure, would

24   her condition improve or worsen?

25   A.  She would not have improved to the extent that I made her

898AFRO4ps                    Babu - redirect

1    improve.

2    Q.  And, Doctor, am I correct by saying that you are actually

3    the only doctor that operated on her lower back?

4    A.  As far as I know.

5    Q.  Doctor, did you actually see, physically, the removed disk?

6    A.  Of course.  I did the surgery.

7    Q.  Did you remove the portion of the spine, the bone inside

8    the spine?

9    A.  Yes.

10   Q.  Did you have to open this patient physically with -- make

11   an incision and everything else?

12   A.  That's true.

13              THE COURT:  You know, the concept of redirect is that

14   the questions are within the scope of the previous cross?

15              MR. PLATTA:  Thank you, your Honor.  I have no further

16   questions.

17              THE COURT:  You're excused.

18              THE WITNESS:  Thank you, sir.

19              (Witness excused)

20              THE COURT:  I think we provided you with an

21   interpreter, although I don't see him.

22              THE CLERK:  He's here.

23              THE COURT:  I see him now.  You can call your first

24   witness.

25              MR. PLATTA:  I would like to call Mr. Diaz-Diaz, the

898AFRO4ps                    Babu - redirect

1    defendant in this case.

2            THE COURT:  Wait a minute.  We have a Spanish

3    interpreter.  Is that who was on the stand before?

4            THE CLERK:  Yes.

5            THE COURT:  Oh, fine.  Come ahead.

6            I didn't want him coming up --

7            Would you swear the interpreter too.

8            THE CLERK:  Yes.

9            (Interpreter sworn)

10   MARIO E. DIAZ-DIAZ,

11        a defendant herein, having been duly sworn through

12        the interpreter, testified as follows:

13           THE CLERK:  For the record, Jordan Fox is the

14   interpreter, F-o-x.

15           THE COURT:  Go ahead.

16   DIRECT EXAMINATION

17   BY MR. PLATTA:

18   Q.  Mr. Diaz, were you involved in a motor vehicle accident on

19   February 14th of 2007?

20   A.  (Through interpreter) Yes, sir.

21   Q.  Sir, do you know what kind of vehicle did you collide with?

22   A.  Yes, sir.

23   Q.  Can you tell us what was the force of -- strike.  I will

24   withdraw this question.

25           Sir, can you tell me what kind of vehicle were you

898AFRO4ps                    Diaz - direct

1    driving that day?

2    A.  I was driving a Mack.

3    Q.  Can you tell the jury what a Mack is.

4    A.  A Mack is the make of truck.

5    Q.  Is it fair to say that it was a sanitation truck?

6    A.  What do you mean by "sanitation"?  You mean a garbage

7    collector?

8    Q.  For example, yes.

9    A.  Yes.

10   Q.  Do you know the weight of this truck?

11   A.  Yes, 60,000 pounds.

12   Q.  Sir, can you describe the force of impact at the time of

13   the accident between your 60,000-pound truck and Ms. Frometa's

14   vehicle?

15   A.  May I say something?  Excuse me.

16        THE COURT:  You really have to just answer the

17   question.  You'll get a chance to talk with your lawyer.

18   Q.  I will prefer to listen to the answer.

19   A.  Could you repeat it to me, please?

20   Q.  Sure.  Can you tell us, in your own words, what was the

21   force of impact between -- at the time of the accident --

22   between your 60,000-pound truck and my client's vehicle?  Was

23   it soft, was it medium, or was it heavy?

24   A.  It was more or less medium.

25   Q.  Sir, I want to ask you to look at your screen that you have

898AFRO4ps                    Diaz - direct

1   right there on the stand, and tell me if you recognize the

2   vehicle that you see on the picture.

3   A.  Is this the woman's vehicle?

4   Q.  That is correct.  But do you recognize this picture -- I

5   mean, sir, do you recognize this vehicle?

6   A.  Yes, because of the area that's been broken.

7   Q.  I will ask you to look at another picture.  Do you

8   recognize this vehicle?

9   A.  It's that one, but it's broken.

10  Q.  And, sir, what about this picture?  Do you recognize this

11  picture?

12  A.  Not that one.

13  Q.  And how about this one?

14  A.  It wasn't broken.  All there was was an impact there.

15  Q.  And you still call this a medium impact, right?

16          MR. MILLER:  Objection.

17          THE COURT:  Overruled.

18  A.  Mm-hmm.

19  Q.  Is this yes or no?

20  A.  Yes.

21          MR. PLATTA:  Thank you.  I have no further questions.

22          THE COURT:  Any questions?

23  CROSS EXAMINATION

24  BY MR. MILLER:

25  Q.  Good afternoon, Mr. Diaz-Diaz.

898AFRO4ps                    Diaz - cross

1    A.  Hello.  How are you?

2    Q.  There was something you wanted to say before.  What is it?

3    A.  Yes.  By 60,000 pounds I mean when the truck is loaded.

4    Q.  Was the truck loaded at the time of the impact?

5    A.  No, sir.

6    Q.  Thank you, sir.

7           THE COURT:  So how much is it when it's not loaded?

8           THE WITNESS:  It depends on how much trash has been

9    put inside, but when it's completely full, at 60,000 pounds.

10          THE COURT:  It wasn't full, so how much does it weigh

11   when it's empty?

12          THE WITNESS:  What you're really given is the weight

13   when the truck is completely full, what its capacity is.

14   Q.  Sir, you see the --

15          THE COURT:  Thanks.

16   Q.  You see the photograph of plaintiff's vehicle in front of

17   you, correct?

18   A.  Yes, sir.

19   Q.  After the accident, was it driven away or was it towed

20   away?  Or do you not know?

21   A.  It was put -- parked on the side of the street, and it

22   remained there until a tow truck took it away.

23   Q.  Was it driven to the side of the street?

24   A.  I believe that it was pushed.

25   Q.  Thank you, sir.

898AFRO4ps                    Diaz - cross

 1              THE COURT:  You're excused.  Thank you.

 2              THE WITNESS:  OK.

 3              (Witness excused)

 4              THE COURT:  What's next?

 5              MR. PLATTA:  Your Honor, I would like to call my next

 6     witness, Dr. Andrew Davy.

 7              THE INTERPRETER:  Your Honor, is that it?

 8              THE CLERK:  That's it for you.

 9              THE COURT:  I think we're finished.  Are we?

10              MR. PLATTA:  Yes.

11              THE COURT:  Between the two of you, it's unfortunate

12     that the Court didn't hear that you needed an interpreter.

13     Actually, the defendants ought to have let you know since in

14     fact it was their client, essentially.  But the answer is, no,

15     we don't need you.  Thanks a lot.

16              (The interpreter left the courtroom)

17              THE COURT:  Let's go.  Let's go.  Who is your next

18     witness?

19              (Pause)

20              MR. PLATTA:  Should I bring the witness in?

21              THE COURT:  Call him or someone else to get him, but

22     put him on the stand.

23              THE CLERK:  Come right this way, please.

24      ANDREW MICHAEL DAVY,

25         called as a witness by the plaintiff,

898AFRO4ps                    Diaz - cross

1        having been duly sworn, testified as follows:

2    DIRECT EXAMINATION

3    BY MR. PLATTA:

4    Q.  Good afternoon, Dr. Davy.

5    A.  Good afternoon.

6    Q.  Dr. Davy, can you tell us more about your education.

7    A.  I attended Columbia University School of Engineering,

8    Applied Science, where I applied in 1986 with a bachelor's

9    degree in chemical engineering.  I then went on to Columbia

10   Presbyterian's College of Physicians and Surgeons for medical

11   school.  I then did my residency in anesthesiology at the

12   Presbyterian Hospital.  Then I did one-year fellowship in pain

13   medicine at University of Rochester in Rochester, New York.

14   Q.  Doctor, are you board-certified?

15   A.  Yes, I am.  I am board-certified in anesthesiology and

16   pain, yes.

17   Q.  Can you explain to the jury, what does it mean to be

18   board-certified?

19   A.  It means that a peer group in your specialty have

20   administered, in my case, a written and oral examination

21   process, and therefore I qualified as a consultant and expert

22   in that particular area.

23   Q.  Thank you, Doctor.

24        MR. PLATTA:  Your Honor, at this point I would like to

25   request that Dr. Davy be certified as a specialist, an expert

898AFRO4ps                    Davy - direct

1     in the field of pain management.

2               THE COURT:  Any objection?

3               MR. COFFEY:  No objection, your Honor.

4               THE COURT:  Very well.

5               You're an expert.

6     Q.  Dr. Davy, do you know Ms. Adonna Frometa?

7     A.  Yes, I do.

8     Q.  How did you come to know her?

9     A.  I saw her in consultation at the request of Dr. Krishna to

10    manage her pain.

11    Q.  And, Doctor, when was the first time that you saw

12    Ms. Frometa?

13    A.  April 20, 2007.

14    Q.  Doctor, can you tell me, what was her complaints at the

15    time of this visit?

16    A.  She complained of neck and low-back pain.

17    Q.  Do you know what was the cause of this complaint?

18    A.  Yes.  She gave a history that on April -- I'm sorry --

19    February 14, 2007, she was driving her car when she was

20    rear-ended by another car.  She reported about two minutes of

21    loss of consciousness.  And she was evaluated at Cabrini

22    Hospital, where she was treated and discharged.  CAT scan was

23    negative.

24    Q.  Doctor, approximately how many times did you see her as a

25    patient?

898AFRO4ps                     Davy - direct

1   A.   After that I saw her on average about once every two to

2   four weeks.

3   Q.   And, Doctor, what were your findings at this first

4   examination?

5   A.   I thought that she had neck and low-back pain secondary to

6   post traumatic disk pathology and cervical and lumbar

7   radiculopathy, as well as facet syndrome.

8   Q.   And, Doctor, can you tell me if you recommended any

9   treatment for her?

10   A.   Yes.  Along with the physical therapy she was receiving, I

11   recommended epidural steroid injections, facet steroid

12   injections, and if these did not help to ease her pain,

13   percutaneous diskectomies.

14   Q.   And, Doctor, what was the course of treatment later on with

15   your office?

16   A.   She was tried on medications.  Essentially she received

17   epidural steroid injections, diagnostic facet joint injections,

18   and the percutaneous diskectomies in the neck and -- in the

19   neck.  She did not respond to those.  And in the interim had

20   also had back surgery.  And she then received a spinal cord

21   stimulator trial in the neck and in the lower back.

22           THE COURT:  A spinal what?  A spinal cord --

23           THE WITNESS:  Spinal cord stimulator trial.

24           THE COURT:  What does that mean?

25           THE WITNESS:  A spinal cord stimulator is an

898AFRO4ps                    Davy - direct

1    implantable device that modulates the nervous system by using

2    electrical impulses in the dorsal column of the spinal cord.

3    It creates a gentle tingle or pins-and-needles-like sensation

4    over the peripheral nerves, and that blocks pain transmission

5    in painful nerves.

6              THE COURT:  Thank you.

7              THE WITNESS:  I can tell you more.  It works off the

8    gate control theory of pain.  If you've ever stubbed your toe

9    or bumped your hand and it's sharp burning pain and you rub it,

10   when you rub it, you stimulate one set of fibers called beta

11   fibers.  They require a smaller current.  And when they fire,

12   they block firing in the painful firers, which are A, delta,

13   and C firers.  So that's the theory behind the spinal cord

14   stimulator.  Most patients who have injuries are more familiar

15   with a TEMS unit.  It works off the same principle as a TEMS

16   unit.

17   Q.  Doctor, I will show you on the screen, but sticking with

18   physical therapy and epidural injections, can you tell me when

19   did you administer and what does it exactly mean to have a

20   steroid injection?

21   A.  I will first tell you when.  These were done in April of

22   2007.  She received a series of three injections over a

23   three-week period, one each week, during which an anti-

24   inflammatory steroid, not the steroids that athletes use --

25   these are steroids that decrease inflammation and swelling and

898AFRO4ps                      Davy - direct

1    specifically block the production of a chemical called

2    phospholipase A, which irritates nerves and causes tingling and

3    pain.

4    Q.  And, Doctor, what is the apparatus?  What do you have to

5    use in order to perform a steroid injection?

6    A.  OK.  First you need the patient -- you have -- you use a

7    needle and a fluoroscope.  A fluoroscope is an x-ray machine

8    that allows you to see the patient's bony structures and helps

9    to guide the needle into the area where you have to deliver the

10   anti-inflammatory steroid.

11   Q.  Could you show the jury in the projection as to where

12   exactly was the needle inserted.  If you would come into the

13   screen that would be great.

14   A.  You want me to come over.

15        In this case the patient is sitting facing away from

16   me, and actually the machine is on both sides of her, shaped

17   like a C.  And I see the bones of her neck.  I see the bones of

18   her neck on x-ray.  And the soft tissues appear as a clear

19   background.

20        I then numb up the skin overlying the -- these are the

21   spinous processes.  I identify them.  I usually go in at the C6

22   to C7 spinous process.  I numb up the skin overlying the area

23   with local anesthetic after cleaning it with Betadine or an

24   antiseptic solution.  I then use a second needle, which is

25   called an epidural needle.  And I advance it under x-ray

898AFRO4ps                    Davy - direct

1   guidance into the epidural space, using what's called loss-of-

2   resistance technique.

3            The epidural space is a potential space, meaning

4   there's tissue there with a space that you can create.  There

5   is no potential space from the skin to the epidural space.  So

6   if I have air or fluid attached to the needle, I will not be

7   able to inject that air until it gets into that potential

8   space.  Once I get what's called loss of resistance, where I

9   can inject the air, I know I'm in the epidural space.

10           I then inject dye to confirm that I'm in the epidural

11   space, because I could also be in a blood vessel or in the

12   spinal cord.

13   Q.  Doctor, is this procedure performed under anesthesia or

14   not?

15   A.  Not in my office.  The patient in this case -- and I do

16   offer my patients oral sedation, which consists of Valium by

17   mouth, for patients who are apprehensive or afraid of needles.

18   Q.  And, Doctor, did this patient actually -- did you insert

19   this medication to this patient?

20   A.  Yes, I did.

21   Q.  Is this procedure painful?

22   A.  The first -- compared to the other procedures that I do, it

23   is not as painful, but it is not -- it is not without pain.

24   The first needle does require -- does cause some pain, a pinch

25   and a burn, when I put the numbing medicine in.

898AFRO4ps                    Davy - direct

1   Q.  And, Doctor, how deep do you have to go with this needle in

2   order to reach the area?  Can you show us on the picture.

3   A.  Yeah.  The space from the skin to the epidural space is

4   between 3 and 4 inches.

5   Q.  On the small depiction underneath the main picture, can you

6   point out, where exactly do you go with this injection?

7   A.  You have skin, subcutaneous tissue or fat.  You have what's

8   called the inter-spinous ligament, which is the ligament

9   between the spinous processes.  And then you have a leathery-

10  type substance called the ligamentum flavum.  And then once you

11  go through the ligamentum flavum, you're in the epidural space.

12  Q.  What is exactly the space?  Can you describe it in --

13  A.  The epidural space is the space directly outside of the

14  thicker lining of the brain and spinal cord, the dura.

15  Q.  And what is dura?

16  A.  The dura is the lining of the brain and spinal cord.

17  Q.  Doctor, how many times did you have to inject Ms. Frometa

18  with steroids?

19  A.  A total of six times, three in the neck and three in the

20  lower back.

21  Q.  Talking about the lower back, I will ask you to look at the

22  depiction of the lower back injection.  Can you explain to the

23  jury how this one work.

24  A.  OK.  The approach to the epidural space in the lower back

25  can be done two ways.  It can be done through what's called the

898AFRO4ps                    Davy - direct

1    sacral hiatus, or it can be done through the spinous processes.

2    I do my procedures through the sacral hiatus because it's

3    technically in here, and it allows me to give medication to

4    cover the entire lower back.  The sacral hiatus is a defect or

5    absence of bone in the sacrum, which is the bone just above the

6    tail bone.  It has a ligament overlying it and it's located

7    just between the butt cheeks.

8            So the area is again cleaned, anesthetized with local

9    anesthetic, and fluoroscopic guidance is used to put the

10   same-sized needle through the sacral hiatus into the epidural

11   space.  Dye is then injected and the steroid mixed with local

12   anesthetic or saline is then injected, and this bathes the

13   irritated nerve roots and bulging or herniated disks.

14   Q.  Doctor, is it fair to say that each time you have to stick

15   the needle in, it goes right into the spine?

16   A.  Let me define what most laypersons' perception of the spine

17   is.  Most laypersons think the word "spine" means spinal cord.

18   And it doesn't.  The spine is only the bony part of your back,

19   from stem to stern.  The needle does not traumatize the spine

20   or bony part of the back.  It goes into the ligaments.  So

21   there is no injection of the spine with these procedures.

22   Q.  And where exactly do they end up being?  Once you inject

23   the steroid, where does it stay?  In the spine or somewhere

24   else?

25   A.  It stays in the epidural space.  It pervades the nerve

898AFRO4ps                    Davy - direct

1    roots and it slowly gets through eventually to the bloodstream.

2    But the steroid that I use is in a depo-preparation, so it

3    stays where you put it.

4    Q.  And for how long is this steroid injection is good for?

5    A.  It varies.  What we look for is at least a three-month

6    period where the patient's pain is reduced by 50 percent or

7    more, and then -- and we also see how that extrapolates to the

8    patient's functioning, their ability to sleep, work, and do

9    their daily activity.

10   Q.  And, Doctor, what was the reason for you to administer this

11   kind of injections to Ms. Frometa?

12   A.  Because in my opinion she had failed conservative therapy,

13   including medicines and physical therapy, and in the lower

14   back, she continued to have pain after her back surgery.

15   Q.  And, Doctor, did you do any other kind of injections?

16   A.  Yes, I did.  In the lower back, after her limited response

17   to the epidural steroids, I ruled out the facet joints as a

18   cause for her continued low back pain.  And when that was ruled

19   out, I did a spinal cord stimulator trial.  In the neck, I

20   ruled out the facet joints.  And in the neck I also did a

21   percutaneous disk compression or diskectomy.  And then after

22   her limited response I also did a spinal cord stimulator trial.

23   Q.  Doctor, when you mentioned the other type of injection, can

24   you explain for the jurors, what types of injections are those?

25   A.  Well, the facet joint injections involves numbing up the

898AFRO4ps                    Davy - direct

1    nerve that transmits pain from -- I don't see the picture here,

2    but these joints up to the side that goes up the back.  They

3    have a joint at each level.  And when you herniate or bulge a

4    disk, because of the anatomy of the spine, the disk keeps the

5    facet joints aligned.  So if you lose disk height by herniating

6    a disk, the vertebral bodies, or the bones in the back, they

7    collapse, and the facet joints can rupture, and they can cause

8    the same type of pain as a bulge in the herniated disk.  So we

9    need to rule that out by numbing up the nerve that transmits

10   pain to the facet joints.  And those nerves serve only that

11   purpose.  They only transmit pain from the facet joints.

12          She did not respond to those injections.  And with

13   regards to the lower back, she had already had a disk

14   decompression, an open disk decompression, so she was not a

15   candidate for the percutaneous disk compression.  So she was

16   not classified as having chronic, intractable low-back pain,

17   and was next, then, candidate for a spinal cord stimulator

18   trial.  The spinal cord stimulator trial involves placing three

19   electrodes or wires in the epidural space through three

20   separate needles and positioning them in what we call the sweet

21   spot.  This is the area in the epidural space where a tingling

22   of the spinal cord will cause -- I'm sorry -- stimulation of

23   the spinal cord will cause tingling in the painful areas and

24   block the pain.  Similarly in the neck.

25   Q.  Doctor, you have behind you a picture of the cervical

898AFRO4ps                     Davy - direct

1     implant of the neural stimulator.  If you could use this

2     example and explain to the jury, how did you do this procedure?

3     A.  Right.  In the neck, we go in around the mid thoracic area,

4     T4, T5, with two separate needles.  And using x-ray guidance we

5     advance the needles into the epidural space using the same

6     technique, lots of resistance technique, and then we thread the

7     spinal cord stimulator wires.  In the neck we use two

8     electrodes, one on each side of the midline.  In the lower back

9     we use three electrodes, one in the middle and two on each side

10    of that first electrode.

11    Q.  Doctor, could you show us where is the epidural space based

12    on this picture.

13    A.  Right here.

14    Q.  And, Doctor, you're going to see right now the lumbar spine

15    implant of the neuro-stimulator.  Can you explain this one to

16    the jury.

17    A.  This, instead of two leads, we use three leads.  And of

18    course we go, we plan for the epidural space at about L1, L2.

19    And we position the leads at about the end.  And we tingle, or

20    stimulate, make sure she has coverage over the painful areas.

21    We, with the needle in the epidural space, we can pull the

22    leads back and forth and make sure we get the sweet spot before

23    removing the needles, suturing the trial leads and then

24    dressing it up.

25    Q.  Do you have a sample of those leads with you today?

898AFRO4ps                    Davy - direct

1    A.  Yes.

2    Q.  Can you show them to the jury.

3    A.  (Witness complies)

4    Q.  Can you show us how far into the spine or into the lumbar

5    or cervical spine do the leads go into?

6    A.  They go in through here.

7    Q.  Is this how far it has to be inserted?

8    A.  Is it has to, even in the cervical spine, it usually is at

9    the upper end of the second cervical vertebral body.  And to

10   cover the lower back, the back and legs, you need at least the

11   location at the superior T10 vertebral body.

12          THE COURT:  You can take your seat back there until

13   they need you again on your feet.

14          THE WITNESS:  Thank you.

15   Q.  Doctor, the three leads that you described before, what do

16   they have to do?

17   A.  As I stated earlier, they have to be at a specific location

18   in what we call the dermatome location in the spinal cord.

19   During embryonic development, or while we're being formed, the

20   spinal cord stretches to accommodate the limbs.  And so the

21   belly button, which is innervated by T10, is actually located

22   higher up on the spinal cord.  So it's sort of spines down.  So

23   you have to position the leads in a position where you will get

24   that part of the body, in terms of your stimulation.

25   Q.  Doctor, how long does it take to insert the

898AFRO4ps                        Davy - direct

1    neuro-stimulator to the neck and back?

2    A.  Well, in experienced hands, you can put in two leads in

3    about, I've done it in as quick as a half hour, but because you

4    have to get it in the sweet spot, it could take up to four

5    hours.

6    Q.  And in the case of Ms. Frometa, how long did it take?

7    A.  It took in each area about an hour.

8    Q.  Was she sedated?

9    A.  Um, she was given oral Valium in addition to a pain

10   medicine called hydromorphone.  So she was sedated.

11   Q.  Did you hear her screaming during this procedure?

12   A.  Yes.

13   Q.  Doctor, how many neuro-stimulator implants do you do in

14   your practice?

15   A.  In a year?

16   Q.  Yes.

17   A.  Implants or trials?

18   Q.  Let's start with trials.

19   A.  Trials.  I do about four trials a month.

20   Q.  Was the case of Ms. Frometa -- did you implant the trial,

21   neuro-stimulator or the actual implant?

22   A.  The trial, the trial.

23   Q.  What is the difference between the trial and the actual

24   neuro-stimulator?

25   A.  Right.  The trial involves putting in temporary leads that

898AFRO4ps                    Davy - direct

1   are then attached to an external power source and computer,

2   handheld, that you -- that the patient can use to turn the

3   stimulation on or off, left, right, or center.  If that is

4   successful -- and, in my practice, my success rate is about 80

5   percent, trial, so eight out of ten patients who get tried go

6   to the implant -- the implant is done in a hospital.  The

7   patient is fully sedated, with intravenous drugs.  Their vital

8   signs are monitored by an anesthesiologist.  Two incisions are

9   made, one in the upper back or lower back, whether the cervical

10  or lumbar spinal cord stimulation implantation, and one on

11  either the right or left gluteal area.  The gluteal area is

12  where the pulse generator, the energy source in the brain, is

13  implanted.  And then two or three new wires, or leads, are

14  implanted in the neck or lower back.  They are then sutured to

15  the ligaments around the spinal canal.  And they are tunneled

16  under the skin and attached to the pulse generator in the

17  gluteal area.  The wounds are then closed and dressing is

18  applied.  And the patient uses a remote to control the pulse

19  generator.

20  Q.  So is it fair to say that the leads are inserted into the

21  spine and they are sticking out of the skin and being

22  controlled by an outside machine?

23  A.  During the trial, yes.

24  Q.  And within -- when you have the actual implant of the

25  actual neuro-stimulator, not the trial one, is everything being

898AFRO4ps                        Davy - direct

1     implanted or no?

2     A.  Yes.  Everything is under the skin.

3     Q.  And what is the determination whether someone is a

4     candidate for an actual neuro implant, neuro-stimulator

5     implant?

6     A.  A 50 percent reduction in their pain, and the patient's

7     ability to tolerate the tingling.

8     Q.  Is pain something that is objective or subjective?

9     A.  It's defined by the International Association for the Study

10    of Pain as basically what the patient tells you hurts.

11    Q.  What did Ms. Frometa tell you after having those two

12    implants of the trial neuro-stimulators?  What was her

13    complaints?

14    A.  She didn't think that they decreased her pain by 50

15    percent.

16    Q.  What would be the next step for her in her treatment once

17    this procedure didn't work?

18    A.  This far out from her injury, it will be prudent to do

19    repeat diagnostic studies, another MRI, nerve conduction

20    studies, to see what her options were, and if she needed

21    additional surgery, which would include but not limited to disk

22    replacement or fusion, and she decided to have the surgery,

23    then she would have it.  If she was not a surgical candidate,

24    or if she continued to have pain after any of the

25    aforementioned surgical procedures, then she would be a

898AFRO4ps                    Davy - direct

1    candidate for an intrathecal drug trial.

2    Q.  And what is that?

3    A.  It involves injecting a drug into the spinal fluid.  That's

4    the fluid bathing the spinal cord underneath the dura.  And

5    they -- there's a variety of medicines.  The FDA approves

6    morphine, which is an opiate or narcotic; baclofen, which is an

7    antispasmodic, and a new drug called ziconotide, Prialt, which

8    is a sodium channel moderator derived from the spit of a sea

9    snail, which in fact is the most promising drug and is probably

10   what I would try on Ms. Frometa if she came to that point.

11           You inject a trial dose of either of those drugs into

12   the spinal fluid, and the patient is observed for 24 to 72

13   hours for pain relief versus side effects.

14           Again, if the patient has a 50 percent reduction in

15   their pain, without any adverse side effects, then they would

16   require -- then they would be a candidate for implanting a pump

17   that's implanted under the abdomen, and then a catheter is

18   tunneled from the abdomen into the spinal fluid.  The punch has

19   a reservoir and a computer and a power source.  The reservoir

20   is filled with the drug.  The power source provides the energy.

21   And the brain allows you to use in-telemetry to program the

22   pump, to give the patient a milligram of drug or half a

23   milligram or 2 milligrams over a 24-hour period.  Depending on

24   what drug is in the reservoir, it needs to be refilled at 30 to

25   120-day intervals.

898AFRO4ps                    Davy - direct

1    Q.  And, Doctor, how many, in your practice, how many times did

2    you do the neuro-stimulator implants, the trial one?

3    A.  Trial, as I -- in my entire practice?

4    Q.  Yes.

5    A.  I didn't and -- I could get you the number.  I've done

6    over -- I've placed over a thousand leads for trial,

7    remembering that each patient gets between two to three leads.

8    I do about four trials a month.

9    Q.  And Doctor, with the actual neuro-stimulators, how many did

10   you do?

11   A.  The implant, permanent implants?

12   Q.  Yes.

13   A.  This year so far, maybe about ten so far this year.

14   Q.  Mm-hmm.  And, Doctor, can you tell me how much was your

15   cost of treatment of Ms. Frometa?  So far.

16   A.  There are two costs.  There's physician's costs and

17   equipment costs.  The spinal cord stimulator leads are between

18   2 and 7 thousand dollars.  She's had five of those.  And the

19   physician's fees for the estimate -- for the stimulator, for

20   the three-lead, would be $6,000, for the two-lead it would be

21   4.  So that's 10.  Plus 3500.  So 4500.  She had a disk

22   decompression, which is about 3,000, so that's 4800.  She had

23   three epidurals to the neck and three to the lower back.

24   That's another 6.  That's about $50,000.

25   Q.  How much?

898AFRO4ps                      Davy - direct

1    A.  $50,000.

2    Q.  And, Doctor, what would be an estimate for her future

3    treatment cost?

4    A.  All right.  In terms of my areas of -- area of expertise,

5    she is reaching the endpoint.  Her only option would be the

6    intrathecal drug delivery system, or the pump.  The pump trial

7    would cost at least between 5 to 7 thousand dollars.  The drug

8    is very expensive because it's very new.  It's about $3,000 for

9    a 5 cc vial, which would be the trial and then the physician's

10   fee.  And the pump, if she had a successful trial, the pump is

11   about 25, 30 thousand dollars.  And then that would require

12   another -- a physician's fee for implanting the pump, which

13   would be between 3 and 5 thousand dollars, in addition to the

14   hospital visit and anesthesia fees.

15   Q.  Could you give us a general estimate.

16   A.  I'm leading up to that, because unlike the stimulator, the

17   pump does require periodic visits for refills.  So if you have

18   a 20 cc reservoir and each vial is 5 cc's, that's $1,000 for

19   the ziconotide, for the drug, and that's every 120 days.  And

20   the physician's fee for refilling the pump is just a couple of

21   hundred dollars.  So assuming she lives another 30 years, it

22   could add up to a high amount.

23   Q.  Can you tell us more or less how much, approximately?

24   A.  It would, it would cost, to implant the pump, it would

25   probably cost close to $50,000, trial and implant, and then for

Case 1:07-cv-06372-HB-MHD   Document 46-37   Filed 11/04/08   Page 90 of 132

1    refills, at least $48,000 a year, assuming you use ziconotide.

2    Q.  You said a year?

3    A.  Yeah.  That's just for the drug.

4    Q.  Each year she would have to spend 50,000 bucks for just the

5    drug?

6    A.  Yes.

7    Q.  And, Doctor, how much are you being paid for your day in

8    court today?

9    A.  $9,000.

10   Q.  And how much money would you normally make at your office

11   at the same time?  Is it more money or different?

12   A.  It depends on what day.  If I were doing procedures today,

13   I would probably make between 20 and 40 thousand dollars.

14   Q.  And, Doctor, how did you get to know me, myself?

15   A.  I met you at Dr. Krishna's last Christmas party.

16   Q.  And when was it?  In December?

17   A.  Yes.

18   Q.  And when was the first time you saw this patient?

19   A.  March of 2007.

20   Q.  And at this party when we met, how many people were there?

21   A.  Over a hundred.

22   Q.  And who is Dr. Krishna?

23   A.  Dr. Krishna is a neurologist who refers patients.

24   Q.  OK.  And, Doctor, how many times do we have discussions

25   regarding this case and what were the subjects of those

898AFRO4ps                      Davy - direct

1    discussions?

2    A.  We've had several conferences regarding me explaining to

3    you what the procedures are, what the cost is.  I spoke to the

4    artist to help with the diagrams.  Scheduling of depositions

5    and whether I have to do whatever I have to.

6    Q.  I understand.  Doctor, did you testify in this case before?

7    A.  No -- yes, I did.  Yes, I was deposed.

8    Q.  Correct.  And were you paid for this testimony then?

9    A.  No, I wasn't.

10   Q.  Doctor, I would like to move to the last part of the

11   procedures that you did.  And I will introduce to the jury a

12   depiction of your percutaneous diskectomy.  If you could stand

13   up.

14   A.  Sure.

15   Q.  Doctor, at the same time, I am showing the same procedure

16   on the screen in bigger detail.

17          Can you describe for the jury, what was the procedure

18   that you performed on Ms. Frometa's cervical spine?

19   A.  It was removal of about 1/2 to 1 cc of her intervertebral

20   disk material, or nucleus pulposis, by inserting a specialized

21   needle into the disk using x-ray guidance and feel.

22   Q.  Can you show us the needle on the picture.

23   A.  It's called a percutaneous diskectomy probe.  It's a little

24   bit more than a needle.  It has a hollow outer cannula into

25   which a specialized tool is inserted.  And using centripetal or

898AFRO4ps                    Davy - direct

1    centrifugal, I forget which one, force, it sucks up the disk.

2    If you've ever been to a carnival and you go into the, they

3    call it the house without a floor, where you -- the floor goes

4    down and you're sucked onto the wall, that's the same force

5    that this device uses.  And it sucks up the disk onto the

6    device.

7    Q.  Why did you need to perform this procedure?

8    A.  She continued to have radicular pain radiating down her

9    arm.  She was not responsive to epidural steroid injections.

10   The facet joint injections didn't help her pain.  And she had a

11   herniated disk.  She also had a healthy disk.  These are some

12   of the criteria you have to meet before you do this procedure.

13            (Continued on next page)

14

15

16

17

18

19

20

21

22

23

24

25

8988FRO5                    Davy - direct

1    Q.  Can you show us on which level did you perform this

2    surgery?

3    A.  The C3-C4 level.

4    Q.  Doctor, how long was this procedure?

5    A.  The patient was in the operating room for about an hour and

6    a half, but the actual procedure took about 15 to 20 minutes.

7         The patient is laid on her back.  Her neck is

8    extended.  She is sedated but not fully asleep.  She is under

9    surgical drips.  I use a special X-ray glove to palpate the C2

10   and C4 vertebral bodies, which you count from the second, third

11   and fourth levels.  I keep my finger on the bones and use one

12   finger to move the trachea medially to the center and then the

13   other finger palpates the carotid artery, which I move out of

14   the way, and I then take the probe, advance it into the disc.

15   I shoot dye to make sure I am inside the disc, and then I

16   attach the decompressor, activate it for about three minutes,

17   and send the material to the pathologist for analysis.

18   Q.  You can have a seat.

19        Doctor, what was the result of this surgery?

20   A.  Ms. Frometa had about a week and a half of about 60 percent

21   reduction in the pain and then the pain came back.  So it was

22   not successful.

23   Q.  Can you tell me if you are familiar with Dr. Krishna's

24   neurological studies in this case?

25   A.  Yes.  After the percutaneous discectomy, a nerve conduction

8988FRO5                         Davy - direct

1    EMG was done, which showed that she continued to have

2    irritation of the nerve roots.

3    Q.  Is this an objective or subjective finding?

4    A.  This is an objective finding.

5    Q.  Can you describe for the jury what kind of study that is?

6    A.  The EMG study?

7    Q.  Yes.

8    A.  It studies the conduction velocity in the nerve.

9    Q.  What is that?

10   A.  How fast the nerve can send a signal from one point to

11   another point.  And there are certain normal values that it's

12   compared to, and if it's reduced, then it's abnormal.

13   Q.  The finding that you saw that she still has a positive

14   radiculopathy, what does that exactly mean?

15   A.  It means that although the disc was decompressed, there

16   continues to be irritation of the nerve, and this could be one

17   of two things.  Either we need to take some more disc out or

18   the nerve is so far damaged that it will not recover regardless

19   of how well you decompress the disc.

20   Q.  Doctor, can you tell me if in this case it was a contained

21   disc herniation?

22   A.  Yes, it was.

23   Q.  Can you explain to us what does it mean?

24   A.  Yes.  When I inject dye into the center of the disc, the

25   dye will leak out and the volume that leaks out will help to

8988FRO5                         Davy - direct

1    determine just how much connection there is between the outside

2    or epidural space and the center of the disc.  In her case, the

3    dye stayed in the center of the disc ruling in containment of

4    the herniation.

5    Q.  Doctor, what is the success rate of this surgery that you

6    performed?

7    A.  In my hands I get about a 80 to 90 percent cure rate.

8    Q.  Would there be a specific reason why it was not successful

9    in this case?

10   A.  Yes.  The nerve might be too far damaged or too badly

11   damaged, or I have had instances where I had to go back in and

12   take some more disc out.

13   Q.  Doctor, what is the percentage of your patients that have

14   percutaneous discectomy, the procedure that you just described,

15   as well as implant of the neurostimulators?

16   A.  Please repeat the question.

17   Q.  Can you tell me what is the percentage of patients in your

18   practice that actually require both percutaneous discectomy as

19   well as implants of the neurostimulator?

20   A.  Less than 3 percent.

21   Q.  Is this indication of anything?

22   A.  Well, yes.  The percutaneous discectomy is about 15 percent

23   of my patients, those who failed the epidural injections,

24   therapy, medicines, and the facet joint treatments.

25        Then 5 percent of my practice end up having spinal

8988FRO5                    Davy - direct

1   cord stimulator trials because they have failed, in addition to

2   the routine interventional treatments, they have failed not

3   only the percutaneous discectomy, but open discectomies.

4   Q.  Doctor, can you tell me, did you refer Ms. Frometa to any

5   other physician before you did implants of the neurostimulator?

6   A.  Yes.  After the lower back trial and her poor response, I

7   sat back and I said, everything is failing and I needed to rule

8   out other things, secondary gain, depression, anxiety,

9   personality disorders.  There have been reports in the

10  literature where patients can frustrate physicians by going to

11  procedures and reporting that they just don't work.  So I

12  referred her for a psychological evaluation before the cervical

13  spinal cord stimulator trial.

14  Q.  Do you know the outcome?  What was your understanding of

15  the outcome?

16           MR. COFFEY:  Objection.

17           THE COURT:  Sustained.

18  Q.  Dr. Davy, did you have any understanding of the outcome of

19  the psychological evaluation for the needs of your treatment?

20           THE COURT:  Sustained.

21  Q.  Doctor, when did you refer Ms. Frometa to a psychologist?

22  A.  His report is dated 5/27/08.  So I assume I referred her to

23  him before then.

24           THE COURT:  I think that's it, my friend.  Anything

25  else?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8988FRO5                      Davy - direct

 1          MR. PLATTA:  Not regarding the psychological, your

 2   Honor, but yes.

 3   Q.  Dr. Davy, can you explain for us whether there was a spur

 4   existing in Ms. Frometa's spine?

 5   A.  A spur?

 6   Q.  Yes.

 7   A.  I would have to look at her MRI report.

 8   Q.  Can you explain for us what a spur is?

 9          THE COURT:  If he doesn't know if there was one, I

10   just as soon not listen to what it is.  We have enough here in

11   terms of hypotheticals.

12   Q.  Can you tell me with a reasonable degree of medical

13   certainty whether this injury was created by the accident that

14   occurred on February 14 of 2007?

15   A.  Yes.

16   Q.  That is why?

17   A.  Excuse me?

18   Q.  Why do you think so?

19   A.  The patient, when I saw her at her initial visit, denied

20   any prior issue of neck and lower back pain.  She worked two

21   jobs.  She came to the procedures very reluctantly.  She is

22   deathly afraid of needles and most patients who I do epidural

23   steroid injections on does not require the pill I had to give

24   her.  She even went to have more invasive surgery before the

25   needles because during the surgery she would be asleep.

8988FRO5                    Davy - direct

1            So, as I have gotten to know Ms. Frometa, she appears

2    to me to be a very -- used to be a very active, hard-working,

3    productive person, and my concerns were ruled out by the

4    referral to the psychologist.  Therefore, I think to restate

5    Mr. Slawek's statements, within a reasonable degree of medical

6    certainty, I think all her pain suffering and current inability

7    to work is a result of the motor vehicle accident dated 2/14/07

8    without any preexisting or intercedent events that affects the

9    causality.

10   Q.  Doctor, were you aware of any treatment that was preceding

11   your treatment of Ms. Frometa, meaning prior to February 14 of

12   '07?

13   A.  Nothing besides therapy and medication.

14   Q.  Can you tell me if prior or subsequent motor vehicle

15   accidents without treatment without injuries could be creating

16   any kind of problem for her from your perspective?

17   A.  Not that was being expressed clinically; not that it was

18   limiting her sleep, recreational activities, activities of

19   daily living, job activities.

20   Q.  So, in other words, is it fair to say that without medical

21   treatment from any prior accidents, any fender-bender accidents

22   she might have had in her life, you never heard about any other

23   treatment besides yours and the one that she received as a

24   result of the February 14 of 2007 accident?

25   A.  That is correct.

8988FRO5                        Davy - direct

1              THE COURT:  It's the last time we are going to be

2       talking in those terms.  We have had it about three times.

3       Enough is enough.

4              MR. PLATTA:  Thank you, your Honor.

5       Q.  Dr. Davy, I put on the projector a copy of the report.

6              MR. COFFEY:  Objection.

7              THE COURT:  Whose report?

8              MR. COFFEY:  This is the MRI report of the spine of

9       Ms. Frometa that was admitted in evidence before.

10             THE COURT:  As far as I am concerned, we don't need it

11      twice.  He can testify to it or you can put the piece of paper

12      in evidence, one or the other.

13             MR. PLATTA:  I was going to use it only to refresh the

14      witness's recollection.

15             THE COURT:  If he needs refreshing, we will worry

16      about it then.

17      Q.  Doctor, in this report, there is a mention of a spur.

18      Could you explain for us --

19             THE COURT:  Sustained.

20      Q.  Doctor, was there any time in which you were contacted by

21      Dr. Charles Kincaid, an expert in this case, a life care

22      planner?

23      A.  Yes.

24      Q.  Can you tell me what was the sum and substance of the

25      conversation that you had with him?

8988FRO5                    Davy - direct

1          THE COURT:  Sustained.  We will take it from him.

2    Q.  Doctor, can you tell me what kind of recommended treatment

3    did you prescribe for Ms. Frometa in the future?

4          THE COURT:  Which we can also get from Kincaid, but if

5    you want to tell us in a moment, you can tell us.

6          THE WITNESS:  I thought I did.

7          THE COURT:  I thought you did too, but that doesn't

8    seem to make any difference to Mr. Platta.

9    A.  The intrathecal drug delivery system would be one of the

10   additional treatments she might be a candidate for.

11   Q.  Is it correct that you didn't advise her to have any

12   further MRIs?

13   A.  Yes, I did.

14   Q.  Is it also correct that she will not need any future

15   percutaneous discectomy, the one that you just described here?

16   A.  I don't know.

17   Q.  Doctor, what are your usual charges for a visit?

18   A.  For a follow-up visit $400.

19   Q.  If someone would pay cash, would you discount the rate?

20   A.  If they request it.  If they request consideration or

21   adjustment of the fees, I ask them to write a hardship letter

22   just stating that they cannot afford that amount and what they

23   can afford.  That is sent to my billing company and is filed in

24   the chart and usually I accept -- I usually offer them a 50

25   percent discount, but I usually accept whatever they can

8988FRO5                    Davy - direct

1   afford, especially if they are just coming for prescriptions.

2   Q.  Is it also correct that you advised Ms. Frometa to have

3   physical therapy evaluation once in a lifetime?

4   A.  I am sorry?

5        THE COURT:  I didn't get it.  Once when?

6   Q.  Once lifetime.

7   A.  I think functional capacity evaluation.  Because of the

8   subjectivity of pain, I tend not to ascribe disability versus

9   ability to patients with chronic pain.  I defer that to a

10  functional capacity evaluation, which is usually done by a

11  physical therapist.  They interview the patient and find out

12  what they do during their daily activities.  And then in a gym

13  setting they try to recreate it.  If you lift 50 pounds and

14  walk 40 yards, they measure how far you do, how far you can

15  carry the 50-pound weight.  Do you fatigue?  Do you grimace?

16  And they have different computer calculations and they come up

17  with what is called a functional capacity evaluation that will

18  lend some objectivity to the patient's disability versus

19  ability.

20  Q.  Doctor, can you tell me, if you know, the cost of a

21  physical therapy evaluation?

22       THE COURT:  Sustained.

23  Q.  Doctor, do you know the cost of physical therapy?

24       THE COURT:  Sustained.

25  Q.  Did you advise physical therapy for Ms. Frometa?

8988FRO5                          Davy - direct

1    A.  Yes.

2    Q.  Do you know what would be the cost of that?

3          THE COURT:  Sustained.

4    Q.  Doctor, what is the medication that you prescribed for

5    Ms. Frometa?

6          THE COURT:  Sustained.

7    Q.  Doctor, beside the procedures that you did, what kind of

8    treatment did you recommend for Ms. Frometa?

9          THE COURT:  We have had this testimony.  You have got

10   to be finished soon.  Don't do it twice.

11         MR. PLATTA:  I believe we didn't have testimony

12   regarding medicine that Ms. Frometa is taking and the cost of

13   that.

14         THE COURT:  My view is to the opposite conclusion.

15   Q.  Doctor, do you know what is the yearly cost for

16   Ms. Frometa's medicine, pain medicine?

17   A.  That she is taking now?

18   Q.  Yes.

19   A.  No, I don't.

20   Q.  Can you estimate?

21         THE COURT:  No, thanks.

22         What else?  You have got five minutes, use it any way

23   you would like.

24   Q.  Doctor, when you were talking about the neurostimulator,

25   does a neurostimulator require a battery replacement?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8988FRO5                        Davy - direct

1    A.  Yes.

2    Q.  What is the cost of that?

3    A.  A generator costs about $30,000.

4         THE COURT:  Did you testify to that cost before?

5         Mr. Platta, you now have three minutes but try to do

6    something different.

7         MR. PLATTA:  I will.

8    Q.  Doctor, as a result of the accident, did Ms. Frometa

9    permanently lose the use of her spine?

10   A.  No.

11   Q.  How would you describe the loss of function of her spine?

12   A.  With the functional capacity evaluation?

13   Q.  Yes.  Can you tell me if she lost any percentage of the use

14   of her spine?

15   A.  The question cannot be answered.  It's also not phrased

16   right.  I think what you're looking for is the result of a

17   functional capacity evaluation.

18   Q.  That's correct.

19   A.  Which I don't do.

20   Q.  OK.  Doctor, as a result of this accident, did Ms. Frometa

21   sustain a significant limitation in the use of her spine?

22        THE COURT:  If you know.

23   A.  I don't understand the question.

24        THE COURT:  Then you don't know.

25   Q.  To the best of your understanding, can you explain for us

8988FRO5                    Davy - direct

1    whether the injuries and the treatment that she received

2    resulted in the significant or any limitation of her spine

3    function?

4            MR. COFFEY:  Objection.

5            THE COURT:  He has one minute, let him do what he

6    wants.

7    A.  Functional capacity evaluation, it's subjective.  Can she

8    bend more or less?

9            THE COURT:  Did you test whether she bends more or

10   less?

11           THE WITNESS:  No.  That's done in the functional

12   capacity evaluation.  Can she lift more or less?

13           THE COURT:  That's it.

14           MR. PLATTA:  Can I have one last question, Judge?

15           THE COURT:  No.  It's over.

16           We will take ten minutes, everybody.

17           (Jury exits courtroom)

18           (Continued on next page)

19

20

21

22

23

24

25

8988FRO5

```
 1              THE COURT:  Mr. Platta, I have got news for you.  If I
 2   hear you go over the same material a second time, we are going
 3   to stop your examination right then and there.  Understood?
 4              MR. PLATTA:  Yes, your Honor.
 5              THE COURT:  The doctor and I found anything in the
 6   last 15 or 20 minutes -- I don't like to talk to him, but he
 7   talked to me -- to be repetitive.  There is no need for that.
 8   If they understand it at all, they can get it once, but they
 9   are not going to keep getting it from you.  Is that understood?
10              MR. PLATTA:  Yes, your Honor.
11              THE COURT:  We will see you in eight minutes.
12              (Recess)
13              (Continued on next page)
14
15
16
17
18
19
20
21
22
23
24
25
```

8988FRO5

```
 1              (Jury present)

 2     CROSS-EXAMINATION

 3     BY MR. COFFEY:

 4     Q.  Doctor, do you remember giving a deposition back on May 9th

 5     of 2008 at my office in White Plains?

 6     A.  Yes.

 7     Q.  Do you remember being asked about if you were familiar with

 8     the cost of medications?

 9     A.  I don't remember.

10     Q.  I draw you to page 89, line 2 to 12.

11     "Q.  Talking about medications and the cost of medication, are

12     you familiar with the cost of medication?

13     "A.  Somewhat.

14     "Q.  When you say somewhat, how much does that come down to?

15     "A.  I don't have the numbers offhand, estimates.

16     "Q.  Who would have those?

17     "A.  I guess drug companies, pharmacists."

18              Do you remember giving that answer?

19     A.  No, I don't remember, but I guess I did.

20     Q.  Now, the other thing is, you were talking about your cost

21     for visits also that day.

22              Do you remember saying that your cost for a visit was

23     you received $71 most of the time?

24     A.  Might I interject before I answer the second question?

25              Those questions regarding drugs were probably oral
```

8988FRO5                         Davy - cross

1   drugs and not the intrathecal drugs because those I am familiar

2   with.

3           And then, $71 is what I am paid based on no-fault

4   guidelines.  I charge $400.

5   Q.  And you get reimbursed $71?

6   A.  Yes.  By the no-fault insurance company.

7   Q.  At your deposition, though, you didn't talk about the

8   difference between intravenous and oral drugs, you didn't

9   separate the two, is that correct?

10  A.  I think, with all due respect, you didn't separate that.

11  Q.  Fair enough.

12          Now, going back to testifying, how often do you

13  testify in court?

14  A.  This is my third testimony in court, in a trial setting.  I

15  do testify for Workers' Comp.  I go to Workers' Comp court and

16  I do telephone depositions for Workers' Comp. patients quite

17  often.

18  Q.  How often is that?

19  A.  About, maybe, three to four times a month.

20  Q.  What percentage of the work you do is for plaintiffs versus

21  as for defendants?

22          MR. PLATTA:  Objection.

23          THE COURT:  I will allow it.

24  A.  The majority of my work is for the plaintiff.

25  Q.  So the majority, if we were to use percentages, over 90

8988FRO5                    Davy - cross

1    percent?

2    A.  Yes.

3    Q.  You do you know Dr. Babu?

4    A.  I met him today.

5    Q.  Now, you said that you met with Mr. Platta.  Approximately

6    how many hours did you meet with Mr. Platta in total before

7    testifying here today?

8    A.  About five or six.

9    Q.  Now, you said you prepared some of the diagrams.  How did

10   you help him prepare for that?

11   A.  I consulted with the artists.  I spoke to the artist once

12   and the artist had some specific questions.

13   Q.  What kind of questions did the artist have?

14   A.  They were very brief.  I don't remember.

15   Q.  So these weren't taken from a textbook, but they were done

16   specifically by an artist?

17   A.  They were taken from my operative report, as I understand

18   it.

19   Q.  And your operative report has color photos like that in it?

20   A.  No.  It has a verbal description of the procedure.

21   Q.  Now, when we are talking about a disc bulge or herniation,

22   you said that she had contained herniation.  What is a

23   contained herniation?

24   A.  A contained herniation is one that does not have any loose

25   disc in the epidural space.  It's described as a wide-neck

8988FRO5                          Davy - cross

1    herniation.  If you were to inflate a balloon and if you were

2    able to put a finger inside the balloon and press on it, you

3    would get a bulge that would have a wide neck.  And a contained

4    herniation, because it has a wide neck, the herniated disc or

5    bulge is not preventing any communication from inside the disc

6    to outside, as opposed to a narrow neck herniation where the

7    disc is flopping in the breeze and there is a small hole there.

8    Q.  So it's also typically small, is that correct?

9    A.  The contained disc herniation, yes.

10   Q.  Typically, there is no ongoing neurologic changes with

11   them?

12   A.  Typically.

13   Q.  And no ongoing deficits?

14   A.  Correct.

15   Q.  By that we mean no bowel dysfunction or no bladder

16   dysfunction?

17   A.  Correct.

18   Q.  Did she have any loss of motor strength when you first

19   examined her?

20   A.  I did not do motor functions on my initial exam.

21   Q.  Did you see any wasting of muscles?

22   A.  No.

23   Q.  So from that standpoint, all those symptoms would point

24   that it was rather minor, is that correct?

25   A.  What was rather minor?

8988FRO5                    Davy - cross

1    Q.  Having no ongoing deficits, no wasting of muscles and a

2    small disc herniation?

3    A.  To answer your question, yes, those things helped.  The

4    qualifying minor, I don't know what you're calling minor.

5    Q.  I will rephrase it.

6         When she first came to you, did she give you a

7    history?

8    A.  Yes, she did.

9    Q.  What did she tell you in her history?

10   A.  That she was the driver of a car that was rear-ended while

11   moving.  She had two minutes of loss of consciousness.  She was

12   wearing her seat belt.

13   Q.  What date was that on?

14   A.  February 14, 2007.

15   Q.  What date did she first come to see you?

16   A.  April 25, 2007.

17   Q.  At any time did she tell you that she was involved in a

18   motor vehicle accident on March 8th of 2007 with Carey

19   Williams?

20   A.  No.

21   Q.  At any time subsequent did she tell you she was involved in

22   a subsequent motor vehicle accident in Englewood, New Jersey,

23   on July 29th of 2007, did she tell you about that motor vehicle

24   accident with Patrick Demlin?

25   A.  No, she did not.

8988FRO5                    Davy - cross

1   Q.  Now, why is a history important?

2   A.  The history, as coined by Dana Ashler, a clinician, where I

3   trained, gives you 90 to 98 percent of your diagnosis.  It's

4   very important.  It helps you formulate your physical exams and

5   your diagnostic studies.  It helps you to formulate

6   differential diagnostic lists that you sequentially rule out

7   and then arrive at an accurate diagnosis.  So it's very

8   important.

9   Q.  If you do not get a correct history or a complete history,

10  what can happen?

11  A.  It can mislead your diagnosis and treatment.

12  Q.  Can it also potentially change causation?

13          MR. PLATTA:  Objection.

14          THE COURT:  Do you understand the question or do you

15  want him to rephrase it?

16  A.  Rephrase the question.

17  Q.  Do you understand if someone is not forthright in the

18  history, and there could be other intervening or succeeding or

19  preceding or any other type of event, that that could change

20  what your causation is?

21  A.  I think it can cause -- it can change your differential and

22  your investigational studies.  Then the results of those

23  certainly can change the causality of what you're looking at.

24  Q.  Now, when she first came to you, did she bring any reports

25  or diagnostic films with her?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8988FRO5                          Davy - cross

1     A.   Yes.  She had an MRI of the lower back, an MRI of the neck,

2     X-rays of the neck.

3     Q.   You didn't review the actual films, isn't that correct?

4     A.   That's correct.

5     Q.   So you reviewed the reports?

6     A.   Yes.

7     Q.   When you reviewed the report for the L5-S1, did she have

8     any degenerative change there that would have preexisted before

9     this event, before the February motor vehicle accident?

10    A.   The MRI I reviewed was a month later and it showed disc

11    hydration loss, which means the disc is dried up, anterior disc

12    extension and anterior spur with adjacent osseous vertebral

13    edema as well as posterior disc herniation.

14         So yes and yes.  Some of these changes are old and

15    some are new.  The edema is certainly new.  The disc

16    herniation, it is hard to tell whether it's new or old; you

17    would have to have a prior film to compare.  The hydration

18    loss, it's only been a month so that may have preexisted.  The

19    edema would not have been around for longer than maybe four to

20    six weeks.

21    Q.   Did she ever tell you that she was involved in a prior

22    motor vehicle accident out in the state of California?

23    A.   No prior accidents were reported.

24    Q.   At any time up till we sit here today, did she ever talk to

25    you about any of these motor vehicle accidents?

8988FRO5                    Davy - cross

1   A.  No.

2   Q.  Did anyone ever bring them to your knowledge that this

3   would come up here today?

4   A.  Yes.

5          MR. PLATTA:  Objection.

6   Q.  Who brought that up to you?

7          MR. PLATTA:  Objection.

8          THE COURT:  Overruled.

9   A.  I think in the deposition they were brought up.

10  Q.  Did you speak about this with Mr. Platta?

11  A.  Did I speak to him about the accidents?  Yes, I did.

12  Q.  What was said to you?

13  A.  He asked me if she --

14         THE COURT:  This is privileged.  If you want to waive

15  the privilege?

16         MR. PLATTA:  I don't want to.  Objection.

17         THE COURT:  Sustained.

18  A.  My response is that I did specifically --

19         THE COURT:  You don't have to answer.

20  Q.  Now, when we talk about the percutaneous discectomy, this

21  machine that you use for that, is it approximately a $2,000

22  machine?

23  A.  Can I say something before I answer that?

24         Basically, and from experience, I do ask patients, and

25  I did ask Ms. Frometa, if she had any prior neck or lower back

114

8988FRO5                        Davy - cross

1   pain.  She said no.

2          Now, repeat the question.

3   Q.  The Stryker device, is that a $2,000 device instrument?

4   A.  About, yes.

5   Q.  Were you trained on that instrument in your fellowship or

6   did you take a weekend course in how to use it?

7          MR. PLATTA:  Objection.

8          THE COURT:  Overruled.

9   A.  I took a course, a two-day cadaver course, where I was

10  familiarized with the device, having trained how to place

11  needles into the disc, which the only difference is instead of

12  a needle, it's this device.

13  Q.  You have a delineation of privileges at your hospital?

14  A.  Yes, I do.

15  Q.  This procedure falls under anesthesia, not surgery, isn't

16  that correct?

17  A.  I have dual appointment at the hospital.  I admit under

18  surgery, which is unique, and this procedure is sanctioned or I

19  have privilege under the surgery department to do this

20  procedure.

21  Q.  But you're not board certified in surgery?

22  A.  That's correct.

23  Q.  Typically, anesthesiologists perform this procedure, isn't

24  that correct?

25  A.  Pain medicine physicians.  They might be anesthesiologists,

8988FRO5                          Davy - cross

1    internists, neurologists, physiatrists, orthopedists.

2    Q.  You gave testimony that it takes about 15 minutes per level

3    for doing that procedure?

4    A.  Yes.

5    Q.  How long did that procedure take in total for Ms. Frometa?

6    A.  About an hour and a half.

7    Q.  So you do about 20 of those a month?

8    A.  Approximately.  Not 20.  I do every other -- it might be 20

9    because some patients I do between one and three levels, and I

10   may have three or four patients twice a month.

11   Q.  It's become a pretty common procedure, is that correct?

12   A.  For me or in general?

13   Q.  For you.

14   A.  For me?  No, it's still only about 15 percent of my

15   practice.

16   Q.  Now, you also talked about a stimulator.  The purpose of

17   that was to block pain, is that correct?

18   A.  Yes.

19   Q.  Now, did the disc compression that you performed fail in

20   your estimation?

21   A.  Yes.

22   Q.  Isn't it also fair to say pain is purely subjective?

23   A.  It's defined as an emotional and sensory response to actual

24   or perceived tissue injury.  So as we speak today, there is no

25   objective measure of pain.  So it is purely subjective, yes.

116

8988FRO5                          Davy - cross

1    Q.  By subjective, you mean it's what Ms. Frometa tells you?

2    A.  Yes.  You cannot measure it, you cannot ascribe a

3    temperature to it, you cannot do an EKG to show any changes.

4    There are studies being done now, PET scans in the brain, that

5    looks favorable, but as we speak, there is no accepted

6    objective measure of pain.  So the governing body says pain is

7    basically what the patient tells you hurts.

8    Q.  Did you corelate her subjective findings of pain with

9    subsequent MRIs in her cervical spine?

10   A.  Yes.

11   Q.  When was that?

12   A.  At her initial visit, she had a physical exam, history, and

13   I did look at the MRI report.

14   Q.  When is the last time she had an MRI of her cervical spine,

15   as far as you're aware?

16   A.  I don't think she has had one since the initial study.

17   Q.  So after she had the failed disc decompression, you didn't

18   send her for a follow-up MRI to see if the subjective elements

19   of pain corelated with objective findings of an MRI?

20   A.  That's correct, I did not.

21   Q.  The Stryker Web site says -- the Stryker, that's the name

22   of the instrument that you use for the disc decompression?

23   A.  Yes.

24   Q.  They say that it takes six months to determine if there is

25   success or failure of the procedure.  Did you wait six months?

8988FRO5                              Davy - cross

1                MR. PLATTA:  Objection.

2     A.  No, I did not.

3     Q.  Did you go against the literature that the Stryker, the

4     manufacturer of the machine, recommends?

5     A.  I went based on my clinical experience and the patient's

6     discomfort and severe pain level.  I was not going to wait six

7     months with her pain above an eight to determine if this

8     procedure was successful.

9     Q.  Were you also aware that Dr. Babu said his operation was

10    not wholly successful?

11    A.  I was not in here for his testimony.

12    Q.  So did you ever read his records?

13    A.  No.

14    Q.  So you're not aware of what he did, what procedure, what

15    operation he did?

16    A.  Vaguely.

17    Q.  Now, you said you met Mr. Platta at a Christmas party.

18    Whose Christmas party was this?

19    A.  Dr. Krishna.

20    Q.  Was this for doctors primarily who work with the

21    plaintiffs' bar?

22    A.  It's an annual Christmas party.  Dr. Krishna has several

23    offices and he has an annual Christmas party where I meet

24    lawyers, who we share patients and I send them reports, and

25    they don't know who Dr. Davy is, and so they put a face to a

8988FRO5                    Davy - cross

1    name.

2    Q.  Where was this party?

3    A.  Terrace on the Park in Queens; I think that's the name.

4    Q.  How were you introduced to Mr. Platta?  What was said to

5    you?

6    A.  Oh, Dr. Davy, this is one of the newer lawyers who we work

7    with, Mr. Platta.

8    Q.  How many offices do you currently have, Doctor?

9    A.  Five.

10   Q.  You share space with Dr. Krishna?

11   A.  I rent space from Dr. Krishna in some of his offices, not

12   all of them.

13   Q.  In how many of them do you rent space from Dr. Krishna?

14   A.  One.  I'm sorry, two.

15   Q.  Which ones are they?

16   A.  Westchester and Voorhies Avenue.

17   Q.  Now, does he refer you patients?

18   A.  Yes, he does.

19   Q.  Is it fair to say it's over 100 patients a year that he

20   refers to you?

21   A.  Probably.

22   Q.  Has Mr. Platta referred to you any other cases?

23   A.  Not that I am aware of.  He has never referred any.  I

24   don't think he has referred anybody to me.

25   Q.  Now, when we talk about the films, who would have been in a

8988FRO5                        Davy - cross

1    better place to review films, you reading the reports or a

2    radiologist?

3              MR. PLATTA:  Objection, your Honor.

4              THE COURT:  Why don't you rephrase the question?

5              MR. COFFEY:  OK.

6    Q.  You're not a board certified radiologist, is that correct?

7    A.  That's correct.

8    Q.  They are different and distinct medical professions?

9    A.  Yes.

10   Q.  Now, talking about publications, are you familiar with the

11   New England Journal of Medicine?

12   A.  Yes.

13   Q.  I think we spoke about this at your deposition.  Are you

14   aware of the study where a certain percentage of herniations

15   will heal on their own without medical treatment?

16   A.  Nine out of ten.

17   Q.  How long does the New England Journal of Medicine typically

18   say we should wait to see if they heal spontaneously on their

19   own or not?

20             MR. PLATTA:  Objection.

21   Q.  If you know?

22             THE COURT:  Overruled.

23   A.  I probably knew once, but it doesn't apply clinically.

24   You're looking at an isolated statement.  I look at patients in

25   pain.

8988FRO5                    Davy - cross

1    Q.  Typically, do you wait a year to see if they cure

2    themselves, the herniations?

3    A.  I usually give patients a good try at conservative therapy.

4    I always stress physical therapy, medications, behavior

5    modification, because, as is clear in the medical community,

6    acute low back pain, if you decrease your activities, not

7    necessarily stay in bed, take some medicines, do some therapy,

8    nine times out of ten you get better.  So I do give patients a

9    trial of that.  Is it six months, a year, six weeks?  It

10   depends on the patient.

11   Q.  Is it typically longer than three months?

12   A.  Typically.

13   Q.  Isn't a contained disc really a bulging disc, what we call?

14   A.  The difference is in a bulging disc there is intact annulus

15   fibrosis of the lining of the disc, and that lining is in

16   layers like an onion skin.  So there are at least some layers

17   that are completely intact.  Whereas a herniation none of the

18   layers are intact.

19         Because I am a pain specialist, I usually see patients

20   after that three-month trial period so most of my patients have

21   failed the trial period for conservative recovery.

22   Q.  I didn't ask this specifically and this is the only time.

23   It's possible that the spur could have been caused by the prior

24   motor vehicle accidents?

25   A.  Repeat the question.

121

8988FRO5                    Davy - cross

1          MR. PLATTA:  Objection.

2    Q.  A spur could have been caused by a prior motor vehicle

3    accident?

4    A.  A spur could have, yes.

5    Q.  You also did a report on April 25, is that correct?

6    A.  Yes, my typed report.

7    Q.  That would be your typed report.

8          You also stated in that report that no preexisting

9    condition exists that affects the causality, other motor

10   vehicle accidents could affect the causality, is that correct?

11         MR. PLATTA:  Objection.

12         THE COURT:  I am not sure I understand what you're

13   reading.  Is he saying that another motor vehicle accident

14   could affect, but there weren't any?

15         MR. COFFEY:  Right.  Based upon his history in that

16   report.

17   Q.  Is that correct?

18   A.  No.  My specific meaning from that statement was that the

19   patient did not report any prior history of neck or low back

20   pain.  But even if she had five spurs and four herniations,

21   they were not causing any clinical symptoms.

22   Q.  You never reviewed the records from any other doctors for

23   the plaintiff, is that correct?

24         MR. PLATTA:  Objection.

25         THE COURT:  Overruled.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

8988FRO5                         Davy - cross

1    A.  I saw the MRI, but no other reports from any doctors.

2    Q.  That would be the records, correct?

3    A.  Yes.

4    Q.  When you injected the dye into the disc, there was no

5    extravasation of the dye, is that correct?

6    A.  Yes.

7    Q.  What is that clinically significant for?

8    A.  It shows me that the connection -- does not exist a

9    connection between the center of the disc and outside the disc.

10   Q.  It also then would show that it was possible it was a bulge

11   and not a herniation, is that correct?

12   A.  If you just looked at the discogram, yes, but we have an

13   MRI.

14   Q.  Did you ever review Ms. Frometa's physical therapy records?

15   A.  No.

16   Q.  Did you ever check to see if she had nerve root

17   compression?

18   A.  Yes.  I did a sensory test in my initial evaluation; she

19   had some decreased sensation in some of the cervical dermatome.

20   Q.  You did not find nerve root compression, is that correct?

21          MR. PLATTA:  Objection.

22   A.  Yes.  I actually --

23          THE COURT:  You have to wait until I rule.

24          THE WITNESS:  I am sorry.

25   Q.  Isn't it true that she did not have nerve root compression?

8988FRO5                         Davy - cross

1   A.  She did have nerve root -- a positive spurring sign is a

2   clinical indicator of nerve root compression in the neck.

3   Positive straight leg raises is a clinical indication of nerve

4   root compression in the lower back.

5   Q.  She had no weakness, is that correct?

6   A.  I don't think I did motor function.

7   Q.  Would that have been relevant?

8   A.  Not for pain management.  It would have been relevant to

9   determine whether she had a severe neurologic deficit and would

10  need spine surgery.

11  Q.  Isn't it also true she had no radicular pain?

12  A.  She did have radicular pain.  The pain radiated into the

13  fingers and into the toes in the neck and back respectively.

14  Q.  So are you saying those were neurologic deficits?

15  A.  No, just radiating pain; that is what a radiculopathy is.

16  Q.  There were no dire symptoms, isn't that correct?

17  A.  I think what you're driving at is that there were no

18  mechanical nerve root compression, but there was chemical nerve

19  root irritation, which caused the symptoms that I found and she

20  described.

21  Q.  So if there was a chemical one, which chemical test did you

22  perform that would have positive chemical findings?

23  A.  The history, the history of radiating pain and reproduction

24  of pain with the spurring maneuver.  The spurring maneuver

25  causes the disc to herniate and irritate the nerve

8988FRO5                    Davy - cross

1    mechanically, but that's transient, that's not a permanent

2    finding.  And so the MRI might not show nerve root compression

3    because the spurring sign is a maneuver where you tilt the head

4    to one side and you rotate -- you tilt the neck to one side and

5    you rotate the head, and then you apply pressure on the top of

6    the head.  So that's not done in an MRI.  And so you wouldn't

7    see any disc irritating the nerve root in a mechanical fashion.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

898AFRO6ps                    Davy - cross

1    Q.  When a herniation is sustained, is there typically

2    significant onset of pain immediately?

3    A.  It depends.  Usually, the patients will describe a pop or a

4    snap or a crackle, and they'll have pain in the axial spine,

5    the neck or back.  Then hours to days later, the pain will

6    start to radiate down an extremity or nerve.

7    Q.  In your deposition, do you remember, on page 97, being

8    asked:

9    "Q.  Now, when a herniation is sustained from the onset, is

10   there significant pain typically?

11   "A.  Typically there is."

12   A.  Yeah.  I just qualified -- I just described the type of

13   pain.  I did say the patient gets pain in the axial area and

14   that it rad -- yes.  So the answer is yes, there is pain,

15   typically.

16   Q.  And also, do you recall talking about whether the

17   herniations preceded the accident and saying you cannot tell if

18   they did, Doctor?

19   A.  Correct.

20   Q.  Is it fair to say that the most common herniation is the

21   L5-S1?

22   A.  Probably.

23   Q.  And isn't degeneration also responsible for that in the

24   human body?

25            MR. PLATTA:  Objection.

898AFRO6ps                    Davy - cross

1           THE COURT:  I'm not sure I understand the question.

2    Q.  Isn't typically L5-S1 herniation caused by degeneration?

3           MR. PLATTA:  Objection.

4           THE COURT:

5    A.  I disagree with that statement.

6    Q.  Do you know when Ms. Frometa stopped working?

7    A.  I don't know.

8    Q.  Have you ever read any of the Dartmouth studies about spine

9    surgery?

10   A.  No.

11   Q.  And did you read the sports study?

12   A.  No.

13          MR. PLATTA:  Objection.

14   Q.  At any point in time, did you review -- did you get a

15   questionnaire from Doctor -- from Mr. Kincaid?

16   A.  I think I did, yes.

17   Q.  Now, did you speak to Mr. Kincaid's office, or did your

18   receptionist?

19   A.  I spoke to them.

20   Q.  You spoke with who from there?

21   A.  I think it was -- it's not -- it was a woman.  I know that

22   Dr. Kincaid is a woman.

23   Q.  OK.  But you didn't speak with him ever?

24          THE COURT:  He's asking you if it's a man or a woman.

25   Q.  Oh, no, I just thought you -- it's a man.

898AFRO6ps                    Davy - cross

1   A.  OK.  I never spoke to him.

2   Q.  Now, did you ever review the ambulance call report for this

3   accident?

4   A.  No.

5   Q.  Did Ms. Frometa tell you that she lost consciousness when

6   this accident occurred?

7   A.  Yes.

8   Q.  Did you find it unusual -- would it be unusual, Doctor, for

9   someone to have as many failed procedures as Ms. Frometa?

10  A.  Yes.

11          MR. COFFEY:  I have no further questions.  Thank you.

12          THE COURT:  Any brief redirect?

13          MR. PLATTA:  Very brief, your Honor.

14  REDIRECT EXAMINATION

15  BY MR. PLATTA:

16  Q.  Doctor, I'll ask the last question.  When would you find it

17  unusual for a person to have so many unsuccessful procedures?

18  A.  Just from a sample size, I guess from personal bias and my

19  ego, you know, I do have some patients who get to the point

20  where I say, I have nothing more to offer you.  I pride myself

21  on being a pain physician who uses from pills to the pump.

22  So -- and everything between.  And so when it gets to the point

23  where patients aren't responding to everything and that

24  prompted me to get the -- to rule out depression, secondary

25  gain, anxiety, personality disorders.  And that's why I got the

898AFRO6ps                    Davy - redirect

1    psychological evaluation before the last procedure, which ruled

2    those things out.

3              MR. PLATTA:  Thank you, your Honor.  Your Honor, I

4    would like to introduce into evidence the artwork that was

5    testified by Dr. Davy to be accurate for presentation of the

6    procedures that he did.

7              THE COURT:  Any objection?

8              MR. COFFEY:  Just so I'm being on recross -- on

9    redirect.  But other than that, no objection.

10             THE COURT:  I didn't hear you.

11             MR. COFFEY:  No objection.

12             THE COURT:  That's better.

13             OK.  They will be admitted without objection.

14             (Plaintiff's Exhibits 1 through 8 received in

15    evidence)

16             THE COURT:  You're excused.  Thank you very much.

17             (Witness excused)

18             THE COURT:  All right, ladies and gentlemen.  I think

19    that's enough for today.  We will start tomorrow at 9:30.  We

20    can't start until you're all here.  So try and be here like

21    maybe five minutes early, or whatever.  In any event, we'll

22    begin, if you're here, at 9:30.  Have a good evening.  Do not

23    discuss this case amongst yourselves or with anybody else.

24             (The jury left the courtroom)

25             THE COURT:  OK, everybody.  We ended pretty much

898AFRO6ps

1    earlier than we will tomorrow, because one of the jurors has

2    tickets to the final tennis match.  So that was good enough for

3    me.  Have a good evening.

4            MR. PLATTA:  Thank you, your Honor.  Your Honor, can I

5    have one question?

6            THE COURT:  Yes.

7            MR. PLATTA:  It's just scheduling.  There was a

8    subpoena of a Geico representative, and I don't know if this

9    person was in court today.  I would like to be able to have him

10   or her on the witness stand as providing the economic loss and

11   I would like for him to appear for testimony.

12           THE COURT:  Would you say that all again.

13           MR. PLATTA:  Sure.  I have served subpoena on Geico

14   insurance no-fault provider, and this, as we know, is for

15   representative to be present in court with a copy of her file.

16   I know that she testified about the 50,000 of the no-fault

17   policy for medical treatment of Ms. Frometa.  This will

18   actually go to the future economic loss and meeting the basic

19   economic loss in this case.

20           THE COURT:  Is that the Geico testimony?

21           MR. PLATTA:  That's correct.  That's what I didn't see

22   today.  I'm not sure if they request --

23           THE COURT:  I'm glad you didn't see it, because I'm

24   not letting it in.  If you read the cases, apparently, you

25   thought it might be admissible, but it turns out it's my job.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

898AFRO6ps

1          MR. PLATTA:  Your Honor, I would like to note an

2     exception.

3          THE COURT:  You're welcome.  You don't even have to

4     explain it.  You have one.

5          MR. PLATTA:  Thank you.

6          THE COURT:  Anything else?

7          MR. COFFEY:  Yes, your Honor.  Just for scheduling

8     purposes for tomorrow, we were going to try to get all three of

9     our doctors in for tomorrow afternoon.  Should we get one of

10    them, then, for Wednesday morning if we're going to do two

11    excerpts tomorrow morning?

12         THE COURT:  Well, you're going to get two experts and

13    what about the plaintiff?

14         MR. COFFEY:  He has a plaintiff and, I believe, two

15    experts.

16         THE COURT:  I would guess we probably could finish

17    by -- it probably would be -- if it turns out to be this, I

18    really don't want to describe it.  It would be adjectives that

19    occur to me.  If this were long as Mr. Platta, if you're going

20    to be as long as that on direct, then I think all you can count

21    on is five.  My hope is, you could be a little briefer and

22    carry the ball over the goal line once.  But it's your call.

23    If you're going to be more than an hour, it's all just a

24    question of time.  If you're going to be more than an hour on

25    direct, then I doubt that we can do more than five witnesses.

898AFRO6ps

1    If you're going to be less than an hour, then we probably can.

2    It's your call.

3            MR. COFFEY:  I know.  I'll cut down on my questioning,

4    Judge.  I'm just asking if counsel --

5            THE COURT:  He'll cut down because I'll help them.

6            MR. COFFEY:  We'll bring all three, then, tomorrow.

7            THE COURT:  Very well.  Anything else?

8            MR. COFFEY:  Thank you, Judge.

9            (Adjourned to 9:30 a.m., September 9, 2008)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    INDEX OF EXAMINATION

 2   Examination of:                        Page

 3   RAMESH BABU

 4   Direct By Mr. Platta . . . . . . . . . . .    32

 5   Cross By Mr. Coffey  . . . . . . . . . . .    51

 6   Redirect By Mr. Platta . . . . . . . . . .    65

 7   MARIO E. DIAZ-DIAZ

 8   Direct By Mr. Platta . . . . . . . . . . .    67

 9   Cross By Mr. Miller  . . . . . . . . . . .    69

10   ANDREW MICHAEL DAVY

11   Direct By Mr. Platta . . . . . . . . . . .    72

12   Cross By Mr. Coffey  . . . . . . . . . . .   106

13   Redirect By Mr. Platta . . . . . . . . . .   127

14                    PLAINTIFF EXHIBITS

15   Exhibit No.                          Received

16     1 through 8  . . . . . . . . . . . . . .   128

17

18

19

20

21

22

23

24

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300