133

899MFROT

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   ADONNA FROMETA,

 4
                       Plaintiff,
 5
               v.                          07 CV 6372 (HB)
 6
     MARIO E. DIAZ-DIAZ and
 7   ALL AMERICAN HAULERS RECYCLING,

 8                     Defendants.

 9   ------------------------------x

10                                        New York, N.Y.
                                          September 9, 2008
11                                        9:30 a.m.

12
     Before:
13
                          HON. HAROLD BAER
14
                                          District Judge
15                                        - and a jury -

16
                            APPEARANCES
17
     SLAWEK W. PLATTA, PLLC
18        Attorneys for Plaintiff
     BY:  SLAWEK W. PLATTA
19
     WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
20        Attorneys for Defendants
     BY:  STUART A. MILLER
21        MICHAEL W. COFFEY

22

23

24

25
```

899MFROT

1           (Trial resumed; jury present)

2           THE COURT:  Good morning, ladies and gentlemen.  I'm

3  delighted that you were on time, but I'm sorry that I wasn't.

4  I think we are ready to go.

5           Can we swear the witness.

6   RANGA KRISHNA,

7       called as a witness by the Plaintiff,

8       having been duly sworn, testified as follows:

9  DIRECT EXAMINATION

10 BY MR. PLATTA:

11 Q.  Good morning, Dr. Krishna.

12 A.  Good morning, sir.

13 Q.  Dr. Krishna, do you know Ms. Adonna Frometa?

14 A.  Yes.

15 Q.  When was the first time that you met her?

16 A.  I saw her as a patient on March 29, 2007.

17 Q.  And at that time what were her complaints?

18           THE COURT:  First, let's find out if he's a dentist or

19 medical doctor or some in between.

20           MR. PLATTA:  Judge, thank you.

21 Q.  Dr. Krishna, can you tell us your credentials?

22 A.  Yes.  I'm licensed to practice medicine in the State of New

23 York since 1993.  I completed my training in the field of

24 neurology at Mt. Sinai Medical School and Medical Center.  I

25 then was awarded a position as a chief resident in the field of

899MFROT                    Krishna - direct

1    neurology at the Mt. Sinai Medical School and Medical Center in

2    1993 to 1994.  I was then subsequently awarded a fellowship in

3    the field of epilepsy, epilepsy surgery, neuromuscular diseases

4    and neurophysiology at the Hospital for Joint Diseases in the

5    New York University School of Medicine.  After completing the

6    same I'm in my current private practice and my location in the

7    Bronx and Brooklyn.  I'm an attending physician in the field of

8    neurology at the New York Methodist Hospital, Brooklyn

9    Hospital, Coney Island Hospital.

10          I'm also a diplomat in the American Board of

11   Psychiatry and Neurology in the field of neurology.  I also

12   completed a specialty examination in the field of pain

13   management by the American Academy of Pain Management.  And I

14   also completed certification by the American Board of

15   Independent Medical Examiners.  I'm currently in private

16   practice in Brooklyn and in my Bronx location.  I saw this

17   patient in my Bronx location.

18   Q.  Doctor, are you board certified?

19   A.  In neurology.

20          THE COURT:  I told you yesterday, you got to sort of

21   remember the questions so you don't ask him too many times.

22          MR. COFFEY:  No objection, your Honor.

23          THE COURT:  He's an expert.

24          MR. PLATTA:  Thank you, your Honor.

25   Q.  Dr. Krishna, what were Ms. Frometa's complaints during her

136

899MFROT                    Krishna - direct

1    first visit?

2    A.  She was having pain, neck and back pain after an accident

3    that had occurred on February 14 of 2007.  She was at that time

4    a 37-year-old patient.  She was a driver of a motor vehicle

5    that was struck in the rear and was experiencing neck and back

6    pain.  She came to us because of the symptoms had not improved.

7    Her treating physician, Dr. Villafuerte, had also requested a

8    neurological opinion and, therefore, she came and sought a

9    consultation with us.  And she was experiencing symptoms that

10   were unrelenting for which she was seen by myself for a

11   neurological evaluation.

12   Q.  Doctor, what was the course of treatment that you

13   recommended for her?

14   A.  I recommended that she obtain change in her physical

15   therapy, medication change.  And I suggested that she obtain a

16   pain management evaluation and/or spine surgical evaluation.

17   Both were done subsequently thereof.

18   Q.  Did you also suggest any limitations regarding her work?

19   A.  Yes.  I also suggested that she refrain from any activities

20   that required her to sit, stand, and repetitively move, which

21   were part of her work activities.  She was having a great deal

22   of radiating pain down her arm and leg, resulting in numbness,

23   weakness, and sensory complaints.

24   Q.  What was your finding why she had such pain?

25   A.  Her clinical findings revealed focal abnormalities in the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Krishna - direct

1    upper extremity on the right side and lower extremity on the
2    left side.
3    Q.  Can you explain to us what the focal abnormality means?
4    A.  The nerve roots in our spine innervate the muscles in our
5    arms and legs so that as the nerves exit the brain into the
6    spinal cord, the spinal cord parses out various nerve roots to
7    different body parts.  The nerve root in our neck goes into the
8    arms.  The nerve roots in our back go into the legs so that if
9    a nerve root in our neck, either on the right side or left
10   side, is in some way compromised, it translates into patient's
11   subjective symptoms of pain, sensory complaints, such as
12   numbness, tingling, et cetera, and weakness.  Some of those can
13   be present.  Not all of those have to be present.  Those are
14   the subjective symptoms that a patient is experiencing.
15       The objective findings that a physician identifies
16   when examining the patient include sensory problems on testing
17   the patient with pinprick sensation, motor weakness, reflex
18   abnormalities, and range of motion abnormalities.
19       In this patient I found that she had motor weakness in
20   the shoulder girdle muscles and some in the lower extremity,
21   which conform to the C5 nerve root and the L5 nerve root.  And
22   what that means is that the spine in the neck is categorized as
23   the cervical spine and it has -- it is used commonly in medical
24   terms as an abbreviation C.  So the nerve root coming out of
25   the C5 level was clinically abnormal on examination.  The nerve

899MFROT                    Krishna - direct

1    root coming out of L5 level in the lower extremities was

2    clinically abnormal.  And this was identified on my examination

3    based on weakness in those muscle groups, sensory loss in that

4    area, and abnormal reflexes that corresponded to that area.

5            And what a reflex means is that when you go to your

6    doctor and you sort of cross your knee over and the doctor taps

7    your knee and the knee jerks out, that's considered a reflex.

8    That doesn't happen just because the doctor is tapping your

9    knee.  It happens because the nerve going to that knee tendon

10   is actually functioning.  If that nerve is in some way

11   compromised, the reflex will either be lost or diminished.  In

12   this case it was diminished in the C5 distribution of the neck

13   and the L5 in the lower back.

14   Q.  Doctor, did you review MRI films in this case?

15   A.  Yes.  I had the option to review the films and reports.

16   Q.  Doctor, I will ask you to use the table that I presented

17   the jury yesterday to show the description of the injury that

18   you just gave.

19           THE WITNESS:  May I stand up, Judge, and look?

20           THE COURT:  Absolutely.  Go right ahead, if there is a

21   question.

22   Q.  Doctor, could you describe for the jury, using this diagram

23   and the depiction of the spinal cervical MRI, the injury that

24   my client sustained?

25   A.  Yes.

899MFROT                    Krishna - direct

1           MR. COFFEY:  Objection.

2           THE COURT:  Overruled.

3    A.   This is a picture of an MRI of the cervical spine.  Just to

4    give you a background of what an MRI is, we in medicine have

5    the ability to look at the body from inside out by several

6    diagnostic tests.  The most common diagnostic test that we have

7    had for years and years and years is the X-ray machine.  The

8    X-ray machine is useful in looking at bony or calcified areas

9    of our body.  It's not good and very useful for soft tissue

10   body parts like disks, spinal cord, and nerve roots, et cetera.

11          The MRI is a more sophisticated medical tool and if

12   you've not had one, it's basically a machine like a tube.  You

13   lie down on a gurney or flatbed and your body goes through that

14   machine.  And the machine, very much like a baker, would slice

15   a loaf of bread, slices the body into thin slices, like a loaf

16   of bread.  And if you look at a slice of bread, the bread has

17   two open sides that you can see and it has a thickness.  And

18   the MRI allows you to look at both sides of the slice and gives

19   you a picture of what the body looks like from inside out so

20   that you don't actually have to open the body.  In this case,

21   this is an MRI view of Ms. Frometa's cervical spine.  The

22   cervical spine, if you can look closely, it has these sort of

23   rectangular parts which are known as the vertebral bodies, and

24   these are the pillars of our spine, the bony pillars of our

25   spine.

899MFROT                    Krishna - direct

1          In between you have a donut-like structure which looks

2     almost from the side view, looks almost like an oval structure.

3     That's the hydraulic mechanism of our spine and that's

4     considered the disk or disk material right behind this central

5     line of dark shadow that comes in from the top which is where

6     the brain sits up here.  It is called the spinal cord.  And

7     that's the core where the nerve roots are coming out of.

8          At different levels you'll notice that the disk has

9     actually gone beyond and creates a shadow beyond its

10     parameters.  And what are the normal anatomical parameters?

11     The normal anatomical parameters of a disk are the bone above.

12     That's this rectangular bone above and then an imaginary line

13     drawn below to the rectangular bone below.  When the disk

14     exudes or goes beyond that margin it can be termed medically as

15     either a bulging disk or a disk protrusion or a disk

16     herniation, depending on order of severity and what is

17     identified on the MRI.

18          In this case, Ms. Frometa has a bulging disk at the

19     C2-C3 and C4-C5 levels.  She also has a disk herniation at the

20     C3-C4 level which is sort of abutting.  And if you look at the

21     spinal canal, this white line that goes around the spinal cord,

22     that's that fluid that surrounds the spinal cord to give it a

23     little bit of protection.  The disks are pressing, some of them

24     are pressing against the coverings of the spinal cord.

25          There is also, down below, in the thoracic level, a

899MFROT                    Krishna - direct

1    disk herniation at the P1-P2 and P2-P3 levels.  So there is

2    several abnormalities in the cervical spine and because this

3    MRI was done in the cervical spine we were able to get a

4    glimpse of the upper thoracic level also.  We find that there

5    are several abnormalities.  These are what were clinically

6    causing her sensory complaints, pain, and objectively causing

7    her -- some of them were causing her weakness and motor

8    weakness and sensory problems.

9    Q.  Thank you, Doctor.  I'll ask you to do the same with the

10   lumbosacral MRI.  I'll put it on.

11        MR. COFFEY:  Objection.

12        THE COURT:  Overruled.

13   A.  The lower back of our spine is called the lumbar and

14   lumbosacral region of the spine.  It's sort of this part of the

15   spine which I'm pointing to right above the buttocks.  And that

16   part of the spine is visualized in this -- as you take the

17   picture, the upper left inside corner picture of this screen

18   which shows you the bones and disk material in between and the

19   spinal canal with its contents.

20        The lumbar component of the spine and lumbosacral

21   component of the spine is anatomically and structurally similar

22   to the cervical.  It has the same architecture, the bone, the

23   disc, and the spinal canal.  Here, Ms. Frometa has a disk

24   bulge, as read, at the L3-L4 and L4-L5 level with a disk height

25   that was lost at the L5-S1 level.  There is also some extension

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

142

899MFROT                    Krishna - direct

1    of this material into the canal with spurring and some

2    herniation of the disk material.  The patient's clinical

3    findings are related to in the lower extremities, are related

4    to the back disk problem causing pain, numbness, and weakness

5    at the L5 levels.

6           The patient has, as you can see in this artist's

7    rendition of the same MRI film, has a disk herniation which is

8    exuded beyond the margins of the bone above and bone below if

9    you draw that anatomical line, which is imaginary, and causing

10   compression and pain along -- causing compression along the

11   spinal canal, which can translate into pain, sensory loss and

12   weakness.

13          THE COURT:  My understanding, by the way, is this is a

14   stipulated exhibit.  That's what it says on the piece of paper

15   in front of you.  It's hard for you to object if it was

16   stipulated to.

17   Q.  Doctor, hypothetically, if I would tell you that there is a

18   doctor who states that by reading this MRI that he read as well

19   that there was evidence of chronic degenerative disk disease at

20   L5-S1 and this is manifest by disk space narrowing and disk

21   desiccation and he will also state that there was a small

22   superimposed central disk herniation at L5-S1 without evidence

23   of nerve root compression, would you agree or would you

24   disagree with such statement?

25          MR. COFFEY:  I have an objection, your Honor.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Krishna - direct

 1            THE COURT:  I am not quite sure to what, but go ahead

 2      and answer.

 3      A.  I would disagree with the statement because the

 4      degenerative component in medicine, as we are born into this

 5      world, we spend our lives degenerating over time, hopefully not

 6      too fast.  So the problem is that we are not what we were when

 7      we were one day old.  Everything undergoes wear and tear.  As

 8      things undergo wear and tear, it does not necessarily mean it's

 9      pathologic or causes clinical problems that are functionally

10      disabling.  Because we wear and tear, we are able to live life

11      normally, as much as possible, and continue our functional

12      capacity.

13            Here we do have some signs of wear and tear.  Parts of

14      the bone in the lower parts have some signs of normal wear and

15      tear.  Parts of the disks have some signs of normal wear and

16      tear, but there are signs of a traumatic event occurring also,

17      like edema.  The white parts inside some of the bone is

18      considered edema.  Edema is a swelling of a body part.  And

19      many of you may have fallen sometimes and found that you have a

20      bruise.  That's edema.  Edema can occur externally or

21      internally.  In this case it has occurred internally.  Edema is

22      a sign of trauma.  A disk herniation in the context of

23      vertebral edema is consistent with a traumatic event occurring,

24      causing the patient's symptoms.

25      Q.  And, Doctor, with a reasonable degree of medical certainty

144

899MFROT                        Krishna - direct

1    can you state that this injury to the lower back is causally

2    related to the accident of February 14, 2007?

3    A.   Yes.

4    Q.   And why?

5            THE COURT:   Can you go back on the witness stand

6    because I can hear you better.

7            THE WITNESS:   Yes.   Sorry.

8    Q.   Why do you think it's related?

9    A.   The patient's clinical symptoms, signs, and examination and

10   findings, the MRI findings that show disk bulging, disk

11   herniations at several levels, vertebral edema, all correlate

12   to the patient's subjective symptoms and objective findings.

13   They are consistent with the patient's chronology of

14   complaints.   And that is the main reason why I feel that the

15   patient's findings are related to the accident of February 14,

16   '07.

17           THE COURT:   When did you see her for the first time,

18   Doctor?

19           THE WITNESS:   Approximately five weeks later, March

20   29, after the imaging studies.

21   Q.   Doctor, with a reasonable degree of medical certainty can

22   you tell us whether the cervical injuries causally related to

23   her accident of February 14 of 2007?

24   A.   Yes.   I believe the cervical injuries also causally related

25   to the February 14, 2007 accident.

899MFROT                    Krishna - direct

 1          THE COURT:  Was there anything that you found that you

 2    concluded was not part of the results of that accident?

 3          THE WITNESS:  There is some bone spurring which is

 4    unrelated and nonpathologic.

 5          THE COURT:  That's all?

 6          THE WITNESS:  That's all.

 7          THE COURT:  That will save us half an hour.  Thank you

 8    very much.

 9    Q.  Doctor, are you aware that Ms. Frometa received a steroid

10    injections?

11    A.  Yes.  The patient was referred for pain management and

12    spine surgical treatment.  She had multiple procedures to her

13    spine, both neck and back.  Some of those were steroid

14    injections.

15          THE WITNESS:  May I stand up?

16          THE COURT:  If he asks you.

17    Q.  Doctor, from this neurological point of view, from your

18    perspective, what effect does the steroid injection like this

19    to the lower back have?

20    A.  The epidural injection done to the lower back,

21    especially -- is primarily done to get rid of the swelling

22    that's around the canal of the spinal canal they are in that's

23    being caused by the disk herniations and disk bulges as a

24    result of this accident.  This was done -- this was done

25    approximately six and a half, seven months after the accident

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

899MFROT                    Krishna - direct

1    because the patient's clinical findings had not shown any signs

2    of improvement with medications and therapy and conservative

3    approach.

4    Q.  And from your point of view, what kind of relief is

5    supposed to happen after such injection?

6    A.  There should be some pain relief and should be some symptom

7    relief.  And in this case the symptom relief should have

8    occurred in the form of sensory improvement and functional

9    capacity improvement with activities of her employment, et

10   cetera.  There was no sustained improvement.

11   Q.  Doctor, are you aware that before she had this lumbar

12   steroid injection, Ms. Frometa underwent surgery by Dr. Babu?

13   A.  Yes.

14   Q.  Doctor, from neurological point of view can you tell us

15   what is the effect of this surgery on the patient?

16   A.  The reason a patient undergoes surgery to the lumbar spine

17   or any part of the spine is to remove the offending agent from

18   compressing neuro elements.  And that's the main purpose of

19   doing that so that it does a couple of things:  One, prevents

20   further damage; two, it also prevents or improves the patient's

21   clinical symptoms; and, three, it also improves their

22   functional capacity.  In this case, the disk at the L5 level,

23   L5-S1 level was causing significant amount of pain, numbness

24   and weakness and sensory and motor complaints.  And the surgery

25   was to remove some of that compression from the nerve root.

147

899MFROT                    Krishna - direct

1    Postsurgically the patient continued to have some symptoms and

2    after conservative treatment the patient had some more pain

3    management procedures.

4    Q.  Doctor, can you explain for us whether you did an EMG NCV

5    test?

6    A.  Yes.  The patient had an EMG or electromyographic test with

7    nerve conduction studies.  The EMG and nerve conduction studies

8    were done to identify an underlying physiological cause for the

9    patient's signs and symptoms.  In medicine there are two basic

10   principles that we use.  We like to find an anatomical cause

11   for the patient's diagnosis and a physiological cause.  And

12   that to me is structure and physiology is function.

13          With the MRI we can look at the structure of the

14   spine, but it doesn't tell us the function of the nerve roots.

15   With the EMG and nerve conduction study it tells us the

16   function.  And the function of the nerve roots were tested on

17   my initial visit on March 29, 2007.  This revealed a right C5

18   and L5 radiculopathy.  What that means is that nerve root --

19   radiculopathy is where the nerve root at that level is inflamed

20   or compromised so that the clinical findings that we were

21   seeing on our exam, the patient's subjective complaints, came

22   together with a physiological answer in conjunction with the

23   anatomical answer on the MRI.  So that all coordinates were

24   pointing to the same diagnosis.

25   Q.  Doctor, can you tell me if that actually substantiated the

899MFROT                    Krishna - direct

1    surgery that Dr. Babu did?

2              MR. COFFEY:  Objection.

3              THE COURT:  What's the ground for your objection?

4              MR. COFFEY:  To ask him to a part about Dr. Babu's

5    result.

6              THE COURT:  I'll sustain the objection, but I am not

7    sure if it's necessary, but it will speed things along.

8    Sustained.

9              MR. PLATTA:  Thank you.

10   Q.  Doctor, can you tell me, what is the result of the positive

11   EMG test, what is the kind of treatment that the patient can

12   have following that?

13   A.  Many patients have subjective complaints, may not have an

14   anatomical cause and don't have a physiological cause.  By

15   that, I mean, no MRI findings and no EMG findings to

16   corroborate their subjective complaints.

17             In this case that's not the case.  We have an MRI that

18   corroborates a patient's clinical findings and an EMG that

19   corroborates the clinical findings.  Now that we know that the

20   diagnosis is an issue with the nervous system being

21   compromised, we can treat the patient with certain medications

22   and certain forms of therapy.  If that does not impact the

23   patient's outcome relatively soon, then we move forward as fast

24   as possible to a more aggressive pain management intervention.

25   That includes surgery, epidural injections, and/or combination

899MFROT                    Krishna - direct

1   of those treatments.

2   Q.  Doctor, did you also perform the same test, the nerve test,

3   EMG test, following the surgery and, if so, what were your

4   findings?

5   A.  Yes.  I performed it most recently on May of this year, May

6   8 of this year.

7   Q.  And what were your findings?  Did her condition change

8   following this surgery?

9   A.  No.  It still revealed a chronic right-sided cervical

10  lumbar radiculopathy with active irritative features.

11  Q.  Can you tell me if your test, EMG NCV test, is it

12  subjective or objective?

13  A.  It's objective.  It's beyond the control of the patient.

14  Q.  She would not be able to fake that?

15  A.  No.  It's beyond the control of the patient.

16  Q.  And, Doctor, are you aware that Dr. Davy performed a

17  percutaneous discectomy on this patient?

18  A.  Yes.

19  Q.  Are you also aware that there were steroid injections to

20  her cervical spine done prior to his surgery?

21  A.  Yes.

22          THE COURT:  Where are we going, Mr. Platta?  We have

23  had this testimony yesterday from the horse's mouth?

24          MR. PLATTA:  I'm combining neurological findings,

25  Judge, with the surgeries that she actually had.  There was a

899MFROT                    Krishna - direct

1    connection between both of them, actually.

2              THE COURT:  Ask him what the connection is.

3              MR. PLATTA:  Thank you.

4    Q.  Doctor, in regards to the neurological findings --

5              THE COURT:  I'll ask the question.  Is there any

6    connection between those two, the neurological and the other

7    efforts that were made for Ms. Frometa?

8              THE WITNESS:  Yes.  Those efforts were primarily made

9    because the neurological findings were present.  The

10   neurological findings were fixed, and they revealed significant

11   abnormalities, and those efforts were embarked upon to treat

12   the neurological findings.

13             THE COURT:  How did they come out?

14             THE WITNESS:  It wasn't a successful outcome.

15             THE COURT:  Anything else?

16             MR. PLATTA:  Yes.

17   Q.  Doctor, can you tell us whether the percutaneous discectomy

18   that Dr. Davy performed on this patient in December of last

19   year changed anything in her neurological condition based on

20   your findings from the EMG?

21   A.  There was no change.

22   Q.  What is the next course of treatment that you can recommend

23   for this patient?

24   A.  She had trial of spinal cord stimulator for her symptoms.

25   It wasn't successful.  I think the only other course that's

899MFROT                     Krishna - direct

1    remaining is potentially resurgical evaluation and treatment

2    with fusion.

3    Q.  Can you tell us what is the connection between your

4    positive finding, the same finding as you had last year, in the

5    EMG test and the neurostimulator trial implant?

6    A.  I'm sorry.

7    Q.  Is there any connection between the findings from your EMG

8    positive findings, following both of her surgeries and the

9    implant of the neurostimulator; in other words, is this a

10   natural course of treatment?

11   A.  It is a natural course of treatment.  The neurostimulator

12   trials are done to alleviate the patient's subjective pain

13   symptoms and improve some of the objective functional capacity.

14   If it doesn't work, then it's removed.

15   Q.  And did you have a conversation with Dr. Davy as to whether

16   it was successful or not, both of them?

17   A.  He felt they were not successful.

18   Q.  What is the next step for Ms. Frometa following that?

19   A.  Is to recircle back with spine surgical treatments.

20   Q.  What would you recommend?

21   A.  The current -- given her current anatomical abnormalities

22   and her failure to many conservative treatments and

23   interventional procedures, the only remaining procedures that

24   would be left would be fusion, both at the cervical and lumbar

25   levels, and to modify her medication regime after that to try

899MFROT                        Krishna - direct

1    to get a combination that gives her best relief.  There is no

2    hope for 100 percent relief at this point.

3    Q.  Doctor, if I were to tell you that there would be,

4    hypothetically, a doctor testifying here that regarding her

5    cervical spine that there is a straightening of the cervical

6    lordosis and there is also evidence of chronic degenerative

7    disk disease and that is manifested by osteophyte formation and

8    there is also small superimposed disk herniation at C3-C4

9    without evidence of spinal cord or nerve root compression, can

10   you tell me if you would agree with this finding or you

11   actually have some different finding regarding her cervical

12   spine MRI?

13   A.  I don't disagree with the evidence of the degenerative

14   changes in the cervical spine -- I mean, I disagree with the

15   evidence of degenerative changes in the cervical spine.

16   Q.  And, Doctor, you testified before that she had some

17   degeneration in the lower back.  Can you tell us whether

18   degenerative change in the spine could be asymptomatic?

19   A.  Yes.  Many times mild degenerative changes like bone

20   spurring can be asymptomatic throughout our lives and doesn't

21   usually impact our day-to-day functional capacity.

22   Q.  And in this case, did you have any information about any

23   kind of treatment that Ms. Frometa had prior to February 14 of

24   2007 regarding her spine?

25   A.  There is no documentation of prior treatment.

899MFROT                          Krishna - direct

1    Q.  Are you aware that she had other accidents, motor vehicle

2    accidents?

3    A.  Yes.

4    Q.  Which one would be important for your diagnosis, the fact

5    that the patient has some kind of bumper-to-bumper accidents or

6    that she has treatment resulting from these accidents?

7    A.  The key for us is that whether or not she had an accident

8    that required any sustained treatment in the form of imaging

9    studies, neurological evaluations, and/or pain management

10   procedures.  There was no such treatment in the past.  Only

11   after this accident, the clinical symptoms and signs seemed to

12   have gone awry and not resolved with conservative treatment.

13   Q.  Doctor, can you tell me, if you know, about any further

14   treatment that Ms. Frometa had at your facility, at Westchester

15   Medical Care?

16   A.  She has undergone some therapy with physical therapy and

17   underwent some lumbar strengthening treatments in the past with

18   a chiropractic treatment and found they really did not help.

19   She is following up with Dr. Davy for spinal cord stimulator

20   implantation and postimplantation treatments.

21   Q.  Doctor, do you remember being contacted by Dr. Charles

22   Kincaid, a life care expert in this case?

23   A.  Yes, sir.

24   Q.  And can you tell me if you recommended any kind of

25   treatment; for example, psychiatric evaluation for Ms. Frometa

899MFROT                    Krishna - direct

1   in the future?

2   A.  Yes.  She had seen a psychologist for the pain management

3   procedures.  And given the complexity of her current clinical

4   findings, she would need some psychological care as time goes

5   on.

6   Q.  And, also, what about psychology evaluation?

7   A.  Yes, she would need that.

8   Q.  Can you tell me what would be the cost, in your opinion,

9   for both?

10          THE COURT:  Sustained.

11  Q.  Doctor, can you tell me if you're qualified in New York to

12  assess no no-fault rates for?

13          MR. COFFEY:  Objection.

14          THE COURT:  Sustained.

15  Q.  Do you know what is a peer review?

16  A.  Yes.

17  Q.  Can you tell me it is?

18  A.  It's a review done by independent third-party physicians

19  who specialize in reviewing the necessity and fee structure for

20  certain procedures.  In my case it's primarily neurological and

21  pain management related services.

22  Q.  Would you be aware of the rates attributable to the New

23  York area for treatment of patients?

24  A.  Yes.  These are published guidelines by the New York State

25  Workmens Compensation Guidelines.

155

899MFROT                    Krishna - direct

1    Q.  If I were to tell you hypothetically that the psychiatric

2    evaluation was estimated to cost $333.03 per unit, would you

3    agree with this opinion?

4            THE COURT:  Sustained.

5    Q.  Doctor, can you tell me if you also recommended for

6    Ms. Frometa gym membership?

7    A.  Yes.  I had recommended that in the past.

8    Q.  Do you know the cost for same?

9    A.  Yes.  The cost based on what she had identified was

10   approximately listed in my report, $18,000 total.

11           THE COURT:  Forever?

12           THE WITNESS:  No.  That was for her trainer and for

13   membership.

14           THE COURT:  Forever?

15           THE WITNESS:  Not forever.

16           THE COURT:  For how long?

17           THE WITNESS:  Annualized.

18   Q.  Doctor, did you also recommend for this patient additional

19   MRI of the cervical and lumbar spine?

20   A.  Yes.

21   Q.  And what would be the cost of that?

22   A.  The cost of ten MRIs over a lifetime for the cervical and

23   lumbar spine was approximately $30,000.

24   Q.  And, Doctor, are you aware of any medication that

25   Ms. Frometa is taking at this time?  I will withdraw the

899MFROT                    Krishna - direct

1    question.

2            Did you prescribe any medication for Ms. Frometa?

3    A.   Yes.   There are medications for her pain modulating agents.

4    Q.   Doctor, did you also recommend for Ms. Frometa to see a

5    psychologist?

6    A.   Yes.

7    Q.   What would be the cost of that?

8            MR. COFFEY:   Objection.

9            THE COURT:   Sustained.

10   Q.   Doctor, did you also recommend for Ms. Frometa to have a

11   home health aide in case the neurostimulator implant is not

12   successful?

13           MR. COFFEY:   Objection.

14           THE COURT:   I don't think so, right?   Go ahead.   You

15   can answer it.   I didn't hear any objection.

16           MR. COFFEY:   I objected, your Honor.

17           THE COURT:   Sustained.   Put another question,

18   Mr. Platta.

19           MR. PLATTA:   Sure.

20   Q.   Doctor, do you think Ms. Frometa will need any kind of

21   assistance in the future from a neurological standpoint?

22   A.   Yes.   Given that she has family members helping her now,

23   this is no guarantee of the future.   And given her spine

24   condition is significantly compromised, her need for future

25   care to assist her with some of her daily chores is inevitable,

899MFROT                    Krishna - direct

1    and that cost would be based on the cost of labor going

2    forward.

3    Q.  Doctor, when you mentioned before that she had physical

4    therapy and chiro treatments at your office, do you know more

5    or less until when and how many times, approximately?

6    A.  She was seen two times a week, sometimes three times a

7    week.  Most recently she was seen until June of this year.

8    Q.  Doctor, can you tell me what are your office expenses, how

9    much does her chiropractor care cost so far?

10   A.  I don't have the total expense.  I think it was submitted

11   as part of the evidence.

12   Q.  Would you be able to estimate, more or less --

13        MR. COFFEY:  Objection.

14   Q.  -- based on the cost of the EMG?

15        THE COURT:  We don't really want you to guess.  If you

16   have a reasonable estimate, that's fine.  If not -- I have yet

17   to see it.  If you gather it's within the evidence, we will

18   wait until when.

19        THE WITNESS:  I think we submitted our bills with the

20   evidence.

21   Q.  Doctor, I will present you on the screen what is -- Doctor,

22   can you tell me with a reasonable degree of medical certainty

23   whether Ms. Frometa permanently lost the use of her spine as a

24   result of this accident?

25   A.  Yes.

899MFROT                    Krishna - direct

1    Q.  And that is why?

2          THE COURT:  We have heard why in chapter and verse.

3    Why do we need it again.

4    Q.  Doctor, as a result of this accident has Ms. Frometa

5    sustained an injury --

6    A.  Yes.

7    Q.  -- that would prevent her from performing her normal

8    regular duties in her life; for example, work, social life,

9    anything?

10   A.  Yes.  They would impair all of those aspects of her life.

11   Q.  Doctor, as a result of the accident, did the plaintiff

12   sustain a significant limitation of use of the spine?

13   A.  Yes.

14   Q.  Doctor, as a result of the accident, has the plaintiff

15   sustained a permanent consequential limitation of use of the

16   body organ or member?

17   A.  Yes.

18   Q.  And which body organ would that be applicable to?

19   A.  The spinal canal and the spinal cord and nervous system.

20   Q.  Doctor, are you aware that Ms. Frometa was working

21   approximately until the end or the middle of April of 2007?

22   A.  Yes.

23   Q.  And are you aware that she wasn't working after the surgery

24   that was performed by Dr. Babu?

25   A.  That's correct.

899MFROT                    Krishna - direct

1  Q.  When you saw her did she ever indicate to you that she came

2  back to work?

3  A.  I had no notification of that.

4  Q.  Doctor, with a reasonable degree of medical certainty, were

5  the procedures that were performed in this case necessary,

6  medically necessary?

7          MR. COFFEY:  Objection.

8          THE COURT:  I'll sustain the objection.

9  Q.  Doctor, taking into consideration your neurological

10 experience, would you recommend a patient like Ms. Frometa the

11 same course of treatment that she received in this case?

12 A.  Yes.

13 Q.  And why is that?

14 A.  Because she failed conservative treatment and when you fail

15 conservative treatment for neurological deficits the only

16 course of treatment that's available is a more aggressive

17 approach, including surgical intervention and/or interventional

18 pain management procedures like what she has obtained.

19 Q.  Doctor, you mentioned before that there was a bone

20 spurring.  Can you tell us what it is and why it would not be

21 related to the accident?

22 A.  Yeah.  The lower back at the lumbar spine, there is those

23 rectangular areas are bones.  Because the low back is a

24 weight-bearing part of our body, as you grow older you can find

25 some bone spurring.  The bone spurring is on the opposite side

899MFROT                      Krishna - direct

1   of the spinal canal.  It's not related to the spinal canal so

2   it's not really anatomically relevant.

3   Q.  And, Doctor, when you reviewed the report that Dr. Kincaid

4   prepared, the tables that he prepared for this trial, did you

5   agree with the dollar amounts that he included in the treatment

6   that he recommends?

7              MR. COFFEY:  Objection.

8              THE COURT:  Sustained.

9              MR. PLATTA:  Your Honor, please note my exception.

10  Q.  Doctor, can you tell us what are the activities of daily

11  living that Ms. Frometa will not be capable of doing from your

12  perspective?

13  A.  The primary activities that would be restricted would be

14  activities that require her to repetitively bend, push, and

15  pull, and lift objects more than 25 pounds in weight.  This

16  could be as simple activities as grocery shopping to

17  repetitively going up and down staircases in a subway station,

18  to repetitively bending and pushing and pulling objects at

19  home.  And some activities would require assistance, like

20  standing up from a toilet, bending over a sink so that you need

21  to at least hold onto something or have somebody help her.

22  These are activities that involve the flexibility and

23  malleability of our spine.  And given that the spine at two

24  levels, the neck and back, have been compromised, this is a

25  significant limitation that is afforded to her.

899MFROT                    Krishna - direct

1   Q.  Doctor, during your examination of this patient, did you

2   have any clinical correlation to conclude that the disk

3   herniation that she has in her cervical as well as lumbar spine

4   will be the cause of any symptoms she reported to you?

5   A.  Yes.  The patient's clinical correlation included weakness,

6   sensory abnormalities, and reflex abnormalities.

7   Q.  Doctor, if hypothetically I will tell you that there will

8   be a doctor who will come here to testify that the procedure

9   performed by Dr. Davy for percutaneous discectomy using a

10  striker device is not accepted in the mainstream of orthopedic

11  and medical care as a beneficial mode of treatment for a

12  cervical disk herniation, can you tell me if you agree with

13  this statement?

14  A.  I disagree.

15  Q.  Why?

16  A.  The striker device is an FDA-approved device.  It's

17  approved by the federal Food and Drug Administration for use

18  for this diagnosis.

19  Q.  In other words, you agree with Dr. Davy's procedure?

20  A.  Yes.  It's a device made for this procedure.

21          MR. COFFEY:  Objection.

22  Q.  Doctor, can you tell the jury, how do you know myself?

23  A.  Through your previous employer.

24  Q.  Do you remember the name of the firm?

25  A.  Mr. Ripka and Rotter.

899MFROT                    Krishna - direct

1    Q.  During yesterday's deposition Dr. Davy testified that you

2    introduced us to each other during a party.  Is this correct?

3    A.  Yes.

4    Q.  And, Doctor, are you being paid for your time in court

5    today?

6    A.  No.  Actually, you've been kind enough to donate $4,000 to

7    the United Way Heart and Hand for the handicapped children's

8    fund.

9    Q.  Doctor, can you tell us what kind of fund is that?

10   A.  It's for orphan handicapped children that are paid for

11   their medical care and their educational care.

12   Q.  Are you basically supporting them?

13   A.  No.  I have nothing to do with the foundation.  It's my

14   standard and practice not to accept any fees.  So I usually

15   give a choice of three charities that I have donated personally

16   to, and your office chose this one.

17          MR. PLATTA:  Thank you very much, Doctor.

18          THE COURT:  Any cross?

19          MR. COFFEY:  Yes.

20   CROSS-EXAMINATION

21   BY MR. COFFEY:

22   Q.  Doctor, did you say that Ms. Frometa cannot sit for long

23   periods of time?

24   A.  No.  Repetitive sitting, standing motions.

25   Q.  So she can sit in certain places for periods of time?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Krishna - cross

1   A.  She can sit.  She just cannot do repetitive bending

2   pushing, pulling.

3   Q.  Now, as we sit here today, what medical records have you

4   reviewed other than your own?

5   A.  I reviewed the procedure notes for the procedure that she

6   underwent, the MRI reports, and films, the entire life care

7   plan which was submitted by Mr. Kincaid.  Actually, that

8   include as part of the life care plan our billing records and

9   all of the other stuff.  I just noticed that.  And treatments

10  from therapy and some of the emergency room visit notes.

11  Q.  Now, do you have your initial intake form in your chart

12  there?

13  A.  Yes.

14  Q.  And what -- could I see it?

15  A.  Yes.

16          THE COURT:  Mr. Coffey, haven't you seen this before

17  in discovery?

18          MR. COFFEY:  Some of it.

19          THE COURT:  It's a yes or no question.

20          MR. COFFEY:  No.  Not all of it.

21          THE COURT:  The intake form that you have asked him to

22  extricate, the question is whether you have seen that or not

23  before?

24          MR. COFFEY:  No.

25          THE COURT:  Why is that not part --

899MFROT                    Krishna - cross

1           MR. COFFEY:  Some of it is different, your Honor.

2           THE COURT:  It's different today than it was at the

3    deposition?

4           MR. COFFEY:  Yes.  It's fuller.  I just wanted to see

5    it.

6    BY MR. COFFEY:

7    Q.  When you look at the intake form, did Ms. Frometa tell you

8    about the March 8 collision she had with Kerry Williams in his

9    Hyundai Sonata?

10          MR. PLATTA:  Objection.

11          THE COURT:  Overruled.

12   A.  No.

13   Q.  Now, this collision occurred two days before the diagnostic

14   films of March 10, isn't that correct?

15   A.  That's correct.

16   Q.  So now also I want to draw your attention to your last

17   report which is May 8 of 2008.  Do you have a copy of that?

18   A.  Yes, sir.

19   Q.  Now, you first saw her on August 1 of 2005, is that

20   correct?

21   A.  No.  That's a typographical error.

22   Q.  You also examined her back in January 10 of 2007?

23   A.  No.  Those are typographical errors.

24   Q.  Who typed it up?

25   A.  We have a typist.  Those are typographical errors.

899MFROT                    Krishna - cross

1    Q.  Did you read the report before you prepared it?

2    A.  I did.  There was a faux pas on my part.  It was a

3    typographical error.

4    Q.  If prior motor vehicle accidents are part of the history

5    here, don't you think that's rather significant that your

6    records would indicate that you had seen her in 2005 and 2007

7    before the accident?

8    A.  Yeah.  I didn't see her then because we have no records of

9    that.  We have no treatment records.  It was on that one report

10   it was a typographical error.

11   Q.  You say at some point Ms. Frometa told you she was involved

12   in motor vehicle accidents?

13   A.  Yes.  She had mentioned she had had a fender bender which

14   she found nonconsequential.

15   Q.  And she found it to be nonconsequential?

16   A.  Yes.  She said she had no symptoms from it.

17   Q.  But that's based on what she told you, is that correct?

18   A.  Yes, sir.

19   Q.  And tell me the first time she told you that in your

20   medical records.

21   A.  It was in December of '07.

22   Q.  What does the note say, if you could read it to the jury.

23   A.  She just told us that there was a fender bender in --

24   nonconsequential fender bender in May of '07 and July of '07.

25   Q.  Now, if there was a March of '07 accident right around the

899MFROT                      Krishna - cross

1   time of the films, couldn't that have also been the cause of

2   the edema that you were talking about in the MRIs?

3   A.   Unlikely because the edema would have been significant in

4   its impact with regards to pain, clinical findings.  It's

5   unlikely to have been nonconsequential.

6   Q.   Now, we talked about -- you talked about in the future you

7   wanted MRIs for Ms. Frometa.  How often were you talking about

8   MRIs needed to be done?

9   A.   These were primarily based on MRIs being done based on her

10  life expectancy and also based on potential surgical

11  interventions that would be required.  I had suggested that

12  given her life expectancy and given her potential surgical

13  procedures, I had suggested that she would need approximately

14  10 MRIs to the cervical spine and 10 to the lumbar spine, which

15  would be over a 30-year period, one every three years.

16  Q.   Now, Doctor, don't you find it a little unusual that no

17  subsequent MRIs have been done when every treatment has failed

18  for Ms. Frometa?  Since the March 10 one, all this medical

19  treatment occurred, there hasn't been one subsequent MRI either

20  to the cervical area or lumbar area.  Isn't that unusual?

21  A.   The question is, it's not unusual because we are now at

22  that point where we are going to look at the next set of

23  treatments.  The last set was just done relatively few months

24  ago.  And the question now we are trying to answer and grapple

25  with is whether or not she is a candidate for one of several

899MFROT                    Krishna - cross

1   surgical procedures, like fusion, et cetera.

2   Q.  Now, the physical therapy that she went to, approximately

3   how many hundred visits did she have for physical therapy?

4   A.  It wasn't hundreds.  It was probably less than -- I don't

5   know the exact number, but I would assume it's for four months,

6   seven, eight visits a month, so that about 30 visits.

7   Q.  The physical therapy center, that's also located in your

8   office suite, isn't that correct?

9   A.  Yes.  Part of it is in our office suite and the other part

10  is in our adjacent building.

11  Q.  You own an interest in the physical therapy company, isn't

12  that correct?

13  A.  It's a part of our practice.

14          MR. PLATTA:  Objection.

15  Q.  So you recommend someone over to your own physical therapy?

16          MR. PLATTA:  Objection.

17          THE COURT:  Overruled.

18  Q.  Did you recommend her to your physical therapy practice?

19          MR. PLATTA:  Objection.

20          THE COURT:  Overruled.

21  A.  Yes.  She had therapy in my own practice.

22  Q.  When we talk about Dr. Davy, you share space with him in

23  how many offices?

24  A.  He is a tenant in the same buildings that we are in.

25  Q.  And you refer over a hundred patients a year to him?

899MFROT                    Krishna - cross

1    A.  I refer patients to him.  We refer many patients to him,

2    yes.  I don't know the exact number.

3    Q.  I want you to assume he said it was over a hundred.  Would

4    you disagree with him?

5    A.  No, I wouldn't disagree with him.

6    Q.  Now, we talk about the Christmas party that you met with

7    Mr. Platta.  Who would come to that party?  Do plaintiff

8    attorneys come to it?

9                MR. PLATTA:  Objection.

10               THE COURT:  Overruled.

11   A.  Our employees.  It was an employee party, plus some people

12   that I know personally for years.

13   Q.  Is Mr. Platta an employee or how does he fall --

14   A.  No.  He just accompanied Mr. Ripka, who was a friend of

15   mine.

16   Q.  You also did work with Napoli Bern & Kaiser, the other firm

17   that Mr. Platta used to be at?

18               MR. PLATTA:  Objection.

19   A.  I think Mr. Ripka moved to that form and that's how I know

20   him.

21               THE COURT:  I think that's enough of the inbreeding

22   subject matter.

23               MR. COFFEY:  Yes.

24   Q.  Now, are histories important to you, Doctor?

25   A.  Histories is important, yes.

899MFROT                    Krishna - cross

1    Q.  Why is it important?

2    A.  Especially it gives us a context as to where the

3    symptoms -- whether the symptoms are neurological or not

4    neurological.

5    Q.  It can also affect causation, is that correct?

6    A.  We are expecting the history to be accurate.  It will help

7    us with the causation, yes.

8    Q.  And if you don't have a complete history it could make your

9    conclusions speculative, isn't that correct?

10   A.  Sometimes.

11   Q.  Now, do you also have on staff a chiropractor in your

12   office?

13   A.  No.  He's a tenant in the same buildings as we are tenants

14   in.

15   Q.  When you say tenant in the same building, that's a building

16   you own or a company that you have an interest in?

17           MR. PLATTA:  Objection.

18           THE COURT:  No.

19           You want to withdraw it?

20           MR. COFFEY:  I'll withdraw it.

21           THE COURT:  If he wants to withdraw his objection.

22           MR. PLATTA:  At this point, yes.

23           THE COURT:  Put another question.

24   Q.  Is that Excel Aire Chiropractic?

25   A.  They are in the same building as us in the Bronx.

899MFROT                    Krishna - cross

1    Q.  You also refer clients to them?

2    A.  Yes.  Sometimes we do, sometimes they refer us patients

3    also.

4    Q.  Are many of the papers that you share the same records with

5    your physical therapy center?

6    A.  If they are treating patients of ours, they give us copies

7    of their treatments.

8    Q.  Now, in May '08, you were asked to opine in your report

9    where you proffered an opinion about mental status, is that

10   correct?

11   A.  Yes.

12   Q.  And under mental status, the portion of your report that

13   talks about mental status, there is no mention of anything

14   other than the mood when the mood was discussed.  It said

15   within normal limits, isn't that correct?

16   A.  Yes.

17   Q.  That's a little different from your testimony you're giving

18   here on the stand today, isn't that correct?

19   A.  No.

20   Q.  And also the sensory exam, you found that to be within

21   normal limits, is that correct?

22   A.  The sensory exam was within normal limits, yes.

23   Q.  And motor strength was intact?

24   A.  Except for certain muscles.

25   Q.  And now, when we talk -- you're talking about other rates.

899MFROT                    Krishna - cross

1    You're talking about rates that are charged but not

2    reimbursement.  There is a difference between charges and

3    reimbursements when you're talking about rates, is that

4    correct?

5              MR. PLATTA:  Objection.

6              THE COURT:  Overruled.

7    A.  In medicine there is rates that are charged and rates that

8    are reimbursed for, that's correct.

9    Q.  Now, do you believe that the MRI that you reviewed, it did

10   show degenerative changes?

11   A.  Which one?

12   Q.  For the lumbar spine.

13   A.  There was some degenerative change.

14   Q.  And the bone spurring is what shows the preexisting

15   degenerative change, isn't that correct?

16   A.  That's correct.

17   Q.  Now, did you ever review Dr. Kaisman's records?

18   A.  No.

19   Q.  Now, do you agree with the statement that disk bulges can

20   shrink or go away or become asymptomatic over time?

21   A.  It's possible.

22   Q.  It is also based upon a study in the Journal of New England

23   Journal of Medicine.  Are you familiar with that study?

24   A.  Yes.

25   Q.  What do you believe the conclusion of the study was?

899MFROT                    Krishna - cross

1    A.  I am assuming that you're talking about the July 1994

2    study.

3    Q.  Correct.

4    A.  The conclusion of the study was categorical in some facts.

5    The fact is that that single level; that is, one-level disk

6    bulges can occur in the normal population and be asymptomatic.

7    Multiple levels they could not comment on because the study did

8    not have statistical value to comment on multiple levels like

9    in this case it's multiple levels.  It was also identified that

10   single-level disk bulges that were asymptomatic can over time

11   resorb and shrink in size.  Unfortunately, that study primarily

12   was focused on single-level disk bulges.

13   Q.  Do you refer a lot of cases to Dr. Babu?

14   A.  Some.

15   Q.  And is he part of your Manhattan spine surgeon team?

16   A.  No.

17   Q.  Do you remember being asked at a deposition on May 15,

18   2008, page 23, line 14:

19   "Q.  Do you work a lot with Dr. Babu?

20   "A.  He is one of the spine surgeons we use.  He is one of the

21   five or six spine surgeons in Manhattan that we use.  We have a

22   team in the northern Bronx also."

23         Do you recall saying that?

24   A.  Yes.  We use many spine surgeons, but he's one of them.

25   Q.  Then you also on your team have a pain management

899MFROT                    Krishna - cross

1    specialist?

2              MR. PLATTA:  Objection.

3    A.  We have several.

4    Q.  And you have a chiropractor?

5    A.  We have several chiropractors we refer patients to.

6    Q.  And a physical therapy center?

7    A.  The physical therapy center is a part of our practice.

8    Q.  That's part of the team approach?

9              MR. PLATTA:  Objection.

10             THE COURT:  Overruled.

11   A.  It's a part of being comfortable with physicians who do

12   good work and are able to treat patients, regardless of their

13   financial background.

14   Q.  But you also all refer cases to each other?

15   A.  Actually, Dr. Babu has never referred us a case.

16   Q.  Now, do you believe that people can be injured in

17   low-impact motor vehicle accidents?

18             MR. PLATTA:  Objection.  He's not an expert.

19             THE COURT:  Could you rephrase the question.

20   Q.  Is it possible for back injuries to occur in low-impact

21   motor vehicle accidents?

22   A.  I'm sort of not an expert on low-impact motor vehicle

23   accidents.

24   Q.  Did you ever talk to Dr. Babu on why he never performed a

25   cervical surgery?

899MFROT                    Krishna - cross

 1   A.  I don't remember having that conversation.

 2   Q.  Now, what part, portions of the spine -- he operates on the

 3   lumbar, the cervical, and the thoracic spine, Dr. Babu, isn't

 4   that correct?

 5   A.  Yes.

 6   Q.  And is it fair to say the percutaneous discectomy is a

 7   procedure and not a surgery?

 8   A.  Yes.  All surgical procedures are procedures.  Each one has

 9   a slightly different degree of exposure of the spine.  The one

10   that Dr. Babu did was actually opening the spine with a scalpel

11   and exposing the spine.  The one that was done by Dr. Davy was

12   using a slightly different approach with a tube-like needle

13   that allows you to shrink the disk.

14   Q.  Now, the C3-C4 herniation, that herniation was not

15   extruding.  It was a contained herniation.  Isn't that correct?

16   A.  That's correct.

17   Q.  While you have some familiarity with reading films, you're

18   not board certified in radiology, is that correct?

19   A.  That's correct.

20   Q.  Sir, is it fair to say, in your opinion, that a board

21   certified radiologist is in a better position to interpret

22   radiological films, MRIs, and x-rays than you are?

23            MR. PLATTA:  Objection.

24            THE COURT:  I'll overrule it.

25   A.  With regards to the spine and brain, because it's a part of

899MFROT                    Krishna - cross

1     our board certification process, as a core of competency, I'm
2     equally capable of reading the spine and the brain.  But with
3     regards to general radiology, such as abdomen and the vascular
4     of the rest of the body is not a part of my core competency or
5     my board certification process, so I would not be able to
6     comment on general radiology.
7     Q.  All these procedures, weren't the purposes of them to
8     reduce pain?
9     A.  To reduce pain, to reduce future disability, and to improve
10    current functional capacity.
11    Q.  Now, you did say in your deposition that she had a
12    permanent partial disability.  You didn't opine a full
13    disability, isn't that correct?
14    A.  That's correct.
15    Q.  And there is a big difference between the two, isn't there?
16    A.  There is a difference insofar as she is able to perform
17    some activities, but will need assistance with other
18    activities.
19    Q.  When you said earlier about $18,000 a year for gym
20    membership, which gym did you talk to that you got those
21    figures?
22    A.  I don't remember who I spoke to, but I think a lot of this
23    is related to her submitting some documentation on the costs.
24    Q.  You had bills for $18,000 a year for a gym?
25    A.  Not bills.  These are prospective costs.

899MFROT                    Krishna - cross

1           MR. COFFEY:  I have no further questions.  Thank you.

2           THE COURT:  Any brief redirect?

3           MR. PLATTA:  Yes, your Honor.

4   REDIRECT EXAMINATION

5   BY MR. PLATTA:

6   Q.  Doctor, how many MRIs did you review in your practice so

7   far?

8   A.  I review anywhere from five to ten a day over a period of

9   at least the last 15 years.

10  Q.  Can you estimate?

11          THE COURT:  That sounds like a good estimate to me.

12          MR. PLATTA:  Thank you.

13  Q.  Doctor, how many EMGs did you do until today?

14  A.  Thousands, more than 2,000.

15  Q.  And, Doctor, when the defense counsel was asking you about

16  the costs, if there is a difference between the charge and the

17  refund from the carrier, can you tell me what happens when a

18  person's policy is exhausted when her carrier doesn't pay for

19  treatments like in this case?

20          MR. COFFEY:  Objection.

21          THE COURT:  Sustained.

22  Q.  Doctor, were your bills recently paid or they were not

23  paid?

24          MR. COFFEY:  Objection.

25          THE COURT:  Sustained.

899MFROT                    Krishna - redirect

1   Q.  Doctor, can you tell me what kind of refund can you receive

2   when person doesn't have insurance?

3            MR. COFFEY:  Objection.

4            THE COURT:  I don't even understand that.

5   Q.  Doctor, when a person doesn't have health insurance, how do

6   they pay you?

7   A.  They are personally liable for the bill.

8            THE COURT:  I thought you weren't taking money for

9   bills, but giving it to charity.

10           THE WITNESS:  Not me.  I'm saying --

11           THE COURT:  You're talking about the -- we are really

12  only interested in you, Doctor.  He has got an array of experts

13  on other areas that he can talk to about other things.  Let's

14  stay with what you know of of your own personal knowledge.

15  Q.  Doctor, in other words, in a situation where there was no

16  more payments --

17           THE COURT:  In your practice.

18  Q.  In your practice for a patient like Ms. Frometa, actually

19  in her case, can you tell me what happens?

20           MR. COFFEY:  Objection.

21           THE COURT:  I'd like to know.

22  A.  We personally don't go after the patient.  But

23  traditionally speaking, other physicians who are in our

24  building do go after the patients.

25  Q.  And if the patient doesn't have money, what happens then?

178

899MFROT                    Krishna - redirect

1    A.  They are personally liable for collection.

2            THE COURT:  A question that's already been asked and

3    answered.

4            MR. PLATTA:  Thank you, your Honor.  Thank you,

5    Doctor.

6            THE COURT:  You're excused.  Thank you very much.

7            (Witness excused)

8            THE COURT:  What's next?

9            MR. PLATTA:  Your Honor, our next witness is

10   plaintiff, Ms. Adonna Frometa.

11           Your Honor, can we approach first?

12           (Continued on next page)

13

14

15

16

17

18

19

20

21

22

23

24

25

899MFROT                      Krishna - redirect

1              (At the side bar)

2              MR. PLATTA:  Your Honor, my client just asked me --

3              THE COURT:  I can't hear you.

4              MR. PLATTA:  My client asked me if she can use the

5    rest room before she testifies.

6              THE COURT:  You have to come up here for that.

7              MR. PLATTA:  I apologize.

8              (Continued on next page)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

899MFROT                    Krishna - redirect

1          (In open court)

2          THE COURT:  We will take a five-minute recess.

3          (Recess)

4          THE COURT:  I heard something on the way out about

5    objections.  I haven't said anything because we are a

6    reasonably relaxed group here.  If you don't stand, not so much

7    for me, but because the reporter won't get it, the witness

8    won't know what to do, not that they often do, but indeed it

9    will make things a lot easier and it's also appropriate.  I

10   don't know what it's like across the street, having not been

11   there for about 15 years, but I can tell you what it's like

12   here, and lawyers rise to make objections, not just because

13   it's courteous, but so everybody knows what they are doing.

14   When you whisper under your breath, objection, any of you, the

15   likelihood is that none of us are going to hear us.

16          (Jury present)

17    ADONNA FROMETA,

18        called as a witness by the Plaintiff,

19        having been duly sworn, testified as follows:

20   DIRECT EXAMINATION

21   BY MR. PLATTA:

22   Q.  Good morning, Ms. Frometa.

23   A.  Good morning.

24   Q.  Ms. Frometa, can you please tell us your address right now?

25   A.  Yes.  I live now with my aunt at 48 -- 448 Meadow Avenue in

899MFROT                    Frometa - direct

1    Brooklyn between Washington and Tillary Street.

2    Q.  How long do you reside at this address?

3    A.  Probably since the first lower back surgery from Dr. Babu.

4    Q.  And where did you live before?

5    A.  With my mom at 233rd Street in the Bronx between 87 and

6    there is a number 4 train around there.

7    Q.  How long do you reside at that prior address?

8    A.  At my mom.  About four years.

9    Q.  Can you tell me where did you live before?

10   A.  Yes.  Besides New York, I moved into Dallas, Texas for

11   probably ten months.  Then I moved -- that was before September

12   11, so I moved to Dallas, Texas.  Then I moved to Las Vegas.

13   Then I got stuck there because I wanted to move back to New

14   York and because of what happened I had to stay out there.  And

15   then --

16   Q.  You mean September 11?

17   A.  Yes.  I stay stuck over there.  I didn't come back here

18   because I stayed for about three and a half years.  Then I

19   moved to Boston, Massachusetts, and then I moved back to New

20   York.

21   Q.  Can you tell us something about your education, all your

22   basic schooling?

23   A.  When I -- I went to fifth grade here in New York, Brooklyn.

24   P.S. 108, and it's by Ashford Street and the J train and it's

25   about ten minutes away from the JFK Airport.  Then I went to

899MFROT                         Frometa - direct

1    Martha Valley Junior High School by Delancey Street and Vesey

2    Street and I think the J train pass around there, too.  Also I

3    went to John Jay High School on Seventh Avenue in Brooklyn and

4    it's supposed to be a law school for high school.  And the G

5    train pass around there.  Then I went to Kingsborough College,

6    and I did not complete it, the Kingsborough College.  I didn't

7    do the year.  And that's my education.

8    Q.  Ms. Frometa, were you involved in the accident, motor

9    vehicle accident, on February 14 of 2007?

10   A.  Yes.  I was in the red light and something hit me really

11   hard.  It felt like an atomic bomb.

12   Q.  By red light, meaning you were stopped in the red light?

13   A.  I was in the red light and something hit me.  I didn't know

14   what.  It hit me twice, and then I blacked out.  It hit me like

15   an atomic bomb.

16   Q.  For how long did you black out?

17   A.  I have no idea.  Maybe a few minutes, two, three.  I am not

18   sure.

19   Q.  Ms. Frometa, I am going to show you some photographs.  You

20   will see them on your screen.  Can you tell me if you recognize

21   your car after the accident on this picture?

22   A.  No.  It says 4 Runner.

23   Q.  Is this your vehicle?

24   A.  Yes, that's my vehicle.

25   Q.  What about on this picture?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Frometa - direct

1   A.  Yes, that is my vehicle.

2   Q.  Does it show the damage to your vehicle as a result of this

3   accident?

4   A.  Yes, that is very damaged.

5   Q.  What about this one?

6   A.  Yes, that is very damaged.

7           THE COURT:  That's your car is what he's asking you?

8           THE WITNESS:  That is my car.  Sorry, sir.

9   Q.  What about that one?

10  A.  Yes, that is my car.

11  Q.  Ms. Frometa, can you tell me what kind of treatment did you

12  undergo as a result of this accident?  Basically, was there

13  ambulance, for example, at the scene?

14  A.  When I woke up from the blackout, I called the 911, and,

15  yes, the ambulance came within about maybe ten minutes together

16  with the police.  I don't know who got there first.  And the

17  two ladies helped me to get out of my vehicle to place me

18  inside of the ambulance.  Right before I went in the ambulance

19  I took a look very quickly and I noticed a huge dark truck that

20  I realized that's what probably hit me.  It had hit me.  And

21  then they put me inside of the ambulance and they strapped me

22  on the stretcher.

23  Q.  And where did they take you to?

24  A.  They took me to Cabrini Hospital on 19th Street between

25  First and Second.

899MFROT                    Frometa - direct

1   Q.  Can you tell me what was done for you at Cabrini Medical
2   Center?
3   A.  They got me out of the stretcher, they put me in a
4   wheelchair, and they took me to the CAT scan, the CAT scan,
5   where they do the CAT scan, and they left me in there and they
6   did whatever they had to do, and then they placed me again in a
7   wheelchair and they put me in another waiting area while I was
8   waiting for whatever the result was.  And the doctor came back
9   and he said that I have lower back and neck injuries and that
10  my spinal cord was no longer in the center.  It was off.  That
11  will bring me problem in the near future.  But I have to come
12  back and follow up.  I also have to find another doctor for
13  this type of treatment, that he might be able to tell me the
14  future what might be going on or -- I might be going on foot
15  treatment after two months or three months, or I might not need
16  I, but it looks bad, he said.
17  Q.  Ms. Frometa, let's step back for a moment to the moment of
18  impact.  Can you describe for us the force of impact?  Was it
19  hard, medium, heavy, or something else?
20  A.  I cannot tell.  It was so hard it felt like an atomic bomb.
21          THE COURT:  That's the third time we understood it was
22  an atomic explosion.
23          THE WITNESS:  I'm very sorry.
24          THE COURT:  It's not your fault.  It's his fault.
25          MR. PLATTA:  I apologize, your Honor.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

899MFROT                        Frometa - direct

1    Q.  Ms. Frometa, once you left the Cabrini Medical Center, what

2    was the next treatment that you received?  Where did you go to?

3    A.  Nine days after I went to Dr. Villafuerte on 43rd Street

4    between Madison and Park.

5    Q.  What kind of treatment did you receive from

6    Dr. Villafuerte?

7    A.  Dr. Villafuerte just recommended me to see him -- to take

8    therapy five days a week for five weeks on therapy and he said

9    to visit him once a week for five weeks.

10   Q.  Did you do that?

11   A.  Yes.  He also told me he was not going to be able to tell

12   me anything until he received the MRIs and the X-ray because

13   after that he would be able to know what's going to be with me.

14   In the meantime, just follow the therapy and try to keep a

15   normal life but diminish any lifting on too much work.  I can

16   go to work, but work less, less hours and less days.

17   Q.  Can you tell me how many jobs did you have soon after the

18   accident?

19   A.  They call me from the Excel Aire, or the private elite

20   aircraft, their elite flights.  I applied for 30 of them for a

21   couple or two years, and they finally call me two days after

22   the accident.  I was so so happy and I just went over there, I

23   try my best and I said, I don't have to go dancing anymore and

24   I go, they are going to like me, and sure enough I apply with

25   them and she try me for a week and she say you are going to go

186

899MFROT                    Frometa - direct

1    full time as a flight attendant.

2           Now, I want you to take your license, it's in New

3    Jersey, and come back, it's a seven-day training.  They can

4    only hire private flight attendant for that.  We already work

5    for a larger commuter aircraft.  That's the only way they can

6    hire for elite aircraft.  And the only problem with that

7    training is, we do the fire department training.  It's like

8    being a fire fighter.  We do the paramedic training.  I know

9    how to use all the CPRs and they teach us, if a lady is giving

10   birth after six months, with a cord around the neck and -- they

11   teach us how to be basically a nurse.  And it's a basic

12   training, also how to be a firefighter and a nurse and a

13   waitress in the sky.

14          But the most important thing about this training is

15   not about the food.  It's about saving the passengers, saving

16   the passengers.  It requires to be able to lift an 80-pound

17   raft that we have inside of the aircraft, not the one that they

18   are attached on the door.  Those are already attached, which

19   the door is very heavy to manipulate, but we have to be in

20   excellent physical condition to do that.  I can no longer pass

21   that part of the training.  I can pass anything else, but the

22   most important is the safety of the passengers in case of

23   unplanned landing or crash and hopefully we all safe.  Then I

24   will be able to bring the raft that is 85 pounds which I cannot

25   no longer carry that.  We have to pull it.  We have 30 seconds

899MFROT                    Frometa - direct

1    for that.  We attach it to the door.  If the door is jammed, I

2    take it to the near exit window and I just attach it and make

3    sure that doesn't float away.  And I pull the red tag and I

4    come back and do the evacuation.

5            I no longer have the strength.  My spinal cord

6    injuries on my neck and my lower back will not allow me to pull

7    an 85-pound raft to save the passengers.  My carrier flight

8    attendant career is out of the window for that.  And that is my

9    passion and that's what I always wanted to do that before and I

10   have done that before at the MGM and Bellagio in Las Vegas.  I

11   used to work for them.

12   Q.  What kind of airline did you work before for?

13   A.  I also worked for American Transair and at that time they

14   needed only for the summertime flight attendant.  After that,

15   they lay off the people.  Some of them got called back.  They

16   never called me back.  I also worked for private jet, but it

17   was not private.  It was a commuter airline.  I was much

18   younger then.  That only lasted six months.  The company went

19   out of business.  That was a lot of fun and it was really nice.

20   I really enjoyed it.

21   Q.  Ms. Frometa, can you tell us, did you do any acrobatics

22   before the accident?

23   A.  I have always been very athletic.  My mom -- I figure skate

24   since I was 14 years old on ice, I'm level 6 on ice skates

25   which in a level 4 you're already pretty good to skate with a

899MFROT                    Frometa - direct

1    lot of experts on ten skaters or 15 on the ice, and we are

2    allowed to stay for an hour or hour and a half.  I'm on that

3    level.  I can do -- I can do back flip and spins and jumps, and

4    I really love ice skating and I use my ice skates that I use,

5    they are olympic skates.  I can't skate with anything else.  I

6    haven't been skating since the accident, since the surgery.  I

7    cannot.

8         Also, I've been skiing for 15 years.  I'm an excellent

9    skier, actually.  I go out west or wherever they have snow.  I

10   bring my goggles and my helmet and it's wonderful.  I ski 15

11   days to 40 days a year.  I get the cheapest whatever so I can

12   stay longer in the mountains.  It's beautiful.  And it requires

13   the physical strength that it requires for any of the sports is

14   to have a perfect condition -- when we are tired, we are tired.

15   But we are injured, we are injured.  When I'm skiing, I don't

16   ski the baby slope, which is pink, green.  The blue is okay,

17   but I go on the single black and which is very nice and smooth,

18   no bumps.  It is wonderful.  I can no longer go skiing, half an

19   hour.  You stay for four, five, six hours or more.

20        To stop, go sideways, you bring your hips to one side

21   and the shoulder to the other side, that's going to injure my

22   spinal cord and my neck and my lower back.  The same with the

23   skating.  The jumps and the flips and the spins.  The problems

24   I have since this accident -- this is fine.  But if I look down

25   for about three minutes or five and I go back up, everything

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                          Frometa - direct

1    spins a thousand miles an hour.  So I cannot actually do my

2    spins on my ice skates anymore.

3              I did gymnastics for a while, probably almost 15 years

4    growing up.  And that is wonderful, too.  I'm very athletic.

5    I'm not a lazy person.  I'm a workaholic.  I play tennis and I

6    play racquetball.  But those sports require a lot of strength

7    from the body, to jump, to keep the ball, to squat.  Most of

8    the people you have to squat down.  I can't go on my bike

9    anymore, which I don't have it anymore because it requires to

10   stay a period of time leaning forward and your head up.  I'm

11   not a lazy person.  I don't want to be a burden to the

12   community.  I look, I try to do my best.

13             I work, either dancing -- the place is legal.  It's

14   legal by the government.  It's like a McDonald's.  It's like

15   anyplace else.  It's legal for the place to be there and it's

16   legal for whoever have to be 21 years old, have paper to work

17   there, and it's a wonderful place.  The management, they are

18   very professional.  They look at us straight in the eyes to

19   management --

20             THE COURT:  Why don't you let him ask some questions

21   just for the change of pace.

22   Q.  Ms. Frometa, going back to your treatment for a moment, can

23   you tell me where else did you go beside Dr. Villafuerte?

24   A.  Besides Dr. Villafuerte.  After that, I went to Dr. Kaisman

25   on 51 25th Street, and I saw Dr. Kaisman and I gave him the

899MFROT                    Frometa - direct

1    MRIs and CAT scan and films.  And he told me -- there were two

2    visits and he told me I needed a steroid injection in my neck

3    and I may need one section or one section might just work.

4    Because we don't know, we are just going to give it a try.  We

5    did -- I'm sorry.  I didn't do any with them.  When I went for

6    the treatment with him, I went out when I saw the needle, I

7    just run out.  I cannot do it.  Now, he did told me, you don't

8    have to do this.  You read the pamphlet, read what's going to

9    happen and everything, you think about it.  It's your decision.

10   If you don't do it, you are going to keep having tingling and

11   numbness.

12            THE COURT:  You don't mean section.  You mean

13   injection?

14            THE WITNESS:  Injection, yes, your Honor.

15   Q.  Ms. Frometa, did you go to any other doctor beside Dr.

16   Kaisman?

17   A.  Yes.  He recommended me to Dr. Babu, which at the time

18   there they were -- Dr. Babu had an office in the same building

19   or the same floor.  I didn't see them together at the same

20   time, but they were in the same building.  And I showed Dr.

21   Babu the films.  And Babu looked at the films and he told me --

22            MR. COFFEY:  Objection.

23            THE COURT:  Sustained.

24            Let your lawyer ask you questions.  If you can answer

25   them a little more directly, that will also be helpful.

899MFROT                    Frometa - direct

```
 1              THE WITNESS:  Okay.  And slower.  I think the
 2    reporter --
 3    Q.  Ms. Frometa, what was your understanding of what Dr. Babu
 4    told you?
 5    A.  My understanding with Dr. Babu was that he looked at the
 6    film and the X-ray and he read whatever was in the paper.  And
 7    he said, I cannot --
 8              MR. COFFEY:  Objection.
 9              THE COURT:  Sustained.
10    Q.  Ms. Frometa, did Dr. Babu tell you that you need surgery?
11    A.  Yes, he did.  He told me I needed surgery, but it will be
12    my decision to make that decision because if I don't do the
13    surgery then I will have like no leg.  But I will be feeling
14    tingling, some numbness.  Already it was very -- it was
15    tingling and numbness.  I still took the pamphlet and I read it
16    and I was thinking about it.  It took me about a couple of
17    months before I made the decision when I felt that my leg
18    was -- literally was like, it was not there.  I didn't feel my
19    leg.  For about ten minutes up to about 40 minutes, up to an
20    hour I will not feel my leg.  I will have to hop on my right
21    leg to do things.  I will not go out of the house.
22    Q.  Ms. Frometa, in the days when you were able to work, did
23    you work after the accident?
24    A.  Honestly, yes, I did, because at Cabrini the doctor said,
25    just do things less and you can work, but just don't lift
```

192

899MFROT                          Frometa - direct

1    anything.  If you're working -- I told him that I dance.  He

2    said, just dance less or pretty much everything.  Wait until

3    you get the next whatever the doctor is going to tell you,

4    whoever you are going to go to, and then follow his

5    instruction.  Yes, I did go to work.  I went to work a little

6    over two months, but I didn't work the entire two months.  I

7    work a total of 20 days in the period of two months and that

8    was including dancing at the club, waitressing, and flight

9    attendant, whenever they needed me for a flight.

10           With the flight we don't carry luggage.  The pilots

11   take care of that because different elite aircraft.  They close

12   the door and they open the door and we don't have a cart.  It's

13   only 14 passengers.  And I carry the food with the tray one by

14   one and place it on their table, and the plate is different.  I

15   just bring it over.  It's nothing like pushing anything heavy.

16   It's a light work.

17   Q.  And you were working for this airline after the accident up

18   until the time that you had to undergo this test, safety test,

19   with airlines?

20   A.  Yes.

21   Q.  After unsuccessful attempt to this test did you go back to

22   working as a flight attendant?

23   A.  No.  Because I didn't go back to work as a flight attendant

24   or go dancing.

25   Q.  When you said almost two months, how many days,

                      SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

899MFROT                    Frometa - direct

1    approximately, did you work after the accident for the club?

2    A.  Probably, around 20 days in a period of two months.

3    Q.  That would be around a month still working after the

4    accident?

5    A.  Yes.  If they have a first job and they go dancing, that

6    will be their second job because they want to pay bills or

7    whatever, and that's okay.  A lot of entertainers, they have

8    first one job and there will be a second job where they can go

9    one day, two days a week or three days a week.

10                MR. COFFEY:  Objection.

11                THE COURT:  I'll allow it.

12   Q.  Ms. Frometa, where did you work before besides being a

13   flight attendant and dancer?

14   A.  I work as in an optical store on 14th Street between

15   Seventh and Eighth four years.  That was, I think, '88.  And I

16   was there for four years.  They went out of business and then I

17   worked for another optical store as a salesperson of eyeglasses

18   and contact lenses for Economy Best Vision between Seventh

19   Avenue -- between Seventh and Eighth.  They are still there.

20   And I also worked as -- part-time, I helped my friend at the

21   bookstore, which it was next door from the optical store.  And

22   his wife is a psychiatrist and he's a salesperson.  He owns a

23   bookstore, not any longer.  It went out of business.  I used to

24   babysit his kids.  I've taken them ice skating and wherever

25   they wanted to go.  They used to pay me something.  I learned

899MFROT                         Frometa - direct

1    the business on the bookstore.  I know how to run the business

2    on the bookstore.

3    Q.  Were you able to do that after the accident?

4    A.  Yes, I did went and helped out, but it was nothing lifting.

5    I help them to order books or take the money to the bank, or

6    just keep the books in place or put the price tags in the

7    books.  And that was okay.  That was fun.

8    Q.  Ms. Frometa, were you able to -- I'll withdraw this

9    question.

10            Ms. Frometa, did you also see Dr. Davy as your

11   physician?

12   A.  Yes.  He's a pain management and he also -- I saw him.  And

13   he reviewed the papers.  And when I met him he said, look --

14            MR. COFFEY:  Objection.

15            THE COURT:  Listen to the question and just answer.

16   All he asked is whether or not you met Dr. Davy.  You don't

17   really need volume.

18            THE WITNESS:  I'm sorry, your Honor.

19            THE COURT:  Don't be sorry.  Just listen.  You can

20   tell us whatever your story is, but do it the right way.  And

21   you can't tell us what other people said because that's really

22   not evidentiary, allowable.

23   Q.  Ms. Frometa, I'm only asking about your understanding of

24   what was going on.  You cannot, as the judge told you, talk

25   about anything else.

899MFROT                    Frometa - direct

1           Ms. Frometa, what did you complain to Dr. Davy about?

2    A.  I complained to him about neck and lower back pain.

3    Q.  And what was the course of treatment that you had with his

4    office?  What did he do for you?

5    A.  He did a steroid injection first.  And if that did not work

6    we did another steroid injection.  It's a total of amount of

7    section for that.  After that, it might work.  And if that

8    didn't work, which I will know, he told me I will feel that all

9    the pain came back, tinglings and numbness on my arms from my

10   neck.  He said, we will have to do the compression of the disk,

11   but we will not able to do both sides at the same time because

12   that's not the way to do it.  We have to do first the right

13   side, and we did.  It worked.  But once the body is injured

14   it's never the same.  So when -- we are scheduled for the left

15   side, he said, you have to come over to the office.  We never

16   did the left side.  There is an obstruction obstructing the

17   left side which if he tries to operate on the left side he will

18   leave me paralyzed from the neck down.  He said --

19           THE COURT:  You don't want to tell us that.  What

20   happened next might be a better way to frame questions.

21   Q.  Ms. Frometa, when you mentioned steroid injection, was it

22   the first steroid injection that you received to your cervical

23   spine in April of last year?

24   A.  Yes.

25   Q.  Was the needle inserted into your neck?

899MFROT                    Frometa - direct

1    A.  Yes.

2    Q.  Following that procedure did you also have what was called

3    a percutaneous discectomy done by Dr. Davy?

4    A.  Yes.

5    Q.  You can see that on the screen right now.  Was it done in

6    December of last year?

7    A.  That was in December, correct.

8    Q.  Do you remember this procedure?

9    A.  Yes.  Well, I was awake, but when I was asleep I don't

10   remember.

11   Q.  When you woke up did you have any pain?

12   A.  A lot of pain, very uncomfortable.

13   Q.  And did the doctor describe for you what's going to happen

14   to you, that he's going to put a needle inside your throat and

15   go to your neck?

16   A.  He did.  He described the whole surgery, he described it.

17   I didn't jump into the decision right away.  Before doing that,

18   it took me a couple of months before doing that surgery.

19   Q.  After the steroid injection did your pain decease, the

20   steroid injection to your neck?

21   A.  The steroid injection?

22   Q.  Yes.

23   A.  The first one he did, they didn't work.  That's why he did

24   the compression of the disk.

25            THE COURT:  He asked you about the third one?

899MFROT                    Frometa - direct

```
 1            THE WITNESS:  The third one.  None of them work.  I'm
 2    sorry.  None of them work.
 3    Q.  Ms. Frometa, do you remember when you saw Dr. Babu and he
 4    recommended surgery, do you remember what did he tell you, what
 5    kind of surgery he's going to do?
 6            MR. COFFEY:  Objection.
 7    A.  I'm sorry.
 8            MR. PLATTA:  I'll rephrase the question.
 9            THE COURT:  Why don't you do that.
10    Q.  Ms. Frometa, what was your understanding of Dr. Babu's
11    surgery?  Did you understand that he's going to cut you open in
12    your back?
13    A.  Yes.  And that will be for my legs so I can feel it, at
14    least, and, yes, I feel my leg back, but I still have tinglings
15    and pain.  My leg never left me again.  I have my leg.  I can
16    feel it.  But the tinglings and numbness, a little numbness and
17    tinglings and pain is still there.  It does not go away.
18    Q.  And, Ms. Frometa, do you have a scar as a result of this
19    procedure on your back?
20    A.  Yes, I do.
21    Q.  How long is the scar?
22    A.  It's about this long.
23    Q.  Is it something very visible?
24    A.  It's too big because I don't have -- I don't like that.
25    That's a big scar.
```

899MFROT                     Frometa - direct

1          THE COURT:  Let the record indicates it looks to me

2     about two inches.  Is that what you would guess?

3          THE WITNESS:  I would say two inches, yes, your Honor.

4     Q.  Ms. Frometa, how did you feel after Dr. Babu's surgery?

5     Did it improve your condition, make it worse, stay the same?

6     What happened?

7     A.  They -- it did improve up to a point because I could feel

8     my leg.  My leg never left me again.  I still feel tinglings

9     and still bothers me, especially with the weather condition

10    when it changes very much.  It's just the pain is there always.

11    At least I feel my leg.  I'm glad I feel it.

12    Q.  Did you also have lumbar steroid injection done to your

13    lower back following this surgery when you not have much

14    improvement in your pain?

15    A.  I did not.  I did not.  It helped a little bit.  Like I

16    said, everything helped a little bit, but it's not perfect.

17    Q.  And is this the steroid injection that you had when they

18    placed you on a table and they inserted the needle again into

19    on your back?

20    A.  Yes.

21    Q.  Do you remember the procedure?

22    A.  Yes.  It lasted about 40 minutes.  And they injected also,

23    they put -- they injected something on my spinal cord which I

24    have to do every year and a half or every two years for the

25    rest of my life.

899MFROT                     Frometa - direct

1            The reason why I'm sitting straight like this right

2    now is because I was already bending forward walking in a

3    position, bending forward, and that procedure helped me to stay

4    straight like this.  And that only lasts a year and a half up

5    to two years.  Once that wears off, I have to go back and do it

6    again and it's a very expensive surgery.

7    Q.  And, Ms. Frometa, can you tell me if Dr. Babu recommended

8    to you that you have a spinal neurostimulator implanted into

9    your back and into your neck?

10            MR. COFFEY:  Objection.

11            THE COURT:  We will allow it.  We are not asking about

12    whether you did it or didn't do it.  You're just being asked

13    whether you recall having that suggestion made to you.

14            THE WITNESS:  Yes, I did recall they suggested it.  I

15    thought about it.  I didn't jump into the decision right away.

16    Yes, we did the procedure, and, again, for me it did not work.

17    Not everything works for everybody.

18    Q.  How did you feel when you had this implant in your body?

19    A.  I felt more pain.  It did not help me.  I felt more pain.

20    Q.  We are talking about the lower back, right?

21    A.  The lower back and the one in the upper.

22    Q.  Did you have to have the implant removed at some point?

23    A.  Only after seven days they have to remove it.  The other

24    one, the one they put a little higher, I have it removed

25    because it bothered me too much.  After four days I have to

899MFROT                    Frometa - direct

1    check myself into a hospital if you guys don't take this one

2    out.  It's too painful.

3    Q.  Basically, you have to have two procedures, you had two

4    procedures each time you had an implant done?

5    A.  Yes.

6    Q.  Was it painful?

7    A.  Very, extremely painful.  I don't wish this to anybody

8    here, nobody.

9    Q.  And, Ms. Frometa, can you tell me if you had any physical

10   therapy with Dr. Krishna's office?

11   A.  At Dr. Krishna's office, yes.  I did -- at first the other

12   one I finished my five weeks, like they say, and Dr. Krishna I

13   followed for almost a year or a year of therapy three days a

14   week, two or three days a week, like they recommended, but I

15   tried to go at least the three days a week every time.  And he

16   helped for the therapy, but, again, the next day I was back to

17   square one.

18   Q.  Did you have to pay for the treatment that you received?

19   A.  No.  The insurance at the time was -- the insurance people

20   were taking care of the treatment and everything.  But now I am

21   exhaust -- I exhausted the $50,000 --

22           MR. COFFEY:  Objection.

23           THE COURT:  Sustained.  Don't answer.  Do you

24   understand my job?

25           THE WITNESS:  I'm sorry, your Honor.

899MFROT                    Frometa - direct

1           THE COURT:  What do you think it is?

2           THE WITNESS:  You are the one that makes the decision

3   here, your Honor, in court.

4           THE COURT:  As to whether or not the question is

5   objectionable, I can rule either to sustain the objection or

6   overrule it.  If you keep on talking before I make my ruling,

7   it's quite complicated for either the jury or the reporter to

8   get it and, in fact, it may be something I sustain in the way

9   of an objection and then you shouldn't answer it at all.  So

10  when you hear an objection, hopefully when the defendant rises

11  to provide it so we hear it, just wait until I rule on that

12  objection before you answer.

13          THE WITNESS:  I understand, your Honor.

14  Q.  Ms. Frometa, who pays for your treatment right now?

15  A.  Nobody.  I have no insurance and nothing to pay for my

16  treatment.  I'm already due for my steroid injections and soon

17  I have to do the one for the spinal cord where that is very

18  expensive, and that's what keeps me standing up.  At least I

19  try to do things halfway, normal of the way I used to do in the

20  past.

21  Q.  Do you actually get treatments once the payment is stopped?

22  A.  They don't pay anymore.  They stopped.

23          MR. COFFEY:  Objection.

24          THE COURT:  Sustained.

25  Q.  Ms. Frometa, when you mentioned before that you were living

899MFROT                      Frometa - direct

1    with your mom, who was there living with you guys?

2    A.  That was -- that's my mom, Nadia, she is 60, and my sister,

3    Annie, she is a year younger than me, and my nephew, Albert,

4    now he's 16 years old, and then my mom asked me to move in with

5    her, and at the time I used to live in Brooklyn by Ocean

6    Parkway, near Coney Island with my other aunt, she just passed

7    away a couple of months ago, and I move in with my mom.

8    Q.  What was the reason for you moving with your mom?

9    A.  Because she needed help with basically with food and all

10   the things in the house and whatever we might need.

11   Q.  Ms. Frometa, what was the reason -- I assume that you moved

12   in before the accident, right?

13   A.  Yes.  I live with my mom before the accident.

14   Q.  What was the reason for you to move out?

15   A.  Because it was closer.  My other aunt Eva, she is younger

16   than my mom and she had the energy to take care of me after,

17   for the surgeries, especially the one that Dr. Babu did for the

18   lower back.  My aunt had to take care of me, and she had more

19   energy than my mom.  She cleaned me up.  It was very -- it was

20   like going back to being a kid, a baby, and she washed my

21   clothes, she did everything for me, she feed me, she just took

22   care of me like back to when I was one years old.

23   Q.  Ms. Frometa, are you a United States citizen?

24   A.  Yes, I am.

25   Q.  Ms. Frometa, can you tell me what other treatment that you

899MFROT                    Frometa - direct

1   received from the Dr. Krishna's office beside physical therapy?

2   A.  He prescribed me some -- if I tell him I have pain, he will

3   prescribe me medication for my pain.  Also, he told me to keep

4   following the physical therapies, and he recommended me to Dr.

5   Davy for the pain management, neck and back.

6   Q.  Before you had the implant of the trial neurostimulator,

7   did you see any other doctor referred by Dr. Davy?

8   A.  I'm sorry?

9   Q.  Were you referred to any other physician by Dr. Davy before

10  you had the neurostimulator implant?

11  A.  Before the stimulator implant.

12  Q.  Did you see any psychologists as a result?

13  A.  Yes, I did.

14  Q.  Where was it?

15  A.  That was in New Jersey.

16  Q.  And what was the reason for you to see him?

17  A.  Because I had been very stressful.  This is not the way I

18  live my life.  Just standing still doing nothing and I get

19  anxiety and nervousness.  I want to know when I am going to go

20  back to whatever -- at least my normal life will be.  I cry a

21  lot and I'm not the same.

22  Q.  Ms. Frometa, do you remember Dr. Krishna doing a test, a

23  nerve test, at his office for you?

24  A.  Yes.  It's very painful.  They just kind of stick things,

25  like bubble gum with a piece of wire where they can find the

899MFROT                    Frometa - direct

1   nerves or whatever might be missing.  They electrocute me and

2   it's very painful.  I scream or just jump.  And then he also

3   place a needle right here with a long wire and that is also

4   very painful.  He place it here on my leg and I don't like it

5   but that's the only way they are able to find out where the

6   pain is coming from or where the -- they might be able to do

7   surgery for.

8   Q.  Ms. Frometa, did you have any prior accidents prior to

9   February 14 of 2007?

10  A.  In the past in L.A., I was driving my Jeep with my mom and

11  nephew --

12          THE COURT:  It's a yes or no question.

13  A.  Yes, I did.

14  Q.  Do you remember having one in Los Angeles in 2001?

15  A.  In 2001, yes.  September 4, 2001.

16  Q.  Did you go seek any medical treatment for that accident?

17  A.  No, not for me, not for my mom, not for no one.

18  Q.  Do you remember having another accident in '04?

19  A.  '04?

20  Q.  Yes.

21  A.  No.

22  Q.  Can you tell me if you had any other accidents between 2001

23  and 2007 for this accident that we are here for today?

24  A.  Yes.  In 2004, there was five cars, we standing in the red

25  light, and I was somewhere in the middle, and a taxi driver

899MFROT                    Frometa - direct

1   just bump into everybody and everybody just went bumper to

2   bumper and no one got hurt.  It's just a bumper to bumper

3   thing.  Nothing happened.

4   Q.  Did you seek any medical treatment for this accident?

5   A.  No.

6   Q.  Did you bring a lawsuit as a result of this accident?

7   A.  Not at all.  Why would I waste my time on little things

8   like that.

9   Q.  Ms. Frometa, the accident in Los Angeles, can you tell my a

10  little bit more what happened there?

11  A.  Yes.  It was past 12 and I'm driving and there is people

12  there are driving pretty fast and I have to follow with the

13  same speed as everyone else is.  At one point the car in front

14  of me just stooped too quickly.  And I jam on the brake and I

15  feel so bad for this oriental old gentleman.  I hit him and his

16  car was a little dent and I told him to please not get out of

17  the car, it's not good.  You don't know what's wrong with you.

18  Stay in your car.  I did not get out of my car.  We waited for

19  the police and the police was there pretty soon.  They pull us

20  to the side, we were there for about an hour and a half.  I saw

21  a lot of ambulance and police and whatever, but it was mainly

22  for the old oriental gentleman.  I felt really bad.

23  Q.  This was approximately seven years -- six years prior to

24  the accident?

25  A.  Yes.

899MFROT                    Frometa - direct

1    Q.  During this six years, did you feel any kind of discomfort

2    to your neck or back?

3    A.  Not at all, not at all.  Not from this.

4    Q.  How about after the accident?  What about the accident in

5    '04, did you have any kind of discomfort to your neck or back?

6    A.  Not at all, never, never.

7    Q.  Ma'am, did you have any subsequent accidents following this

8    accident, any fender bender, anything at all?

9    A.  Yes.  I was actually coming out of a diner in New Jersey,

10   and I looked back and I go slow and, suddenly, large SUV, the

11   cover -- it took the cover of my back light on the car and that

12   was it.  So I stopped the car, we both got out, and I noticed

13   they were throwing some beer bottles over a fence or something.

14   I don't know what it was.

15   Q.  Did you get injured?

16   A.  I did not.  And the police came over and he said, your car

17   is good, your car is good, you can go home.  Here is my card,

18   you can report it.  If you do, you want to report it, fine, but

19   you don't have to.  Both of your cars are okay.  You can drive

20   it.

21   Q.  Did you bring a lawsuit as a result of this accident?

22   A.  No.

23   Q.  Did you go to the emergency room?

24   A.  Not at all.

25   Q.  Did you have any other fender benders?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                         Frometa - direct

1    A.  I believe there was one.  They said March 8, which I don't

2    recall that, but I guess I have to say yes.  And I say I did,

3    but I was not in the car.  I was not in the car.  The car was

4    parked and I went back the next day and the car was hit.  I

5    don't know whether it got hit by a car, got a truck, by a

6    bicycle.  I don't know.

7    Q.  Did you report it to your carrier?

8    A.  I did.  I did report that the car I had, the Sonata,

9    whatever, it has a dent and it has to be fixed.

10   Q.  Did you bring a lawsuit against anyone?

11   A.  Not at all.

12   Q.  And did you have any other accidents?

13   A.  That I remember, no.

14   Q.  And was there a situation once when there was a car rental

15   from car rental company that you were driving and following

16   that time there was an allegation there was a scratch or some

17   damage to the car?

18   A.  When I rented the car, the car rental, the only car they

19   had left when I went to pick it up, he said, this is the only

20   car left.  It's pretty damaged.  We are aware of the damages,

21   don't worry, you can take it.  When I turned it back, which was

22   March 5 or March 8, he said, you damaged the car, you crashed

23   it, I'm sorry, and he said, well, this car was not like this.

24   I said, this is the only car was left and you told me it was

25   okay.  I don't work in a car rental.  I don't know how they do

899MFROT                    Frometa - direct

1    things.  When I returned the car the only one -- he claimed I

2    damage it.  I guess I damage it, I damage it then.

3    Q.  Ms. Frometa, can you tell me something about your regular

4    daily life.  Can you tell us what are the things that you can

5    no longer do?

6    A.  I can no longer brush my teeth normally as I used to.  I

7    cannot bend my body forward.  I have to use a cup and stay like

8    this and brush my teeth.  And I will spit back in the cup and

9    put it.  I cannot put on my clothes normally like I used to.  I

10   have to be against the wall.  If I were going to wear

11   stockings, I would be laying down on my leg and I would bring

12   one leg over and the other one.  I put on my clothes.  And

13   whenever I need help, like the dress I have now, my aunt, even

14   though I am up against the wall, I put my clothes on, then my

15   aunt will put the zipper up.

16          Also, I cannot bend all the way forward to touch the

17   floor.  I cannot go all the way on -- my sports, ice skating or

18   tennis or swimming, because it requires too much of the back

19   and forth.  I can no longer be sitting like this for a long

20   time because it's hurting me.  You have to because I'm here.

21   Also, it's difficult for me to go to sleep also.  I have to put

22   a pillow on my back facing back.  I cannot do grocery shopping

23   like I used to in the past where I can carry a nice amount, but

24   not too heavy.  I can probably carry no more than five pounds

25   per hand or 12 pounds per hand, but that's it.  I don't like

899MFROT                    Frometa - direct

1    doing it because it hurts.  What I do, I go to the grocery, I
2    go to the shopping, I ask for delivery or I have a little cart
3    which I take home and then my aunt will come down and she will
4    bring the food upstairs.
5            Also, to do laundry is very difficult for me.  I can't
6    carry the bag.  My aunt will bring it down.  I take my laundry
7    to the Laundromat, I ask for help to take it out of the cart
8    and the lady who put it on the other cart and then I put the
9    clothes in the machine, wash it, same thing, I have to go help,
10   help, help.
11   Q.  Ms. Frometa, can you do your nails?
12   A.  I cannot do -- actually bring my feet and go down like
13   this.  I cannot.  I have to either go to the pedicure, which is
14   very expensive, or have somebody do it.
15   Q.  Who usually helps you at home?
16   A.  My aunt helps me for almost everything.  She helps me for
17   almost everything.
18   Q.  What does she do for you?
19   A.  She used to do all the laundry in the past, but she helps
20   me to just bring it up and down.  Also, I can only do light
21   dishes.  I can't mop the floor because it requires my body
22   bending.  I can sweep the floor or do the water -- I put some
23   water on the mop and just go once over it.  That's fine.  I
24   notice also I cannot open jars like red peppers, I cannot open
25   that jar.  I don't have the strength on my right arm anymore or

210

899MFROT                        Frometa - direct

1    my left arm.  But if it's not too tight, I can open it.

2    Sometimes I need help, I will ask for assistance.  But those

3    jars, to open, when I want to open things to cook, it's very

4    difficult.  I cannot open.

5    Q.  Ms. Frometa, can you work right now?

6    A.  No, I cannot.

7              MR. COFFEY:  Objection.

8              THE COURT:  Overruled.  Just answer yes or no.

9    A.  No.

10   Q.  What is the reason for you not working?

11             MR. COFFEY:  Objection.

12             THE COURT:  Sustained.

13   Q.  Ms. Frometa, have any doctors told you that you should not

14   work or you should be working part-time?

15             MR. COFFEY:  Objection.

16             THE COURT:  Sustained.

17   Q.  Ms. Frometa, what is your understanding of your doctor's

18   treatment?  Is your understanding that any of them recommended

19   for you to stay out of work?

20             MR. COFFEY:  Objection.

21             THE COURT:  Sustained.

22   Q.  Ms. Frometa, can you dance right now?

23   A.  Not at all.  Out of the question.

24   Q.  Can you work as a flight attendant?

25   A.  Not at all because of the safety of the passenger is

899MFROT                    Frometa - direct

1    first --

2              THE COURT:  We have heard all of this.  Are you

3    finished or do you have something new to talk about?

4              MR. PLATTA:  I'm almost finished, Judge.

5              THE COURT:  I don't care about length.  I would like

6    for the jury to hear it once.  That's the way it's supposed to

7    work here in the United States.

8              MR. PLATTA:  Thank you, your Honor.

9    Q.  Ms. Frometa, what is your understanding of your future

10   medical care?

11   A.  My understanding --

12             MR. COFFEY:  Objection.

13             THE COURT:  Sustained.

14             MR. PLATTA:  I have nothing further, Judge.  Thank

15   you.

16             THE COURT:  Any cross?

17             MR. MILLER:  Yes, your Honor.

18   CROSS-EXAMINATION

19   BY MR. MILLER:

20   Q.  Ms. Frometa, good afternoon.

21   A.  Good afternoon.

22   Q.  Do you recall that you and I met back in December of 2007

23   at your deposition?

24   A.  I remember you.

25   Q.  I asked you a series of questions, correct?

899MFROT                    Frometa - cross

1   A.  Yes.

2   Q.  Do you remember giving me testimony that you worked for

3   three weeks to four weeks following this incident on February

4   14, 2007?

5   A.  I did say that and I apologize, but I did work on the 17th.

6   Q.  Ma'am, I promise I am going to go as fast as I can.  I need

7   quick, short, direct answers.  You testified in December of

8   2007 that you worked three to four weeks after the accident?

9           MR. PLATTA:  Objection.

10          THE COURT:  Why don't you read it.  Let me explain to

11  you why sometimes the depositions are read.  They are really

12  something called prior inconsistent statements.  And they are

13  used for you to examine and think about when you deliberate as

14  to whether this impeaches the credibility of the witness.  If

15  in fact it is immaterial, it really doesn't make much

16  difference.  If it's a material contradiction from what the

17  witness has said on the stand, then you can balance it against

18  her credibility and use it as a function of determining that

19  credibility.  That's why it's better for him to put a question

20  and an answer than for him to sort of paraphrase.

21  Q.  Ma'am, I read from the testimony --

22          THE COURT:  Did you make these answers to these

23  questions is the way it's supposed to be done.

24  Q.  Have you employed in any capacity in terms --

25          MR. PLATTA:  Page.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Frometa - cross

1            MR. MILLER:  Page No. 15, line 4.  I should strike
2    that.  Hang on one moment:  I withdraw that, your Honor.
3    Q.  Ma'am, do you remember --
4            THE COURT:  After all that prelude from me, you're
5    going to withdraw it.  I'm kidding.  Go right ahead.
6    Q.  I'm sorry.  I found it.  Page 14, line 11:
7    "Q.  When is the last time danced?"
8            Line 14.
9    "A.  Probably three weeks after the accident, up until maybe
10    four, but just no longer than five hours due to pains and
11    aches."
12           Do you remember giving that testimony?
13   A.  I did.  And I'm sorry I said that.
14           THE COURT:  Just a yes or no question.  Did you make
15    those answers to those questions and you said yes?
16           THE WITNESS:  Yes.
17   Q.  Ma'am, do you remember testifying that you had a New York
18    State driver's license at the time of the accident?
19   A.  I'm sorry?
20   Q.  Do you remember giving testimony that you had a New York
21    State driver's license at the time of the accident?
22           MR. PLATTA:  Objection.
23   A.  I had a U.S. driver's license, yes.
24   Q.  A New York State driver's license?
25   A.  U.S.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

899MFROT                    Frometa - cross

```
 1            THE COURT:  What is a U.S. driver's license?
 2            MR. MILLER:  I don't know, your Honor.  I am going to
 3    try to figure that out.
 4    Q.  Ma'am, what I'm showing you right now is a copy of the
 5    police report that was admitted into evidence by stipulation.
 6    A.  Yes.  I see it here.
 7    Q.  Ma'am, there is no question.
 8    A.  I'm sorry.
 9            THE COURT:  Where do you get your U.S. driver's
10    license?
11            THE WITNESS:  In Boston, Massachusetts.  When I lived
12    there, I had a Boston, Massachusetts.  And when I came here, I
13    kept it because it's good until 2010.
14            THE COURT:  So it's a Massachusetts license?
15            THE WITNESS:  Yes.
16    Q.  Ma'am, do you remember giving the following testimony, line
17    61 -- page 61.
18            THE COURT:  This is a stipulated exhibit.
19            MR. PLATTA:  Note my objection.  Goes to the way the
20    accident happened, and I would object to the portion --
21            MR. MILLER:  It's already --
22            THE COURT:  You can't have it both ways.
23            MR. PLATTA:  Your Honor, I was trying to avoid any
24    confusion.
25    Q.  Ma'am, do you remember this question, line 12:  Did you
```

899MFROT                        Frometa - cross

1    have a driver's license in good standing?

2    "A.  Yes."

3    A.  Yes.

4    Q.  "QUESTION:  What kind of driver's license was it?

5    "A.  A regular driver's license.

6    "Q.  Was it issued by the New York State?

7    "A.  New York State."

8            MR. PLATTA:  Which page?

9            MR. MILLER:  Same page I said before, 61.

10   Q.  Do you remember giving that testimony?

11   A.  Yes.

12   Q.  Is that testimony accurate?

13   A.  Yes.

14   Q.  It was accurate?

15   A.  Yes.

16   Q.  Because of the driver's license that's reflected on the

17   police report is inaccurate?

18   A.  That's a U.S. driver's license.  It's legal.

19   Q.  Ma'am, you see -- if you look in front of you where it says

20   the address on your license plate, it says Winchester,

21   Massachusetts?

22   A.  Yes.

23   Q.  That was the address on your license?

24   A.  I'm sorry?

25   Q.  That was the address on your license?

899MFROT                    Frometa - cross

1   A.  At the time, yes.

2   Q.  So when the question was asked:  Was it issued by New York

3   State in reference to your driver's license and you said New

4   York State, that was inaccurate?

5   A.  I guess so.  I'm so sorry.  I'm sorry I said that.

6   Q.  Ma'am, do you remember your testimony before where you

7   stated you lost consciousness?

8   A.  I lost consciousness, yes.

9   Q.  And you said you lost consciousness for a few minutes?

10  A.  I don't know how long, but I did lose consciousness for a

11  few minutes.

12  Q.  Do you remember you testified about the ambulance coming?

13  A.  The where?

14  Q.  The ambulance coming to the scene.

15  A.  The ambulance came in when I woke up from the blackout.  I

16  call 911.

17  Q.  Do you remember telling anyone, any of the ambulance

18  drivers or EMTs, that there was no loss of consciousness, LOC,

19  denies loss of consciousness?

20  A.  No, never.  I'm sorry.  I don't understand.

21  Q.  I apologize.  Is there a chance that the ambulance drivers

22  got it wrong and they misunderstood you and they misunderstood

23  the witnesses at the scene and they wrote down that you were

24  unconscious?

25          MR. PLATTA:  Objection.

899MFROT                    Frometa - cross

 1   Q.  You denied consciousness?

 2            THE COURT:  Overruled.

 3   A.  No, I did not deny consciousness.

 4   Q.  Ma'am, you testified a few minutes ago that the airlines,

 5   Excel Airlines, called you a couple of days later, correct?

 6   A.  I'm sorry?

 7   Q.  You said Excel Airlines, where you were a flight attendant,

 8   called a couple of days later?

 9   A.  Yes, they did.

10   Q.  I want to show you what's already been marked into

11   evidence, your flight log.

12            MR. PLATTA:  Actually, it wasn't.

13            MR. MILLER:  The judge already ruled on this.

14            MR. PLATTA:  Objection.

15            THE COURT:  What's the number and we will see if we

16   made an error, which is certainly possible.

17            MR. MILLER:  For good measure, your Honor, I also note

18   that this was also under -- this was submitted with an

19   affidavit under evidentiary Rule 904 and Mr. Platta was given

20   full access to these documents and without objection these

21   documents were provided.

22            THE COURT:  Do you have a defendant or plaintiff

23   number for the exhibit?

24            MR. PLATTA:  Your Honor, to save time, I will

25   stipulate from these records.  I have nothing to hide.  That's

899MFROT                    Frometa - cross

1    fine.

2              THE COURT:  That's very kind of you.  Let's move

3    along.

4              If you're going to introduce others, since it doesn't

5    seem to work, do it, please, over lunch, make sure that both

6    sides agree they are admissible under my ruling or, in fact,

7    they were agreed to in the stipulation.

8    Q.  You see this document in front of you?  Have you ever seen

9    a document that looks like this?

10   A.  Yes.

11   Q.  This is a flight log, correct?

12   A.  Yes.  But I haven't seen that in a while, so I have to go

13   over it.

14   Q.  No problem.  We have got plenty of time.  You testified

15   that you waited two days before getting a call from the

16   airline?

17   A.  Correct.  They call me about two days after the accident,

18   yes.

19   Q.  If you notice, that the first entry on there is for

20   February 16 that says KCOS, correct?

21   A.  KCOS.

22   Q.  It says arrive, next to it, at KISP?

23   A.  We do three flights a day.

24   Q.  I understand.  Do you understand the first entry to mean

25   Colorado Springs?

899MFROT                        Frometa - cross

1    A.   I guess so.

2    Q.   It says:  Out at BLK out, that's 4:32.  That's a.m.,

3    correct, military time.  That means you were on a flight going

4    from Colorado all the way to Islip, Long Island on February 16?

5    A.   I guess so, if that's what it says.

6    Q.   If you're on a flight at 4:32 a.m. leaving Colorado, didn't

7    you have to fly out there to Colorado and you flew out on the

8    15th of February?

9    A.   I didn't fly out on the 15th, no.

10   Q.   How did you get to Colorado on February 16 to be on a 4:30

11   flight?

12          MR. PLATTA:  Objection.

13          THE COURT:  Overruled.

14   A.   I don't remember.  Whatever is here, that's what it is.

15   Q.   Fair enough.  I'll move forward then.

16          On February 16, at 5:38, you left Islip, Long Island,

17   and you went to White Plains, is that correct?

18   A.   Yes.  To pick up some passengers.

19   Q.   Later that day -- I remind you, less than 36 hours after

20   this February 14 accident?

21   A.   Yes.

22   Q.   On February 16, at 8:22, you flew from White Plains back to

23   Rifle, Colorado?

24   A.   We do that.

25   Q.   That's a four hour and 42 minute flight?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

899MFROT                         Frometa - cross

1    A.   That's great.

2    Q.   So my understanding, if I add it up, on February 16, you

3    have three hours and 18 minutes going from Colorado Springs to

4    Islip, you had Islip to White Plains for an hour and 24

5    minutes, and then you had White Plains to Rifle for four hours

6    and 42 minutes.

7         So, ma'am, is it fair to say you had approximately

8    eight and a half hours of flight time just on February 16

9    alone?

10   A.   I'm glad I was working, yes.

11   Q.   You don't know how you arrived in Colorado to fly a 4:32

12   a.m. flight?

13   A.   We didn't have any passengers.  I don't believe we had any

14   passengers.  We were empty flight.

15   Q.   That wasn't my question, ma'am.  Let me ask it again.  Do

16   you know how --

17        MR. PLATTA:  Over objection.

18   Q.   -- from February 14, to the time of the accident, until the

19   time you left the Colorado airport on February 16, do you know

20   how you physically got from New York City to Colorado?

21   A.   On the 14th, 15th, I was home stiff, I didn't go anywhere.

22   I went to see the lady to fill out --

23   Q.   That's not my question.  Do you know how you got from New

24   York to Colorado to fly on a 4:30 a.m. flight, approximately

25   4:30 a.m. flight on February 16?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                        Frometa - cross

```
 1    A.  I don't remember.
 2    Q.  That's all I asked.
 3         Ma'am, let's take a look at the next entry on here.
 4    February 19.  You fly to -- February 19, you fly from West Palm
 5    Beach, you fly to West Palm Beach, Florida, is that correct?
 6    A.  That's what they have there, yes.
 7    Q.  And on February 19, you fly from West Palm, 3:32, to Aspen,
 8    correct?
 9    A.  That's what flight attendants do.
10    Q.  That's nearly a five-hour flight, four hours, 48 minutes?
11    A.  Yes.  I'm glad I was working.
12    Q.  Ma'am, how did you get down to Florida?  That's not listed
13    on here.
14    A.  They call it deadhead.  If the pilots already have the
15    aircraft in another state, then my manager will call me to say,
16    you have to catch a flight, you are going to catch it in
17    Florida.  You have to catch a flight out of LaGuardia or Newark
18    or whatever.  Here is your flight number and everything.  This
19    is already paid for.  I have to dress like this --
20    Q.  Ma'am, I don't have a question.
21    A.  Sorry.
22    Q.  When you go out to Colorado on these deadhead flights, do
23    you go skiing in between?
24    A.  No.
25         THE COURT:  Wait for the question and then try and
```

899MFROT                    Frometa - cross

1   answer it directly, briefly, short.

2   Q.  We will come back to the flights in a moment.  I want to

3   show you your employment application.

4             MR. PLATTA:  Objection, your Honor.

5             MR. MILLER:  This was ruled on already.

6             THE COURT:  If you give me a number.

7             MR. MILLER:  I ruled on this right at the beginning of

8   the trial.

9             MR. PLATTA:  Your Honor, there is a difference between

10  attendant records and employment records.

11            THE COURT:  You haven't answered my questions.

12  Doesn't anybody answer questions here?

13            MR. PLATTA:  Yes, your Honor.

14            THE COURT:  This is an effort to make things happen

15  quicker.  I gather it's DI and DJ.  Unfortunately, neither of

16  you can see that, but indeed with certain redactions they were

17  both admitted.  In fact, I ruled on them and the decision I put

18  out or will put out later today in more detail, but for the

19  moment, they are admissible.

20            MR. PLATTA:  Your Honor, what about the redactions?

21            THE COURT:  What are they?  You are supposed to

22  provide them.  I'm not supposed to do the redacting.

23            MR. MILLER:  I'm not making any suggestions for

24  redacting.  I don't see any need here for employee records from

25  Excel Aire.

899MFROT                    Frometa - cross

1           MR. PLATTA:  Your Honor, I think would be prejudicial

2     to my client if her employment history is at issue here.  It's

3     an accident case and it's not an employment case.

4           THE COURT:  I think that's absolutely the wrong

5     answer.  You want to try another?

6           MR. PLATTA:  No, your Honor.  Thank you.

7     Q.  Ma'am, I am going to show you your employment application.

8           MR. PLATTA:  Your Honor, note my exception to this

9     ruling.

10          THE COURT:  I am not going to note your exception

11    because as far as I'm concerned, if you wanted it redacted, we

12    agreed that it should be redacted.  I did not agree that the

13    Court will do the redacting.

14          MR. PLATTA:  Your Honor, at this point, these records

15    are going without redaction.  That's what I'm opposing.

16          THE COURT:  You had all the time in the world after my

17    ruling to do the redaction and get it agreed to by your

18    adversary and nothing happened.  So the fellow doesn't have it

19    redacted now.  Does that mean I should keep it all out or

20    should I let you stand up after each line you think should have

21    been redacted?

22          MR. PLATTA:  Your Honor, at this point I will have no

23    objection to the records.  The jury will see them and I have no

24    problem with them anymore.

25          THE COURT:  Comforting.

899MFROT                    Frometa - cross

1    Q.  Ma'am, what's the date on this employment application?

2    A.  2/16/07.

3    Q.  You went and filled out that application at the start of

4    your first flight, correct?

5    A.  I started my first flight on that day.

6    Q.  Ma'am, the second page of your application states that

7    there is an authorization.  You see that certification, all

8    those legal lines.  You see that?

9    A.  Where?

10   Q.  Right over here.  I certify that the facts contained in

11   this application -- you see that sentence -- are true and

12   complete to the best of my knowledge and understand that

13   falsified statements of this application will be grounds for

14   dismissal.  You see that statement?

15   A.  Yes.

16   Q.  You made a certification, you signed underneath, correct?

17   A.  Yes.

18   Q.  And you signed it actually on February 17, after you

19   returned from your flight, correct?

20   A.  I guess so.

21   Q.  Ma'am, I should go back to the first page of the

22   application.  You listed a few of your employment locations,

23   correct?

24   A.  Yes.

25   Q.  Those aren't all the employment locations that you've

225
899MFROT                      Frometa - cross

1    testified since you've been here today, is it?
2    A.  No.
3    Q.  You left out other airlines, you --
4    A.  They asked me, put the one that you want to.  You don't
5    have to put them all.
6    Q.  You chose which ones that you thought were important, such
7    as Cone-Opt will be more important than the airlines that you
8    were laid off from?
9           THE COURT:  Sustained.  Enough already on this
10   credibility issue.  Can we move along?
11          MR. MILLER:  Sure, your Honor.
12          MR. PLATTA:  Your Honor, can I approach?
13          THE COURT:  No.  After your last effort at the side
14   bar, I think we will maintain our positions of not having any.
15   Q.  I am going to show you, ma'am, in deference to my counsel
16   here, just your attendance records.
17          MR. PLATTA:  Your Honor, please note my objection.
18          THE COURT:  I don't know what we are talking about.
19   Do you have a number or a letter?
20          MR. PLATTA:  Your Honor, these employment records
21   actually show the amount paid by my client or for my client and
22   employment -- lost wages are not part of this lawsuit and
23   that's why I was preventing these records from getting to the
24   jury.
25          MR. MILLER:  Mr. Platta, I am willing to stipulate to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

899MFROT                    Frometa - cross

1   the earning dollars on the side.  What I am more interested in

2   is the attendance of Ms. Frometa showing up at Rick's Cabaret.

3              THE COURT:  We will take away the dollars and we will

4   talk about the timetables.

5              MR. MILLER:  Here we go.  The dollars are taken away.

6   Q.  Ms. Frometa, you see that document in front of you,

7   correct?

8   A.  Yes.

9   Q.  This is called the RCI NYC entertainer charge summary, is

10  that correct?

11  A.  Yes.

12  Q.  And this would be a printout from Rick's Cabaret in

13  Manhattan?

14  A.  Yes.

15  Q.  This would be the document that would log when you worked,

16  correct?

17  A.  I guess so.

18  Q.  I want you to take a look at this document and tell me, did

19  you work on February 17?  You did, correct?

20  A.  I don't see nothing here.

21  Q.  How about February 17?

22  A.  On the bottom?

23  Q.  Yes.

24  A.  I was between flying and dancing, yes.

25  Q.  Just so I understand, when you say February 13, that was

899MFROT                    Frometa - cross

1    the night going into the date --

2    A.   Where is the 13th?

3    Q.   Ma'am, when you look at February 13 --

4    A.   Yes.

5    Q.   -- that is the night that you were working going into the

6    day of the accident, correct?

7    A.   Yes, correct.

8    Q.   So if you worked on February 13, and the accident happened

9    February 14, that would be at 4:30 in the morning, correct, on

10   the 14th?

11   A.   What do you mean 4:30 in the morning, what?

12   Q.   The accident occurred at approximately 4:30 a.m. on

13   February 14 that we are here for today?

14   A.   Whatever the police report says.

15   Q.   I am going to suggest to you that it happened at

16   approximately 4:30.

17   A.   If you say so, okay.

18   Q.   So February 13 you worked, February 14 you had the

19   accident, correct?

20   A.   Yes.

21   Q.   Somehow, on February 15 you had to get out to Colorado?

22   A.   No.  February 13.  15.  I was home and stiff.  I got a

23   phone call on February 15 that I may be on a flight on the 16th

24   or 17th.

25   Q.   Ma'am, the flight was February 16, correct?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Frometa - cross

1    A.  Yes.

2    Q.  We talked about that before?

3    A.  Yes.

4    Q.  And you had the flight on February 16 started at

5    approximately 4:30 a.m.?

6    A.  What day?

7    Q.  February 16.

8    A.  The flight started, yes.

9    Q.  So in order to be out on the 16th, at 4:30 a.m. in

10   Colorado, how --

11   A.  4:30 a.m. in Colorado?

12   Q.  Yes.  I'll show you the other record.

13   A.  Whatever I have there, that's right.  You're right.  I

14   don't remember what I have for dinner last week.

15   Q.  You don't remember the other car accidents, correct?

16        MR. PLATTA:  Objection.

17        THE COURT:  Sustained.

18   A.  Yes.

19   Q.  Ma'am, February 17, did you work?

20        THE COURT:  She says she doesn't remember what she had

21   for dinner last week.

22        MR. MILLER:  Judge, I'm asking --

23        THE COURT:  Mr. Miller, forget it.

24   Q.  Ma'am, do you remember any of the dates on the 22nd?

25   A.  I'm sorry?

899MFROT                    Frometa - cross

1   Q.  Did you work at Rick's Cabaret on the 22nd?

2   A.  If it's on record, I did.

3   Q.  I'll submit all these, but you agree that you worked from

4   February 17 all the way through to April 18, correct?

5   A.  Yes.  But only 20 days.

6   Q.  April 18.  The jury can count the days on the chart.  I

7   actually -- it's 27 or 28.

8   A.  But not 60 days.

9   Q.  Because you're also working at the airlines?

10  A.  It's okay for me to work.  I'm a workaholic.

11  Q.  There is no question.

12          MR. PLATTA:  Objection, your Honor.

13          THE COURT:  Sustained.

14  Q.  Your first consultation with Dr. Davy, was that on April

15  20?

16  A.  It was about few months after the accident.

17  Q.  Couple of months?

18  A.  Couple of months after the accident.

19  Q.  If Dr. Davy testified the first time he saw you April 20

20  and your records demonstrate that you were first seen by Dr.

21  Davy on April 20, you accept that, correct?

22  A.  Whatever you have there, that's what it is.

23  Q.  Ma'am, I forgot to ask you a question.  I am going to show

24  you something back on Rick's records.  Ma'am, back on February

25  29 you got -- February 29, you got a charge-back, correct?

899MFROT                    Frometa - cross

1    They gave you an adjustment?

2              THE COURT:  You sure it was a February 29.

3              MR. MILLER:  I'm sorry.  March 29.

4              MR. PLATTA:  Objection, your Honor.  Out of court

5    statement.

6              MR. MILLER:  It's a business record.

7              MR. PLATTA:  Out of court statement.

8              THE COURT:  Overruled.  Didn't we go through all these

9    and rule on them.  Why are you getting up and making

10   objections?  Do you have a copy of my rulings in front of you?

11             MR. PLATTA:  Yes, your Honor.

12             THE COURT:  Let me see it.

13             MR. PLATTA:  Not in front of me, but I have it

14   somewhere here.

15   Q.  You see a March 29, '07 entry?

16   A.  No, I don't see it.

17   Q.  I am going to point right over here.

18   A.  I don't see it.

19   Q.  You see where it says March 29?

20   A.  Okay.

21   Q.  March 29?

22   A.  Okay.

23   Q.  There is a charge-back over here.  It says no fee.  You

24   know why it says no fee.  It says that you were in a car

25   accident on March 16?

899MFROT                      Frometa - cross

1              MR. PLATTA:  Objection.

2   A.  No.  They got it wrong.  They got it wrong.  They made a

3   mistake.

4   Q.  Let me ask you another question.  They got it wrong.  And

5   when they got it wrong on March 16 -- on March 17, they noted

6   you were a no-show on the 16th and two weeks later they gave

7   you the charge-back, correct?  You see the 17th entry?

8   A.  What do you mean, the charge-back?  What does that mean?

9   Q.  They didn't charge you your dancing fee, correct?

10  A.  Whatever they have, that's what it is.

11  Q.  So they indicate here that you were a no-show on March 16,

12  correct?

13  A.  Okay.

14  Q.  We talked about that other car accident on March 8 as well

15  and you were also a no-show on March 8.

16  A.  I don't know what to tell you.  It's on record, it's on

17  record.

18  Q.  So the incident before when you testified to Mr. Platta

19  about a car rental on March 8 and they accused you of being in

20  an accident, you said you weren't in an accident, correct?

21  A.  Whatever you have on record, that's fine.

22  Q.  And the record that says March 16 that you were in an

23  accident as well, that record is wrong?

24  A.  No.  Because I called them on the 16th and that's when I

25  called them.  I didn't call them the same date of the accident.

899MFROT                         Frometa - cross

1   Q.  Ma'am, the 16th you were a no-show, correct, and it wasn't

2   until March 29 that they gave you the credit back, correct?

3   A.  I don't know how they do things there.  I don't know.

4   Q.  Maybe we will hear from them later.

5   A.  That's fine.

6   Q.  You talked a little bit before about responsibilities as a

7   flight attendant, correct?

8   A.  Yes.

9   Q.  Did you tell anyone when you applied for this job that you

10  had any back problems or you were in an accident the day

11  before?

12  A.  I did.  I told her, look, I just got into an accident,

13  something happened, but I don't know how serious it is.

14  Q.  I didn't ask you what you told him.  Did you speak to her?

15  A.  Yes.

16  Q.  Who did you tell?

17  A.  To the lady that hired me.

18  Q.  What's her name?

19  A.  I forgot.  I have to look for it.

20  Q.  Are you required to wear high heels when you work as an

21  tenant?

22  A.  No.

23  Q.  Were you required to wear high heels as a dancer?

24  A.  Two inches.

25  Q.  You testified in all the questions that I just asked you,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Frometa - cross

1    those records were listed essentially as entertainer charge

2    summaries.  That's when you're in the role of a dancer?

3    A.  Entertainer what?

4    Q.  It was entitled up top, entertainer charge summary.  This

5    is for when you were dancing, correct?

6    A.  I guess so.

7    Q.  You testified you also waitressed?

8    A.  Yes.

9    Q.  I apologize because maybe Rick's Cabaret didn't send me the

10   entire file.  If these are the days you danced -- and you

11   danced, you say 20, I say 28, 27.  The jury will count.  How

12   many days did you waitress?

13   A.  Whenever they needed a waitress at night, they would let me

14   know.

15   Q.  Did you waitress during this time period as well that's not

16   on these records?

17   A.  A couple of times.

18   Q.  20, I say 27, 28 times that you danced, a few times

19   waitressing, and then you were the flight attendant as well?

20   A.  They will not say I waitressed.  They will just leave it as

21   dancer.

22   Q.  Then these records reflect the time that you were

23   waitressing?

24   A.  I'm a workaholic.  I don't mind working.

25   Q.  That wasn't my question.  These reflect the times that you

899MFROT                    Frometa - cross

1    were waitressing, correct?

2    A.  I guess so.

3    Q.  And you would pay a fee to be a waitress?

4    A.  We all do.

5    Q.  Do you pay a fee when you dance or do you pay a fee when

6    you waitress?

7    A.  Both.

8    Q.  Same fee?

9    A.  Depends.

10   Q.  You didn't mention to these doctors about these other

11   accidents, did you?

12   A.  I did not.

13   Q.  That's yes or no.

14   A.  No.

15   Q.  Did you tell the captain of the airplane that you had these

16   accidents?

17   A.  They all knew.

18   Q.  Do you know the names of the captains?

19   A.  No.

20   Q.  I don't really want to get into too much detail.  As a

21   dancer are you required to move your body, bend, twist?

22   A.  No.  The rules here are different.  We are not allowed to

23   do floor work.

24   Q.  Ma'am, did you ever join a gym since this accident?

25   A.  No.  I hate the gym.  I don't like the gym.  It's gross.

899MFROT                    Frometa - cross

1    Q.  You don't like the gym?

2    A.  I don't.

3    Q.  You don't think you need a $18,000 gym membership?

4    A.  For physical therapy, for special treatment, yes.

5            THE COURT:  Are we coming close --

6            MR. MILLER:  I'm almost done.  I have two more

7    minutes.

8            THE COURT:  Great.

9    Q.  Is it true, ma'am, that your airbag never deployed?

10   A.  I'm sorry?

11   Q.  On the February 14, '07 accident, your airbag did not

12   deploy, did it?

13   A.  No.

14   Q.  And those photographs that we put up before, those were

15   taken, if you looked at the bottom, within two weeks of the

16   accident, correct?  I believe a week, correct?

17   A.  I believe so.  I don't know.

18   Q.  And there was a tape measure in one of the pictures?

19   A.  I saw a tape measure.

20   Q.  Was that tape measure put there by your lawyer?

21           MR. PLATTA:  Objection.

22   A.  I don't know.

23           MR. PLATTA:  Objection.

24   A.  I don't know my lawyer back then.

25   Q.  Do you know who took the photographs?

899MFROT                    Frometa - cross

1    A.  Probably, at the shop.

2    Q.  Ma'am, you said that you live with your aunt and your mom,

3    correct?

4    A.  Correct.

5    Q.  Are they here today?  Did they come?

6    A.  No, they are not.

7    Q.  All these other accidents we talked about that you said

8    were fender benders or insignificant, they are significant,

9    correct, that you reported them all to your insurance company?

10           MR. PLATTA:  Objection.

11           THE COURT:  I don't think that was her testimony.

12           MR. PLATTA:  Thank you.

13   Q.  Ma'am, you testified before that the trial neurostimulator

14   implants you didn't like, you wanted them out.  You took them

15   out?

16           MR. PLATTA:  Objection.

17   A.  I did not took them out.  I'm sorry.  I did not took them

18   out.

19   Q.  You didn't like them?

20   A.  They don't work on me.  They hurt.

21   Q.  Ma'am, when did you implant them?

22   A.  I did not implant them.  The doctor did.

23   Q.  When were they put in?

24   A.  On the last five months they implanted it --

25   Q.  In May?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

237

899MFROT                    Frometa - cross

1   A.  Somewhere -- in the last five months one, and they tried

2   the other one after.

3   Q.  Wasn't that about the time that this trial was supposed to

4   start?

5          MR. PLATTA:  Objection, your Honor.

6   Q.  Wasn't that the time of the initial trial date?

7          MR. PLATTA:  Objection.

8   A.  I needed it to try to see what works for me.

9          THE COURT:  Overruled.

10          MR. MILLER:  I have no other questions.

11          THE COURT:  The adjournment of this trial has nothing

12   to do with her.  It was all me.

13          MR. MILLER:  Your Honor, I have no other questions.

14          THE COURT:  Any redirect?

15          MR. PLATTA:  Very short, your Honor.

16   REDIRECT EXAMINATION

17   BY MR. PLATTA:

18   Q.  Ms. Frometa, I heard from your testimony when the defense

19   counsel asked you about deployment of the airbag.  Was the

20   impact from the rear of your vehicle?

21   A.  The impact was on the rear of the vehicle.

22   Q.  Are you aware that when the impact is from the rear that

23   the airbag in front doesn't deploy?

24          MR. MILLER:  Objection.

25   A.  It does not deploy.  It does not.

899MFROT                    Frometa - redirect

1          THE COURT:  She is not a mechanic.

2     Q.  Ms. Frometa, how old is your mom?

3     A.  My mom is 60.

4          MR. MILLER:  Objection.  Asked and answered.

5          THE COURT:  That's the first time you've raised that,

6     Mr. Miller.  It's commendable if you're catching on.  Go ahead.

7     Q.  Ms. Frometa, what is your mom doing today?  Why is she not

8     here?

9     A.  She is at home.  She cannot -- she is basically too old.

10    She feels tired and she should stay at home.

11    Q.  Is she with your sister?

12    A.  Yes.

13    Q.  Why is she with your sister?

14    A.  My sister, she is a schizophrenic, very mentally ill.  She

15    is the violent type and my mom have to take care, take care of

16    my sister.

17    Q.  Are you nervous today?

18    A.  Very, very nervous for my future and how do I know I am

19    going to take care of my family.

20    Q.  Are you nervous because of testifying in court with

21    Mr. Miller, for example?

22    A.  No, no.

23    Q.  And Ms. Frometa, at the time of the accident, was there a

24    lot going on when the ambulance came?

25          THE COURT:  Sustained.  How would she know if she

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                        Frometa - redirect

1    really wasn't with it.

2    Q.  Ms. Frometa, you said that you were transported to the

3    ambulance by two people, right?

4    A.  Two ladies, they helped me to get out of the car.

5    Q.  Did you have any discussion with anyone from the crew about

6    anything?

7    A.  That I remember, no.  Nothing.

8    Q.  How would you describe your state of mind from the time

9    when they were transporting you to the ambulance after you were

10   hit by 40,000 pounds of truck?

11          THE COURT:  That wasn't part of the testimony either,

12   so I'll sustain the objection.

13   Q.  What was your state of mind at the time when you were

14   getting in to the ambulance?

15   A.  Very confused and shaking.

16   Q.  And, Ms. Frometa, I just want to make sure that we have

17   this straight.  When I was asking you questions before, you

18   testified that you were actually working two months after the

19   accident for the club as a dancer, right?

20   A.  Yes.  Maybe a little over two months.

21   Q.  And you also testified today that you were working for the

22   flight as a flight attendant?

23   A.  Yes, I did.

24   Q.  I will ask you one more question.  Did you work in any of

25   those capacities after April of last year?

899MFROT                        Frometa - redirect

1    A.  I'm sorry?

2    Q.  Were you working at all after April of last year?

3    A.  No, never.

4              MR. PLATTA:  Nothing further.

5              MR. MILLER:  Recross, your Honor?  Two questions.

6              THE COURT:  We are counting.

7              MR. PLATTA:  Your Honor, if we are going --

8              MR. MILLER:  You already put them in.

9              MR. PLATTA:  Your Honor, please note my objection.

10   This is redirect --

11             THE COURT:  It's not redirect, first of all.

12             MR. PLATTA:  It's recross.

13             THE COURT:  Second of all, I have no idea what he's

14   going to ask, so I can't rule.

15             MR. PLATTA:  I just want to say I didn't use that

16   photo.

17             THE COURT:  You didn't use any photos?  You ought to

18   wait until we see what he puts up.  It seems to me there were

19   photos.

20   RECROSS EXAMINATION

21   BY MR. MILLER:

22   Q.  Ma'am, you still drive your car today?

23   A.  Yes, I do.

24   Q.  And do the photographs that you saw before that Mr. Platta

25   put up on the screen, they also depicted a side impact as well,

899MFROT                        Frometa - recross

1    correct?

2    A.  Can you go slower, please?

3    Q.  The impact of the vehicle, of your collision, was also a

4    side impact, correct?

5    A.  I don't know.

6    Q.  If the photographs depict a side impact you have no reason

7    to dispute the photographs that Mr. Platta showed you?

8    A.  I never got out of the car to look at the car.

9    Q.  I think I asked you this.  Do you still drive your car

10   today?

11   A.  Yes, I do.

12           MR. MILLER:  I have no further questions.

13           THE COURT:  You're excused.  Thank you very much.

14           (Witness excused)

15           THE COURT:  I think we will adjourn for lunch.  You

16   can step down, Ms. Frometa.  Thank you for having spent the

17   morning with us and some of the afternoon.

18           THE WITNESS:  Thank you so much, your Honor.

19           (Witness excused)

20           THE COURT:  Let's agree that we will be back at 2:00,

21   to not discuss the case amongst yourselves or with anybody

22   else.

23           (Jury not present)

24           THE COURT:  Gentlemen, I've been trying cases for a

25   long time.  If I had to guess, I would guess that you haven't

242

899MFROT

1   been in the federal court once.  In any event, it's a very

2   different way of life here and it's good you learn it.  Each

3   side keeps a list of the exhibits and if the judge has ruled on

4   those exhibits already and if they have an objection they will

5   say, this is Exhibit P-6 and indeed you called it inadmissible

6   and then we will know where we are.

7           Second of all, I looked at your charges and apparently

8   you don't know from anything but CPLR.  Just for your

9   information, in case you get here again, we don't count the

10  alternates as people that are let go at the end of the trial.

11  All seven or eight jurors deliberate.  You're shaking your head

12  as you knew that.  Why did you give me a charge that says no?

13          In any event, let's try, just try to clean up your act

14  so that we understand what we are doing, we understand what I

15  ruled on, we understand what I rule, and we can roll along here

16  a little faster, which indeed we should be doing at the

17  defendants' request.  They wanted to move it along.  You can't

18  do it if you don't know the players, and the players here are

19  the exhibits.  You've got to understand what they are and where

20  they are and whether they were ruled in or out.  If we hadn't

21  done that, then I can understand your squabbling.  Since I took

22  a lot of time and spent a lot of effort to try to do that so as

23  to avoid arguments in front of the jury, I find it very

24  unfortunate that you guys can't get it.  I have a list of those

25  exhibits and you must have a list, if you listen to me, which

899MFROT

1    is another problem.

2              We will see you after lunch.

3              MR. COFFEY:  Your Honor, if I could, for one moment,

4    we have three of our experts for this afternoon because we had

5    come in today, we are going to use this afternoon to put them

6    on.

7              THE COURT:  You are.

8              MR. COFFEY:  I will.  I want to make sure that I am

9    doing the direct of all my witnesses.  I will keep that

10   compact.  I'm just asking that I can get the three of them

11   because they are doctors who shifted their schedules around.  I

12   don't know if we need to put limitation on examination for each

13   of them or how we go through them.

14             THE COURT:  Let's hope you don't have more than we can

15   handle.  As far as I'm concerned, I thought I told you that I

16   was prepared to stay here until we finish.  Once again, if you

17   just listened to what I say, the likelihood is that over time I

18   don't change my mind.

19             MR. COFFEY:  The only reason I thought that changed

20   was right before the end of the day one of the jurors said they

21   wanted to get to the U.S. Open.

22             THE COURT:  It's over now.

23             MR. COFFEY:  I thought it was tonight.  I'm sorry.

24             THE COURT:  It's been a pleasure.

25             MR. PLATTA:  Your Honor, in accordance to what you

899MFROT

1    said, I did make mistakes in my proposed plaintiff's requests
2    to charge and my verdict sheet, and I would like to submit
3    corrected versions.
4         THE COURT:  Hand it to my deputy.  We will have a
5    charge conference.  We will all learn the law by the end of the
6    trial.  Most of it is state law but it's not all state law.
7    What isn't is federal and you are going to learn it before you
8    finish, so don't feel badly.
9         MR. PLATTA:  Your Honor, I would also like to request
10   that before the jury comes back I will be allowed to put a
11   bad-faith statement on the record.
12        THE COURT:  I don't know what you're talking about,
13   but I'll be here before the jury comes back.
14        (Luncheon recess)
15
16
17
18
19
20
21
22
23
24
25

899MFROT

```
 1                      AFTERNOON SESSION

 2                          2:10 p.m.

 3              THE COURT:  Mr. Platta, you had a request to make a

 4    statement of some sort before I left.  You were going to make

 5    it now when I came out?

 6              MR. PLATTA:  Yes, your Honor.

 7              Your Honor, on May 5 of 2008, I had sent a letter to

 8    both insurance carriers, Carolina Casualty Insurance as well as

 9    State Farm Insurance Company, requesting surrendering of their

10    policies.  The respective policies were 100,000 for State Farm

11    Insurance and 1 million for Carolina Casualty Insurance

12    Company.  I gave them additional time to respond to that after

13    which we had this trial.  They did not come forward with their

14    policies, and at this time I'm intending on holding them

15    responsible for any excess verdict, if applicable.  The case

16    presented today and yesterday proves that the recovery in this

17    case could exceed 1 million or actually $1.1 million in

18    applicable insurance policies.  Therefore, I would make a last

19    effort to request at this point that the policies, insurance

20    policies, will be surrendered.  In case they are not, I will go

21    after the access after the verdict, if applicable.

22              THE COURT:  Fine.  Anything else?

23              MR. PLATTA:  I would like to include this into the

24    record of the case, the correspondence that I sent to both

25    carriers as well as confirmation of receipt.
```

246

899MFROT

```
1              THE COURT:  Not in front of the jury.
2              MR. PLATTA:  No.  Right here.  Only for the record.
3              THE COURT:  It was my view that one of these insurance
4    companies was in fact insuring the personal policy of the
5    driver of the truck, and I think I told you in so many words
6    that didn't seem to me to be something that you could be
7    collecting on.
8              MR. PLATTA:  Your Honor, without a decision on the
9    declaratory judgment action, there will be no clear answer to
10   this question.  I understand your position.  I respectfully
11   disagree.
12             THE COURT:  Let's bring in with the jury.
13             MR. PLATTA:  Can we move Plaintiff's No. 9 and
14   continuing to, I believe 12, 9 to 12.
15             (Plaintiff's Exhibits 9-12 received in evidence)
16             THE COURT:  I have not imposed time limits because I
17   think that's sort of a last resort.  I think if you know that I
18   may, you will be guided accordingly.
19             MR. PLATTA:  Yes, your Honor.
20    CHARLES KINCAID,
21         called as a witness by the Plaintiff,
22         having been duly sworn, testified as follows:
23             (Jury present)
24             THE COURT:  I swore the witness.  I have sworn the
25   witness whose name is Kincaid, but I am sure he will spell it
```

899MFROT

1    for the record, unless he did already.

2             THE WITNESS:  I did already.

3             THE COURT:  You may inquire.

4    DIRECT EXAMINATION

5    BY MR. PLATTA:

6    Q.  Good afternoon, Dr. Kincaid.

7    A.  Good afternoon.

8    Q.  Dr. Kincaid, were you hired to prepare a life care plan in

9    this case?

10   A.  Yes, I was.

11   Q.  How much were you paid for preparing this plan?

12   A.  It was $5,000.

13   Q.  And did you actually prepare this life care plan?

14   A.  Yes, I did.

15   Q.  Can you tell us something about your education and your

16   background?

17   A.  Yes.  I have a bachelor of arts in psychology from the

18   University of Wisconsin Milwaukee.  I have a certificate in

19   rehabilitation management from DePaul University, master's

20   degree in criminal justice administration, University of

21   Wisconsin Milwaukee.  I have a Ph.D. in rehabilitation

22   counseling from Syracuse University, and I have a certificate

23   in life care planning from Capital University Law School.

24   Q.  And did you do any publications regarding life care plan?

25   A.  No, I have not.

248

899MFROT                    Kincaid - direct

1   Q.  Doctor, can you tell us, did you actually interview

2   Ms. Frometa in order to prepare this report?

3   A.  Yes, I did.

4   Q.  When was it?

5   A.  That was on April 26, 2008.

6   Q.  And did you generate a report as a result of this visit?

7   A.  Yes, I did.

8   Q.  Can you tell me what were your findings?

9   A.  My findings were, after interviewing Ms. Frometa, doing

10  research, speaking with her doctors, researching costs in her

11  local area, that she had needs, according to her medical

12  providers, for continuing care for a neurological pain

13  management, as well as physical therapy, home health care, and

14  other needs as well.

15  Q.  Doctor, besides preparing this life care plan, how many

16  times did you prepare such a life care plan in the past?

17  A.  I probably have prepared at least 60 to 90 of these in the

18  last four to five years.

19  Q.  What do you do on a daily basis?

20  A.  Daily basis I do evaluations for people with injuries, I

21  assist them to return to work, I do case management, I do

22  vocational evaluation, career counseling, as well as life care

23  planning.

24  Q.  Doctor, do you know what is the International Academy of

25  Life Care Planners?

899MFROT                    Kincaid - direct

1    A.  Yes.  I'm a member of that organization.  That's the

2    organization that provides published standards of practice for

3    life care planners in the United States.

4    Q.  Do you know what is the Commission on Health Care

5    Certification?

6    A.  Yes.  That's the body that certifies life care planners in

7    the United States, and I'm a certified life care planner.

8    Q.  Do you know what is the American Board of Vocational

9    Experts?

10   A.  Yes.  That's a board that certifies individuals who provide

11   vocational evaluations.  I'm certified as a member of that

12   board as well.

13   Q.  Doctor, can you tell us what were your findings in regards

14   to the future life care plan for Ms. Frometa?

15   A.  Well, after speaking to her doctors, Dr. Davy, Dr. Krishna,

16   Dr. Babu, they provided me with a list of medical services that

17   they thought were necessary for her into the future, and there

18   were several of those and I can go over those in detail, if you

19   would like.

20   Q.  Yes, please.

21   A.  There were annual evaluations that were suggested, pain

22   management evaluations by Dr. Davy.

23            MR. COFFEY:  Objection.

24   A.  Once yearly.

25            THE COURT:  What exactly is your objection, now that

899MFROT                        Kincaid - direct

1    you've learned how to stand up?  Maybe you should tell me.

2              MR. COFFEY:  The objection is, A, hearsay and, B,

3    Doctor -- all these doctors testified as to what they believed

4    the cost and the future treatment would be.

5              THE COURT:  The latter is simply the recollection that

6    I share.  So I don't really want to hear what I've hear before,

7    but I've said that so often that I presume you understand it,

8    Mr. Platta.  If I hear one phrase of the injuries and the

9    proposed costs that I heard earlier today or yesterday, you are

10   going to be sitting down.

11             MR. PLATTA:  Yes, your Honor.

12             THE COURT:  I hope you understand it.  It's easy for

13   you to say yes, but it hasn't seemed to make any difference up

14   until now.

15             MR. PLATTA:  Your Honor, I am only trying to present

16   to the jury the costs which were not presented before.

17             THE COURT:  The costs that were not presented before

18   I'm prepared to have, although lots of them were.  This is a

19   life care plan.  I presume, since I have it in front of me,

20   that he can testify to the future expenses as well.  I haven't

21   heard all of them, but I have heard a lot, including the

22   $18,000 gymnasium fee.  So try not to do them again.

23             MR. PLATTA:  Thank you, your Honor.

24   Q.  Doctor, what were the recommendations?

25   A.  The recommendations were for continued pain management

251
899MFROT                    Kincaid - direct

1    evaluations for psychiatric evaluation and psychological

2    evaluation, for physical therapy.

3    Q.  Can we once at a time.  Can you tell me which doctor

4    recommended what?

5    A.  Surely.  Dr. Davy recommended pain management.

6            MR. COFFEY:  Objection.

7            THE COURT:  I don't think you get it.  Maybe I should

8    ask the questions.  It's really up to you, but if I hear again

9    what I've just heard, it's over and we won't have any problem

10   with meeting our timetable.

11           Why don't you do this.  If there are numbers that are

12   attached to the pain management future, which is, I assume,

13   what you're talking about --

14           MR. PLATTA:  Yes.

15           THE COURT:  Let him give us a number which may or may

16   not have been testified before, but that's all.

17           MR. PLATTA:  Sure.

18   Q.  Doctor, can you tell me what is the cost for pain

19   management and evaluation?

20   A.  The average cost is $416.66.

21           MR. COFFEY:  Objection.

22           THE COURT:  Overruled.

23   Q.  Doctor, can you tell me what is the cost for psychiatric

24   evaluation in the future?

25   A.  $333.33.

899MFROT                    Kincaid - direct

1    Q.  And what about psychology evaluation?

2            THE COURT:  Sustained.  If it's in your report, it's

3    coming out.

4    Q.  Doctor, the three costs that you mentioned, are they per

5    year or per unit?

6    A.  That was per unit, but there they were only one per year,

7    so it would be both per unit and per year.

8    Q.  Which one was per year and which one was per unit?

9    A.  Both were only annual, so each one would be both, per unit

10   and per year.

11   Q.  Doctor, what about physical therapy evaluation?

12   A.  That cost was $141.66 and that was once per year, so it's

13   per unit and per year.

14   Q.  And what about physical therapy?

15           THE COURT:  I thought that he just asked you.

16           MR. PLATTA:  The physical therapy is not the same as

17   physical therapy evaluation.

18           THE COURT:  Tell me the difference.

19   A.  The evaluation sets the standards and goals.  It determines

20   what's the appropriate exercises and treatment to provide to

21   the person.  It provides the guidelines for the therapist to

22   provide that therapy going forward.

23   Q.  Dr. Kincaid, regarding physical therapy, what was the cost

24   per unit?

25   A.  $100 per unit.

899MFROT                    Kincaid - direct

1   Q.  And what was the frequency recommended?

2   A.  Three times per month for one year.

3   Q.  And what about gym membership.  We had some numbers before,

4   but I think they were not exactly correct.

5   A.  That was $122.22 per month and per year is $1,466.66.

6   Q.  That would come out to -- I will withdraw the question.

7           Doctor, was there also a recommendation for a personal

8   trainer and what would be the cost of that?

9   A.  That was $65 per session and it was once per week for one

10  year.  The annual cost was $3,120.

11          THE COURT:  How long a session is that?  I am going to

12  have to get the name.

13          THE WITNESS:  Usually, they are about 45 to 50

14  minutes.

15          THE COURT:  Good to know.

16  Q.  Doctor, what about the MRI for the cervical spine?

17  A.  Yes.  That was recommended by Dr. Krishna once every three

18  to five years.  The cost was per unit was $1,356.66.  And per

19  year the average cost was $323.79 when you average it.

20  Q.  What was the total cost?

21  A.  The total cost for her lifetime or --

22  Q.  Lifetime.

23  A.  Let me go back to that table.  I'm sorry.  It's right here.

24  The lifetime cost is $13,566.60.

25  Q.  What about the MRI for the lumbar spine?

899MFROT                        Kincaid - direct

1    A.  That was $1,363.33.

2    Q.  How often was it supposed to be done?

3    A.  Every three to five years so that the per-year cost would

4    be $323.79.

5    Q.  And the total cost of that?

6    A.  $13,566.

7    Q.  Is it fair to say that the MRI itself will cost over

8    27,000?

9    A.  Yes, that's right.

10   Q.  Is it fair to say that the cost of physical therapy,

11   evaluation with physical therapy, the total cost of that would

12   be close to 4,000?

13   A.  Yes, that's right.

14   Q.  Is it fair to say that gym membership with personal

15   trainer, the total cost of that would be approximately 5,000?

16   A.  Yes, that's correct.

17   Q.  Doctor, can you tell me anything about medication?  What

18   kind of medication was recommended and the cost of same?

19   A.  The medication recommended by Dr. Davy was Lyrica.

20          MR. COFFEY:  Objection.

21          THE COURT:  Go ahead.

22   A.  The medication when I spoke to him was Lyrica, baclofen,

23   Opana, amitriptyline, and Esgic.

24   Q.  Doctor, what was the cost of Lyrica per year?

25   A.  Per year, the cost was $949.

255

899MFROT                    Kincaid - direct

1          THE COURT:  And he recommended all of these?

2          THE WITNESS:  Yes.  At the time that I interviewed the

3    doctors, these were the medications that she was receiving.

4          THE COURT:  Did you think they were continued to be

5    needed?

6          THE WITNESS:  Yes.

7          THE COURT:  Can you give us the total of the cost

8    rather than identifying amitriptyline that none of us really

9    understand anyway?

10         THE WITNESS:  Medications.  The annual cost is

11   $5,668.45.  The lifetime cost would be $237,508.05.

12   Q.  Doctor, there was also a recommendation for neurostimulator

13   trial which was actually done?  What was the cost per unit?

14         MR. COFFEY:  Objection.

15   A.  The cost per unit was $29,000.

16         THE COURT:  I am not sure exactly what this was, but

17   it was testified to, so we don't need it again.

18   Q.  Doctor, was there any cost associated with her daily

19   living, for example, cost of the shower chair, hand-held

20   shower, reacher, cervical pillow?

21         MR. COFFEY:  Objection.

22         THE COURT:  I don't think I remember the cost.  What

23   is a reacher?

24         THE WITNESS:  That's a device, it has like a grip and

25   a trigger and it has two pincers, so a person can reach and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                      Kincaid - direct

1    grab an item and bring it to them rather than using the

2    reacher, rather than having to use their body to reach it.

3             THE COURT:  You can answer the total price of all

4    them, if you will.

5             THE WITNESS:  The cost for shower chair was $47.98.

6             THE COURT:  We can combine the shower chair with a

7    reacher.

8             THE WITNESS:  I can give you the cost of all of them.

9    The aids for independence, the cost, lifetime costs were

10   $1831.87.

11   Q.  Doctor, what was the cost of neurosurgeon follow-up?

12            MR. COFFEY:  Objection.

13            THE COURT:  Overruled.

14   A.  The cost was $241 per unit.  Four times per year, and the

15   per year cost was $966.40.

16   Q.  And did you have any neurologist follow-up recommended as

17   well?

18   A.  Yes.  That would be Dr. Krishna.  The per-unit costs for

19   once every three months was $114.  The per- year cost was $456.

20   Q.  Total cost?

21   A.  The total cost was $19,152.

22   Q.  For the neurologist?

23   A.  That's right.

24   Q.  What was the total cost for neurosurgeon?

25   A.  I don't believe I put it down here, but I can multiply it

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

257

899MFROT                    Kincaid - direct

1    for you very quickly, if you'd like.

2    Q.  Would it be fair to say that it's around a thousand?

3    A.  Yes.  It was $966.40 per year.

4    Q.  And was there also a recommendation for pain management

5    specialist follow-up?

6    A.  Yes, there was.

7    Q.  What was the cost per unit and total cost?

8    A.  Per unit was 239.16 and that was once every six weeks for

9    one year and once every three months thereafter.  There were a

10   total of 172 visits over her expected life expectancy, and the

11   total cost was $41,135.52.

12   Q.  Doctor, what about psychologists?

13   A.  The psychologists, the frequency was once weekly for six to

14   12 months, 36 sessions, and then six to eight sessions per year

15   to lifetime.

16   Q.  What was the cost per unit?

17   A.  The cost per unit was $77.50.  Per year, you average it, it

18   was $595.58.  Lifetime cost was $34,955.

19   Q.  Doctor, the home health aide cost, what was the

20   recommendation and what is the rate for that?

21   A.  Forty-eight hours per day, seven day.

22   Q.  You said four to eight hours?

23   A.  Four to eight, average of six, the cost per unit is $17.33

24   and the average cost would be $103.98 per day.  Per year it

25   would be $37,930.80.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                        Kincaid - direct

1    Q.  What is the total cost for that?

2    A.  It depends on when you start.  If she started immediately,

3    the full cost would be $1,590.  I'm sorry.  1,590,218.

4    Q.  Doctor, you have also asterisks on the bottom of this

5    table.  Can you comment on this?

6    A.  Yes.  Currently, she is receiving assistance from an aunt

7    who helps her with her daily living needs, helps her with

8    dressing, bathing, laundry, cooking, most of her activities of

9    daily living.  If that aunt wasn't available, then she would

10   need home health assistance.  That's why I started it at the

11   time of writing the life care plan and going forward.

12           THE COURT:  How many hours a week is this home health

13   aide?

14           THE WITNESS:  In total it would be 42 hours.  It would

15   be an average of six hours per day.  So 42 total.

16   Q.  Doctor, how about case management, your specialty?

17   A.  Case management would be one to two hours per month.  That

18   would be to assist Ms. Frometa if there were any adjustments to

19   her plan to make sure she was getting the care and assistance

20   that she needed.

21   Q.  Doctor, can you tell us, what was the total amount that you

22   came up in this report with?

23   A.  There were two options that I arrived at.  The first was

24   option A, which involved having home health care start

25   immediately so that the total cost with all those items that we

259
899MFROT                        Kincaid - direct

1   discussed was $2,325,610.19.  If home health care started
2   later, I am going to use the age of 55, then the total cost
3   would be $1,760,114.96.
4   Q.  Doctor, when you saw Ms. Frometa at your office, what kind
5   of background information did you receive from her?
6   A.  I questioned her about her living situation, her
7   educational background, her work history, about her current
8   living situation, any functional limitations she was
9   experiencing, pain symptoms, what her plans were for the
10  future, any proposed medical care.
11  Q.  Doctor, did you also review medical records in preparation
12  for this report?
13  A.  Yes, I did.  Prior to meeting with Ms. Frometa, I reviewed
14  records from a variety of hospitals, as well as doctors.
15  Q.  Who did you talk to and when?
16  A.  I talked to Dr. Davy and that was on the 28th of April, and
17  I talked to Dr. Krishna on the 1st of May.  And Dr. Babu
18  corresponded, sent back a questionnaire indicating what he
19  thought were the necessary services in the future.
20  Q.  Is it fair to say that you contacted all of her treating
21  doctors?
22  A.  Yes.
23  Q.  Doctor, can you tell me what medical records did you
24  review?
25  A.  Yes.  I reviewed medical records from the Cabrini Medical

899MFROT                    Kincaid - direct

1    Center, also from Midtown Medical Practice, also from Brooklyn

2    Hospital, from Westchester Medical Care Center, from Dr. Davy,

3    Dr. Krishna, Dr. Babu, from the Xcalibur Chiropractic Center.

4    There were also some records of MRI results.

5    Q.  Is it fair to say that you reviewed pretty much all the

6    providers that treated Ms. Frometa in this case?

7    A.  To the best of my knowledge.

8             MR. COFFEY:  Objection.

9             THE COURT:  Overruled.

10   Q.  Doctor, are you aware of the medical history of

11   Ms. Frometa?

12   A.  Yes, I am.

13   Q.  What do you know?

14   A.  I noted she was involved in an accident on February 14,

15   2007, that she received care from her physicians.  She required

16   surgery to her lumbar spine in May of 2007, that Dr. Babu

17   performed the removal of the herniated disk at L5-S1, that she

18   received ongoing pain management care for a variety of

19   injections, epidural, facet injections, that she had surgery in

20   December of 2007, a discectomy to her cervical spine at C3-C4.

21   Q.  Doctor, a portion of this report discusses current

22   functional limitations and behavioral problems.  Can you

23   comment on that?

24             MR. COFFEY:  Objection.

25             THE COURT:  Sustained.

899MFROT                        Kincaid - direct

1    Q.  Doctor, does Ms. Frometa require assistance with activities

2    of daily living?

3    A.  Yes.  That's my understanding, that she requires assistance

4    from her aunt for all of those activities of daily living, that

5    she has difficulty with physical activities, walking, climbing,

6    bending, stooping, kneeling, reaching, handling.

7    Q.  Is she unable to lift or carry over ten pounds?

8             MR. COFFEY:  Objection.

9             THE COURT:  Have you not heard this testimony before,

10   Mr. Platta?

11            MR. PLATTA:  From my client I've heard, but not from

12   experts.

13            THE COURT:  But from an expert --

14            MR. PLATTA:  I don't remember that, Judge.

15            THE COURT:  -- that you put on the stand.

16            MR. PLATTA:  No, your Honor.

17            THE COURT:  Actually, you did a little better then,

18   because he said 30 pounds.  Shall I find it for you in the

19   record?

20            MR. PLATTA:  No, your Honor.

21   Q.  Dr. Kincaid, did you find that my client had difficulty --

22   poor balance and gait?

23            MR. COFFEY:  Objection.

24            THE COURT:  I don't remember the balance.  I'm very

25   sensitive to that these days.  You can answer that question.

899MFROT                    Kincaid - direct

1    A.   Yes.  She indicated that that was the case, that she had

2    difficulty with her gait and her balance.

3    Q.   And does she have any problem driving a car?

4    A.   Yes.  She also indicated that she is limited in both the

5    amount of time that she can drive to less an hour, and she

6    requires assistance from her aunt when it has to be moved on

7    odd and even days.  She has difficulty with parking and turning

8    her neck to do that.

9    Q.   Does she also experience difficulty seeing when she has

10   migraine headaches?

11           MR. COFFEY:  Objection.

12           THE COURT:  Sustained.  I never heard any of that

13   before.

14   Q.   Are you aware that she has difficulty grasping and holding

15   objects with her left hand?

16           MR. COFFEY:  Objection.

17           THE COURT:  Sustained.

18   Q.   Doctor, are you aware of any other limitations that

19   Ms. Frometa has?

20   A.   I believe that covers them, and I mentioned the

21   difficulties with her activities of daily living.  She also

22   mentioned she suffered from anxiety and a depressed mood at the

23   time of the interview, and I administered something called the

24   back depression inventory.  According to her results on that

25   test, she scored --

899MFROT                    Kincaid - direct

1           MR. COFFEY:  Objection.

2           THE COURT:  I'll allow it.  Go ahead.

3     A.  She scored in the severe range for depression.

4     Q.  Doctor, what is a life care plan?

5     A.  It's a dynamic document that's based on published standards

6     of practice, comprehensive assessment of the person, data

7     analysis, research, and it provides a concise detailed plan of

8     a person's current and future needs related to their

9     catastrophic injury or chronic health care need.

10    Q.  And what was the purpose of such life care plan?

11    A.  The purpose is to provide a plan that will allow for all of

12    the medical services, care, any items, medical items that the

13    person might need, medications that will assist them to live to

14    their highest quality of life possible, and to help them

15    function to their highest level as well.

16    Q.  Doctor, what did you base the cost figures in this case?

17    A.  My research was, I contacted at least three sources for

18    each item, so if it was a medical service visit, I would

19    contact at least providers in the New York City area to

20    determine what their costs were, and then I average the cost

21    for those three providers.

22    Q.  Would you tell us by looking at your records, who did you

23    contact and when?

24          THE COURT:  No, thanks.

25          MR. PLATTA:  Thank you, your Honor.

899MFROT                      Kincaid - direct

1    Q.  Sir, can you tell us what is life expectancy and how you
2    applied that?
3            MR. COFFEY:  Objection.
4            THE COURT:  Why don't you tell us what hers was.
5    A.  Hers was 41.9 years.  Her life expectancy is 82 years of
6    age for females in the United States.
7    Q.  Is this based on the National Center of Health statistics?
8    A.  Yes.  The CDC, the national vital statistics reports, the
9    United States life tables for 2004.
10   Q.  Doctor, which were your own personal recommendations for
11   Ms. Frometa, not based on any other doctors?
12           MR. COFFEY:  Objection.
13           THE COURT:  Overruled.  Don't answer the question.
14   Q.  Doctor, what is your conclusion based on this evaluation
15   and based on the records that you reviewed and the
16   conversations that you had with my client and with all the
17   doctors in this case?
18   A.  That Ms. Frometa has medical needs going into the future,
19   that she will require care from the pain management specialist,
20   physical therapies, medications to assist her to function, that
21   she will need help with her activities of daily living.
22   Someone who assist her, that there are some items of assistive
23   technology that could help her function a little bit more
24   effectively.  She would also need psychotherapy for a
25   foreseeable period to help her adjust to her disability and

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Kincaid - direct

1   cope with the ramifications of her limitations.

2   Q.  Doctor, if I were to tell you hypothetically that there

3   will be a doctor testifying here in court who states that based

4   on his independent review of the documents, of the records that

5   you reviewed, not all of them, but some of them, he concludes

6   with reasonable medical certainty that the minimal accident of

7   record did not produce a neurological diagnosis, disability, or

8   limitation?

9           THE COURT:  Sustained.  He's not a neurologist.  He

10  just does life planning.

11          MR. PLATTA:  That's exactly where I'm going.

12          THE COURT:  You have about ten minutes to get there.

13  Q.  Doctor, you're not a neurologist, right?

14  A.  No, I'm not.

15  Q.  You're a life care planner?

16  A.  That's correct.

17  Q.  Can a neurologist be a life care planner?

18  A.  They could be certified as a life care planner.

19  Q.  If her not certified, are they considered life care

20  planners?

21  A.  No, they would not be because they would not have the

22  certification and the training.  They may get the training, but

23  I don't know about this particular individual.  They would need

24  the training in life care planning.

25  Q.  If I told you he didn't have the certification, he would

899MFROT                    Kincaid - direct

1    not be a life care planner?

2    A.  That my conclusion, yes.

3    Q.  Doctor, if I were to tell you, hypothetically, the same

4    doctor would call your plan ill-advised, horrendous and

5    unnecessary, would you agree with that?

6    A.  I think based on my conversations with Dr. Ban, Krishna,

7    and Davy, they feel these are necessary items for Ms. Frometa

8    into the future, so that's who I relied on in doing my plan.

9    Q.  Doctor, when you mentioned before that you contacted

10   different offices in the New York area to assess costs of

11   medical care necessary for Ms. Frometa, is this a standard

12   thing to do for life care planner?

13   A.  Yes.  It's one of the standard research methods to

14   determine costs for life care plans.

15   Q.  Doctor, can you explain for us what is the difference

16   between present value and -- actually, I will withdraw that.

17        Doctor, are you aware of the term present value?

18   A.  Yes, I am.

19   Q.  Can you explain that?

20   A.  Well, I'm not an economist, so I don't feel competent to

21   really define that.  I think an economist can do that for you.

22   Q.  Do you usually work with economists?

23   A.  Yes, I do.  Once I prepared the life care plan, they would

24   look at it to determine present value, which would take into

25   account things like inflation, interest rates.  There is

267

899MFROT                          Kincaid - direct

1   various calculations that they use to give you the cost of the

2   plan in today's dollars.

3   Q.  Did you work in this case with one?

4   A.  No, I did not.

5   Q.  Does it mean that the life care plan numbers are lower than

6   they would be with an economist?

7            MR. COFFEY:  Objection.

8            THE COURT:  Do you know the answer to that question?

9            THE WITNESS:  In my experience, the life care plans

10   that I've completed, they are almost always larger because of

11   the calculations that are involved and the inflation that

12   occurs with medical services and items.

13   Q.  Doctor, are you aware that some doctors didn't exactly

14   recommend the same treatment in this case?

15   A.  Yes, I'm aware of that.

16   Q.  Is this a problem for your life care plan, for assessing

17   costs and future care?

18   A.  No.  I look at the totality of the recommendations, and the

19   plan reflects recommendations for providers.

20   Q.  For example, if one of them wouldn't recommend a specific

21   procedure it wouldn't change the life care plan itself?

22   A.  No, it wouldn't.

23            MR. PLATTA:  Thank you, Doctor, I have nothing

24   further.

25            THE COURT:  Any cross?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Kincaid - direct

1    CROSS-EXAMINATION

2    BY MR. COFFEY:

3    Q.  Good afternoon.

4    A.  Good afternoon.

5    Q.  You don't have a Ph.D. or doctorate, is that correct?

6    A.  Yes, I do have a Ph.D.

7    Q.  In what?

8    A.  In rehabilitation counseling.

9    Q.  You also have other occupations, though, because you've had

10   cases with me where you're also a vocational rehabilitation

11   person as well, isn't that correct?

12   A.  That's correct.  That's part of my training.

13   Q.  We actually have a trial coming up where you say someone

14   would never work again, is that correct?

15            MR. PLATTA:  Objection, your Honor.

16            THE COURT:  Sustained.

17   Q.  So you have another -- a second occupation, a vocational

18   rehabilitation.  How many people do you see in that business?

19   A.  Per year?

20            MR. PLATTA:  Objection, your Honor.

21   Q.  Per year.

22            THE COURT:  I'll allow it.  Essentially take it for

23   what it's worth and it's not much.

24   A.  Probably, about three a week.

25   Q.  So you do more of that than the life care planning.  Is

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Kincaid - cross

1    that fair to say?

2              MR. PLATTA:  Objection.

3              THE COURT:  Overruled.

4    A.  That would be fair to say.  It's a combination of the two.

5    Q.  Now, would you be surprised if earlier today Ms. Frometa

6    testified she can ski for up to about half an hour?

7              MR. PLATTA:  Objection.  That's not the testimony.

8              THE COURT:  I don't think that's the testimony either.

9    So I'll sustain the objection.

10   Q.  Are costs different for reimbursement?

11   A.  They can be.

12   Q.  I want you to assume Dr. Davy testified that on a $400

13   thing he said his reimbursement was about $70.  Would you

14   disagree with that type of reimbursement versus cost?

15   A.  If he testified to that, I hadn't talked to him about it,

16   so I couldn't dispute what he said.

17   Q.  He also testified that he never spoke personally with you,

18   is that correct?

19   A.  I have notes that I recall speaking with him.

20   Q.  He testified that he spoke with the receptionist from your

21   office?

22   A.  I don't recall that that was the case.  I know I have

23   notes, so I thought I had spoken to him.

24   Q.  Was it also -- could it have possibly been your

25   receptionist or one of your office workers that spoke with him?

899MFROT                    Kincaid - cross

1    A.  She did this in a short period, so I do have office staff

2    that are trained to help me do the research.  It's possible,

3    but I thought I had spoken to him.

4    Q.  What portion of it was done by your office staff, that of

5    your report?

6    A.  Some of the research might have been done, some of the

7    phone calls.

8    Q.  When we talk about research that was done, you have no

9    writing from any of these offices you contacted and you don't

10   have the names of the people you spoke to, isn't that correct?

11   A.  No, that's not correct.  I always try to get the name from

12   each facility.  If I can't, I do note the place that I

13   contacted, their address, their phone number.  And if I can get

14   a name I will put it down.

15   Q.  Now, out of all the people you called, I think there is

16   only about two names out of all the calls and there was a lot

17   of calls.  Would that be fair to say?

18   A.  I didn't count them.

19   Q.  Why don't you count them.  I'd like to know.

20            MR. PLATTA:  Objection, your Honor.

21            THE COURT:  Sustained.  Why don't you count them.

22   Q.  I see 57 and you only have two names.  So would that be

23   fair to say?

24            MR. PLATTA:  Objection, your Honor.

25            THE COURT:  Two names of what?

899MFROT                    Kincaid - cross

1        MR. COFFEY:  Two names of people, their identity that

2   was spoken to other than saying, spoke with receptionist.

3        THE COURT:  I don't understand that question.  But if

4   you do, you should answer it.

5   A.  Yes.  It may have been a receptionist who didn't want to

6   give her name.  Yes, that sounds about right.  Oftentimes

7   people do not want to gave their names, but they will give the

8   cost information.

9   Q.  Couldn't that throw into doubt that if they want to give

10  you names, they didn't want to give you truthful figures?

11       MR. PLATTA:  Objection.

12       THE COURT:  Overruled.

13  A.  My experience has been, over doing this for many years,

14  that people do give accurate information because it's a common

15  thing for people to call up and ask for information about

16  costs, so they are not going to mislead you.

17  Q.  Also, your research costs only targeted the New York City

18  marketplace, isn't that correct?

19  A.  There was a combination of New York and some Brooklyn.

20  Q.  Other than Brooklyn and New York, you didn't go anywhere in

21  Westchester county, Long Island, New Jersey; you only kept it

22  to this area, correct?

23  A.  Correct.  Because that was Ms. Frometa's area where she

24  lived, in Bronx and Brooklyn.

25  Q.  Where is it indicated in your report that some people

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Kincaid - cross

1    didn't agree with your assessment, such as Dr. Babu?  It

2    doesn't say that anywhere in the report, does it?

3    A.  What is in my report is what Dr. Babu recommended for both

4    follow-up visits and physical therapy.

5    Q.  But aren't the biggest costs the future home health care

6    aide and he put none, isn't that correct?

7    A.  Yes.  And Dr. Krishna recommended that she do receive it,

8    and I do note in my tables that he is the recommending

9    physician for that service.

10   Q.  If one doctor does and one doctor doesn't, you did not put

11   anything in there that said Dr. Babu said she doesn't need

12   this?

13            MR. PLATTA:  Objection.

14            THE COURT:  Overruled.

15   A.  It would not be necessary because this is a plan for her

16   future needs and it's based on the treating physician's

17   recommendations.  So I'm documenting who that physician is,

18   what the service is.

19   Q.  Did you assess at any level in your own experience the

20   weight of the person who has done the actual spinal surgery

21   versus another treating physician?

22   A.  Each one has their own specialty, and they would recommend

23   services based on their specialty and their training.

24   Q.  Were you also aware that Dr. Babu did not recommend

25   medications?

899MFROT                    Kincaid - cross

1    A.  He did not -- the pain management doctor.  Dr. Davy was

2    handling medications.  In his response to me, his written

3    response, he did not indicate anything.

4    Q.  And Dr. Babu also only recommended four follow-up visits

5    for one year, is that correct?

6    A.  Yes, for himself.

7    Q.  And physical therapy three times per month for one year?

8    A.  That's correct.

9    Q.  And what was your cost for physical therapy per unit?

10   A.  I'll have to go back to that table.  The cost was $100 per

11   unit.

12   Q.  And he extrapolated 36 units then for the year three times

13   per month, 12 months, one year?

14   A.  That's right, $3,600.

15   Q.  So he also didn't recommend any shower chairs, adjustable

16   beds or neck braces, is that correct?

17          THE COURT:  What about reachers.

18   Q.  Or reachers.  Did he recommend a reacher?

19   A.  I recommended that based on my expertise as an assistive

20   technology practitioner.

21   Q.  Did Dr. Babu recommend any medications?

22   A.  No, he did not.

23   Q.  Did he recommend any future surgeries?

24   A.  No, he did not.

25   Q.  Did he recommend anything other than a pain management

899MFROT                    Kincaid - cross

1    specialist?

2    A.  No, he did not.

3    Q.  So if we went with -- he also said that if we went with

4    what he just recommended, what was our unit cost for follow-up

5    visits with the pain person four times a year?

6    A.  That was -- the unit cost was $416.66.

7    Q.  How much?

8    A.  I'm sorry.  That's the evaluation.  The pain management

9    specialist, the unit cost was $239.16.

10   Q.  So four visits, that would be about a thousand dollars a

11   year?

12   A.  $981.75.

13   Q.  If we did it that way, that would give us -- if we had done

14   an alternative plan --

15          MR. PLATTA:  Objection, your Honor.

16   Q.  We only used Dr. Babu's figures.  That would be $4,581 per

17   year.  Is that fair to say?

18          MR. PLATTA:  Objection.

19          THE COURT:  Overruled.

20   A.  No.  It would be fair to say because he did recommend a

21   pain management specialist, in this case Dr. Davy, who was

22   recommending the medications as well as a neuro spinal

23   stimulator.

24   Q.  But the cost would be a lot less if we used those numbers,

25   wouldn't that be correct, if we only relied upon the

899MFROT                    Kincaid - cross

1   recommendations of Dr. Babu.  Isn't that correct, yes or no?

2   A.  That would be correct.

3   Q.  And it would be a lot less?

4           MR. PLATTA:  Objection.

5           THE COURT:  Sustained.

6   Q.  When she came to see you you filled out a history?

7   A.  Yes, that's correct.

8   Q.  And in the history when you talked about employment or work

9   experience?

10  A.  Yes.

11  Q.  There is not much -- did you get much information from her?

12  A.  No.  My understanding is there was no wage loss claim, so I

13  got general occupations.  That's all.

14  Q.  Wouldn't that have been important to get a full picture?

15          MR. PLATTA:  Objection, your Honor.

16          THE COURT:  Sustained.

17  Q.  Now, did she tell you anything about any vocational

18  information other than work experience?

19  A.  No, she did not.

20  Q.  Did she tell you about any other prior motor vehicle

21  accidents she was involved in?

22  A.  No, she did not.  Let me double check.  I don't believe so.

23  See if there is anything in my records.  I just want to double

24  check.

25  Q.  And the first time she came to see you was on April 26,

899MFROT                    Kincaid - cross

1    2008, is that correct?

2    A.  That's correct.

3    Q.  That's when we were on the eve of trial for the first time,

4    is that correct?

5            MR. PLATTA:  Objection.

6            THE COURT:  Why don't you rephrase it.

7    Q.  Did our office pay you an expedited fee so we could get

8    your deposition taken right before when the trial was first

9    scheduled?

10   A.  Yes, that's correct.

11           MR. PLATTA:  Objection.

12           THE COURT:  First of all, we agreed that you would

13   stand; second of all, I didn't hear you because you didn't

14   stand; and, thirdly, he answered the question before you got

15   your objection and certainly before you bothered to stand up.

16   So there is very little chance that anybody is going to forget

17   it if I sustain it, so I am not going to sustain it.

18           MR. PLATTA:  Thank you, your Honor.

19   Q.  So the life care plan, though, it's fair to say, was done

20   for litigation purposes, is that correct?

21   A.  It was done in a matter where litigation was involved, yes.

22           THE COURT:  Do most of your life plans come into

23   being?

24           THE WITNESS:  Probably, the majority, I would say 80

25   percent at least.  This would be in case management matters.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

899MFROT                    Kincaid - cross

1          THE COURT:  That would have to do with litigation?

2          THE WITNESS:  About 80 percent would be litigation,

3    that's correct.

4    Q.  You have no medical training, is that correct?

5    A.  I'm not a medical doctor, that's correct.

6    Q.  And you have no credentials in psychiatry, is that correct?

7    A.  Just in rehabilitation counseling.

8    Q.  And are you a CSW?

9    A.  No, I'm not.

10   Q.  What is that?

11   A.  That's a certified social worker.

12   Q.  What do they do differently from what you do?

13   A.  Social workers, they work with a variety of adults and

14   children.  They will assess a person's needs as well as they

15   will do counseling on occasions.

16   Q.  When you prepared the report you hadn't reviewed the

17   medical bills, isn't that correct?

18   A.  That's correct.  They weren't available.

19   Q.  So if you were coming up or tabulating the numbers,

20   wouldn't they be important for you to come up with your

21   numbers, the bills?

22          MR. PLATTA:  Objection.

23          THE COURT:  Overruled.

24   A.  It's one factor that can be considered, but also I used the

25   research technique of looking for three cost centers.

899MFROT                    Kincaid - cross

1   Q.  You never had reviewed Dr. Davy's bills as we sit here

2   today, isn't that correct?

3   A.  No, I have not received those.

4   Q.  And did you ever provide as part of the disclosure a table

5   of reimbursement rates?

6   A.  Reimbursement rates for -- I'm sorry.

7   Q.  You said at the deposition, page 23, line 17:

8   "Q.  There is some type of table that you talked about the

9   difference of what is actually reimbursed depends on the

10  carriers and stuff like that?

11  "A.  You can contact carriers to find out.  I don't have such a

12  table."

13  A.  That's correct.  Again, that was something an economist

14  would do in terms of the difference between what is an offset

15  for insurance.

16  Q.  Wouldn't it be relevant for coming up with what the cost

17  is?

18  A.  It could be a factor.

19  Q.  So it would have been important to have an economist to tie

20  together the figures you've spoken about, is that correct?

21  A.  It would have given you the present value of the costs that

22  I provided.

23  Q.  And the economists would talk about what's been billed and

24  what's actually reimbursed, isn't that correct?

25  A.  They would look at the rate of inflation, any interest

899MFROT                      Kincaid - cross

1    gained from monies.  They also look at offsets for any

2    insurances.

3    Q.  They would also project out the present value which could

4    be -- present value could be less than inflation rates also,

5    isn't that correct?

6    A.  You would have to talk to an economist about that.  We were

7    talking about --

8    Q.  Have you ever reviewed the IME reports by the doctors that

9    we have retained on our behalf in this matter?

10   A.  No, they were not provided to me.

11   Q.  Did you ask for them?

12   A.  I asked for whatever the attorney has that would be

13   relevant to the case.

14   Q.  Could alternative expert opinions been relevant to the

15   conclusions you came up with?

16            MR. PLATTA:  Objection, your Honor.

17            THE COURT:  I heard you.  I haven't ruled that.  I'm

18   sorry.  Overruled.

19   A.  In the case of a life care plan, it incorporates the

20   opinions and the recommendations of the persons, treating

21   providers.  So those might be more important to you or relevant

22   to your case.

23   Q.  And then you spoke earlier and talked about present values.

24   You're not sure about they are significantly lower, is that

25   correct?  You have no way of opining on that?

899MFROT                    Kincaid - cross

1          MR. PLATTA:  Objection.

2          THE COURT:  Sustained.

3    Q.  Do you recall giving a question, page 51:

4    "Q.  So all the present values with offsets could be

5    significantly lower than you're doing?

6    "A.  I don't know.  That would need an economist.

7    "Q.  Would you need an economist to come up with the final

8    number?

9    "A.  When it reflects all of the factors that we discussed."

10   A.  That would be my testimony.

11   Q.  Also, you were asked, page 53, line 14:

12   "Q.  So it's fair to say, Doctor, that you could come to the

13   conclusion of the ultimate evaluation without an economist?

14   "A.  The economist would be important to get it back to present

15   value and take in account all offsets, insurance, no fault and

16   otherwise."

17          You agree with that?

18   A.  That would still be my testimony.

19   Q.  Now, have any of the doctors told you that she was fully

20   disabled as a result of this accident?

21   A.  I don't recall them using that term.  Just that she was

22   disabled and had functional limitations.  I don't recall seeing

23   or hearing that term totally or permanently disabled.

24   Q.  Did anybody talk about a permanent partial disability with

25   you?

899MFROT                    Kincaid - cross

1           MR. PLATTA:  Objection, your Honor.

2           THE COURT:  Overruled.

3   A.  I don't recall that term being used.

4           MR. COFFEY:  I have no further questions.  Thank you

5   very much.

6           THE COURT:  Anything, any redirect?

7           MR. PLATTA:  Yes, your Honor.

8   REDIRECT EXAMINATION

9   BY MR. PLATTA:

10  Q.  Doctor, defense counsel used the word permanent and total

11  disability?

12  A.  Yes.

13  Q.  Did you actually ask the doctors about that or it just

14  wasn't the subject of your conversation?

15  A.  It wasn't the subject of the conversation.  I didn't ask

16  the question.

17  Q.  Therefore, they would never respond to it, is that correct?

18  A.  That's correct.

19  Q.  Doctor, defendants' counsel mentioned to you that you did

20  not review his expert's report.  Are you aware that his expert

21  was actually retained after your report was prepared so,

22  therefore, you couldn't include it in your report?  Are you

23  aware of it?

24  A.  No, I was not aware of that.

25  Q.  When you mentioned that you have contacted different

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Kincaid - redirect

1     offices in the New York City area to assess the cost of future

2     medical care, do you have their names, not the people, but the

3     places where you called?

4     A.  Yes, I do.  I have a full list.

5     Q.  Do you have their phone numbers?

6     A.  Yes, I do.

7     Q.  Therefore, is this verifiable?

8     A.  Yes, it is.  You can call and verify the costs.

9     Q.  In your practice, is it important to know the name of the

10    person who responds to the phone call or the name of the place

11    that you're calling to obtain information from?

12    A.  It's much more important to have the name of the provider,

13    the name of the facility so that it can be verified and someone

14    went to check and call.

15    Q.  Doctor, what kind of life care plan would it be, in your

16    opinion, if you just based it on one doctor and not on the

17    opinion of all the doctors?  Would it be a complete life care

18    plan?

19    A.  It would be unethical on my part because the standards of

20    practice call for the life care planner to incorporate all of

21    the providing treating physicians and therapists.

22    Q.  In other words, if you had followed the defense counsel

23    advice you would be unethical in your work?

24    A.  That's correct.

25    Q.  And, Doctor, defense counsel mentioned to you something

283
899MFROT                    Kincaid - redirect

1    else.  They said about prior accidents.  Was it ever of your
2    interest to find out from her whether she had any prior
3    accidents?  Would it be important to your life care plan?
4    A.  I did ask the question in my questionnaire whether there
5    were any prior injuries or illnesses.
6    Q.  I'm not talking about injuries.  I'm talking about
7    accidents without injuries.
8    A.  The question was whether there were any injuries or medical
9    conditions that affected her in the past or limited her.
10   Q.  In other words, if she would have an accident without any
11   medical condition resulting from that or any treatment
12   resulting from that, it would be of no importance.  Is this
13   correct?
14   A.  Right.  Realistically, she would have answered no to that
15   question.
16   Q.  Therefore, is it fair to say, assuming that she testified
17   here before, that she had nontreatment for any of her
18   accidents, fender benders, whatever it was, would it be fair to
19   say that she signed off on your report truthfully?
20            MR. COFFEY:  Objection.
21            THE COURT:  Sustained.
22            MR. PLATTA:  Thank you, your Honor.  I have nothing
23   further.
24            THE COURT:  You're excused.  Thank you very much.
25            (Witness excused)

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Kincaid - redirect

1          THE COURT:  What's next, Mr. Platta?

2          MR. PLATTA:  Your Honor, I request a five-minute

3     break.

4          THE COURT:  Do you have another witness?

5          MR. PLATTA:  I may.  That's why I'm asking.

6          THE COURT:  You decide right now before the break.

7          MR. PLATTA:  Your Honor, I'll have to go outside to

8     check.  That's why I'm asking for it.

9          THE COURT:  Go outside and check and come back so we

10    don't wait too long to hear you.

11         MR. PLATTA:  Your Honor, I would like to call my next

12    witness, Dr. Edward Crane.  He was outside the courtroom and I

13    served him with a subpoena.

14         THE COURT:  I don't see him on your witness list.

15         MR. PLATTA:  He is not on my witness list.

16         THE COURT:  Then we are not going to hear from him

17    unless the defendant doesn't care.

18         MR. COFFEY:  He's my witness.  I intend to call him.

19         THE COURT:  We will let you call him, if you choose,

20    Mr. Platta, but I think probably it complicates things in terms

21    of examinations, but go right ahead.  You're welcome to call

22    defense witnesses.

23         MR. PLATTA:  Thank you, your Honor.

24         THE COURT:  This is the defendants' witness and

25    provides an opportunity, essentially, for Mr. Platta to ask

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                        Kincaid - redirect

1    what we call leading questions.  Not that he hasn't asked them
2    all day yesterday and today of his own witnesses, but be that
3    as it may, the way it's supposed to work is that you don't ask
4    leading questions of your witnesses and that's sort of a no-no,
5    but when it comes to defense witnesses or anybody you're
6    crossing, then it is valuable to sort of reign them in because
7    you never know what they will say that will hurt you.  So
8    leading questions are permitted.
9     EDWARD CRANE,
10        called as a witness by the Plaintiff,
11        having been duly sworn, testified as follows:
12   DIRECT EXAMINATION
13   BY MR. PLATTA:
14   Q.  Good afternoon, Dr. Crane.
15   A.  Good afternoon.
16   Q.  Doctor, did you meet with Ms. Frometa?
17   A.  Yes.
18   Q.  How many times?
19   A.  Once.
20   Q.  When was it?
21   A.  March 13, 2008.
22   Q.  Did you perform a medical examination?
23   A.  Yes.
24   Q.  Did you review the MRI films?
25   A.  No.

286

899MFROT                    Crane - direct

1    Q.  I'm sorry.  You said no?

2    A.  That's correct.

3    Q.  Did you request MRI films to be delivered to you?

4    A.  No.  I had received a report from Dr. Rothman who had

5    reviewed the MRI films, so it wasn't necessary for me to review

6    them.

7    Q.  In other words, you never requested the MRI films for your

8    own review?

9    A.  That is correct.

10   Q.  Doctor, is this correct that when you checked my client's

11   range of motion she complained of mild pain at the extreme

12   range in each direction?  Is this correct?

13   A.  On her neck, yes.

14   Q.  And how do you define mild pain?  How can you assess from

15   the patient that it's a mild pain?

16   A.  That's a complicated question.  It's really a function of a

17   variety of things that you observe or hear.  Sometimes the tone

18   of response, the volume of response, reaction of moving away, a

19   wincing, and putting all that you see and hear together, one

20   characterizes a response as whether it was mild or severe.

21   Q.  Doctor, did she also complain to you about pressure in her

22   neck and back when you ask her to walk on the balls of her feet

23   and then her heels?

24   A.  Yes.

25   Q.  And you still ask her to do that?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Crane - direct

1    A.  When you say still, I didn't ask her to do it but once.  So

2    when she did it she complained that it was pressure in her neck

3    and back, when she walked on the balls of her feet and heels.

4    That's not something I ask people to do for any periods of

5    time.  It's a few steps.

6    Q.  Doctor, was there a situation during your examination where

7    you asked my client to sit on the examining table with her

8    torso and trunk erect and her thighs and calfs flat on the

9    mattress?

10   A.  Yes.

11   Q.  During this examination, as she was sitting in this

12   position, did you actually press your hand against her back and

13   ask her to bend forward?

14   A.  No.

15   Q.  Did you notice that she had six centimeters' scar on her

16   back?

17   A.  Yes.

18   Q.  And, Doctor, did you state in your report that changes in

19   her spine take at least many months and typically years to

20   develop?

21   A.  That's out of context.  I did say that, but it's out of

22   context.

23   Q.  Correct.  The context was the actual MRI films -- I'm

24   sorry -- the actual MRI reports because you didn't review the

25   films.  And you were commenting on the studies that you just

288

899MFROT                        Crane - direct

1    read based on someone else's review.  Is this correct?

2    A.  Yes.

3    Q.  And you also stated that this preexisting condition was not

4    causally related to the accident, is this correct?

5    A.  Yes.

6    Q.  Did you state two paragraphs above this one that the

7    examination of her low back was normal except for the surgical

8    scar?

9    A.  I did.

10   Q.  Can you explain for us what kind of condition were you

11   referring then not being related to the accident if you said

12   that she has none?

13   A.  Could you repeat that?

14   Q.  Sure.  Could you explain for us what condition did you

15   refer to if you stated in your report that she has a normal

16   examination, normal orthopedic examination, and you also stated

17   that her conditions are not causally related to the accident on

18   2/14 of '07.

19   A.  That's out of context.  I can explain it.  What I said was,

20   when I examined her, I found no objective findings whatsoever

21   in regards her back except for the surgical scar.  And then I

22   said that the MRI that had been done less than a month after

23   the accident of her low back showed chronic degenerative

24   changes that take at least months and typically years to

25   develop and, thus, the changes on the MRI were unrelated to the

899MFROT                        Crane - direct

1    accident of February 14 of '07.

2    Q.  Doctor, do you agree with me that degeneration could be

3    asymptomatic?

4    A.  Yes.

5    Q.  And do you agree with me that an asymptomatic degeneration

6    could become symptomatic as a result of trauma?

7    A.  Theoretically.

8    Q.  Yes or no?

9    A.  It's possible.

10   Q.  Doctor, can you tell us if you reviewed any reports

11   regarding prior treatment of my client prior to February 14 of

12   2007?

13   A.  No, I did not.

14   Q.  Did you request them?

15   A.  Not specifically, no, I didn't ask for any records from

16   prior to the accident date.

17   Q.  Do you think it would be important to have them?

18   A.  Certainly, if defense counsel had some, they would have

19   sent them to me.  I didn't see any nor did I ask for them.  I'm

20   sure if they had them, they would have sent them to me.

21   Q.  I'm sure, too.  Does that mean there were none?

22   A.  I can't answer that.  I didn't see any.

23   Q.  Doctor, what is your specialty in orthopedics?

24   A.  I do general orthopedic surgery.

25   Q.  Did you ever do a surgery that Dr. Babu did in this case?

290

899MFROT                        Crane - direct

1    A.  I haven't done spine surgery for years, but years ago I did

2    several hundred spine cases.

3    Q.  Did you do this specific one ever?

4    A.  Certainly.

5    Q.  When was the last time?

6    A.  I haven't done spine surgery for years.  Probably, 15

7    years.

8    Q.  And do you normally review MRIs?

9    A.  Sometimes.  As part of my practice I see them routinely in

10   my office practice, but I didn't see them in this particular

11   case because Dr. Rothman had reviewed them.

12   Q.  And, Doctor, do you work solely for defendants or do you

13   also do work for plaintiffs?

14   A.  I've been retained by plaintiffs, but most of the time the

15   cases that I review are done on behalf of defendants, probably

16   90 percent.

17   Q.  And what is your annual revenue based on this testimony in

18   court on behalf of defendants?

19   A.  I can give you an estimate.  I don't know an exact number.

20   Q.  Give me your best estimate.

21   A.  I testify between once to twice a month, sometimes eight or

22   ten times a year, sometimes 14 or 16 times a year.  And the fee

23   I charge for my time to come to court is $5,000.  So assuming

24   12 appearances in a year would be $60,000.  And assuming that

25   90 percent of those are done on behalf of defendants, 90

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

291
899MFROT                    Crane - direct

1   percent of that or $54,000, round numbers.

2   Q.  And, Doctor, what about preparation for the testimony, what

3   about the cost of the report?

4   A.  The reports that I generate are billed at $700, which

5   includes the examination and the preparation of the report.

6   And if the records aren't voluminous, it also includes the

7   record review.  If the records are very time consuming, that's

8   billed at an additional fee.

9   Q.  How much?

10  A.  $400 an hour.

11  Q.  Can you give me an estimation, based on everything, what

12  will be the total revenue from the defendants for representing

13  their clients?

14  A.  I don't know.  I can't tell you that.  I don't know.

15  Q.  Is there any reason why you cannot tell us?

16  A.  I didn't quite understand your question.

17  Q.  I'll repeat that.  Doctor, can you give us an estimate of

18  your annual revenue, based on your testimony, preparation of

19  reports that you do for defense?

20          THE COURT:  I thought he already did that.

21          MR. PLATTA:  No, your Honor.  I only ask about the

22  testimony.  I'm asking about the total --

23          THE COURT:  Why don't we stay with Ms. Frometa.

24          MR. PLATTA:  Thank you, your Honor.

25  Q.  Doctor, I would like to show you a presentation that was

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

292

899MFROT                    Crane - direct

1    prepared for this trial.  Would you please stand up and show

2    the jury where Ms. Frometa has a herniated disk in her cervical

3    spine, please.

4    A.  Where she was said to have had a herniated disk in her

5    cervical spine.

6    Q.  You said that you saw the reports of the MRIs, right?

7    A.  Yes.

8    Q.  Could you show us which level was the herniation on that

9    these reports indicated?

10   A.  It's C3-4.

11   Q.  Could you show it to the jury, where it is exactly.

12   A.  Well, this isn't clearly identified on the top of this

13   image.  On this particular diagram, this would be C4 over here.

14   If this is C1, and it probably is, then this would be C3-4 on

15   the photograph of the MRI image.

16   Q.  Thank you.  And I will show you also the same depiction of

17   the lumbosacral spine and I would ask you to identify the

18   herniated disk there as well.

19             MR. COFFEY:  Objection, your Honor.

20             THE COURT:  I'll allow it.

21             MR. PLATTA:  Thank you.

22             THE COURT:  We are not going through all these charts.

23   Give this your best shot and maybe it will do.

24             MR. PLATTA:  Thank you, your Honor.

25   Q.  Doctor, could you show the jury where there is an actual

899MFROT                      Crane - direct

1    indication of herniation in this case?

2             MR. COFFEY:  Objection.

3             THE COURT:  Overruled.

4    A.  On which of the pictures?

5    Q.  Any of them or all of them.

6    A.  Well, the area where she had the surgery was at L5-S1,

7    which is here.  And it's depicted on the diagram here, and you

8    can't identify this from this picture alone, but this is a disk

9    space and a disk rather, and this would be suggestive of a very

10   small herniation if that's L5-S1, which I assume it is.

11   Q.  Doctor, what is the dark space on the MRI film depicted on

12   this presentation on the level of L5-S1?

13   A.  I didn't understand your question.

14   Q.  Is this a herniated disk?

15   A.  I don't understand your question.

16   Q.  Doctor, can you show me on the MRI where is the herniation,

17   where is the actual herniation?

18            MR. COFFEY:  Objection.

19            THE COURT:  Overruled.

20   A.  On this image here there is a small bulge here which one

21   might characterize as a small herniation.  It's not very large.

22   It's small.

23   Q.  Is it rather the bulge or a herniation?

24   A.  We have Dr. Rothman here who is a neuroradiologist who is

25   better equipped than I am to give you a walk-through on this

899MFROT                    Crane - direct

1    particular issue.

2    Q.  Doctor, are you trying to say that you're not qualified to

3    read MRI films ever?

4    A.  No.

5            MR. COFFEY:  Objection.

6            THE COURT:  Sustained.

7    Q.  Can you please show up on the top of the presentation

8    herniation of the disk in this case?

9            MR. COFFEY:  Objection.

10           THE COURT:  Sustained.

11   Q.  You may sit.  I will use the shadow box.

12           Doctor, are you aware that Ms. Frometa had steroid

13   injections?

14   A.  Yes.

15   Q.  Can you tell me when they were done?

16   A.  I have to refer to my records.

17   Q.  Please do so.

18           THE COURT:  I should tell you why he's looking and

19   I'll charge you about expert testimony, hopefully tomorrow.

20   But, in any event, experts are not gospel.  In other words,

21   they are just like any other witness.  If you don't believe

22   what they have to say, then you discard their testimony.  If in

23   fact you do believe it, that's supposed to help you reach an

24   appropriate verdict.

25   A.  I have procedure notes from Dr. Davy indicating an epidural

899MFROT                    Crane - direct

1    injection on April 26, 2007, May 3, 2007, May 10, 2007.

2            THE COURT:  I think there were only three.  Don't keep

3    looking.

4    A.  That's it.

5            THE WITNESS:  Thank you, your Honor.

6    Q.  Did you see that she had any other steroid injections?  I'm

7    asking all the time about lumbar spine.  I was asking you about

8    lumbosacral spine, steroid injections, the one that I presented

9    for the jury on the presentation.

10   A.  You know, I don't remember you saying lumbar, but I'm

11   looking at the report and it doesn't differentiate in Dr.

12   Davy's record whether he was doing lumbar or cervical.  I'm

13   missing something.  Could you show me because I don't see where

14   he refers -- yes.  I apologize.  These were cervical, that's

15   correct.  I have to look for the epidurals in the lumbar spine.

16           THE COURT:  Why don't we take a ten-minute recess and

17   maybe everybody will get their act together before we return.

18           (Jury not present)

19           THE COURT:  Mr. Platta, I am delighted to try and

20   accommodate you.  If we are going to have these kind of

21   hiatuses, if that's a word, it's not going to happen.

22           MR. COFFEY:  I would ask the Court to make an in

23   camera request.  Dr. Crane getting put on the stand in that

24   way, he wasn't on the plaintiff's witness list.  He did not

25   advise us he subpoenaed him.  I think he walked out into the

296

899MFROT                    Crane - direct

1    hallway and just subpoenaed him before he came in.  I would

2    just like -- I'd like to know what happened there because I

3    have to say that's a new one for me.

4         THE COURT:  It should have been on the witness list,

5    but there isn't any doubt that plaintiff can call defendants'

6    witnesses, the same as they do in --

7         MR. MILLER:  Respectfully, your Honor, we would

8    request --

9         THE COURT:  This is not a dog and pony show.  If he's

10   talking, he is the only one talking with respect to this

11   witness.  Similarly, only one person can make objections

12   happily, the person that does the examination.

13        What would you like --

14        MR. COFFEY:  I think he should have to pay the expert

15   fee.

16        THE COURT:  That seems reasonable to me, but why would

17   that be different from anybody else on anybody else's expert?

18        MR. COFFEY:  First of all, Judge, we have a witness

19   list pursuant to your Honor's rules and we did a pretrial

20   report with it.  My doctor, who did the examination, was not on

21   that list.

22        THE COURT:  What does that have to do with the time

23   it's taking to get his act together?

24        MR. COFFEY:  Secondary issue.

25        THE COURT:  I'm only interested in the time to try to

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Crane - direct

1    accommodate you.

2           MR. COFFEY:  I brought in all these witnesses to

3    accommodate the Court.

4           THE COURT:  If you want to continue this tomorrow, we

5    will have no problem.

6           MR. COFFEY:  Now I have them all here.

7           THE COURT:  If you thought I needed more business, you

8    should have asked me.  Because compounding these or condensing

9    these witnesses is not making it any easier for me or the jury.

10   I'm glad to do it for you, but don't think it's my idea because

11   it's not.  I'm glad to do whatever you want with this witness,

12   but we are not going to move at this continuing pace because

13   it's not going to get us anywhere.  You are going to be paying

14   for your experts sitting there.

15          What do you think, Mr. Platta, ten minutes enough for

16   you to finish?

17          MR. PLATTA:  If I can ask for a little bit more, yes,

18   I will finish.

19          THE COURT:  15 minutes.  You will take whatever time

20   you want and we will see what time we are.

21          Juror no. 4 has written the following note:  Her

22   husband called.  They have a problem picking up the children.

23   She has the car with the child seats.  So he can't pick them

24   up.  He needs to talk to her.

25          My guess is, if she doesn't work it out we are going

899MFROT                    Crane - direct

1    to have to excuse her and go with what we have got left.  If

2    you have a different view, I'll be glad to listen.

3              MR. COFFEY:  Yes, your Honor.

4              MR. PLATTA:  Yes, your Honor.

5              THE COURT:  Yes, you agree with me, or you have a

6    different view?

7              MR. COFFEY:  I agree.

8              MR. PLATTA:  I agree.

9              THE COURT:  You can step down for five minutes and we

10   will come back and hopefully only have a few more minutes of

11   your testimony, but nobody knows.

12        (Recess)

13             MR. COFFEY:  I think your Honor did rule he will be

14   paying the expert.

15             THE COURT:  I rule he has 15 minutes.

16             While we have no jury, let me tell you my plan for

17   tomorrow.  If we finish today, that's a wonderful thing and we

18   will have a charging conference at 9:30 in the morning.  If we

19   don't finish today, we will have a charging conference at about

20   11, which is, I assume, the time you need to get finished.  In

21   either event, you boys are on tap for tomorrow morning at 9:30.

22             If you have any charges that I don't have and you

23   ought to, but don't worry about it, I am going to teach you, as

24   I suggested, before I bring -- I am going to try and do it.  We

25   will either meet at 9:30 and we are finished here and we will

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Crane - direct

1    have the charging conference, or we will go ahead here for an

2    hour and a half at about 10:30 or 11.  We are going to do a

3    charging conference first in any event.  No sense of them

4    coming and then taking an hour and a half off.  I will try and

5    explain that to them as well.

6              (Jury present)

7              THE COURT:  You're still under oath to tell the truth,

8    Doctor.

9              THE WITNESS:  Yes, sir.

10   Q.  Doctor, did you have a chance to locate the records?

11   A.  I did.

12   Q.  Do you have the lumbar sacral description of the

13   lumbosacral steroid injection?

14   A.  I do.

15   Q.  Doctor, can you tell me where in your report does it say

16   that you reviewed this record?

17   A.  Just a second.

18   Q.  Sure.

19   A.  It doesn't.  I received those records subsequent to my

20   report.  I received those records with a group of other

21   additional records that were sent to me in May of 2008.

22   Q.  What additional records were sent to you?

23   A.  I was sent additional records from Dr. Davy, another report

24   from Dr. Rothman, the report from life care plan, the report

25   that Dr. Babu sent to the insurance carrier, Dr. Babu's

899MFROT                    Crane - direct

1    curriculum vitae, additional records from Westchester Medical

2    Care, from the chiropractic office, I mentioned Dr. Davy, and

3    I'm really sorry because there is so much paper floating around

4    here I'm trying to keep track of which came when, but I think

5    those were the materials that I received in May.

6    Q.  Doctor, are you aware of the impact, of the force of impact

7    that created my client's injuries?

8    A.  I read some things about it, but to be honest, but I

9    couldn't focus on that because my -- as I see my role is to

10   evaluate her and to evaluate the records and see what residuals

11   she had, if any, from the accident.  I did read the EBT

12   transcript, I read the police accident report, but I don't have

13   all those details in -- on the top of my tongue.

14   Q.  Do you always read police report and deposition transcript

15   when you treat your patients?

16   A.  Do I always read them?

17   Q.  Yes.

18   A.  Read the patients I see as part of my private practice?

19   Q.  That's correct.

20   A.  They don't come in with those.

21   Q.  If they would have it would you read it?

22   A.  I have never had occasion where a patient I'm treating came

23   in with police accident report or deposition transcript.  Would

24   I read it, no, I don't think I would.

25   Q.  And the reason why you paid so much attention to EBT

899MFROT                    Crane - direct

1    transcripts and police reports in this case?

2    A.  I didn't say I paid a lot of attention to the police

3    accident report.  And I did read the EBT transcript.  Why?

4    Because it was sent to me and I was asked to read it.

5    Q.  Doctor, do you think that history is important for a

6    patient?

7    A.  Sometimes.  Sometimes it's very important and many times it

8    isn't very important at all.

9    Q.  Did Ms. Frometa tell you that she was actually working for

10   two months after the accident?

11   A.  Did she tell me personally?

12   Q.  Yes.

13   A.  Yes.

14   Q.  Doctor, would you find important beside reviewing just the

15   police report and EBT transcript to look at the photos of the

16   impact that she was involved in?  Do you think it would be

17   important?

18   A.  No.

19   Q.  I'm sorry, no?

20   A.  No.

21   Q.  Doctor, I will show you on the screen a procedure that was

22   done.  Did you review the records of this procedure?

23   A.  I did.

24   Q.  Did you review the films?

25   A.  What films?

899MFROT                    Crane - direct

1    Q.  From this procedure.

2    A.  What films?

3    Q.  X-rays.

4    A.  X-rays?

5    Q.  Yes.

6    A.  X-rays from this procedure?

7    Q.  That's correct.  From Cabrini Medical Center.

8    A.  They don't take x-rays during a procedure like this except

9    to localize the level of the surgery, but you don't see any

10   part of the surgery on the x-ray.

11   Q.  That's exactly what I'm referring to.  Did you see this

12   film?

13   A.  No.

14   Q.  Would you think it would be important to see that?

15   A.  No.  Not for me.  For the surgeon it would have been very

16   important.  He has to be at the proper level for the surgery,

17   but not for me in reviewing the case, no.

18   Q.  Well, aren't you evaluating what the surgeon did?

19   A.  I had no reason to believe that he was at the wrong place,

20   if that's what you mean.

21   Q.  So you basically agreed that he did the right procedure?

22   A.  No, I didn't say that at all.  Actually, I don't understand

23   why he did the procedure.  He saw her on one occasion, she had

24   no objective neurologic findings, she had a very minor

25   abnormality on her MRI, so I couldn't say at all that I agree

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Crane - direct

1    with why -- what he did or that he did anything.

2    Q.  You just mentioned something interesting.  You said you saw

3    her on one occasion.  By the way, how many reports did you see

4    from Dr. Babu?

5    A.  I said he saw her on one occasion prior to the surgery.

6    That was my understanding.  And the records I got from Dr. Babu

7    were the letter that he wrote to the insurance carrier on April

8    9, and then a subsequent note that he wrote on February 19,

9    2008.

10   Q.  Anything else?

11   A.  Just his operative report and that's all.

12   Q.  Do you know that he saw her on a couple of occasions?  He

13   actually testified to seeing her here in court.  Don't you

14   think it would be important for you to review his findings

15   following his surgery?

16   A.  I would have liked to see any records that Dr. Babu had,

17   and I asked for them.

18   Q.  And you asked for them?

19   A.  I did.

20   Q.  And they were not given to you?

21   A.  What was given to me was what I just told you.

22   Q.  In other words, you do not have a complete record from Dr.

23   Babu, is this correct?

24   A.  Well, if you're telling me that there is more, then that is

25   correct.  I didn't know what else there was.

899MFROT                    Crane - direct

1   Q.  Doctor, I'll show you on your screen the procedure that was

2   done by Dr. Davy.  Did you review anything regarding this

3   procedure?

4   A.  I did.

5   Q.  Did you review the films?

6   A.  What films?

7   Q.  The film -- actually, you're right.  You didn't review the

8   film because Dr. Rothman did.  I'm talking about the film

9   regarding cervical discogram.

10  A.  I didn't.  Dr. Rothman did.

11  Q.  Doctor, did you review records in preparation for this

12  trial?

13  A.  I did.

14  Q.  Do you know what is in your reports?

15  A.  Well, I can't say I know everything that's in the records.

16  There are a lot of records, but I read everything that I

17  thought was important and tried to remember as much as I could.

18  Q.  I'm talking about three pages or four pages of your report.

19  A.  My report?

20  Q.  Yes.

21  A.  Oh, sure.  Did I read it?  Of course, I read it.  I read it

22  several times.

23  Q.  I'm just citing things from your report right now.

24  A.  Okay.

25  Q.  Doctor, are you aware -- I'll withdraw this question.

899MFROT                        Crane - direct

1              Do you know how many times Ms. Frometa had an EMG

2     done?

3     A.   That's not my report.   That's someone else's report.   Do I

4     know how many times she had EMGs done?   I don't recall.   I know

5     she had -- I know that she had one.   I don't know how many more

6     she had.   I don't.

7     Q.   If I were to tell you that she had two, would it change, if

8     anything, of your understanding of the case?

9     A.   No.

10    Q.   If I were to tell you that the second EMG actually

11    confirmed the first one after all her surgeries, would it

12    change any of your opinions?

13    A.   It wouldn't change any of my opinions.

14              THE COURT:   You have five minutes.

15    Q.   But, in fact, you reviewed just one EMG report in this

16    case.   Isn't this correct?

17    A.   I can't tell you.   I'd have to go through all these papers

18    to look.

19    Q.   Doctor, are you aware that my client had an implant of a

20    neurostimulator done to her neck or back?

21    A.   I recall that.   I don't remember the details, no.

22    Q.   Can you show me in your report a place where you have any

23    mentioning about this procedure?

24    A.   No.   I did not mention it in my report.

25    Q.   Do you know when it was done?

899MFROT                    Crane - direct

1   A.  No.

2   Q.  Any of them?

3   A.  No.

4   Q.  Do you have any records regarding this procedure?

5   A.  As I said, I have to look for them.  Do you want me to do

6   that?

7   Q.  No.  Thank you, you don't have to.

8        Doctor, did you ever implant -- do an implant of a

9   neurostimulator?

10  A.  No, I haven't.

11  Q.  Did you ever do steroid injection?

12  A.  Epidural steroid injections?

13  Q.  Yes.

14  A.  No, I haven't.

15  Q.  Did you ever do facet nerve injection?

16  A.  Nope.

17  Q.  Did you ever do percutaneous discectomy?

18  A.  I have done open discectomies.  Percutaneous with a striker

19  device?

20  Q.  Yes.

21  A.  No one I know does that.

22  Q.  Did you do that?

23  A.  No.

24  Q.  Are you specializing in spinal surgeries or general

25  surgeries?

899MFROT                    Crane - direct

1    A.   I don't specialize in general surgery.  I specialize in

2    orthopedic surgery.  Within the field of orthopedic surgery, I

3    do general orthopedic surgery.

4    Q.   Which means, for example, what kind of surgeries?

5    A.   The surgeries I've done over the last ten years have been

6    primarily upper extremity surgery, knee surgery, foot surgery,

7    ankle surgery, fracture surgery, hip surgery; not spine

8    surgery, not neck surgery, not hand surgery, although I've done

9    lots of hand surgery in the past.

10   Q.   And you understand that you were referred in this case by

11   defendants and paid whatever money to testify as a spinal

12   specialist?

13   A.   No.  I was retained to render an opinion as to her

14   condition as an orthopedic surgeon.  Orthopedic surgery --

15   certainly every orthopedic surgeon treats patients with spinal

16   injuries and problems on a routine basis, not as a spinal

17   specialist per se, no.

18   Q.   But you were retained to review the records of a

19   neurosurgeon who does only spinal surgeries, am I correct?

20   A.   Does he only do spinal surgery or does he do brain surgery

21   as well?

22   Q.   He definitely did the spinal surgery here, didn't he,

23   Doctor?

24   A.   Are you talking about Dr. Babu?

25   Q.   That is exactly who I am talking about.

899MFROT                        Crane - direct

1   A.  You're not talking about Dr. Davy because he's not a

2   neurosurgeon.

3   Q.  I'm talking about Dr. Babu.

4   A.  I don't know whether Dr. Babu just does spinal surgery.

5   Some neurosurgeons just do brain surgery, some do peripheral

6   nerve surgery, some do a lot of back, some do no backs.

7   Q.  You know what kind of surgery he did in this case, right?

8   A.  I know what he did, yes.

9   Q.  He was a spinal surgeon, right?

10  A.  Yes, of course.

11          THE COURT:  I think that's it.  This was an agreement

12  that we made that there would be 15 minutes more of whatever

13  you want to call this, direct or cross.  It's now Mr. Coffey's

14  turn.

15          MR. PLATTA:  Thank you, your Honor.

16  CROSS-EXAMINATION

17  BY MR. COFFEY:

18  Q.  Good afternoon, Doctor.

19  A.  Good afternoon.

20  Q.  At my request did you examine Adonna Frometa?

21  A.  I did.

22  Q.  Tell us a little bit quickly -- we have the CV in the

23  records already.  Tell us about your educational background,

24  where you have privileges and if you're board certified.

25  A.  I received my MD degree from New York Medical College.  I

899MFROT                    Crane - cross

1    spent the next five years after medical school at Lenox Hill
2    Hospital in training the first year as an intern, the second
3    year as a resident in general surgery, and the next three years
4    as a resident in orthopedic surgery, orthopedic surgery being
5    the specialty of medicine that deals with the diagnosis and
6    treatment, both surgical and nonsurgical treatment of disorders
7    and injuries to the spine, arms, bones, tendons, joints, and so
8    forth.  I finished my residency in 1971 and spent the next two
9    years in the air force as an orthopedic surgeon.  I took my
10   examinations from the American Board of Orthopedic Surgery in
11   1972 and passed those examinations and was certified as a
12   diplomate of the American Board of Orthopedic Surgery which
13   means you're board certified in that specialty.
14          I've been on the staff at Lenox Hill Hospital since
15   1971.  I'm attending orthopedic surgeon there.  I'm a member of
16   a variety of organizations, including American College of
17   Surgeons, the American College of Orthopedic Surgeons, the
18   American Board of Orthopedic Surgeons, New York State Society
19   of Orthopedic Surgeons, and so forth.  Over the years I have
20   headed up the general orthopedic section of our residency
21   training program, involved in our residency training and so
22   forth.
23          THE COURT:  I think that's enough for me.
24          MR. COFFEY:  I would offer him as an expert, your
25   Honor.

899MFROT                    Crane - cross

1          THE COURT:  Any objection?

2          MR. PLATTA:  No, your Honor.  Beside what I stated

3     before.

4          THE COURT:  You're an expert.

5     Q.  Now, did we retain you to perform an examination?

6     A.  Yes.

7     Q.  And when did you do that examination?

8     A.  March 13, 2008.

9     Q.  And did you take a history from Ms. Frometa?

10    A.  Only insofar as asking her what complaints or problems she

11    still had from the accident of February 14, 2007, as well as

12    her other surgical and medical history.

13    Q.  Did she tell you about any other motor vehicle accidents?

14    A.  She didn't.  I asked her if she had ever had any problems

15    with or any injury to her neck or any part of her back before

16    the accident of February 14, 2007, and she said she didn't.

17    Q.  So you had no reason to try to inquire if there were any

18    other medical records, is that correct?

19    A.  That's correct.

20    Q.  And then what did your examination consist of?

21    A.  Initially, asking her what complaints or problems she had

22    from the accident in February '07 and taking down those

23    comments.  And then performing physical examination focusing on

24    the orthopedic areas that were allegedly injured in the

25    accident of February 14, '07, specifically her neck and back.

311

899MFROT                    Crane - cross

1    Q.  And specifically when you did the examination, tell the

2    jury what you did to perform -- before I get to that, what's

3    the purpose of the examination?

4    A.  Well, it was to review the records, to do the examination,

5    and then to issue a report to you as to what my findings were

6    in terms of what, if any, residuals she had from the accident

7    of February '07 and what her prognosis might be and whether he

8    needed any further treatment resulting from that accident.

9    Q.  And about how long did that examination take?

10   A.  I made a note at the time and it took 52 minutes.

11   Q.  And what did you -- you've already talked about your

12   records and what you've reviewed.  Specifically, what did you

13   do in the examination that would be of relevance to the jury?

14   A.  The first part that I examined was her neck.  And I asked

15   her to move her head in various directions.  And she showed me

16   that she had full motion of her neck, and I won't give the jury

17   the degrees of motion, unless you wish me to, but she moved it

18   fully and normally, but she moved her head very slowly when I

19   asked her to show me to move it.  She moved it hesitantly and

20   she complained of pain at the end of range.

21          Once that part of the examination was over she moved

22   her head freely and rapidly in each direction without any

23   hesitation.  So the only time that she hesitated and moved it

24   slowly was when I had asked her to show me how far it moved.

25   And as she moved it she said, do you hear it cracking, and I

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Crane - cross

1    didn't.  So I put my hand over the back of her neck and asked

2    her to move it again in different directions, and I neither

3    heard any cracking or felt any.  The pertinent parts, I

4    examined her arms and measured the circumference of her arms.

5          And one of the things that I try to do when I do an

6    examination like that is to try to see whether there are

7    objective findings that either substantiate or don't

8    substantiate her complaints.  And an objective finding is

9    something that I can see that I can measure or that I can

10   visualize that's there and a subjective complaint is something

11   that they complain about.  For example, if someone goes to a

12   doctor and complains of an itch, that's a subjective complaint.

13   And if they -- if the doctor examines them and finds a rash,

14   then that's an objective finding that explains the complaint.

15         So one of the things that I tried to do was to see if

16   there were any objective findings in her examination that would

17   explain her pain and or substantiate it one way or the other,

18   whether she had a problem.  So I measured the circumference of

19   her arms at different levels to see whether one side was larger

20   than the others because atrophy of the muscles is something we

21   see when there is nerve damage or pinched nerve or herniated

22   disk.  In fact, I found her right arm to be very slightly

23   larger than her left, which is what we would expect because she

24   is right-handed.  I asked her whether she was right or

25   left-handed and she told me she was right-handed.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Crane - cross

1          Objectively, I found no atrophy of either arm.  I

2     tested the reflexes of her arms, tapping her arms in different

3     locations with a soft rubber hammer, and that's another

4     objective finding.  If there is pressure on the nerve and the

5     neck, we will typically see a reflex that's different from one

6     side to the other because of that pressure.  The signal isn't

7     getting to that tendon, to that reflex properly because of

8     pressure and it wasn't the case either.  Her reflexes were

9     perfectly normal.

10          Then I tested her strength in her arms and, again, the

11     nerves from the neck give signals to the muscles to contract,

12     and if there is pressure on a nerve you'll typically get

13     weakness in certain muscle groups and I found none.  She had

14     normal sensation.  I tested her touching her very lightly with

15     a pin to see whether she had any loss of sensation in her arms

16     and that's another objective test.  But you see with sensation

17     the nerves from the neck each have a particular assignment, a

18     specific area where they give sensation to.  For example, the

19     C5 nerve root gives sensation to the radio side of the forearm

20     here and the C6 nerve root to the thumb and index finger.

21     These have all been mapped out.  If there is pressure on a

22     nerve you'll see a specific area where there is a loss of

23     sensation and everything else will be normal.  In her case, she

24     had a decreased response to pain in the entire right arm, the

25     whole arm from shoulder to fingers.  In order to have that

899MFROT                    Crane - cross

1    she -- one would have to have had a catastrophic crushing

2    injury to the spinal cord which obviously didn't happen.  So

3    that didn't make any sense.  It was an inconsistent finding and

4    it wasn't believable.

5            I asked her to walk, and she did.  She had a

6    subjective complaint of pressure in her neck and lower back,

7    but she was able to walk normally and without a limp.  As we

8    mentioned before, she could walk on the balls of her feet and

9    not her heels, which shows a certain amount of strength in

10   certain muscle groups in the legs, and that was not a problem

11   except for her subjective complaint of pressure.  And then I

12   asked her to bend forward at her waist.  She stood up with her

13   knees straight and I asked her to bend forward at her waist

14   this way as far as she could.  She then bent forward to 45

15   degrees, about this far forward, and stopped and I said, what's

16   the matter, and she complained of severe pain in her lower back

17   and said she couldn't bend any further.

18           But a short time afterwards I asked her to sit up on

19   the examining table and she did and I asked her if she could

20   put her legs up on the table and she did and she sat

21   comfortably with her torso and her trunk erect, vertical, and

22   her thighs and calfs flat on the mattress stretched out in

23   front of her and she sat very comfortably in that position.  As

24   a matter of fact, as she sat there, she herself leaned forward

25   even further creating an angle between her thighs and her trunk

899MFROT                    Crane - cross

```
 1   of 110 degrees and she sat there and I said, does that bother
 2   you?  Do you have any discomfort or pain?  And she said she
 3   didn't.  That showed me that she really had a normal -- she was
 4   quite flexible and she had the ability to bend at her waist
 5   painlessly to 110 degrees as opposed to what she had shown me a
 6   few minutes later when she went forward to just 45 degrees and
 7   said she couldn't go any further.  It was not consistent, nor
 8   was her complaint believable.
 9           She had some mild tenderness in her lower back, but no
10   spasm.  Again, the tenderness being a subjective complaint,
11   spasm being an objective finding.  She did have the scar, which
12   was two and a half inches in length, which was fine and flat.
13   I measured the circumference at her legs at different levels to
14   see if she had any atrophy of her legs, and she didn't.  The
15   legs were equal in size.  The reflexes in her legs were normal,
16   the strength in her legs was normal, and her sensory exam in
17   her legs with the pin, she said her whole right leg was numb.
18   As a matter of fact, not only did she say her whole right arm
19   and right leg were numb, but she said that the right sides of
20   her face was numb, the right side of her scalp was numb, the
21   right side of her upper back was numb, and none of that made
22   any neurologic sense, and it wasn't believable.
23           That really was the sum and substance of the important
24   parts of the examination.  I examined her right hip, which was
25   normal, and her right knee was normal.
```

899MFROT                         Crane - cross

1    Q.  And then, Doctor, you were talking earlier about the
2    difference between -- you've done open disk versus percutaneous
3    disk with a striker device.  What's open disk surgery?
4    A.  The vast majority of the surgery that's done on lower backs
5    is done open.  There are some modifications of that.  There is
6    microdiscectomy which is done with a microscope and there is
7    some experimental work done with arthroscopic or laparoscopic
8    equipment, but it is all basically, you make a decision and you
9    remove the disk piecemeal mechanically.  The device that Dr.
10   Davy uses, I think he's the only person I have ever seen who
11   uses it.  I have seen other cases where he has used it.  It's
12   not accepted.  We have this the main stream of orthopedic care,
13   we have enormous spine surgery service at Lenox Hill Hospital.
14   The machine isn't owned by the hospital and no one does it.
15   It's not of any value.  It doesn't provide any value to the
16   patient.
17   Q.  How long have you been at Lenox Hill?
18   A.  Since 1966.
19   Q.  And when you talk about, you commented about Dr. Babu's
20   surgery, why did you not believe it was indicated based on the
21   records?
22   A.  Well, I wouldn't say that.  I just say that the records
23   don't -- I don't see why he did it.  I'm not saying -- I
24   certainly would say that about Dr. Davy's procedure because it
25   has no value.  Dr. Babu, from the records that I received, saw

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

899MFROT                    Crane - cross

1    her on one occasion.  The report that he sent to the insurance

2    carrier describes no objective findings whatsoever.  And the

3    basis for the surgery that was done was he commented that the

4    straight leg raising test was positive, which is a subjective

5    test, and he also based it on an MRI, which shows a very small

6    disk herniation that doesn't press on any nerves, doesn't press

7    any nerve structures.  So I think it was -- I don't understand

8    why he did it, but what he did was -- the procedure that he

9    did, however, was in the mainstream of medical care.

10   Q.  Now, I just want to show you, here is the records that are

11   in my possession.  I want to ask if they are any different from

12   what you have from Dr. Babu.

13            MR. PLATTA:  Objection, your Honor.

14            THE COURT:  Overruled.

15   A.  That's what I have as well.

16   Q.  Now, did you come to any conclusions with reasonable

17   degrees of medical certainty and, if so, what were they,

18   Doctor?

19   A.  I came to a conclusion that there was no causal relation

20   between the accident of February 14, 2007 and her lower back

21   condition.  Based on the materials that I have reviewed,

22   including the emergency room record, where they didn't even --

23   they made no findings in terms of her back at all.  Her back

24   wasn't even x-rayed.  And the MRI findings, which were minor

25   and the x-ray changes which indicated a chronic preexisting

899MFROT                    Crane - cross

1    condition.

2    Q.  What does a chronic preexisting condition mean?

3    A.  That it had been there for a considerable period of time

4    prior to the accident of February 14, 2007.

5    Q.  And is it your opinion, did the plaintiff permanently lose

6    the total use of the spine?

7    A.  No.

8    Q.  Did the plaintiff sustain a significant limitation of the

9    use of a body function or system?

10   A.  No.

11   Q.  Was the plaintiff -- I want also to ask you a hypothetical.

12   I want you to assume that the plaintiff worked following the

13   accident without limitations.  Was she, in your opinion, able

14   to perform her usual and customary activities following this

15   accident?

16   A.  Yes.

17   Q.  Doctor, I have no further questions.  Thank you very much.

18            THE COURT:  We will give you a few minutes, if you

19   want them, Mr. Frometa, but we are planning to move right

20   along, as you have agreed to do as well.

21            MR. PLATTA:  Your Honor, thank you.  I will not use

22   more time than defendants takes on my experts.

23            THE COURT:  I don't know what that means.  Why don't

24   we be clear.  You have 15 minutes.

25            MR. PLATTA:  Thank you, your Honor.

899MFROT                      Crane - cross

1    REDIRECT EXAMINATION

2    BY MR. PLATTA:

3    Q.  Doctor, you mentioned something about striker device,

4    right?

5    A.  Yes.

6    Q.  Do you know if striker device is FDA approved?

7    A.  No.

8    Q.  It's not?

9    A.  It isn't.

10   Q.  I'm asking you.  Do you know?

11   A.  I said no.

12   Q.  You don't know, right?

13   A.  I don't know.

14   Q.  If I tell you that it actually is, would it change your

15   opinion as to the necessity or actual -- not necessity, as to

16   the use by Dr. Davy of this device in his treatment?

17   A.  Not at all.  The fact that the FDA approved something

18   doesn't necessarily mean that it has any value except to the

19   surgeon who is performing the procedure.  If the striker device

20   was such a good device and it was a way of performing a

21   discectomy and being paid a fee for performing a discectomy in

22   a brief period of time without any incision, then the 15 or so

23   spine surgeons in my hospital, one of them would be using it.

24   They are not using it because it is felt in the medical

25   community not to be of any value to your patient.

899MFROT                    Crane - redirect

1   Q.  And, Doctor, as you said, you're not in pain management,

2   right?

3   A.  I didn't say that, but I'm not a pain management doctor,

4   that's correct.

5   Q.  Do you know what specialty Dr. Davy is?

6   A.  I saw his letterhead.  It's said anesthesiology and pain

7   management, but I couldn't know what his credentials are.

8   Q.  But you're not a specialist in any one of those two?

9   A.  I didn't say I was.

10  Q.  Did you ever see a report prepared on behalf of defendants

11  in this case from an anesthesiologist or pain management

12  doctor?

13  A.  No.

14  Q.  Did you ask for such review?

15  A.  No.

16  Q.  Doctor, you said that all these injuries are preexisting.

17  This is based on any records that you reviewed?

18  A.  No.

19  Q.  Is this based on the information that you got from the

20  defendants?

21  A.  Wait a second.  I never said all of these injuries are

22  preexisting.  That's out of context.  I said that the changes

23  that were seen on the MRI and the changes seen on the x-ray of

24  the lumbar spine done shortly after the accident were

25  preexisting.  I don't see any issue of any pathology in her

899MFROT                        Crane - redirect

1    neck, so I didn't say it was preexisting or not preexisting.

2    Her neck, as far as I'm concerned, was fine, but she did have

3    some degenerative changes in her lower back which were

4    preexisting.  And the basis for that is not any medical records

5    that I received, but, rather, the character of the changes seen

6    on the studies done shortly after the accident.

7    Q.  You did not review the studies, right?

8    A.  That's what I said, yes.

9    Q.  So you're talking about something that someone else did;

10   for example, Dr. Babu; for example, Dr. Krishna, am I correct?

11          MR. COFFEY:  Objection.

12          THE COURT:  If you understand the question, you can

13   answer it.  If you don't, maybe he will go on to something

14   else.

15   A.  I really don't understand.  It was on the basis of

16   Dr. Rothman's review, not Dr. Krishna or Dr. Babu's.

17   Q.  I understand.  I'm just saying you did not review the films

18   that the neurosurgeon reviewed in order to operate on this

19   patient?

20   A.  Did he review the films?

21   Q.  He reviewed the films.  You didn't review the films.

22          MR. COFFEY:  Objection.

23          THE COURT:  Overruled.

24   A.  I don't know.  In his letter to Geico he said that the MRIs

25   showed a disk herniation, but he didn't -- I didn't see it in

899MFROT                    Crane - redirect

1   that report where it says that he actually reviewed the films

2   himself.  Does it say that?

3   Q.  Doctor, he was here testifying.  He did review the records,

4   he did review the films.

5           MR. COFFEY:  Objection.

6           THE COURT:  Sustained.  The jury has a little role

7   here, believe it or not.

8   Q.  Doctor, were the records that you have in front of you sent

9   to you before the exam?  Did you request them, or they were

10  just sent to you?

11  A.  Which ones?

12  Q.  The medical records of Ms. Frometa.

13          MR. COFFEY:  Objection.

14          THE COURT:  I'll let you answer.  It seems to me we

15  have this information before, but go ahead.

16  A.  The records that were sent to me prior to the examination

17  was sent to me by Wilson Elser firm that retained me to do the

18  exam.  The records that were sent to me subsequent to that

19  were, I assume, in part, are a response to my request for

20  records of Dr. Babu.  When I received those additional records

21  in May 2008, they came along with a number of other medical

22  records beyond what I had requested.

23  Q.  At any time, any orders from prior treatment, prior to

24  February 14 of '07?

25  A.  No.

899MFROT                    Crane - redirect

1    Q.  By the way, how did you check the range of motion for my

2    client?

3    A.  Of which part?

4    Q.  Cervical spine.

5    A.  Cervical spine is done visually.

6    Q.  So that means you did not use a goniometer?

7    A.  You really can't.  Have you ever seen a goniometer?

8    Q.  Yes.

9    A.  Would you do that with a cervical spine?

10   Q.  Doctor, this is me asking you questions.

11   A.  There are some -- goniometer is a plastic device.  It's

12   nothing fancy.  It might be something you remember with --

13   something like you remember from geometry and it just measures

14   angles and it's easy to use.  When you want to measure motion

15   at an elbow, you just put one line here and one line here and

16   you go measure it.  Range of motion to the elbow or the wrist.

17   I use them routinely, the goniometer, to measure range of

18   motion, for example, at the elbow or the wrist or the knee.

19          But with the neck, if one were to turn their head to

20   the right, you'd have to get up on top over their heads and put

21   one line this way, one line that way, and really, when you're

22   doing orthopedics for a long time, you get very good at

23   estimating the angles, particularly when you're measuring the

24   neck.  For example, looking straight ahead at zero, if I turn

25   my head halfway, it's 45 degrees.  If I could go to 90, it

899MFROT                    Crane - redirect

1    would be -- we get pretty good at being rather accurate at

2    that.  I can't say it's exact, but it's the best you can do.

3    You can't measure a neck practically with a goniometer.

4    Q.  Did you say it was not exact?

5    A.  You can't measure the neck range, the motion with a

6    goniometer.

7    Q.  The way you did it, is it exact?

8    A.  Of course not.  These examinations aren't -- many parts of

9    them aren't exact, but they are very close and I try to be as

10   accurate as I can be.

11   Q.  Can you tell me if this test is an objective or subjective

12   test?

13   A.  What test?

14   Q.  Range of motion test.

15   A.  From my standpoint, I write down what I measure.  Sometimes

16   someone that you examine doesn't show you full range of motion

17   because they don't want to or because they are hurting or

18   because they are trying to show you less.  So from the

19   standpoint of what a patient shows me in range of motion, it's

20   a combination of subjective and objective.  From the standpoint

21   of what I try to do when I examine, I try to be as objective as

22   I can, and I measure as best I can either visually or with the

23   goniometer.

24   Q.  Just so we understand, is it objective or subjective?

25   A.  Is what?

899MFROT                    Crane - redirect

1    Q.   The test that you did.

2    A.   The range of motion of her neck?

3    Q.   Yes.

4    A.   I don't think I can answer it any better than I just did.

5    What I measure, I measure as objectively as I can and as

6    accurately as I can.  She showed me full range of motion, so I

7    have no reason to think that she was coloring her range of

8    motion part of her exam.

9    Q.   Doctor, what you're saying is basically that range of

10   motion test is an objective test, am I correct?

11   A.   In this case, yes.  Not in many other cases, it isn't.

12   Sometimes I'll see someone and ask them to move their head to

13   the right and they barely move it.  And then five minutes later

14   I'll be tapping on their arm with a rubber hammer and they will

15   turn their head to the right 70 degrees.  In that case it's not

16   purely objective.  In this particular case, on that particular

17   part of the examination, it was objective.

18   Q.   Doctor, do you agree with Dr. Rothman's findings?  I'm

19   talking about the other defense doctor who reviewed the MRI

20   films.

21          MR. COFFEY:  Objection.

22          THE COURT:  Sustained.

23   Q.   Doctor, do you agree with Dr. Rothman's findings?

24          MR. COFFEY:  Objection.

25          THE COURT:  Sustained.

899MFROT                    Crane - redirect

1   Q.  Doctor, do you have any different opinion regarding

2   Ms. Frometa's spinal condition than Dr. Rothman?

3           MR. COFFEY:  Objection.

4           THE COURT:  I think we will let Rothman speak for

5   himself.

6           MR. PLATTA:  I just want to find out if this is

7   inconsistent with Dr. Crane.

8           THE COURT:  I don't.

9   Q.  Doctor, just so I understand, what you basically are trying

10  to say, and tell me if I'm wrong, that all the surgeries, the

11  spinal for the neck, for the back, steroid injections, facet

12  nerve injections, as well as spinal, number, and cervical nerve

13  stimulator implants were not the right way to go for

14  Ms. Frometa?

15          MR. COFFEY:  Objection.

16          THE COURT:  Sustained.

17  Q.  Doctor, you mentioned that this kind of treatment would

18  result from some kind of catastrophic injuries to the spine,

19  correct?

20  A.  What?

21  Q.  In your earlier testimony today you said that such injuries

22  to the spine could only be from catastrophic injuries to the

23  spine.

24  A.  I never have seen any patient, no matter how badly injured,

25  no matter what the nature of their spinal cord injury was, to

                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

327
899MFROT                      Crane - redirect

1   have the pattern where the right side of their body only was

2   numb.  It's not possible.

3   Q.  If you look at your screen right now --

4            MR. COFFEY:  Objection.

5            THE COURT:  I haven't heard the question yet.  Is

6   there a question?  Overruled.

7   Q.  Doctor, please look at the picture.  This is a picture of

8   the impact that was done to my client's vehicle.  Would it

9   change anything in your diagnosis or thoughts about this case,

10  procedures, surgeries, injections, if you had seen this picture

11  before?

12  A.  No.

13           MR. PLATTA:  Thank you, Doctor.

14           THE COURT:  Anything?  You're excused.  Thank you very

15  much.

16           (Witness excused)

17           THE COURT:  What's next, Mr. Platta?

18           MR. PLATTA:  Your Honor, I would like to call my

19  client as a rebuttal witness.

20           THE COURT:  We don't have rebuttal yet.  You can have

21  rebuttal at the end of the case.  Otherwise, you have another

22  witness?

23           MR. PLATTA:  No, your Honor.

24           THE COURT:  Is it fair to say -- I don't know why I'm

25  doing all this -- that the plaintiff rests?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT

1            MR. PLATTA:  That is correct, Judge.

2            THE COURT:  Do you have a case, Mr. Coffey?  If you

3    do, you better start it soon.

4            MR. COFFEY:  Yes, your Honor.  I would like to reserve

5    until out of the jury's presence to make any motions.

6            THE COURT:  Let me explain to you or take a little

7    more time.  What I do is, I presume that all the motions that

8    could be made under the federal rules, may come as a surprise

9    to you, under the federal rules, are being made, have been

10   made, and I reserve decision.

11           MR. COFFEY:  Thank you, your Honor.

12           At this time I would call Dr. Lewis Rothman to the

13   stand.

14           THE COURT:  I'm trying to move this along.  Call her.

15   We will do the rebuttal now.  Maybe it will help.

16           MR. PLATTA:  Sure.

17           THE COURT:  I am talk talking to you, Mr. Platta.

18   Keep in mind that rebuttal testimony is a rare bird, not that

19   we haven't seen a flock of rare birds here.

20           You're still under oath to tell the truth.

21    ADONNA FROMETA, recalled.

22   DIRECT EXAMINATION

23   BY MR. PLATTA:

24   Q.  Ms. Frometa, do you remember being examined by Dr. Edward

25   Crane on March 13, 2008?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Frometa - direct

1   A.  Yes.

2   Q.  Could you describe to the jury the way he examined you when

3   you were sitting on a table with your legs up, what happened

4   then?

5            MR. COFFEY:  Objection.

6   A.  He told me to sit down.

7            THE COURT:  Sustained.  This is not rebuttal testimony

8   in my view, so I'm not allowing it.  Have you got another

9   question?

10  Q.  Ms. Frometa, was there at any point a body contact between

11  you and Dr. Crane?

12           MR. COFFEY:  Objection.

13  A.  Yes.

14           THE COURT:  This is a fun question.  You answered

15  what?

16           THE WITNESS:  Yes.

17           THE COURT:  What kind of contact was there?

18           THE WITNESS:  He pushed me when I was on the table and

19  he went like this and I said ouch, that hurts, don't push me,

20  please.

21  Q.  Was it when you were actually sitting with your legs out?

22  A.  Yes.

23           THE COURT:  Didn't you have the opportunity to ask

24  about this doctor's examination when you had her on direct?

25           MR. PLATTA:  I'm sorry, Judge, no.

330

899MFROT                        Frometa - direct

1              THE COURT:  No, you didn't have that opportunity?

2    Somebody took it away from you?

3              MR. PLATTA:  No --

4              THE COURT:  The problem is, it's really not rebuttal.

5    Do you have a couple more questions?  We will listen to them.

6              MR. PLATTA:  Your Honor, I'm done.  Thank you very

7    much.

8              THE COURT:  Thank you very much.

9              (Witness excused)

10             THE COURT:  We got your doctor coming?

11             MR. COFFEY:  Yes.

12      LEWIS ROTHMAN,

13          called as a witness by the Defendants,

14          having been duly sworn, testified as follows:

15   DIRECT EXAMINATION

16   BY MR. COFFEY:

17   Q.  Good afternoon, Dr. Rothman.

18   A.  Good afternoon.

19   Q.  Tell us a little bit about your educational background,

20   where you're board certified, and where you're on staff at any

21   hospitals.

22   A.  Starting from when?

23   Q.  Let's keep it until we decide you're deemed to be an

24   expert.

25   A.  Education, how far back?

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

899MFROT                    Rothman - direct

1    Q.  Tell me about your medical degree, undergraduate degree.

2              THE COURT:  I don't care about undergraduate degree.

3              MR. PLATTA:  Your Honor, I will stipulate that

4    Dr. Rothman is an expert.

5              THE COURT:  That's good enough for me.

6    Q.  Doctor, you're board certified in radiology?

7    A.  I am.

8    Q.  What is radiology?

9    A.  Radiology is a subspecialty of medicine that deals -- first

10   of all, it's broken up into two areas, diagnostic radiology and

11   therapeutic radiology, or radiation oncology.  My area of

12   expertise or my training was in diagnostic radiology, which

13   uses x-rays, CAT scans, MRI scans, sonography and even

14   radioactive materials to diagnose conditions that affect the

15   body.  I have a subspecialty in neuroradiology which deals with

16   diagnosing conditions that affect primarily the brain, the

17   spine, and peripheral nervous system.

18   Q.  Now, with the subspecialty, just explain a little the

19   difference between the qualification of a radiologist and say a

20   neurologist or an orthopedist to review films.

21   A.  Well, radiologists are trained to review films and that's

22   basically what we do day in and day out.  In order to become

23   board certified in radiology you need to complete an accredited

24   radiology residency program which, when I did it back in the

25   '60s, was three years.  It's now four years.  We have to take a

899MFROT                    Rothman - direct

1   written exam and then an oral examination.  If you pass both of

2   those examinations you're deemed board certified by the

3   American Board of Radiology.

4           In 1995, that board instituted something called a

5   certificate of added qualifications in several areas, one of

6   them being neuroradiology, which is now a subspecialty and then

7   a specialty.  You had to have been trained in the field and

8   practicing a minimum of 50 percent of your time in

9   neuroradiology to be eligible to sit for the examination.  I

10  sat for that examination and received what's called a

11  certificate of added qualifications in neuroradiology.

12          Getting back to orthopedic surgeons and neurologists

13  during the course of their work, they do look at imaging

14  studies and some of them are more expert than others in terms

15  of reviewing and interpreting them, but they don't do it day in

16  or day out, and they are not specifically certified, certainly

17  not by the American Board of Radiology.

18  Q.  How about versus neurologist?

19  A.  Neurologist the same way.  I trained as a neurologist.  I

20  actually trained as a neurologist, got my interest in

21  neuroradiology during that training, and was exposed and

22  performed and interpreted various neuroradiological procedures.

23  But, again, not on a day in and day out basis the way a

24  radiologist would.

25  Q.  Now, are you also currently a professor of clinical

899MFROT                    Rothman - direct

1    radiology?

2    A.  I'm a professor of diagnostic radiology at Westchester

3    County Medical Center.

4    Q.  Now, with regards to this case, at some point -- we have a

5    shadow box over there.  Your CV is part of the record.  We

6    don't have to go through everything that's in it.  We just

7    wanted you to know that.  I am going to show you some films.  I

8    want you to start talking about what you think is important.

9    There is a shadow box there if that will assist you, Doctor.

10   A.  Sure.  I think it ought to be up there because the jury

11   will be able to see it closer.

12          MR. COFFEY:  Judge, can I move it on top of the edge

13   of the jury box?

14          THE COURT:  Yes.

15          I'm changing my mind.  I don't want it there.  If you

16   put it on the jury rail, you would probably be in the box by

17   now.

18   Q.  At some point, Doctor, we sent you some x-rays and MRI

19   scans from Adonna Frometa to review, is that correct?

20   A.  Yes, you it.

21   Q.  Why don't you tell the jury what you reviewed and what

22   their relevance is.

23   A.  I reviewed MRI scans of the cervical spine.  That's the

24   neck and the lumbar spine, the low back.  I'm putting up films

25   from the cervical spine first.  We normally do these films in

899MFROT                    Rothman - direct

1    what we call the sagittal or side view and axial or horizontal

2    view when we look at them.

3            The first set that I've put up are sagittal or side

4    views, and if you can imagine that I'm the patient for the

5    moment and you're looking at a series of slices that go through

6    my spine from one side to the other, this is a side view so

7    that one slice starts over here and then we go and move

8    steadily in about quarter of an inch increments from one side

9    to the other.

10           The top of the patient is at the top of each one of

11   these slices and the slices go from the upper left-hand corner

12   to the lower right-hand corner.  You can see a little bit of

13   the jaw over here, to orient you, and a little bit of the upper

14   chest down here.

15           If we look at the third row, we see views that go

16   through more or less the center of the spine.  You may be able

17   to see from back there.  I don't think you're going to be able

18   to see it from all the way in the back --

19           THE COURT:  You're welcome to move over and go into a

20   back row if you can't see what he's doing.

21   A.  There are several square structures here that represent the

22   vertebra or the bony supports to the spine.  And in between

23   them there are horizontal flat structures that represent the

24   disks, the intervertebral disks.  Behind those structures is a

25   dark area that's coming down that represent the spinal cord.

899MFROT                    Rothman - direct

1    The spinal cord is what conducts all of the nerves from the

2    brain through the body to ultimately go out to the extremities,

3    the abdomen, et cetera.

4           And what we look at normally in these particular cases

5    is we look to see whether or not the disks are normal.  Do they

6    have their normal signal appearance, are they sticking out, are

7    they herniated?  Are they degenerated?  Is there any pressure

8    on the spinal cord?  Is there any pressure on any of the nerve

9    roots?  What we see in this particular case is we see some very

10   minor bone spurs or dried-out disks that we call osteophytes at

11   a couple of levels, at the highest level between C2 and C3 and

12   between C4 and C5.  You see a very small disk herniation at the

13   C3-4 level.

14          Now, in order to evaluate this disk herniation more

15   completely, we have to do what's called a horizontal or axial

16   view, and this sheet of film shows us an axial view.  And try

17   to imagine me suspended in midair with my feet towards you and

18   a series of views going this way instead of this way through

19   the cervical spine.  So that's what we have here.  Again, going

20   from the upper left-hand corner to the lower right-hand corner,

21   and those of you who are up front may be able to see lines on

22   this one picture from the side view, each one of these lines

23   represents where in the cervical spine one of these horizontal

24   views were done.

25          And as we look through them we see that at one level,

899MFROT                        Rothman - direct

1    the C3-4 level, there is a small disk herniation, a small

2    protrusion of the disk material backwards into the spinal

3    canal.  It is not pressing on the spinal cord, nor is it

4    pressing on any of the nerve roots.  And that's basically what

5    we see.  We see the other small osteophytes or bone spurs at

6    the other two levels that I had indicated earlier.  So we have

7    here a patient who has some degeneration in her cervical spine

8    at two levels, some degeneration and a small disk herniation at

9    the C3-4 level.

10   Q.  And with that, Doctor, with that review, that was dated

11   what, March 10 of 2007?

12   A.  Yes.

13   Q.  And did you come to have any impressions or conclusions

14   based upon your review of that?

15   A.  Well, yes.  My impression is that there is evidence of

16   degenerated disk disease at several levels with a small disk

17   herniation at C3-4 without evidence of either spinal cord or

18   nerve root compression.

19   Q.  And what does that mean?

20   A.  That means that one would not expect there to be any

21   neurological dysfunction as a consequence of this disk

22   herniation since it's not pressing or interfering with the

23   function of either the spinal cord or the nerve roots.  There

24   might be some stiffness in the neck, there might not be any

25   symptoms whatsoever.  It's not uncommon to see disk

337

899MFROT                        Rothman - direct

1   degeneration and small disk herniations in asymptomatic

2   individuals.

3   Q.  There is no extruded disk material?

4   A.  There is no extruded disk material, that's correct.

5   Q.  And if this was taken March 10 and the accident occurred

6   February 14, would it be your opinion that this predated the

7   March 14 motor vehicle accident that we are here for today?

8           THE COURT:  February?

9           MR. COFFEY:  February 14.

10  A.  The disk degeneration and osteophytes at two levels

11  certainly preceded the accident.  One couldn't tell one way or

12  another when the disk herniation occurred.  It could have

13  preceded it, it could have occurred at the time, it could have

14  occurred subsequent to it.

15  Q.  If you were to take a look at -- you review many of these

16  MRIs, is that correct?

17  A.  I do.

18  Q.  To put it in perspective for the jury, how many do you

19  review monthly or annually?

20  A.  Thousands.  Annually, thousands.  Over the lifetime of my

21  career, tens of thousands.

22  Q.  And this is in the small range of herniated disks, if at

23  all?

24  A.  Extremely small.

25  Q.  What does the gamut, when you rank them, what does it go

338
899MFROT                    Rothman - direct

1     from, extremely small up to what, pretty large?

2     A.  Very large.

3     Q.  What would be the next film set that would be of import for

4     the jury?

5     A.  The next set is a series of MRI scans of the lumbar spine,

6     the low back.  And I've put them up starting the same way, so

7     these are the sagittal or side views.  Again, picture the

8     patient positioned as I am, with the front of the patient to

9     the left of each one of these individual films, the upper part

10    of the abdomen near the top and the lower part of the pelvis

11    towards the bottom.  Once again, if we look at the third row,

12    we can see a series of images through the center of the spine

13    and we can see square areas representing the vertebra, flat

14    areas in between them representing the disks, and the white

15    area behind it representing the spinal fluid in the spinal

16    canal.  And if you were close enough, you can see some black

17    lines running through that spinal fluid and they represent the

18    nerve roots.  The spinal cord actually ends in the upper lumbar

19    or lower part of the chest and does not extend all the way down

20    into the spinal canal as it is located in the rest of the

21    spinal canal.

22            If you look carefully you can see that one of the

23    disks, the disk between the fifth lumbar and first sacral

24    segment, is very dark.  That indicates that it's severely

25    degenerated and this kind of degeneration takes a long time to

899MFROT                    Rothman - direct

1   develop.  One can also see, again, a very small disk herniation

2   at that L5-S1 level, which can be, once again, demonstrated in

3   the horizontal or the axial views, and we see it down here as a

4   very small disk herniation, once again, with no evidence of

5   spinal nerve compression.  And that would be the sum and

6   substance of the important findings in the lumbar spine.

7   Q.  What is spinal cord compression?

8   A.  Spinal cord compression is just literally a force being

9   applied in distorting the configuration of the spinal cord.

10  Q.  And you do not see that?

11  A.  The spinal cord doesn't extend down this far, so there

12  could be no spinal cord compression in this level, but there is

13  no nerve root compression.  All we have down at this level are

14  the nerve roots that are ultimately going to go to the lower

15  extremities.

16  Q.  So your review of that film finds no herniation?

17  A.  It finds a very small herniation, but no evidence of nerve

18  root compression.

19  Q.  And that would be the important thing you would be looking

20  for, is that correct?

21  A.  Correct.

22  Q.  And would it be fair to say that there was evidence then of

23  chronic degeneration in the lumbar spine?

24  A.  There is no question that at the L5-S1 level there is

25  rather severe chronic degeneration, and that's seen by the very

340

899MFROT                    Rothman - direct

1    dark appearance indicating the degeneration at that level.

2    Q.  Now, was there also desiccation at L2-3, L3-4 and L5-S1?

3    A.  There is actual mild desiccation at all of the levels, but

4    it's most marked at L5-S1.

5    Q.  What does desiccation mean?

6    A.  Desiccation means a drying out of the disks, and it happens

7    to all of us, unfortunately.  As we age, there is no blood

8    supply to the disk, so there is no way to replenish water that

9    ultimately leaches out of the disk.  So all our disks

10   ultimately dry.  And as they dry, they lose their elasticity

11   and they become more prone to degeneration and to herniation as

12   a consequence of that drying-out process.

13   Q.  Would you have an opinion, if these were taken on March 10,

14   if the accident occurred on February 14, that these would have

15   been preexisting before the February 14 accident?

16   A.  There is no question that the degeneration that's present

17   at the L5-S1 level preceded it and preceded it by a long time.

18   There is really very extensive degeneration.  And it's quite

19   likely that the disk herniation also preceded it because it has

20   a very dark appearance to it, meaning that it's desiccated.

21   But one can't be quite as definitive about that.  The odds are

22   is that all these changes in the lumbar spine preceded the

23   accident and many of them by a long period of time.

24   Q.  And is there any way to see if the changes that preceded

25   the accident, would you be able to tell if they were -- they

899MFROT                    Rothman - direct

1    were caused because of any trauma or degeneration or you can't

2    tell, Doc?

3    A.   You can't tell by simply looking at the MRI.  A trauma

4    could have contributed to it.  More often than not it's just

5    essentially normal wear and tear, if you will, and repetitive

6    stress as opposed to a single or two or three traumatic events.

7    Q.   There was also some degeneration when you looked at the --

8    bringing you back to the cervical imaging, the cervical imaging

9    also showed chronic degenerative changes?

10   A.   There are chronic degenerative changes in the cervical

11   region.  The osteophytes that I described at two levels are the

12   result of chronic degeneration, and there is some disk

13   desiccation in the cervical region as well.  And one would

14   expect to see disk desiccation in one part of the spine and the

15   other as part of the aging process that leads to degeneration.

16   Q.   Now, on the x-rays -- did you review some x-rays?

17   A.   I did.  I don't have those with me, but they are here.  I

18   saw them earlier.

19   Q.   What's really better for us to be looking at?  What tells

20   the jury more, the x-rays or the MRIs?

21   A.   In terms of degeneration and disk herniation, there is no

22   comparison.  The MRIs tell us the most.  The x-rays can tell us

23   whether there are fractures or dislocations and this is a

24   lateral view of the cervical spine, the side view.  You can see

25   the jaw and the skull here.  You can see the cervical spine

899MFROT                         Rothman - direct

1    here.  You can see all of the vertebra.  And this is -- there

2    may be some minimal degenerative change at the C5-6 level, the

3    small osteophyte there, but a relatively unremarkable looking

4    cervical spine, certainly no evidence of any acute injury here.

5    Q.  And were you able to determine from your review if there is

6    a normal range of motion and flexion and extension?

7              MR. PLATTA:  Objection.

8              THE COURT:  Overruled.  You know, Mr. Coffey, we have

9    made a variety of timetables for the plaintiff.  We are

10   approaching that procedure with you.

11             MR. COFFEY:  Okay.  Thank you.

12             THE COURT:  You're welcome.

13   A.  There were films of flexion and extension and there was no

14   evidence of abnormality in flexion or extension.

15   Q.  Finally, did you review a discogram that you provided a

16   supplemental report on April 28 of 2008?

17   A.  I did.

18   Q.  And what's a discogram?

19   A.  A discogram is a test that shows us to some degree what the

20   disk looks like by injecting a contrast material into the disk

21   with a needle to try to outline the center of the disk.  That

22   discogram showed a small disk herniation at the C3-4 level.

23   Q.  Was there any other abnormalities noted?

24   A.  No.

25   Q.  So that corroborated some of the earlier MRI findings?

899MFROT                     Rothman - direct

1    A.  Correct.

2            MR. COFFEY:  I have no other questions.  Thank you.

3    One other.

4    Q.  Are you being paid for your time here?

5    A.  Yes.

6    Q.  How much are you being paid?

7    A.  $3500.

8    Q.  You're taking time away from your practice to be here?

9    A.  Yes.

10           MR. COFFEY:  Thank you.

11           THE COURT:  Any cross?

12           MR. PLATTA:  Yes, your Honor.

13           THE WITNESS:  Do I sit down?

14           THE COURT:  Stay right there.  Cross-examination is

15   part of what we do here in America.

16           THE WITNESS:  I meant should I sit in the chair?

17           THE COURT:  You should sit wherever you feel welcome

18   other than the jury box.

19   CROSS-EXAMINATION

20   BY MR. PLATTA:

21   Q.  Good afternoon, Doctor, how are you?

22   A.  Good afternoon.  Very well.  Thank you.

23   Q.  Doctor, could you have a look at artwork.  This is a

24   depiction of the MRI film that we just showed to the jury.  We

25   have the same one on the table right on your left side.  Could

899MFROT                    Rothman - cross

1    you show the jury where exactly is the herniation in the lumbar

2    sacral spine of my client?

3              And, Doctor, how do you know it's a herniation?

4    A.  I know it's a herniation by looking at the side view, the

5    sagittal view and the axial view by seeing that there is a

6    localized protrusion beyond the normal disk margin.

7    Q.  How do you know whether it preexists the accident of

8    February 14 or it doesn't?

9    A.  The only way one can make that determination is based on

10   the color, if you will, or the darkness.  Fresh disk

11   herniations in this particular sequence, which we call a T2

12   sequence, remain relatively bright in their appearance.  They

13   look light in color as opposed to this, which is dark.  That

14   tells me that it's dried out, it's desiccated, and more likely

15   than not has been there for a while.

16   Q.  Doctor, do you agree with me that a herniation could be

17   asymptomatic?

18   A.  Could be asymptomatic?

19   Q.  Yes.

20   A.  Absolutely.

21   Q.  Do you agree with me that symptoms of herniated disk

22   compressing the spine could start after the accident?

23   A.  Symptoms from herniated disks can occur at any time.

24   Q.  Correct.  But, hypothetically, if I were to tell you that

25   my client had no prior treatment for her spine and she started

899MFROT                          Rothman - cross

1    having treatment after the accident only, would that be an

2    indication to you that it's possible that this herniation

3    became painful after the accident?

4    A.  I see.  You're asking me if a patient has a preexisting

5    herniation that was asymptomatic and had an accident, could it

6    become symptomatic?

7    Q.  That is correct.

8    A.  It's possible.

9    Q.  And, Doctor, could you show us also the herniation from the

10   cervical spine?

11   A.  Yes.  The herniation in the cervical spine in the side view

12   is here between 3 and 4, and in the axial view is here; and,

13   again, somewhat similar appearance in the axial view to the

14   herniation in the lumbar spine.

15   Q.  Doctor, the same question, is it possible that this

16   herniation was asymptomatic prior to the accident and became

17   symptomatic postaccident?

18   A.  Possible.

19   Q.  Did you review any records that would indicate that it was

20   actually symptomatic before February 14?

21   A.  No.  I saw no records that I can recall that had anything

22   to do with anything before the accident occurring.

23   Q.  Did you see any MRI films?

24   A.  Before the accident?

25   Q.  Yes.

899MFROT                    Rothman - cross

1    A.  No.

2    Q.  Do you know of any?

3    A.  I don't know of any, no.

4    Q.  Did you ask the defense counsel to provide you with any

5    prior records?

6    A.  Yes.

7    Q.  Did they do that?

8    A.  I asked them if there were prior MRIs and, as far as I

9    know, there were no prior MRIs.

10   Q.  Why do we usually have MRI?

11   A.  Pardon?

12   Q.  Why patients are referred for MRI, usually?

13   A.  A whole host of reasons.

14   Q.  Could it be also be because of the pain?

15   A.  Certainly.

16   Q.  Doctor, the disk injury that you see here, is this the

17   herniation or it's a bulging --

18   A.  This is a herniation.

19   Q.  What is the difference between bulging disk and herniated

20   disk?

21   A.  In a bulging disk, the entire disk stretches and uniformly

22   extends out so that if this were -- if there were a bulging

23   disk we would see a uniform extension of the disk beyond its

24   bony margin, and that is a phenomenon that occurs in disk

25   degeneration.  When it's localized and just sticks out in a

347

899MFROT                         Rothman - cross

1   focal area, then we call it a herniation because that implies

2   that there has been some extension of the center of the disk

3   beyond the margin of the disk and that's my definition disk

4   herniation.

5   Q.  Doctor, as a matter of fact, you wouldn't be able to tell

6   when this herniation became symptomatic?

7   A.  You can't look at a film and determine whether it is even

8   symptomatic.  It might not be symptomatic at all.

9   Q.  I agree with you.  But it can also be symptomatic.

10  A.  Could be symptomatic.

11  Q.  Did you see the patient?

12  A.  No.

13  Q.  I'm sorry.  It wasn't the patient.  Did you see

14  Ms. Frometa?

15  A.  No.

16  Q.  Did you operate on her?

17  A.  No.

18  Q.  If I were to tell you hypothetically that there was a

19  doctor who did the surgery on her and found this herniation and

20  removed portion of the disk, would it surprise you?

21  A.  That somebody found the herniation?

22  Q.  No.  That someone would decide to operate on this disk.

23  A.  It would.

24  Q.  In front of you you can see the depiction, artwork of the

25  procedure that Dr. Babu did and referred to it as being very

899MFROT                    Rothman - cross

1   specific and accurate and it's in evidence.  Could you please

2   show us where do you see herniated disk in these pictures?

3             MR. COFFEY:  Objection.

4             THE COURT:  I'll overrule it.

5   A.  Where I see a herniated disk on the artwork, not where

6   there is necessarily a herniated disk in the patient?

7   Q.  I want you to assume --

8             MR. COFFEY:  Your Honor, this is exactly --

9             THE COURT:  You can't all talk at once.  Because

10  obviously if he's talking, at least if I'm included, the

11  reporter is only going to take me.  Second of all, I can't rule

12  if I don't hear who is saying what.

13            MR. COFFEY:  The objection is, your Honor, it's not

14  that one.  It's the diagram.  It's not a film that he has up on

15  the easel.

16            THE COURT:  Please correct it, Mr. Platta.  I'm only

17  looking at this, so it's really too bad.

18            MR. PLATTA:  I'm showing right now the same thing as

19  the expert is showing.

20            THE COURT:  Good to know because I can't see that, but

21  I can see this fine.

22  Q.  Sir, could you show us exactly where the herniation is on

23  this artwork?

24  A.  Well, this is what is supposed to be representing the

25  herniation on the artwork.  That does not correspond to what's

899MFROT                    Rothman - cross

1    on the MRI scan.

2    Q.  It's not, right?

3    A.  Correct.

4    Q.  And if I were to tell you that Dr. Babu testified under

5    oath that this is the accurate depiction of what he saw

6    actually in my client's spine, you wouldn't agree with that,

7    right?

8    A.  I can't disagree with what he actually saw.  I wasn't

9    there.  I can only respond to what I see on the MRI scan.

10   Q.  Would you agree with me that a neurosurgeon who opened

11   somebody's back would be in a better position to say what kind

12   of herniation, what kind of injury to her disk happened than

13   just by reviewing the MRI?  Would you?

14           MR. COFFEY:  Objection.

15           THE COURT:  I'll allow it.

16   A.  In general, I would.

17   Q.  In this case?

18   A.  I can't speak to this case because I wasn't there and I

19   don't know the people involved.

20   Q.  So we agree on the fact that neurosurgeon would be in a

21   better position to say whether this disk was actually causing

22   pain, numbness, tingling, correct?

23   A.  Yes.

24   Q.  Doctor, you never did any surgeries?  You're a radiologist,

25   right?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    Rothman - cross

1    A.  Correct.

2            THE COURT:  You can sit down, I think.

3            MR. PLATTA:  Yes, your Honor.

4            THE WITNESS:  Thank you.

5    Q.  Doctor, when you testified a few minutes ago, you said that

6    there could be no spinal compression based on the review of the

7    MRI films?

8    A.  I believe that I said there was no evidence of either nerve

9    root compression in the lumbar area, and no evidence of either

10   nerve root or spinal cord compression in the cervical region.

11   Q.  You never used the word could during your testimony

12   regarding spinal compression?

13   A.  I'm sorry.  I don't understand the question.

14   Q.  I will withdraw the question.

15           Doctor, do you testify in court only for defendants or

16   for plaintiffs as well?

17   A.  Plaintiffs and defendants.

18   Q.  How would you say percentage wise, which one is more?

19   A.  In medical malpractice cases or personal injury cases?

20   Q.  Any.  All together.

21   A.  More often for defendants, but plaintiffs as well.

22   Q.  And you were called here by defendants, correct?

23   A.  Yes.

24   Q.  I want you to ask you one last question.  Are you aware

25   that Dr. Crane depended on your reading of the MRI films in his

899MFROT                    Rothman - cross

1    diagnosis stating that my client has no injuries resulting from

2    the February 14, '07 accident?  Do you know that?

3    A.  No.

4           MR. PLATTA:  Thank you.

5           THE COURT:  You're excused, I presume, unless you got

6    anything further.  Thank you very much.

7           THE WITNESS:  Thank you, your Honor.

8           (Witness excused)

9           THE COURT:  What's next, Mr. Coffey?

10          MR. COFFEY:  Dr. April.

11          MR. PLATTA:  Your Honor, can we take a five-minute

12   break?

13          THE COURT:  Sure, we will take a five minute break.

14          (Recess)

15    ROBERT S. APRIL,

16         called as a witness by the Defendants,

17         having been duly sworn, testified as follows:

18   DIRECT EXAMINATION

19   BY MR. COFFEY:

20   Q.  Doctor, you're being paid for your time here today?

21   A.  Yes.

22   Q.  How much time are you being paid for your time today?

23   A.  I'm being paid $6,000 for the day.

24   Q.  Have you testified in court before?

25   A.  Yes.

899MFROT                    April - direct

1   Q.  And have you testified for plaintiffs and defendants?

2   A.  Yes.

3   Q.  Have you testified more for defendants, is that fair to

4   say?

5   A.  Yes.

6   Q.  Tell us a little bit about, are you board certified?

7   A.  Yes.

8   Q.  What are you board certified in?

9   A.  In the field of neurology.

10  Q.  Do you have any privileges in any hospitals?

11  A.  Yes.

12  Q.  What hospital?

13  A.  Mt. Sinai Hospital and Medical Center and Lenox Hill

14  Hospital and New York University Medical Center.

15  Q.  Where did you receive your medical degree?

16  A.  At University of California.

17  Q.  Do you have any military training?

18  A.  Yes.

19  Q.  And what was that?

20  A.  I was a commander in the coast guard and director of the

21  United States Marine Hospital neurology department in

22  Baltimore, Maryland between 1969 and 1971.

23  Q.  And in that position did you deal with pain management?

24  A.  Yes.

25  Q.  And do you have any experience in dealing with pain

899MFROT                    April - direct

1    management?

2    A.   Yes.

3    Q.   And you're a neurologist?

4    A.   Yes.

5    Q.   At some point did we retain you to review medical records

6    and come up with a conclusion in response to the plaintiff's

7    life care plan?

8    A.   Yes.

9    Q.   Could you tell the jury what medical records you reviewed?

10          MR. PLATTA:  Your Honor, I would like to object.  This

11   expert was retained as a life care planner to rebut my expert,

12   Dr. Kincaid.  I don't see the qualifications necessary for life

13   care planner testimony.

14          THE COURT:  I am not sure he's going to be a life care

15   planner.  What are we going to have when we are finished

16   qualifying him?

17          MR. COFFEY:  He is going to talk about that he didn't

18   believe that what the life care planner talked about was

19   medically necessary.

20          THE COURT:  That's about the life planner?

21          MR. COFFEY:  Yes.  And he came to conclusions for

22   that.

23          MR. PLATTA:  Your Honor, I am saying this witness is

24   not qualified to discuss life care plan because he doesn't have

25   qualifications --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

354

899MFROT                    April - direct

1          THE COURT:  Can I listen to some more before I rule?
2          MR. PLATTA:  Thank you, your Honor.
3          THE COURT:  We all agree what he's going to be
4    testifying to allegedly, right?
5          MR. COFFEY:  Yes.
6    Q.  Doctor, as a neurologist, you have patients?
7    A.  Yes.
8    Q.  At times are you ever asked to make life care plans or
9    future medical need assessments for your patients?
10   A.  Yes.
11   Q.  How many years have you been practicing medicine?
12   A.  I suppose, since I graduated medical school.
13   Q.  Would it be fair to say you've made these assessments,
14   these life care type assessments, for many patients through the
15   years?
16   A.  Yes.
17         THE COURT:  We heard the plaintiff.  He doesn't share
18   your view.  I would like a little more information about what
19   you do in the way of life care planning, how often you make
20   reports with respect to life care planning, and the like.
21   A.  I don't know if the term life care planning is always used
22   per se, but what we are talking about is prognosis for the
23   future of an individual who has an alleged disability.
24         In terms of the cost of maintaining the function and
25   structure of his lifestyle depends entirely on the severity of

355

899MFROT                    April - direct

1    the disability and its objective nature in terms of assessing

2    what will be the needs for other individuals caring for the

3    person, what kinds of support systems, what kinds of

4    nutritional facilities, and in general what kinds of housing.

5    All of those are cost-related items that deal with life care

6    planning and they are based on, in a neurological case, the

7    neurological aspects, without which there would be no caring.

8    It would be simply building a house without a foundation.

9              THE COURT:  I understand your objection, but I'm

10   overruling it.

11             MR. PLATTA:  Your Honor, I just want to point out to

12   your attention that this witness is qualified in the field of

13   neurology, not in the life care planning.  Note my exception.

14             THE COURT:  Didn't you hear what he has done for a

15   living and what he's done for the last 40 or 50 years?

16             MR. PLATTA:  Yes, I have.

17             THE COURT:  You're welcome to object.

18   Q.  Doctor, did you review records?

19   A.  Yes, I did.

20   Q.  What were they briefly?

21   A.  Briefly, it was the life care plan prepared by Dr. Charles

22   A. Kincaid, and that was a 39-page document.  In addition to

23   that, I reviewed various medical documents which were referred

24   to in the life care plan and which were used as the basis for

25   the formulations reached by Dr. Kincaid.

356

899MFROT                    April - direct

1   Q.  After you reviewed all those did you come to any opinions

2   with regards to what the accident caused and what the future

3   neurological needs would be for the plaintiff?

4   A.  Yes.

5   Q.  What were they?

6   A.  My conclusion was that the assumptions on which the life

7   care plan was based, those assumptions were not correct and

8   that based on that review, which was entirely medical, this

9   individual had not reached a catastrophic disability or really

10  any significant disability that would need the kinds of

11  interventions, cares, and prognosis that were established,

12  solely on the basis of information given by those practitioners

13  who were taking care of that individual.

14  Q.  Based upon your review did you come to a medical conclusion

15  with a reasonable degree of medical certainty?

16  A.  Yes.  First, I concluded that the accident of record was

17  not sufficient to make a neurological diagnosis.

18          MR. PLATTA:  Objection, your Honor.

19          THE COURT:  Overruled.

20  A.  Secondly, I concluded that the degree of disability was not

21  justified by any evidence-based statements made by

22  practitioners whose reports are in the record, and that,

23  thirdly, therefore, the conclusions reached by Dr. Kincaid

24  were, although well meaning, they were erroneous and therefore

25  the numbers that are involved have to be questioned.

357

899MFROT                    April - direct

1   Q.  So you believe that much of what the doctor -- what the

2   life care planner recommended were not necessary?

3   A.  That's correct.

4   Q.  So you would disagree with his conclusion that would say

5   that there is several million dollars worth of future treatment

6   needed?

7           THE COURT:  During the balance of her life?

8   Q.  During the balance of her life.

9   A.  Yes.

10  Q.  You would also agree that she does not need a home health

11  care aide for many hours a week starting now or in the future

12  on the basis of this accident, is that correct?

13  A.  Yes.

14  Q.  And you did not see the need for any further surgical

15  interventions based upon this accident, is that correct?

16  A.  That's correct.

17  Q.  And did you see anything that caused the plaintiff to be

18  permanently losing the total use of the spine?

19  A.  No.

20  Q.  Did you see anything that showed that the plaintiff from a

21  neurological life care standpoint sustained a significant

22  limitation of the use of a body function or system?

23          MR. PLATTA:  Objection.

24          THE COURT:  Overruled.

25  A.  No.

358

899MFROT                    April - direct

1   Q.  Now, I want you to assume that following the accident --
2   and you reviewed some of the records -- the plaintiff worked
3   following the accident without limitations.  Was she, in your
4   opinion, able to perform --
5              MR. PLATTA:  Objection.
6              THE COURT:  Sustained.  I'm not clear about the
7   without limitation piece.
8   Q.  Did you see anything that as a result of this accident she
9   would be unable to perform her usual and customary activities
10  following this accident?
11  A.  I did not.
12             THE COURT:  All these hospitalizations and all these
13  spinal problems and operations and all these disk problems and
14  operations, they were just gossamer?
15             THE WITNESS:  They were gossamer.  I am not sure what
16  you mean by that.
17             THE COURT:  They were meaningless.
18             THE WITNESS:  They might have been meaningful to the
19  patient herself who was suffering from symptoms and the doctors
20  chose to intervene to alleviate those symptoms, which were the
21  subjective statements of the plaintiff, but none of the
22  documents that I reviewed showed any degree of motor
23  incapacitation on an objective basis that would limit functions
24  or limit the use of a functional body part.  And those are the
25  bases for which the long-term prognosis and the degree of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

359

899MFROT                    April - direct

1    intervention that led to the costs you've cited actually were

2    based, and that's where I disagree.  I mean, in a sense, the

3    analogy -- certainly I see patients who complain of pain and we

4    certainly do intervene.  I send them to surgeons who do

5    epidural injections.  Pain is relieved, but these people on

6    that basis don't necessarily or most of them go on to

7    progressive loss of function that will in the future allow me

8    to say that ten years down the road you're going to be

9    disabled.

10          THE COURT:  What do you do with these people?  Do you

11   turn them out?  Do you say, listen, you have had enough of my

12   time?

13          THE WITNESS:  Not at all.  I don't see --

14          THE COURT:  I don't quite understand what you're

15   saying.  You've got somebody who opines that she is in

16   significant pain, the doctor believes that from what he can

17   see, the doctor, just like you, she needs an operative

18   procedure, he does the operative procedure, it doesn't take the

19   pain away, so he does another one, and she still has the kind

20   of pain that she testified about and three other doctors

21   testified about.  So I'm asking you what you would do.

22          THE WITNESS:  Well, I would continue treating her the

23   way the doctors do.  But you're asking me what we do in the

24   future with someone like this.  We don't, on the basis of what

25   you just stated and what I've been able to review, simply

899MFROT                    April - direct

1   conclude that this person is permanently and totally disabled

2   unless her behaviors, motor and behavior and general sense of

3   social interaction, daily activity suggests that she is in such

4   pain that she is limited, and that's the objective basis of

5   pain analysis because ultimately you're reduced to saying, how

6   do you feel?  And if somebody says I hurt, that's the best you

7   can do.

8           But if he doesn't act like he hurts or in any way

9   doesn't fulfill a constraint of activity, a restriction of

10  activity -- that is what we expect to be consonant with pain --

11  then we can't make a disability rating that could generate a

12  lifelong of passive receipt of millions of dollars of help.

13  Otherwise, we would have to stop attempting to be objective and

14  simply take everybody's word for hurting and anybody's pain

15  could be sufficient to generate something like that.

16          THE COURT:  Happily, we have a jury.  I don't have do

17  this fact finding.

18  Q.  Doctor, is your conclusion that the life care plan was

19  unnecessary and erroneous, is that correct?

20  A.  My conclusion was it was based on erroneous bases of fact,

21  and I'm basing that on examinations that are described by

22  various practitioners whose reviews I saw.

23  Q.  You read Dr. Krishna's records, Dr. Babu's records, and Dr.

24  Davy's records?

25  A.  Yes.  And also Dr. Crane's records.

899MFROT                        April - direct

1   Q.  And also Dr. Rothman's independent review of the x-rays?

2   A.  Yes.

3           MR. COFFEY:  I have no further questions.  Thank you,

4   Doctor.

5           THE COURT:  It's your turn.

6           MR. PLATTA:  Thank you.

7   CROSS-EXAMINATION

8   BY MR. PLATTA:

9   Q.  Good afternoon, Doctor.

10  A.  Good afternoon.

11  Q.  Did you ever examine Ms. Frometa?

12  A.  No.

13  Q.  Did you ever review an MRI film of Ms. Frometa?

14  A.  No.

15  Q.  Let me think.  Did you ever operate on her?

16  A.  No.  I didn't see her.

17  Q.  Doctor, do you know what is the International Academy of

18  Life Care Planners?

19  A.  I'm sorry?

20  Q.  Do you know what is the International Academy of Life Care

21  Planners?

22  A.  No, not independently.

23  Q.  If I were to tell you that Dr. Kincaid, that you criticized

24  so heavily, is actually a member of this organization, as a

25  professional life care planner, would you be surprised?

899MFROT                     April - cross

1    A.  No.  I think I knew that because he signed his name that

2    way.

3    Q.  And, Doctor, do you know what the American Board of

4    Vocational Experts is?

5    A.  I've heard of it.  I've seen its name.

6    Q.  Are you a member of that?

7    A.  No.

8    Q.  Do you know who is the commissioner of health care?

9    A.  In the State of New York?

10   Q.  Yes.

11   A.  I don't know him by name.

12   Q.  You're not certified by them to be a life care planner, are

13   you?

14   A.  No.

15   Q.  As a matter of fact, you don't have any certification for

16   life care planning, correct?

17   A.  I think we have established that, that's correct.

18   Q.  But you do have field of specialty in which you testify

19   most of the time, correct?

20   A.  Yes.  All of the time.

21   Q.  All of the time, correct?

22   A.  Yes.

23   Q.  What is it?

24   A.  It's neurology.

25   Q.  As a neurologist, would you be able to give an opinion with

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                     April - cross

1   a straight face to the jury?

2              MR. COFFEY:  Objection.

3              THE COURT:  Sustained.

4   Q.  Doctor, as a neurologist, without seeing a patient once,

5   without reviewing her medical records, without operating on

6   her, without having anything to do with her besides seeing

7   medical records, would you be able to say or would you be able

8   to give any kind of opinion as to her injuries?

9   A.  Yes.

10  Q.  Let's go through that.  Doctor, you said that you reviewed

11  some medical records, right?

12  A.  I can't understand what you're saying.  I'm sorry.

13  Q.  I will speak up.  Doctor, you reviewed some medical

14  records, correct?

15  A.  Yes.

16  Q.  What kind of medical records did you review?

17  A.  I reviewed Dr. Kincaid's life care plan, I reviewed

18  narrative reports from Dr. Villafuerte, I reviewed the records

19  from the Cabrini Hospital emergency room on the date of

20  accident, I reviewed reports from Standup MRI of Manhattan, I

21  reviewed narrative reports by Dr. Arden Kaisman, I reviewed

22  chiropractic reports from Xcalibur Chiropractic, I reviewed Dr.

23  Krishna's reports, I reviewed Dr. Ramesh Babu's reports, I

24  reviewed Dr. Andrew Davy's reports, I reviewed Dr. Babu's

25  operative note, I reviewed Dr. Edward Crane's narrative report,

899MFROT                    April - cross

 1    I reviewed Dr. Lewis Rothman's independent review of spinal
 2    x-rays and MRIs.
 3    Q.   Doctor, beside the reviews by defendants' doctors,
 4    Dr. Rothman and Dr. Crane, did any of the other physicians who
 5    actually operated, treated, and took care of my client for last
 6    year and a half, did any one of her physicians -- physicians,
 7    not experts hired for this trial, but physicians -- did any one
 8    of them ever indicate in their report that her injuries are not
 9    causally related to this accident of 2/14 of '07?
10    A.   No, with explanation.
11    Q.   I'm sorry?
12    A.   I said no, with explanation.
13    Q.   Doctor, is it fair to say that the only source of your
14    negative review of this case is the review by Dr. Crane and
15    Dr. Rothman because other physicians were actually giving
16    restrictions of motions, pain, suffering, limitations of her
17    body functions, of her spine?  Would you agree with me?
18    A.   No, with explanation.
19    Q.   Doctor, could you show me the records that you reviewed?
20    A.   I can only show you the records of Dr. Kincaid.
21    Q.   Do you have any --
22    A.   The rest were sent back to the attorney's office.
23    Q.   Don't you know that under the federal rules of procedure,
24    you're obligated to have them at the time of trial?
25    A.   I'm sure we have them.

899MFROT                    April - cross

1   Q.  Doctor, are you trying to say that beside the report you

2   don't have anything today with you?

3   A.  If you mean with me in this space?

4   Q.  Yes.

5   A.  I have Dr. Kincaid's reports and the other space is on that

6   desk.

7   Q.  Doctor, do you realize that in your report you are saying

8   that you reviewed many records that you don't have in your file

9   right now?

10  A.  I have explained that to you.

11  Q.  You wouldn't be able to show me a place in the physicians'

12  records that would actually support your position, would you?

13  A.  I think I would or I wouldn't have stated my position.

14  Q.  Could you show me that?

15  A.  I will have to get the records.

16          THE COURT:  The defendant will produce the records if

17  they are in fact, as he says, here.

18          MR. PLATTA:  Sure.

19          THE WITNESS:  If you bear with me, I am going to look

20  for them.

21          THE COURT:  Here he comes.

22          These are all records that you reviewed, as I

23  understand it?

24          THE WITNESS:  Yes.

25  Q.  Doctor, were they delivered to you in the same form like

366

899MFROT                  April - cross

1    you have them right now?

2    A.  To the best of my recollection.

3    Q.  And they have the hard cover and they were --

4    A.  I can't remember.  That was a long time ago.

5    Q.  When was it?

6    A.  Several months ago.  I am going to refer first to the

7    narrative report of April 11, 2007.

8    Q.  Of which doctor?

9    A.  Which is signed by Dr. R.C. Krishna and which is entitled

10   Westchester Medical Care, PC.  And in this I am going to refer

11   to the general physical and neurological examination, which

12   states that there are no cranial nerve abnormalities, there are

13   no abnormalities in mental status, and I can amplify by reading

14   this word for word if you wish, that the strength of cranial

15   nerve innervated muscles are normal, that there is normal power

16   bulk and tone in all muscle groups except for a minimal

17   weakness in the deltoid super spinatus biceps and other muscles

18   on the right side, but it's described as 4 over 5 weakness,

19   which means in neurological parlance that the resistance to

20   movement can be overcome by very strong resistance on the part

21   of the examiner.  It is not consistent with any kind of

22   disability for motor functions in those kinds of muscles.

23   Q.  Doctor --

24   A.  Let me continue, please.

25            THE COURT:  He's asking you the question.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

367

899MFROT                    April - cross

1    A.  I thought he said he wants me to read this.

2          THE COURT:  Now he's asking you another question.

3    Q.  Doctor, did you review EMG results?

4    A.  Yes.

5    Q.  Can you tell me what they say?

6    A.  Of course.  Let me find them.  I can tell you from my own

7    review.  Would you like me to read them?

8    Q.  Yes, please.

9    A.  Which?

10   Q.  Your own review is fine.

11   A.  Dr. Krishna's EMG study of 3/29/07 was reviewed and he

12   didn't find anything that could be used to make a disability

13   conclusion.  And now if you'd like me to go into details of

14   that, I will.

15   Q.  Doctor, I'll ask you one more question.  Are you aware that

16   the EMG result was positive for cervical and lumbosacral

17   radiculopathy?

18   A.  Yes.

19   Q.  Would you find this an objective or subjective neurological

20   finding?

21   A.  It is an objective finding if it's done by a competent

22   electromyographer, especially if he records it and has it on

23   raw data.

24   Q.  Would you find Dr. Krishna to be qualified?

25   A.  I have no idea.

899MFROT                      April - cross

1   Q.  And, Doctor, can you tell me what could be the result of

2   radiculopathy on a patient --

3   A.  What's that?

4   Q.  Can you tell me what could be the result of radiculopathy

5   on a patient?

6   A.  It could be anything from no symptoms to pain, to motor

7   weakness.

8   Q.  What would you need to determine whether there was actually

9   pain?  Would it be examination of the patient?

10  A.  It would be what the patient says and how the patient

11  behaves, as I've tried to explain to the jury.

12  Q.  Did you have the chance to do that in this case?

13  A.  You know I didn't because I didn't see this patient.  I

14  have to rely on the observers and that's what I'm doing.

15  Q.  Did you ask your counselors to have the option to see the

16  patient?

17          MR. COFFEY:  Objection.

18          THE COURT:  Overruled.

19  A.  I was asked to review records.

20  Q.  Did you ask for a meeting with the patient?

21  A.  No.  I was asked to review a life care plan.  I was not

22  asked to see the patient.

23  Q.  I understand.

24  A.  I didn't ask to see the patient because it wasn't my

25  patient.

899MFROT                    April - cross

1    Q.  Doctor, were you asked to see Ms. Frometa?  Forget about

2    the patient.

3    A.  I said no.

4    Q.  Any reason for that?

5    A.  I'm sorry, what?

6    Q.  Would it be important for you to actually see her to be

7    able to fully come to a medical conclusion regarding her life

8    care plan that you're criticizing so heavily right now?

9    A.  I'm not criticizing.  I'm commenting.  The other thing I am

10   saying is, I don't think it would be at all.  Of course, if the

11   patient were in front of me, I would look at her.

12   Q.  Doctor, can you tell me one more thing?  Can you tell me if

13   any place in your report did you disagree with the dollar

14   amounts of Dr. Kincaid?

15   A.  Well, I am not capable, as you pointed out so very well, of

16   coming to any dollar amount conclusions in a normal life

17   planning care because that's not what I'm qualified to do.  I'm

18   only qualified to make a comment on the accuracy of the

19   neurological interpretation which Dr. Kincaid is only qualified

20   to do as a nonneurologist.  In a sense, the two should work

21   together.

22   Q.  Perfectly fine.

23          And you were hired for this case to do what, life care

24   plan evaluation or neurological evaluation?

25   A.  I was asked to make a neurological comment as a neurologist

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

370

899MFROT                        April - cross

1   on a life care plan that was stated in this case.

2   Q.  That's a nice way to put it.

3           MR. PLATTA:  Your Honor, I believe at this point I

4   will have to move to exclude the doctor's testimony because

5   he's not only not qualified as a life care planner, but also he

6   was hired in a different purpose than life care planner.

7           THE COURT:  Overruled.

8   Q.  Doctor, in your career, do you see patients?

9   A.  Yes, sir.

10  Q.  What is the percentage of your practice?  Is it more

11  testifying in courts for defendants or private practice?

12  A.  I'm in my office approximately eight to ten hours a day and

13  I go to the hospital one or two.  And in that time I probably

14  see patients to treat 90 to 95 percent of that time.

15  Q.  And you think it's important to actually see a patient in

16  order to come to any conclusions, medical conclusions?

17  A.  Yes, with explanation.

18  Q.  And would you think it would be important to see

19  Ms. Frometa in this particular case?

20  A.  In this case, I stated why it was not critically important

21  to see this patient, but I'll say it again if you want me to

22  explain.

23  Q.  No, thank you.

24          Doctor, in your review of the Cabrini Hospital

25  emergency room records, did you find any note that my client

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    April - cross

1    lost consciousness as a result of this accident?

2    A.  Excuse me one second.  There was a checkoff part of the

3    nursing triage to which I made reference.  It said lost

4    consciousness.  That didn't say she observed her to be

5    conscious.

6    Q.  I understand.  Based on the medical review of the medical

7    records and also not being able to be present in the emergency

8    room with the patient, you would assume that she actually lost

9    consciousness at the time of the accident, wouldn't you?

10   A.  No.

11   Q.  I thought that you just said that you can base review of

12   patient's health and injuries based just on her records?

13   A.  Yes.

14   Q.  Doctor, in your report did you actually have an opinion on

15   the size of this accident?  Did you state --

16   A.  I am not sure I understood the sequence of verbs.

17   Q.  Doctor, did you state in your report that this is a minimal

18   accident of record?

19   A.  Oh, yes, but that's my opinion based on the Cabrini

20   Hospital emergency room record.

21   Q.  Doctor, in the review of records did you ever see this?

22   A.  What am I looking at?

23   Q.  At your screen.

24   A.  It's not on.  Do I have to turn it on?

25            THE DEPUTY CLERK:  No.

                    SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

899MFROT                    April - cross

1    Q.  Did you ever see that?

2    A.  I am not sure what I'm looking at.

3    Q.  Look at your screen.  You have the same thing on your

4    screen?

5    A.  I am going to have to ask you some questions because I'm

6    not sure what I'm looking at.  I see a man's hand on a metal

7    object which looks like the rear end of a car.

8    Q.  Does it look like severely damaged?

9    A.  It looks like the rear end is damaged.

10   Q.  Does it look like severe damage?

11   A.  I'm not a body repair person either, so I am going to just

12   tell you, it looks damaged.

13   Q.  Doctor, if I would tell you that this is my client's car

14   after the accident, would you still think it's a minimal

15   accident of record?

16   A.  I would like to qualify that.  I think it's a severe

17   perhaps accident for the rear end of the car, but that's not

18   the patient.  The patient is described in the records, not in

19   this picture.

20   Q.  Correct.  And these records do not really indicate, beside

21   your own review and beside the defendants' doctors' review,

22   that my client did not need any surgeries, correct?

23   A.  I'm sorry.  I don't understand the sequence of your

24   statements.  Could you say that again?

25   Q.  I'll rephrase it.  Hold on one second.

899MFROT                    April - cross

1          Doctor, would you please have a look at the depictions
2     of surgeries that was done for Ms. Frometa.  Please assume that
3     they are accurate depictions of the surgeries and what the
4     surgeon, neurosurgeon actually saw in her spine.  And please
5     assume that he stated on the record, under oath, that this
6     surgery was necessary, the same as her pain management doctor
7     put her surgery on the right side and they both saw what is
8     inside Ms. Frometa's spine.  The question is --
9     A.  May I sit down.
10    Q.  Can you tell us, are you still certain that that she wasn't
11    injured?
12    A.  May I just repeat back to you what you're asking me because
13    I want to be sure to give an absolutely honest and truthful
14    answer this way.
15    Q.  Doctor, let he rephrase it this way.
16    A.  But speak up so I can hear you.
17    Q.  Doctor, there were two physicians, Dr. Babu, neurosurgeon,
18    and Dr. Davy, pain management doctor, who operated on
19    Ms. Frometa, not only operated, but did implants of the
20    neurostimulators as well as steroid injections for this
21    patient, and these depictions are exact depictions of the
22    procedures that they did.  By looking at this depiction, this
23    artwork that exactly reflects what they saw with their eyes at
24    the time of the surgery, especially Dr. Babu's surgery where he
25    opened the spine, is this your opinion without looking at the

899MFROT                    April - cross

1   patient, without operating on her, without even seeing her

2   medical -- without seeing her MRI films, that she wasn't

3   injured as a result of this accident?

4   A.  You know, I can't answer that question yes or no.  It's

5   impossible.

6   Q.  Thank you.

7        THE COURT:  Any redirect?

8        MR. COFFEY:  Yes, briefly.

9   REDIRECT EXAMINATION

10  BY MR. COFFEY:

11  Q.  Doctor, you're not aware that you were retained on the eve

12  of trial because plaintiff had disclosed --

13       THE COURT:  Sustained.

14       MR. PLATTA:  Objection.

15  Q.  So you have no idea why you were not able to perform an

16  independent medical examination on the plaintiff, is that

17  correct?

18       MR. PLATTA:  Objection.

19       THE COURT:  Sustained.

20  Q.  When she went to Cabrini Medical Center was she asked about

21  severity of pain?  Did she say it was mild?

22  A.  Would you mind if I refreshed my memory by looking back at

23  the Cabrini Hospital records?  I have them right here.

24  Q.  I'll show you a copy of it.

25  A.  That's what I'm looking for.  Thank you.

899MFROT                    April - redirect

1   Q.  Since that was asked about, what was clinically significant

2   about the Cabrini Medical Center emergency treatment and triage

3   records?

4   A.  Well, there was an ambulance report and there was the

5   medical center report.  And the ambulance drivers did not see

6   any sign of loss of consciousness.  That's number one.  They

7   described her as alert and ambulating, meaning walking, at the

8   site of the accident, and they took her to the hospital.  And

9   in the hospital the examination has checkoffs, and the

10  neuropsych examination, which is neurological and mental

11  status, is all described as normal.  There is, in terms of her

12  complaints, the pain is described as mild and there is no --

13  there is no description here of any neurological limitation.

14        From a neurological point of view, this is a minimal

15  to no injury, and it's very difficult for me to conceive how

16  this trauma, in quotations, could be the result -- could be the

17  cause of this kind of pathology that could lead to the surgery.

18  There is an alternative explanation for all of this.

19  Q.  And denying the loss of consciousness, that differs from

20  what Ms. Frometa told some of her medical care providers in the

21  records you reviewed, is that correct?

22  A.  Apparently, there is a variation in what she said to the

23  ambulance driver and what she said to the triage nurse.  But at

24  no time did anyone see a person who was dazed, confused, had a

25  head injury, or any other sign that would go along with altered

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

899MFROT                    April - redirect

1    consciousness.

2    Q.  When people are triaged in the emergency room, they do

3    check for that, it's in some type of coding they use?

4    A.  It's like going into a restaurant and setting a table.

5    Q.  How do they do that?

6    A.  By examining somebody, making a physical inspection of the

7    body and taking vital signs and looking for areas of bruise, of

8    cut, of bleeding, all of the normal signs of traumatic injury.

9    Q.  And your review of the records found that there was none of

10   that trauma, is that correct?

11   A.  I have reviewed thousands of emergency room records and

12   that falls into the spectrum of minimal.

13          MR. COFFEY:  Thank you, Doctor.

14          THE COURT:  Anything further?

15          MR. PLATTA:  Yes, your Honor.

16   RECROSS EXAMINATION

17   BY MR. PLATTA:

18   Q.  Doctor, would you please have a look at the records from

19   Cabrini Hospital that you have on your screen.  Do you have

20   them on your screen?  You don't have to look around.

21   A.  I know I don't have to, but I just feel more comfortable

22   doing so with your permission.

23   Q.  Of course.  Do you see where lost consciousness is marked?

24   A.  I do, yes.

25   Q.  Doctor, I believe you testified before that my client's

899MFROT                    April - recross

1   pain was mild.  Is this correct?

2   A.  No, I didn't testify to that.  I testified that on these

3   records there is a circle around severity of the pain that says

4   mild.

5   Q.  Doctor, I will ask you to look at this record.  It's the

6   portion of the report from Cabrini Hospital.  It's on your

7   screen as well.

8   A.  You're going to have to identify who wrote it and under

9   what part of this examination it is, if you don't mind.

10  Q.  Doctor, this is Cabrini Medical Center comprehensive pain

11  management and this is part of the medical records of this

12  case.

13  A.  This is not the emergency room.

14  Q.  This is absolutely the emergency room.

15  A.  Then I don't see it at all on any records that I have or I

16  remember looking at.  So could you identify it in the body of

17  the chart?  Because I don't know who wrote it.  That's the

18  problem.

19  Q.  Doctor, does this refresh your recollection?

20  A.  No.  But, all right.  I see what you're looking at.  Thank

21  you.  Yes.

22  Q.  Could you tell us what is the patient's pain intensity

23  rating that you can see in front of you from zero to ten, ten

24  being the highest?

25  A.  Right here it says nine and on this other sheet it says

899MFROT                    April - recross

1    mild and I don't know who filled this out, but at the bottom of

2    the page there is an important statement, if you can just go

3    down to it.

4    Q.  Doctor, I want to thank you for your testimony.

5            THE COURT:  You're excused.  Thank you very much.

6            (Witness excused)

7            THE COURT:  Anything further from the defendant?

8            MR. COFFEY:  No.  The defendants rest.

9            THE COURT:  Ladies and gentlemen, we are going to give

10   you, having spent all this extra time with us tonight to make

11   sure that the experts all got one day rather than two days of

12   fees, we are going to give you until 11 to come in tomorrow so

13   that the lawyers and I can have what we call a charging

14   conference to work out what the charge should say.

15           And then when you come at 11, there will be first

16   summations and then the government in its largess will order

17   your lunch and pay for it.  And as soon as we are finished with

18   lunch we will have a charge on the law from me.  So need not

19   come in until 11.  Don't start salivating.  The food is not all

20   that great, but nonetheless, we will see you at 11:00.

21           Have a good evening, and thanks for being here this

22   late.  Do not discuss the case with anybody.  This is not your

23   case yet.

24           (Jury not present)

25           THE COURT:  I have put together from all your

1   appropriate charges and verdict sheets one that I'm continuing

2   to play with, but I will give it to you at 9:30 in the morning

3   and then we will go over it together.  I would give it to you

4   now, but I haven't gone over it myself.  But I have all of

5   yours.

6           Again, we are pretty much confined now under this

7   short time period to what I've gotten from you, but,

8   nonetheless, if you send us something this evening, we will at

9   least be able to look at it.  Do not bring it to the charging

10  conference because I guarantee you we will not be looking at it

11  there.

12          Good night.

13          MR. COFFEY:  Thank you, your Honor, for accommodating

14  the experts.

15          THE COURT:  That was probably a 2,000 or 3,000 dollar

16  deal.

17          MR. COFFEY:  Your Honor had mentioned we could put in

18  a motion for our fee for the subpoenaed --

19          THE COURT:  They have all been made and they have all

20  had decision reserved.

21          MR. COFFEY:  No.  That was this afternoon when your

22  Honor had mentioned about Mr. Platta had subpoenaed our expert

23  witness.  You said you would entertain a motion.

24          THE COURT:  For what?

25          MR. COFFEY:  For him to pay for the person that he

380

899MFROT

1   subpoenaed.

2          THE COURT:  You can tell me about that, if you'd like.

3          MR. COFFEY:  I would just make that motion because we

4   brought him here.

5          As he was about to rest he walked outside to serve the

6   plaintiff's expert with a subpoena, our expert with a subpoena.

7          THE COURT:  That sounds not so dumb to me.

8          MR. COFFEY:  We would request that he pay the expert

9   fee for today.

10         THE COURT:  I'm not that big an expert on expert fees,

11  but it seems to me that for the most part it was you who did

12  the preparing for this expert and you who essentially

13  contracted with him and you who will undoubtedly will be paying

14  him.

15         MR. COFFEY:  Thank you, your Honor.

16         THE COURT:  I'm not asking for any part of that.

17         Good night.  9:30 in the robing room, which is right

18  down that hall.  You'll have a personal escort.

19         (Adjourned to September 10, 2008, at 9:30 a.m.)

20

21

22

23

24

25

381

```
 1                        INDEX OF EXAMINATION

 2    Examination of:                           Page

 3    RANGA KRISHNA

 4    Direct By Mr. Platta . . . . . . . . . . .  134

 5    Cross By Mr. Coffey  . . . . . . . . . . .  162

 6    Redirect By Mr. Platta . . . . . . . . . .  176

 7    ADONNA FROMETA

 8    Direct By Mr. Platta . . . . . . . . . . .  180

 9    Cross By Mr. Miller  . . . . . . . . . . .  211

10    Redirect By Mr. Platta . . . . . . . . . .  237

11    Recross By Mr. Miller  . . . . . . . . . .  240

12    CHARLES KINCAID

13    Direct By Mr. Platta . . . . . . . . . . .  247

14    Cross By Mr. Coffey  . . . . . . . . . . .  268

15    Redirect By Mr. Platta . . . . . . . . . .  281

16    EDWARD CRANE

17    Direct By Mr. Platta . . . . . . . . . . .  285

18    Cross By Mr. Coffey  . . . . . . . . . . .  308

19    Redirect By Mr. Platta . . . . . . . . . .  319

20    ADONNA FROMETA

21    Direct By Mr. Platta . . . . . . . . . . .  328

22    LEWIS ROTHMAN

23    Direct By Mr. Coffey . . . . . . . . . . .  330

24    Cross By Mr. Platta  . . . . . . . . . . .  343

25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

382

1    ROBERT S. APRIL

2    Direct By Mr. Coffey . . . . . . . . . . .   351

3    Cross By Mr. Platta  . . . . . . . . . . .   361

4    Redirect By Mr. Coffey . . . . . . . . . .   374

5    Recross By Mr. Platta  . . . . . . . . . .   376

6                      PLAINTIFF EXHIBITS

7    Exhibit No.                          Received

8      9-12  . . . . . . . . . . . . . . . . . .   246

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25