89AMFROT

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    ADONNA FROMETA,

4
                      Plaintiff,
5
             v.                              07 CV 6372 (HB)
6
     MARIO E. DIAZ-DIAZ and
7    ALL AMERICAN HAULERS RECYCLING,

8                     Defendants.

9    ------------------------------x

10                                      New York, N.Y.
                                        September 10, 2008
11                                      9:45 a.m.

12
     Before:
13
                           HON. HAROLD BAER
14
                                        District Judge
15                                      - and a jury -

16
                             APPEARANCES
17
     SLAWEK W. PLATTA, PLLC
18        Attorneys for Plaintiff
     BY.  SLAWEK W. PLATTA
19
     WILSON ELSER MOSKOWITZ EDELMAN & DICKER LLP
20        Attorneys for Defendants
     BY:  STUART A. MILLER
21        MICHAEL W. COFFEY

22

23

24

25

                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

89AMFROT

```
 1              (Trial resumed; in the robing room)
 2              THE COURT:  Good morning, everybody.  Did we pass out
 3    the copies?
 4              THE LAW CLERK:  Not yet.  I was waiting for you.
 5              THE COURT:  We have both verdict sheets and our jury
 6    charge and the first 23 or 4 pages are all boilerplate.  These
 7    are just copied from my previous moments of charging.  I think
 8    probably you ought to look them over.  There is no reason why
 9    we can't change them.  I just don't think they are likely to be
10    changeable.  Did you find the previous requests?
11              THE LAW CLERK:  Yes, we have them.
12              THE COURT:  Just as a little additional information,
13    if in fact we get to that juncture after the charge, I am going
14    to mark all of your requests as court exhibits.  So don't
15    bother coming by and telling me how you have these 18, 20
16    objections because, in fact, there will be objections that you,
17    obviously didn't -- they are in your charges somewhere.
18              Go ahead, read these carefully.  I am going to get
19    some water which I only asked for ten minutes ago.
20              Where are you in terms of concerns?
21              MR. COFFEY:  I think the verdict sheet is fine.
22              THE COURT:  I didn't even know we gave that to you.
23    Anna has more faith in terms of movement.
24              MR. COFFEY:  As to the charges, we have no exceptions
25    to the charges.
```

1          MR. PLATTA:  Your Honor, I have asked that the verdict

2    sheet will actually be changed because my client has -- she has

3    actually spent over 50,000 -- in the no-fault coverage in this

4    case which is equivalent to basic economic loss.  Therefore, it

5    becomes a separate and distinct cause of action, not really

6    connected with the threshold question and proximate cause of

7    her injuries.  It's a separate cause of action that just

8    because of her passing the threshold of 50,000 bucks in the

9    no-fault, she is entitled to economic loss, regardless of

10   threshold.

11         THE COURT:  That's a decision I make.

12         MR. PLATTA:  Correct, Judge.

13         THE COURT:  We don't have to put it in the jury

14   charge.

15         MR. PLATTA:  I would just request it be done in a way

16   that the jury has the option to choose between the two causes

17   of action instead of deciding economic loss only after deciding

18   if this is a proximate cause of her injuries.  But basic

19   economic loss only goes to economic loss and it's a separate

20   cause of action unrelated to any of the proximate cause of the

21   injuries.

22         THE COURT:  I understand you.  I am not sure that

23   that's anything that I shouldn't be able to make a decision

24   about independently since we have -- it seems to me that's what

25   the statute suggests, so if there is some language that you

89AMFROT

1    gave us that I can look and see that I should give that to the

2    jury, I'll be glad to give it to the jury.  At the moment all I

3    know is that's something reserved for the Court.

4            MR. PLATTA:  That's correct, your Honor.  All I'm

5    trying to say is that I would appreciate if the jury be given

6    the option of choosing between the two because in this case --

7            THE COURT:  The option between the two.  Between the

8    $50,000 and whatever these -- whatever you've proven.

9            MR. PLATTA:  Between whatever I've proven because of

10   the 50,000.

11           THE COURT:  Over and above the 50,000, correct, if

12   that's how I come out?

13           MR. PLATTA:  Correct.  And then deciding whether it

14   was a threshold case or not because it's a separate and

15   distinct cause of action --

16           THE COURT:  Doesn't the threshold have to do with what

17   we have put down here in terms of what it is --

18           MR. COFFEY:  Yes.

19           MR. PLATTA:  No, your Honor.  It's a separate and

20   distinct cause of action for economic loss in this case.  And

21   because of my client spending over 50,000, she has met basic

22   economic loss pursuant to 5104 insurance statute of New York.

23           THE COURT:  I hope you have a charge like that.  I'll

24   be glad to look at it.

25           What do you have to say?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT

1          MR. COFFEY:  I believe your Honor has already said

2     it's a judicial determination and I think the jury verdict

3     sheet is appropriate, and I believe it goes to the central

4     issue and it is an appropriate verdict sheet.

5          THE COURT:  If you give me a charge, I'll be glad to

6     look at it, but you have to do it in the next hour.

7          MR. PLATTA:  Your Honor, there is no charge for that.

8     I checked that.  However --

9          THE COURT:  You have the statute, right?

10         MR. PLATTA:  The insurance statute states that once

11    you have the 51 -- once you spend the 50,000, that means you

12    met the basic economic loss.  That statute I can definitely

13    give you.  But there is no PJI charge that would actually

14    correlate that.  It's an economic loss.

15         THE COURT:  There is nothing you can give me, there is

16    nothing that's going to change.  That's what the lawyers are

17    supposed to do, is to provide me with requests.

18         MR. PLATTA:  Your Honor, at this point, what happens

19    is, the jury will be deciding the case twice; on the

20    threshold -- once for economic loss and second for the actual

21    threshold.  All I'm asking for is they will be deciding

22    threshold as a separate issue and they will decide economic

23    loss based on what was presented by the life care planner and

24    basically economic loss that was met and whatever expenses

25    Ms. Frometa incurred as a result of this accident.  If they

89AMFROT

1     will have to decide threshold first and go into basic economic

2     loss --

3               THE COURT:  Did you have a verdict sheet that did

4     that?

5               MR. PLATTA:  My proposed verdict sheet was actually

6     addressing that.

7               THE COURT:  Let's see it.  I'll read it so -- you must

8     have a copy of it.

9               MR. MILLER:  Is this the new one you sent to us

10    yesterday?

11              MR. PLATTA:  That's correct.

12              THE COURT:  It's No. 2 or 1 and 2?  1 is as a result

13    of the accident, has the plaintiff sustained a

14    medically-determined injury or impairment of a nonpermanent

15    nature?

16              MR. PLATTA:  The first questions are threshold

17    questions, but the difference between this jury verdict sheet

18    and mine is that after responding no to the threshold question

19    they still have to go to economic loss because it's a separate

20    cause of action.

21              THE COURT:  I understand you now.  I thought that my

22    decision was the threshold decision.

23              MR. PLATTA:  I'm sorry, Judge.  I don't understand.

24              THE COURT:  With respect to the $50,000, that's the

25    threshold decision, right?

89AMFROT

1             MR. PLATTA:  That's the basic economic loss.

2             THE COURT:  So far as I understand it, if the

3   threshold decision is my decision we don't have to give that to

4   the jury?

5             MR. PLATTA:  That's correct, your Honor.  You can do

6   whatever you wish.

7             THE COURT:  I'm here to learn just like you.

8             MR. PLATTA:  Absolutely.  I'm learning all the time

9   and from you the most of course.

10            THE COURT:  I am going to look at the insurance code

11   law, whatever they call it, and see if there is a distinction

12   that I can make.  I don't think there is a problem in terms of

13   making it.  I am not sure what you gain by it.

14            MR. PLATTA:  That, basically, this case has to be

15   decided on two grounds, on the threshold and on economic loss.

16            THE COURT:  One of us is not listening to the other.

17   I thought you agreed with me that with respect to the threshold

18   issue that was an issue that I decide, that's left for the

19   Court, not for the jury.  So if I've made that decision in your

20   favor, let us assume I made it in your favor, then that's not

21   left for the jury to do a second time.

22            MR. PLATTA:  That's correct.  In this situation,

23   you're absolutely right, your Honor.

24            THE COURT:  That helps us all.

25            Anything else?  There is a long decision here on pain

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

and suffering. I trust you've read it carefully -- a long charge. There are numbers that you really have to fill in are from Dr. Kincaid's thought, so we really can't charge the jury like this because it does give -- 29 is where we are or where I am, you apparently not. At the very bottom where it says plaintiff should fill in.

THE LAW CLERK: This information is in the life care plan that in your proposed jury instructions, Mr. Platta, you left a blank here.

MR. PLATTA: Yes.

THE COURT: I asked him that question or you did, but I don't remember the answer. And I gather you're not buying daily, so I can't even look at the transcript. So it's all you. Think about it, but you better give it to me before we pack it in. Not here, but when we go outside to sum up. Hopefully, you will know it and you will have given it to Anna or to me to fill in the blanks.

MR. PLATTA: Sure.

THE COURT: On the summations standpoint, I guess the defendant sums up first. What is it that you believe you will take in the way of time?

MR. MILLER: I'll probably take half hour to 40 minutes, your Honor.

THE COURT: What about the plaintiff?

MR. PLATTA: No more than that.

89AMFROT

1          THE COURT:  We are talking about an hour because that

2     will be just ducky if we can have them here for an hour, hour

3     and 15 minutes.  My 12:30 order to show cause will not be

4     interfered with.  That will be fine.  You are just going to

5     fill in the blanks, right?

6          MR. PLATTA:  That's correct.  Your Honor, I see that

7     the PJI charge 2:301 damages itemized in the verdict would not

8     be included.

9          THE COURT:  I think there may have been another blank.

10          THE LAW CLERK:  Page 30.  It's essentially the same.

11     It's the remaining number of years in her life.

12          THE COURT:  You can stay here and figure it out, but I

13     am going back to see what my desk -- if I can get behind my

14     desk after two trials in two weeks it's unlikely, but we will

15     make a stab at it.

16          We will see you at 11, gentlemen, in an hour.

17          I have something called the defendants' requests to

18     charge which I'm marking as Court Exhibit A.  What's the date?

19     9/10.  And the next one is defendants' proposed verdict form

20     and I'll mark Exhibit B.  And plaintiff's requested charge as

21     Court Exhibit C.  And proposed by plaintiff verdict sheet and

22     that will be Court Exhibit D.  I don't think we have anything

23     else.  If you've submitted anything else, I'll be glad to mark

24     it so you know that anything in here, should you go to a higher

25     authority, will be countenanced by that group of three.

89AMFROT

```
 1          MR. PLATTA:  Your Honor, I believe the only other
 2   thing that is left out are the letters that I put in the
 3   evidence regarding bad faith statement that I made yesterday,
 4   but they are in the courthouse and --
 5          THE COURT:  Do you have a copy of that?
 6          MR. PLATTA:  Yes.  I can bring that in.
 7          THE COURT:  Give me it.
 8          MR. MILLER:  I'll explain --
 9          THE COURT:  We will mark it as Court Exhibit E.
10          MR. MILLER:  Your Honor, one other issue that Mr.
11   Platta and I discussed -- we resolved 99.9 percent of it -- is
12   the employment records.  On the airlines -- rather, on Rick's
13   Cabaret, we have agreed not to give the jury the dancer
14   guidelines but rather the only thing we are giving them is the
15   entertainer charge summaries redacted, if we could just
16   photocopy it and have the amount paid and running totals taken
17   off since it's not in their sight because there is no lost
18   earning claim.
19          And with that, as well, what I want to submit that
20   Mr. Platta is objecting to -- and he can tell you his own
21   objection -- is the general application information form.  It
22   just lists her name and her address and her pedigree.  The
23   reason, which I questioned her about, is her past work history
24   and what she has done and it lists on it where she has worked,
25   which was not the same as what she listed with her other
```

89AMFROT

1    employer, the airlines, and it goes directly to the credibility

2    issues, which is an essential part of our case.

3           THE COURT:  I think we talked about that and it was

4    admitted over objection, at least the testimony was.  I don't

5    know if I ever saw any of your pieces of paper.

6           MR. MILLER:  We took out everything to do --

7           THE COURT:  You don't get on your knees.

8           MR. MILLER:  All of that is gone.  We were never

9    planning to put it in.  This is the only document, your Honor.

10          THE COURT:  Do you have a concern with this?

11          MR. PLATTA:  That's correct.  The last three lines of

12   the document, beside giving personal information to the jury,

13   beside giving social security number, which is privileged,

14   beside giving history, which is actually prejudicial and that's

15   why defendants are looking for that, the history is only

16   talking about her experience as a dancer.  And that is in no

17   way related to the case because it's in prior years, it has

18   nothing to do, it could only be prejudicial and create a

19   question to the jury as to kind the work my client is doing.

20          MR. MILLER:  Your Honor, our position is it's

21   extremely relevant, it's directly on point.  In her application

22   for the airlines she wrote down, Cohen's Optical, Economy Best,

23   private airlines, MGM Mirage.  She has testified that she had a

24   history of dancing.  We never made her dancing a central issue.

25   What we have made an issue throughout the case is her

1    credibility, and she made a misrepresentation on her employment

2    form and that's why we are looking to submit it.

3           If Mr. Platta want to redact her social security

4    number that's written throughout all the medical records, I'd

5    be happy to do it.  If he wants us to redact and put 1, 2, 3,

6    Mary Jane Lane for the address, I'd be happy to that as well.

7           MR. PLATTA:  Your Honor, the reason why I want this

8    not to be presented to the jury is because this is an

9    application for Rick's Cabaret, for the gentleman's club.

10          THE COURT:  With Rick's New York City Entertainer name

11   on it?

12          MR. PLATTA:  Correct.  That is an application for

13   employment as a dancer.  That's why she lists the history as a

14   dancer.  Putting in front of the jury these two documents and

15   saying she's untruthful is not only unfair; it's prejudicial.

16          THE COURT:  What is Scores?

17          MR. MILLER:  I don't know, your Honor.  I have never

18   been there or heard about it.  However, I have come to

19   understand from the New York Post that there are a lot of tax

20   issues in that facility and, as I have done some site

21   inspections on a tax matter.

22          Your Honor, our position is, throughout the case, the

23   jury knows she is an adult entertainer.  Plaintiff's counsel

24   has stated it in jury selection.  We have never discussed it.

25   We never made it a central theme in our case.  In fact, we

89AMFROT

```
 1    don't care that she is a dancer.  What we care about is that
 2    that information is in direct contrast with the information
 3    that she provided in her application of her employment with
 4    Excel Aire.
 5          THE COURT:  Why can't we just say, stipulate to the
 6    fact, we agree that she had different employment than is on the
 7    employment application that's in evidence.
 8          MR. MILLER:  If your Honor would like to read that to
 9    the jury during the charge, I'm okay with that.
10          MR. PLATTA:  Your Honor, the problem with that is
11    this.  This is an application for a dancer.  This is an
12    application for a flight attendant.  If she would be putting
13    her experience as a dancer into her application for flight
14    attendant, she would never be hired.  If she would be putting
15    the experience of a flight attendant into the dancer
16    application, she wouldn't be hired as well.  These are two
17    separate jobs, two separate positions.
18          THE COURT:  All the defendant is trying to show is
19    that in one place she applied saying her experience was X and
20    in another place she applied and said her experience was Y.
21    Now, whether or not you're supposed to mold your experience in
22    the job you're looking for, or you're supposed to simply repeat
23    what's honest as a question that they would like the jury to
24    have in front of them.
25          MR. PLATTA:  Your Honor, I don't think it's a question
```

89AMFROT

1    of honesty because you have three lines here and you have three

2    lines here.  You have to list the most relevant experience to

3    the position that you're applying for and not every single --

4            THE COURT:  I don't understand the most relevant.  You

5    don't think she could have fit American Airlines on these three

6    lines?

7            MR. PLATTA:  I don't think they would be even relevant

8    to her work history for a club.

9            MR. MILLER:  Your Honor, Mr. Platta just made a major

10   misrepresentation.  They don't list three or four lines just to

11   pick and choose what you want.  The employment application,

12   which she filled out the day after the accident, where she

13   certifies, I certify the facts contained in this application

14   are true and it goes on, under former employers, it says:  List

15   below last four employers.  Those are the last four employers

16   on that application with Rick's.  The employers that she lists

17   on her airlines application go back to 1988.

18           MR. PLATTA:  Airline, counselor, not clubs.

19           MR. MILLER:  Employers.  Doesn't say, only list the

20   relevant employers that you think that we want to hear about

21   and remember you're certifying that you're certifying this is

22   true to the best of your knowledge.

23           MR. PLATTA:  Counselor, it's actually an application

24   for a flight attendant position.

25           MR. MILLER:  Cohen's Optical is something --

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT

```
 1        THE COURT:  My concern really is whether or not these
 2   are the last -- they are only looking for the last employers,
 3   generally.  Here, it just says dance experience.  Maybe that
 4   saves you.
 5        MR. MILLER:  No.  But, your Honor, the application
 6   with Excel Aire says the last four employers and that's a lie.
 7   The last four employers are not Cohen Optical.  It's Rick's,
 8   which is not even mentioned on there.  It's the other dance
 9   places where she was dancing.
10        MR. PLATTA:  Your Honor, it's clear that the
11   defendants want to pressure the jury just by showing them that
12   the relevant experience to the position that she is applying
13   for is something that is untruthful in accordance to what they
14   say right now.  It will only prejudice the jury, will not bring
15   any probative value to the case.
16        THE COURT:  As far as I'm concerned, where they ask
17   for the last four employers, if, in fact, one of them was
18   Rick's New York City Entertainer, whenever the last four from
19   2/16/07, which is the date she filled this out, then why
20   wouldn't it be fair to let the defendant show that she really
21   was working at Rick's and not Cohen's Fashion during -- with
22   respect to the last four employees or four employers?
23        MR. PLATTA:  Your Honor, I understand it would be fair
24   to show the jury my client's résumé listing all her positions
25   and places where she worked, but picking and choosing the
```

1    application for employment as an airline flight attendant and

2    expecting to have their position as an entertainer dancer would

3    be as much unlikely as me applying for a position of a lawyer

4    with another firm and telling them that I have experience as a

5    teacher.  I wouldn't be hired for this position if that would

6    be the situation.  It's just going to confuse the jury and the

7    defendants know that very well and that's why they are asking

8    for this right now.

9           MR. MILLER:  Mr. Platta, we concede, we stipulate she

10   is a dancer.  I don't care if it says that she worked at a shoe

11   store.  I don't care if it says she worked as a cafeteria

12   worker.  What it shows is she lied on her application that says

13   list your last four former employers.  Her last four former

14   employers are other establishments.  Cohen Optical goes back 20

15   years ago, 1988.

16          MR. PLATTA:  First of all, not employees, but

17   employers.  Second of all, I will repeat myself.  It's an

18   application for a flight attendant position.  Say you would be

19   applying for a job as a lawyer, you are not going to list that

20   you were a teacher.

21          MR. MILLER:  Does not say the last four.

22          MR. PLATTA:  What would you put yourself on the

23   application for a lawyer position?

24          MR. MILLER:  I have nothing else to say, your Honor.

25          MR. PLATTA:  You were working at a bookstore.  You

89AMFROT

1   would list relevant experience -- employer's experience.

2          THE COURT:  I will allow you not to put this in but to

3   tell the jury that in another application for employment she

4   listed different employers.

5          MR. MILLER:  Can your Honor tell them as well on the

6   charge?

7          MR. PLATTA:  I'm objecting to that.

8          MR. MILLER:  Why?

9          MR. PLATTA:  The judge already told you.  If you want

10  to do that, do that.

11         MR. MILLER:  I'm making an application, but thank you

12  for ruling on it, Judge Platta.

13         THE COURT:  You can do it.  I'm not doing it for you.

14  Different employers were on another -- were on the application

15  for Rick's.

16         MR. MILLER:  For the Excel Aire.

17         THE COURT:  Were on the application.

18         MR. MILLER:  Application which you are not going to be

19  able to have an opportunity to see, correct?

20         THE COURT:  I don't think I'd add that.

21         MR. MILLER:  They are not going to able to see it.  I

22  want them to know that I'm not misrepresenting it.

23         THE COURT:  He's not going to argue with you, so

24  you're not misrepresenting anything.

25         MR. MILLER:  I am not sure what he's going to argue or

89AMFROT

1   not.

2           THE COURT:  If he argues anything about it, he is

3   simply going to say, indeed, the difference were in fact

4   because of the nature of the employment.

5           MR. PLATTA:  Correct.

6           THE COURT:  Everybody gets a chance, but it's not

7   coming in.  If you want the rest of it in, you can just cut out

8   the bottom four lines.

9           MR. MILLER:  Your Honor, may I make another

10  application.  I would request that we redact the names of these

11  three locations and write something that we agree upon that

12  indicates it's something different than what's on this

13  application.

14          MR. PLATTA:  I object to that.

15          MR. MILLER:  By court stipulation.  By court

16  stipulation this is a different employer than the one on Excel

17  Aire -- on Rick's Cabaret.

18          THE COURT:  We are not writing anything.  You can

19  argue that there is a difference between the employment

20  applications in evidence and another employment application

21  that for different reasons the Court kept out.

22          MR. MILLER:  Okay.

23          THE COURT:  He can say what he --

24          MR. MILLER:  We can say the Court kept it out.  Thank

25  you, your Honor.

89AMFROT

```
 1            THE COURT:  Anything else?

 2            MR. COFFEY:  Thank you, Judge.

 3            THE COURT:  See you in an hour or less now.

 4            MR. PLATTA:  Your Honor, do you want me to e-mail to

 5   your law clerk the research that I did on the 5104, paragraph

 6   5104 of the insurance regarding the economic loss?

 7            THE COURT:  I thought we agreed the way it works --

 8            MR. PLATTA:  The jury is not going to get the charges

 9   for threshold --

10            THE COURT:  It's over for threshold.  I am going to

11   decide in your favor for threshold.  It's not easy for me to do

12   that, but I can tell you in this instance not to worry.

13            MR. PLATTA:  Thank you, your Honor.

14            THE COURT:  I think we are finished now.  I thought we

15   finished 20 minutes ago.

16            (Recess)

17            THE COURT:  Gentlemen, I've written out what I expect

18   to hear and no more on the issue that we discussed, so I'm

19   cutting it in half so that once you've read both, the plaintiff

20   will get the plaintiff's and the defendant will get the

21   defendants'.  Let them see it all.

22            MR. MILLER:  Thank you, your Honor.

23            THE COURT:  That's what I expect to hear, but you

24   don't have to do it verbatim.  They have gotten my message.

25            MR. PLATTA:  Your Honor, I respectfully ask to note my
```

89AMFROT

1    exception to the jury verdict sheet regarding the proximate

2    cause combined --

3           THE COURT:  I thought we already agreed that that was

4    okay.  We got to stay on the same table or line or whatever you

5    call it.  Be my guest.

6           MR. PLATTA:  Thank you, your Honor.

7           THE COURT:  The record will reflect that you were

8    approving of both the charge and the verdict sheet.  And should

9    you go to a higher authority they will make sense out of all of

10   your wanderings.

11          Go ahead, bring them in.

12          (Jury present)

13          THE COURT:  Ladies and gentlemen, we are approaching

14   the end of this saga and the way we are going to do it is that

15   the parties will sum up now, the defendant first.

16          I trust Dennis has taken your lunch orders and in fact

17   once you have heard the summations you will have lunch and then

18   you'll come back and we will have a charge on the law, and then

19   the case will be yours.

20          THE DEPUTY CLERK:  I don't have their orders.  It will

21   be quick.  I can get it done quickly, no problem.

22          THE COURT:  What do you mean, it's no problem?  I have

23   a 12:30 order to show cause.

24          THE DEPUTY CLERK:  It will be done.

25          THE COURT:  The defendant sums up first.  We are ready

89AMFROT

1    to hear you if you're ready to talk to us.

2              MR. MILLER:  Thank you, your Honor.

3              Good morning, ladies and gentlemen of the jury.  It's

4    been a long two, two and a half days and I want to thank you

5    for being here and being patient and hearing all the testimony.

6    This is the opportunity that we told you about at the beginning

7    of the trial, the opportunity for us to speak to you again

8    directly and to tell you what we think and discuss what you

9    heard.  So I promise you I am going to try to be no more than

10   30 minutes.  But I just want to touch, highlight some of the

11   testimony you heard and some of the stuff that you didn't hear.

12             What did you see and what did you hear?  You heard

13   about prior motor vehicle accidents.  Plaintiff told you that

14   she had a 2001 accident in Los Angeles.  She told you that the

15   ambulance came and that police came.  She also told you she was

16   involved in a chain reaction in 2004, very little details

17   provided.  Not really sure why.  For that you have to ask team

18   Platta.  Subsequent motor vehicle accidents that you heard

19   about, we heard about a March 8 accident of 2007.  You also

20   heard about a March 16 that were confirmed in records from

21   Rick's Cabaret where she was employed.  Rick's Cabaret is not a

22   party to this action.  They are not an interested party.  They

23   are a nonparty.  They have employment records.

24             What do the employment records say?  What did they

25   show?  You're going to have these records when you go back into

89AMFROT                    Summation - Mr. Miller

1    the jury room to deliberate, and I proffer to you that those

2    records are an incredible piece of evidence.  Why is it so

3    credible and incredible?  Because it shows a March 16 accident.

4    Also, interesting, you heard about the March 8 accident.  Was

5    she in an accident, was she not in an accident, was it a rental

6    car?  You have to decide credibility, whether people are

7    telling you the truth.

8            I'll tell you this.  When you look at Rick's records,

9    when you go in there, you are going to see that she didn't work

10   on March 8.  You are also going to see she didn't work on March

11   16, two very important days, two very important reasons.  I

12   submit to you the reason she didn't go to work, she was in a

13   car accident on both days.  March 8, very important day, two

14   days before her MRI and two days -- four days before her

15   x-rays.

16           Medical records.  No mention of these five motor

17   vehicle accidents anywhere?  Anywhere?  Ask team Platta why

18   they did not tell the medical providers about it.  I cannot

19   give you an answer.  We received testimony from every medical

20   witness about the importance of history, taking a history.  Dr.

21   Davy, their expert, Dr. Davy stated that he believes that

22   history gives you, as he coined the phrase from a former

23   colleague of his, that gives you 90 to 98 percent of your

24   diagnosis and I quote:

25   "Q.  Do you understand if someone is not forthright in the

405

89AMFROT                      Summation - Mr. Miller

 1    history and there could be other intervening or succeeding or

 2    preceding or any other type of event, that that could change

 3    causation?

 4    "A.  I think it can cause.  It can change your differential in

 5    your investigational studies.  Then the results of those

 6    certainly can change the causality of what you're looking at."

 7              Ask team Platta why these histories were not complete.

 8    We also saw testimony from Dr. Crane who said there was a

 9    preexisting degenerative condition that was corroborated by her

10    own doctors.  Her own doctors sat in that chair and said she

11    had a degenerative spur that has been caused by past trauma.  I

12    submit to you that her injuries were caused in combination of

13    past auto accidents, maybe it was caused by her figure skating,

14    jumping, as she said.  She was a class A figure skater, jumps

15    and spinning in the air, hitting the hard ice.  Maybe it was

16    caused by her snow skiing, the double black diamond as she went

17    30 to 40 times a year out to Colorado or out in the Midwest, as

18    she put it.  Her doctor testified that the body slowly breaks

19    down as it wears and tears.  I submit to you that her athletic

20    and occupational lifestyle has accelerated her wear and tear,

21    not this accident.

22              Plaintiff's counsel is going to tell you that

23    Dr. Crane never looked at an MRI film.  He didn't.  Ironic

24    because her own treating doctor, Dr. Davy, sat in that chair,

25    told you he did a surgical procedure, but he never looked at a

89AMFROT                    Summation - Mr. Miller

1    film.  He went in there and never looked at a film.

2    Nonetheless, Dr. Crane relied upon the only neuroradiologist to

3    take the stand, only one.  I did not see plaintiff's

4    radiologist or neuroradiologist testify.  I don't know why.

5    What would they have said if they stood on the stand?  Why did

6    they call him?  You draw the conclusions you want to draw as to

7    why they didn't have a radiologist.  Ask team Platta.

8           We saw a motor vehicle after its impact with the large

9    garbage truck.  You heard testimony that it's 40,000 pounds

10   with waste.  Use your own common sense.  We talked about at the

11   very beginning, your own common sense.  Garbage trucks strikes

12   a vehicle and there is an atomic bomb explosion on the rear

13   side quarter panel causing such nuclear damage.  I don't know,

14   but that car still drives today.  It was a rear-end collision

15   with body damage.  You draw your own opinion as to how

16   significant that body damage was.  Good enough to drive, no

17   airbag deployment.  40,000 pound truck slides into you and

18   that's all the damage it did.  I submit to you, it wasn't a

19   significant hit.

20          It was so insignificant she went back to work.  She

21   went back to work.  It's not that she took a week off or two

22   weeks off.  This accident, I remind you, happened February 14

23   at 4:30 a.m. in the morning.  February 14, 4:30 a.m. in the

24   morning.  She went to the emergency room.  You'll see the

25   emergency room records, and you'll draw conclusions that she

89AMFROT                    Summation - Mr. Miller

1   left the emergency room some time around noon.  She ends up in
2   Colorado on 4 a.m. flight coming back to New York on the 16th.
3   I don't know if space aliens lifted her up or how she got to
4   New York after her accident on the 14th, but she made it to
5   Colorado by the 16th.  She was traveling.  I submit to you she
6   was traveling on the 15th on a four and a half to five hour
7   flight out to Colorado.  Her testimony that she was home stiff
8   is not credible.  It's just not credible.
9           I don't know how she got there.  Ask team Platta.
10  Does that sound like the activities of someone involved in an
11  atomic explosion, going out to Colorado to fly three legs of a
12  trip?  You'll see the records, you'll look at it.  She flew
13  three legs, actually four.  If you count the leg to go out
14  there and then the leg from Colorado all the way back to Islip,
15  Long Island, from Islip back to White Plains, and from White
16  Plains, I want to say, back to Colorado again.  Yes, back to
17  Rifle, Colorado.  Colorado Springs to Islip, three hours, 18
18  minutes, the records will show you; Islip to White Plains,
19  another hour and 24 minutes.  This does not include the time
20  that the plane is on the ground.  White Plains to Rifle,
21  another four hours and 42 minutes, all on the same day,
22  February 16.  Amazing.  Guess what?  February 17 she was back
23  at Rick's working.  She never stopped.  We will talk a little
24  bit more about her employment and her work records in a moment.
25          I want to point out -- maybe we will go right now to

408

89AMFROT                    Summation - Mr. Miller

1    her work records.  It's important.  You're going to see these

2    documents in the jury room.  I ask you, Mr. Diaz asks you to

3    look at these records carefully.  These are the critical

4    records.  These are the records that show that Mr. Diaz is not

5    the proximate cause of her injuries.  I didn't make these

6    records.  Plaintiff's counsel didn't make these records.  These

7    are standalone documents that were taken by employers who are

8    not parties to this action.  You are going to have to look and

9    read these carefully.  You are going to have to look at them

10   more than once or twice, so take a little bit of time.  I am

11   going to walk you through just a little bit to give you the

12   flavor.  But you will see, for example, you'll see 2/13 at

13   11:03 in the evening, that's nighttime, she started and there

14   is no punchout.  No one testified to a punchout.  That's the

15   beginning of the shift.

16          The accident happened at 4:30, which would be the

17   following day on the 14th.  We know what happened on the 14th.

18   Next thing we know is that on the 15th, it's my position she

19   went to Rifle, Colorado Springs.  It's my position that after

20   flying three legs she made it back to New York on the 17th.

21   She had to make it back to New York on the 17th.  If you look

22   at the records, you are going to see she probably flew back on

23   the 17th, so five legs in two days, five legs in two days.  She

24   ended her trip in Rifle, Colorado and she took off at 8:22 p.m.

25   from White Plains.  She is in four plus hours, 17th she had to

89AMFROT                    Summation - Mr. Miller

1    fly back.  She worked on the 17th.  She flew and worked on the

2    same day.

3            Then you are going to take a look at the 18th and

4    19th.  You are going to look at the flight log.  Flight log is

5    a little different to look at and you are going to have to take

6    a careful look at it because you will see the departure codes,

7    the arrivals, those are the different airlines and the times,

8    and I'll show you.  Take a careful look on the 16th.  It says,

9    KISP, KHPN.  What you are going to find out is that -- on the

10   19th, rather.  16th we have already talked about.  19th it says

11   KPBI and then it says KASE.  That's the 19th.  And you will

12   look and you'll see times.

13           What it's going to show you is she went to West Palm

14   Beach, Florida, departed 3:32 p.m. and she was flying to Aspen,

15   Colorado, going back to Colorado for another four hours and 48

16   minutes.  Wait, folks, there is more.  That's February 19.  Her

17   trip started in Florida.  How does she get to Florida?  If the

18   trip started in Florida, she had to fly there.  And she worked

19   the night before of the 17th, so she had to fly out on the

20   18th, maybe the 19th.

21           It also shows on the record here that on February 20,

22   at 9:15 p.m., she flew to Lincoln, Nebraska, one hour and 30

23   minutes.  February 20, you'll see that she went to Lincoln,

24   Nebraska at 11:39 p.m., back to White Plains for two hours and

25   36 minutes.  And then she went on February 21, it says early in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT                    Summation - Mr. Miller

1   the morning, White Plains.  She flew back to Islip.  That is on

2   the 21st.  That is almost five hours plus an hour and a half,

3   plus two and a half hours.  I'm not Archimedes.  I'm not the

4   best mathematician.  But I will tell you that nine hours of

5   flight -- ten hours of flight all in that 24-hour period.

6          Guess what, folks.  On the 22nd -- go back to Rick's.

7   On the 22nd, she made it back to work.  There we go.  She made

8   it back to work.  Now, the accident happened on the 14th.  I

9   submit to you she worked on the 15th, she worked on the 16th,

10  she worked on the 17th, she had to fly on the 18th, she worked

11  on the 19th, she worked on the 20th, she worked the 21st, and

12  she worked the 22nd.  She worked the 23rd, she worked the 27th,

13  she worked the 28th, she worked the 7th.  Oh, wait.  Do you

14  notice what you don't see?  You don't see March 8.  Why don't

15  you see March 8?  Because she had another accident.  She had

16  another accident.

17          MR. PLATTA:  Objection.

18          THE COURT:  Overruled.

19          MR. MILLER:  Take a look.  I am going to show you what

20  else you don't see.  You don't see March 10 and 12.  Why?

21  X-rays and MRIs.  Next day is March 15, March 17.  Wait a

22  minute.  Do you see March 16?  I don't see March 16 either.

23  Why is that missing?  If you look up to March 29, there is an

24  adjustment made.  Why?  Because it says, no fee, 3/16, in a car

25  accident, a car accident that she says didn't happen or she

89AMFROT                    Summation - Mr. Miller

1    said, counselor, if you say so.  I submit to you I say so.

2            Why would they have that in her records?  Either she

3    is not telling them the truth or she is not telling you the

4    truth.  I tell you, it doesn't pass a smell test.  These

5    records are for you to review and I'm not going to belabor

6    them, but they are very important.  You will see that it goes

7    March 20, March 23, March 24, March 28, March 29, March 30,

8    April 2.  April 9 is when she met Dr. Babu for team Platta.

9    April 12, April 14, April 17, April 18 was her last day of

10   work.  April 18.  Guess what happened on the 20th.  April 20

11   she met Dr. Davy, she never went back to work.  She never went

12   back to work.  That was it, over.  May 19, she had her surgery

13   by Dr. Babu for the lawsuit which was filed or filled out on

14   May 31.

15           You saw MRIs and x-rays taken immediately after the

16   March 8 accident.  The only radiologist that you heard from

17   testify, Dr. Rothman, what did he say?  He said these x-rays

18   and MRIs show a small cervical herniation and a small lumbar

19   herniation that were not impinging on the spine and were not

20   cause objective findings of pain.  What did their radiologist

21   tell you?  Silence is deafening because him or her didn't take

22   the stand.  Could have called him, never did.

23           What else did Dr. Rothman, with the wonderful

24   credentials of 35 plus years, tell you as a neuroradiologist

25   specialist?  He told you that the T2 sequence at L5-S1 is dark

89AMFROT                    Summation - Mr. Miller

1    in color, which is textbook indicative of an old herniation.

2    It's not new, folks.  This is a preexisting result.  There is

3    subsequent trauma.  There is March 8 or subsequent trauma as

4    March 16, or there is another accident she testified to on July

5    29, I think was the date, of '07.  A lot of other causes.  I'll

6    tell you what wasn't the cause.  Mr. Diaz was not the proximate

7    cause of her injuries.

8         You saw a lot of fancy artwork.  Do not be fooled by

9    the smoke and mirrors.  You're smarter than that.  Testimony,

10   credibility and the actual films; not the artistic depictions,

11   the actual films.  And the testimony and the credibility of the

12   witnesses, that's what you should decide upon.

13        You did not hear from the sketch artist and you did

14   not hear at all with any radiologist disagreeing with

15   Dr. Rothman.

16        Who else did we not hear from?  We did not hear from

17   Dr. Villafuerte, did not hear from Dr. Kaisman.  Where are

18   these doctors?  These are the first two doctors she saw nine

19   days, ten days, 12 days after the accident.  He didn't put them

20   on the stand.  I can't explain to you why he didn't.  I'll tell

21   you this.  Team Platta has a lot of explaining to do.

22        Talked to you about independent documents before,

23   talked about these employment records, talked about the airline

24   records.  What other independent documents do we have?  We have

25   an ambulance call report.  What did that call report say?  It

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

413

89AMFROT                    Summation - Mr. Miller

1    said, no LOC, no loss of consciousness.  That's contrary to

2    what she told you.  It's also different than what she told her

3    treating doctors after this photograph taken with tape measure

4    by God knows who took those photos.

5         The ambulance call report also said she is alert,

6    oriented times three.  She walked to the ambulance.  She got up

7    and walked to the ambulance.  Why is this significant?  It's

8    not my witnesses telling you this.  Certainly his witnesses

9    aren't telling you this.  The document speaks for itself.

10        Whose observations are you going to give more

11   credibility to, the EMT, who has absolutely no vested interest

12   in this case, who goes to the scene contemporaneously and

13   renders emergency first aid.  Ask team Platta why he didn't

14   call the EMTs.  Why didn't he put them in the box.  I'll tell

15   you why he didn't.  Because he didn't want you to hear what

16   they had to say.  They come, they sit down in their EMT uniform

17   and all their badges and stuff, and they say, I've been doing

18   this for years.  What else are they going to say?  They are

19   going to testify according to their report.  He didn't do it.

20   He didn't put them on the stand.  He didn't call the police

21   officers.  You look at the police report when you're back

22   there, take a look.  Ask team Platta why he didn't call the

23   police officers.  There is only one reason, he doesn't want you

24   to hear what they have to say.

25        She left the hospital room after the emergency room

414

89AMFROT                    Summation - Mr. Miller

1    visit.  After a 40,000 pound truck hit her, she left the

2    emergency room, walked out at noon.  She wasn't admitted to the

3    hospital.  Then she got on a flight.  Some atomic bomb, boom.

4    Some atomic bomb.

5            THE COURT:  Can you keep a little lower voice?

6            MR. MILLER:  Sure.

7            MR. PLATTA:  Thank you, your Honor.

8            MR. MILLER:  Sure, your Honor.

9            Let's take a look at team Platta.  Let's take a look

10   at this.  Think about this.  We saw that Dr. Krishna

11   introduced -- this is going to take me a second.  We saw Dr.

12   Krishna introduce Mr. Platta to Dr. Davy at a Christmas party.

13   Okay.  And he said, and I quote, this is a new young attorney

14   that we work with, work with.  They work with him.  Let's see

15   if I get this team roster correct.  Dr. Davy leases space from

16   Dr. Krishna, Dr. Krishna refers Dr. Davy over 100 patients a

17   year.  And Dr. Babu meets with patients in Dr. Kaisman's office

18   and Dr. Kaisman is the doctor that wouldn't testify here, is

19   not here.  Dr. Krishna refers to Dr. Babu and let's him use his

20   office to meet with them, but doesn't keep his own file.  And

21   let's not forget Dr. Krishna, the one with the physical therapy

22   where she receives her physical therapy, and the chiropractor,

23   they are all in the same building.  What a team.  What a team.

24   Dr. Babu testified, and I quote, so I'm the final.  I'm the

25   final guy.

89AMFROT                    Summation - Mr. Miller

1          Script was written, the dye was cast on April 9, which

2     was 54 days after this accident.  After one consultation in Dr.

3     Krishna's office, Dr. Babu says she needs surgery.  She never

4     saw him again.  The next time she saw him, she was on the

5     table.  This is three months.  So much for conservative

6     treatment.  You heard him, he's a conservative doctor,

7     conservative treatment.  Do you remember these questions,

8     folks.  These were asked to Dr. Babu about second opinion:

9     "Q.  Did you recommend at any time another surgical opinion?

10    "A.  No, sir.

11    "Q.  Why is that?"

12         Back surgery we are talking about, folks.

13         Why is that?

14         Well, I'm of the opinion, because if somebody comes to

15    me, I don't tell them unless I don't know what I'm dealing

16    with, unless I don't know what I'm dealing with.  Otherwise,

17    folks, he's a doctor, a vital doc.

18         We learned that Dr. Davy performed a surgical

19    procedure that is not accepted in the medical community.  We

20    heard that from Dr. Crane, who spent nearly 40 years at Lenox

21    Hill Hospital and said that the nine doctors there that do

22    these type of interventions would love to have something that

23    would work, such as a striker device.  We are talking about a

24    device that is not accepted.  You didn't hear Dr. Babu give any

25    credence to that surgery.  Dr. Babu says -- or procedure.  It's

416

 1   a 12-minute procedure under local anesthesia, if you so choose.

 2          Dr. Babu never talked about it or gave it credence.

 3   Why?  It's not generally accepted, I offer to you, in the

 4   medical community.  Dr. Crane said, they would love to have a

 5   procedure that worked so well, but it doesn't, the striker

 6   method.  Dr. Davy, who did this procedure, who is not a

 7   surgeon, who is an anesthesiologist, does this procedure

 8   without ever looking at films and tells you that his training,

 9   his training on this device was for one or two days some time

10   in Boston.  It's important.  Dr. Davy does this procedure.

11          If you look at the records in December, Christmas is

12   in December.  Team Platta met with Dr. Davy in December at the

13   Christmas party.  A week or two later, guess what?  Dr. Davy

14   was doing this procedure on Ms. Frometa.  They met.  They are

15   part of the team.  They work together.

16          I think the one thing that all of the doctors that

17   came in here -- I know you heard from a litany of them.  They

18   all agreed on a couple of basic principles.  They all agreed,

19   and they couldn't refute, that 90 to 95 percent of all

20   herniations will either reduce in size or go away within one

21   year, one year.  New England Medical Journal.  One year.  Yet,

22   we received testimony from doctors who disregarded this and

23   went with the conservative treatment where they proceed to the

24   operating room within three months.

25          We received testimony from Dr. Babu who said -- he

89AMFROT                    Summation - Mr. Miller

1    said, there is no need for further surgery.  Yet, Dr. Davy does

2    this procedure.  We received testimony from Dr. Babu, who

3    performed the surgery, that she doesn't need much medical care

4    or health care or toilet seats or grabbers or reachers.  They

5    filled out the form.  You'll have the form back there.  I don't

6    want to belabor.  You'll look at what Dr. Kincaid or Mr.

7    Kincaid had.  Dr. Kincaid sent him a form and Dr. Babu's office

8    filled it out and said, if you want to do physical therapy four

9    times for the year, go ahead.  By no means did Dr. Kincaid,

10   Mr. Kincaid, give that any consideration.

11          We received testimony from Dr. Crane that this

12   accident was not the cause of these injuries and that plaintiff

13   had significant unrelated preexisting degenerative disease,

14   degenerative changes.  We received testimony from Dr. Rothman

15   that the motor vehicle accident is not the cause of these

16   injuries and that the plaintiff had significant, unrelated

17   preexisting degenerative changes.

18          We received testimony from Dr. April that the life

19   care plan relied upon -- relied upon erroneous numbers.  Think

20   about it, folks.  The building is only as strong as its

21   foundation, garbage in, garbage out.  Dr. Babu told you that

22   this stuff wasn't necessary.  We talked about -- I think Dr.

23   Babu, if you add up the numbers, he said we received -- he said

24   after looking at the questionnaire and talking to us and

25   talking to us and said it was about $5,000 in the first year of

89AMFROT                    Summation - Mr. Miller

1     treatment.

2          You heard from Dr. Kincaid.  What did Dr. Kincaid say

3     when you look at the numbers?  First he said that you need an

4     economist to understand them.  You need an economist for

5     present value and you need to figure this all out and put in

6     the present value in our discounts and find out what fee

7     schedules are, because there are fee schedules but, yet, team

8     Platta, do they give you an economist?  You didn't see an

9     economist on that stand at all.  There is no economist

10    testifying.  Certainly, Mr. Kincaid is not qualified.

11         What did Mr. Kincaid do with these numbers?  Mr.

12    Kincaid thought about Dr. Babu.  He said he gave it

13    consideration.  So what kind of consideration?  He didn't give

14    it a footnote in his report.  The neurosurgeon, NYU, did the

15    surgery that is not even given consideration in the report, not

16    even a footnote.  What he die was, he considered it addition by

17    subtraction of Dr. Babu since he did not agree with his

18    conclusions.  That's what he did, addition by subtraction.

19         We saw Mr. Kincaid, who was hired on the eve of the

20    original trial date, that, folks, she needs to go to the gym,

21    $18,000 a year with a personal trainer.  A gym -- I would like

22    to go to a gym for $18,000 a year, personal trainer.  How does

23    he come to know his numbers, his conclusions?  He comes with it

24    by -- I think it's 52, 53, 54.  You can do the numbers.  By

25    calling randomly, treating -- other facilities in the New York

419

89AMFROT                    Summation - Mr. Miller

1    City, Manhattan area, he called New York City and spoke to a

2    receptionist to ask what they charge.  Now, only out of 50

3    something, you only got the first name of two of the people he

4    spoke to.  Doesn't have the date he spoke to them.  He does

5    have the date.  I apologize.  What he doesn't have is a fax

6    confirmation of the costs, and he doesn't delineate between

7    what we call -- I don't know what to call it.  Let's think

8    about this thing.  Dr. Davy stood on the stand and says, under

9    the fee schedule Mr. Kincaid didn't give you or didn't discuss

10   with you, didn't give you any detail, for this $400, he gets

11   $71.  That's about 17 percent of the charge.  That's what he

12   gets paid.  But the number you're looking at Mr. Kincaid's

13   report, he says manufacturer's suggested retail price, folks.

14   It's like the Price is Right.  That's what it is.  No one has

15   ever paid those prices, I submit to you.  But those are the

16   numbers that he put up there.  Would you like to spin that

17   wheel.

18        You are not going to see those faxes that document

19   these numbers.  We received testimony that she was

20   significantly injured, she depends on her aunt and her mother

21   and her family and everybody.  Folks, I didn't see them in the

22   courtroom testifying about what she does for them or they do

23   for her.  I live here.  Not one family member took that stand

24   to testify on her behalf, not one.  Ask team Platta why he

25   didn't call them.  Ask them what they would have said if they

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

420

89AMFROT                    Summation - Mr. Miller

1    were in that box.  They know she had five or six past, future,

2    and subsequent accidents.  They know what treatment she had or

3    didn't have.  I don't know which treatment she had or didn't

4    have.  There is HIPA laws out there.  I don't know.  I can't

5    tell you.  I'll tell you this.  They could have testified.

6           You know, what else didn't we see from team plaza?

7    They keep showing on this big giant screen photos of this car.

8    We didn't see a biomechanic take the stand, someone who is

9    going to come in and say 40,000 pounds crashing into, on a

10   snowy night, in the back of her car.  Folks, use your common

11   sense.  40,000 pounds and that amount of damage.  That screen

12   is quite appropriate.  It shows nothing.  Ask him why he didn't

13   bring in the biomechanic.  Ask him why the airbag didn't go

14   off.  Ask team Platta to explain these.  Didn't call the EMTs.

15          You heard the judge earlier at the beginning of trial

16   talk about burdens of proof.  He told you about it, so I am

17   going to say it again.  It's not the defense side to prove.

18   It's plaintiff's case to prove.  And I submit to you he didn't

19   prove that Mr. Diaz was the proximate cause.

20          What else don't you see?  The records.  The records

21   that are very significant are the employment records and you

22   have the employment records from Excel Aire Lines and you are

23   going to look at this.  I don't want to take too much time

24   because these will be in the jury room with you.  But nowhere

25   does it say -- first of all, most important, let's just look at

89AMFROT                    Summation - Mr. Miller

1    the date.  Try to get out there.  The date on her application

2    is February 16, the date of her new job.  She had to get out to

3    Colorado for her new job.  That was exciting, folks.  Guess

4    what.  Is she lying to them, is she lying to you?  She didn't

5    tell them about this significant accident if you believe that

6    it was the proximate cause of her injuries.

7            Why did she tell them?  I submit to you, because it

8    wasn't so significant, she went out and she worked.  You know

9    what, she got on a flight.  Think about it.  Flew how many

10   hours to L.A., three different legs, servicing people, being

11   ready for emergency care, emergency situation, opening doors,

12   rendering first aid, rendering emergency care.  I would be hard

13   pressed -- it would be shocking to find out if we find out that

14   she was really injured and she was willing on take on that

15   role.

16           You will also see on the application, talk about

17   credibility, and we never made -- I don't believe you've heard

18   any issues by any of the witnesses about her profession as a

19   dancer.  It's not an issue.  It's not an issue to the defense.

20   We have made it no issue.  But what I will tell you is an

21   issue, you will see on the application for employment, Cohen's

22   Fashion Optical, you'll see Economy Best Vision, you'll see

23   Private Charter Jet, you'll see MGM Mirage.

24           But, I'll tell you, what you don't see, you don't

25   see -- for other reasons that's really not for the jury's

1    knowledge -- that there is a different employers listed on the
2    employment form by Rick's Cabaret.  And the Court has admitted
3    into evidence certain parts of Rick's, but the Court has given
4    me permission to tell you that those employers that are listed
5    on Rick's Cabaret, her employment, differ than the employers
6    that are listed on here.  You can go into that jury room
7    knowing that they don't match, they don't match.
8          Again, her credibility.  She is flying on airlines,
9    flying on airlines, and she has got to be truthful.  She
10   certifies:  I certify the facts contained in this application
11   are true and complete.  Former employees.  Over here.  List
12   below the last four employers.  She wasn't honest.  She is not
13   truthful.  This is about credibility, folks, credibility.  I
14   don't think she has been too credible to you.  I don't think
15   team Platta has been too credible to you.
16         You know, talking about what else is missing.  If you
17   take a look -- we did not see single MRI or x-ray taken since
18   March 12, 2007.  She has gone through all of this treatment
19   over the past 15 months of her life, but, yet, we do not see
20   any subsequent medical diagnostic films other than the one that
21   might have been taken during the surgeries or procedure,
22   discogram.  Isn't that odd, don't you think?  You have these
23   back procedures.  You think you would have more.  Why not?  You
24   got to ask yourselves.  I don't know.  Are they setting a
25   benchmark for the other three subsequent accidents for

89AMFROT                    Summation - Mr. Miller

1    subsequent lawsuits?  I don't know.  I'll tell you this.  It's

2    kind of odd.  Team Platta at work.  Maybe they don't want you

3    to know.  Maybe after a subsequent accident her position

4    worsened.  I don't know.  But you think, after you go and after

5    these procedures, at least once in 15 months you would have an

6    MRI or an x-ray taken?  None, zero, nada.  Ask team Platta.

7            You did not see a complete and accurate history given

8    to her medical care providers, which means these findings are

9    merely speculative and, thus, there is no position to determine

10   proximate cause of this accident.  In fact, it's quite to the

11   contrary.  Here we have the woman showing no signs, but right

12   back to work.  No signs of slowing down.  You'll see.  Nine

13   days in a row, straight.  I'm not talking sitting behind a desk

14   job.  Nine days in a row, travel up and down.  Use your common

15   sense.  That's a lot of work, lot of running, and, I'll tell

16   you, there is absolutely no signs.  The evidence shows just the

17   contrary, that Mr. Diaz was not the proximate cause.

18           You are going to see a form that the judge is going to

19   explain to you later on.  They are going to ask you, that's the

20   very first question if he was the cause.  I submit to you he is

21   not.  He's not.

22           Trial, this trial, is about taking responsibility and

23   credibility.  Anything else?  Yeah.  Wait a minute, she says,

24   or team Platta says about these injuries, but Mr. Kincaid, he

25   took the stand and he told you about his certifications.  He

89AMFROT                    Summation - Mr. Miller

1   told you that part of his certification, that he spends the

2   majority of his time as a vocational rehabilitation specialist.

3   What does that mean, folks?  And he is testifying for

4   plaintiffs, as a hired gun for the plaintiff.  You would expect

5   that he would testify sitting there, she is unemployable, I

6   can't employ her, I can't give her a job, there is nothing she

7   can do.  Did you hear the vocal rehab specialist, the expert,

8   testify to that?  I proffer to you, she is employable.  She has

9   been employable this whole time.  If she is not employable,

10  it's certainly not as a result of this accident.

11          The trial is about taking responsibility and

12  credibility.  Mr. Diaz, he took responsibility for the events

13  on that snowy night when he slid into Ms. Frometa's car.  On

14  behalf of Mr. Diaz the defense admitted and conceded

15  responsibility for the happening of this accident.  But they

16  vehemently deny that this accident was the proximate cause of

17  her treatment.

18          We met in jury selection and I had the first

19  opportunity to speak with you.  And you promised me when you

20  came in that you would use your common sense and that you keep

21  an open mind.  Those are the two things I asked you.  I didn't

22  have many questions.  Then I gave you a little hypothetical and

23  I talked about a vase.  No way am I saying that this trial is

24  as simple as analogy, but it's important.  Because what about

25  the vase.  I told you about it and we went through a series of

89AMFROT                  Summation - Mr. Miller

1   questions.  I'm telling you now, it's my position, our

2   position, we did not break the vase.  We didn't break it.  We

3   shouldn't have to pay for it.  If it was broken, if it was

4   dropped by somebody else afterwards and it was broken, it needs

5   to be glued back together, but not with our glue.

6        It's okay to feel sympathy for Ms. Frometa, but do not

7   confusion sympathy with causation.  Plaintiff has failed to

8   meet his burden.  Let Mr. Diaz go home with a clear conscience.

9        Mr. Diaz thanks you for being here, spending three

10  days to hear this, and I thank you.  I know you have taken time

11  out of your busy schedules to be here.  When I sit down, you

12  will not hear from me again at all.  I ask, when you go into

13  that jury room, keep an open mind and think about what I've

14  said to you.  Nothing I've said is evidence.  Keep an open

15  mind, think about the ideas that I put out there and the

16  reasons and what team Platta has proffered or what they have

17  not proffered and whose burden it is.  Because when I sit down,

18  Mr. Platta is going to stand up and I need you to keep thinking

19  about what team Platta has done.

20        Thank you, ladies and gentlemen of the jury.

21        THE COURT:  Mr. Platta.

22        MR. PLATTA:  Thank you, your Honor.

23        Good afternoon, ladies and gentlemen, members of the

24  jury.  You have heard a lot about team Platta.  I submit to you

25  it's not about any team Platta.  It's me and my computer,

89AMFROT                    Summation - Mr. Platta

1    pretty much.  And I submit to you that what counsel told you is

2    wrong, wrong for one reason.  He wanted to distract your

3    attention from the case and put it on something else.  That

4    shouldn't happen.  This is the day in court when my client --

5    I'm an assistant here.  I'm just telling you the facts of the

6    case.  That's all I'm here for.  This is no magic team Platta.

7    There is just my client, who had an accident, in which this

8    defendant drove recklessly, and it's untrue what the counselor

9    told you that they admitted liability in this case.  It was

10   Judge Baer who decided that you don't have to waste your time

11   on nonsense, on the fact that this defendant didn't want to

12   admit that he was responsible.  Honorable Baer made a decision,

13   it wasn't admitted.

14          Now, let's look a little more at this defendant who

15   just happened to drive a very heavy truck, 40,000 pounds.  And

16   if my client uses the word atomic bomb, it's the best way she

17   can express it.  And are you surprised that she actually uses

18   this word when you see her truck, when you see the damage to

19   this car, and it wasn't shown to you by defendants because had

20   it been done by them, you probably wouldn't see it at all.

21          I apologize one moment.

22          You can see the pictures of the car.  You can see what

23   kind of damage does directly between a truck to another truck.

24   Remember, this is not a small car.  My client was driving a

25   Toyota 4 Runner.  It's a heavy SUV.  In order to destroy this

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT                    Summation - Mr. Platta

1      car like that, the impact must have been huge.  An atomic bomb

2      is probably a good expression.  We have a jury of females and I

3      think you actually understand what she means by atomic bomb

4      when you get this kind of damage to your car.  Believe me, had

5      this been a regular car, small sedan or anything less heavy

6      than a four-by-four Toyota 4 Runner, I don't think she would be

7      walking here.  I think she would not be with us today.  The

8      defendants want you to forget that this is what happens after

9      the car is being hit by a 40,000 pound truck.

10             And it's not a coincidence.  The defendant was

11     negligent.  The defendant didn't pay attention.  He couldn't

12     stop because, you know what, who cares.  I'm in a big truck.

13     What do I care?  I am not going to get hurt.  Right, Mr. Diaz?

14     You don't care.  You were paid to come here, so who cares.

15             MR. COFFEY:  Objection.

16             THE COURT:  This is the second time that the parties

17     have the opportunity to come in front of you and provide a

18     narrative.  So unless I find a terrible objection and you find

19     it and bring it to my attention, I would rather let each side,

20     as indeed happened with you, tell their stories, since this is

21     the first and last time they have to tell it.

22             Overruled, I guess is the ruling.

23             MR. PLATTA:  Thank you, your Honor.

24             I want you to remember that we are not here because of

25     Ms. Frometa's willingness to bring the lawsuit because she

89AMFROT                  Summation - Mr. Platta

1    actually told you, I had prior accidents and I never sued

2    anyone.  I had accident, fender bender, I never sued anyone.

3    She did sue someone who freaking make a hole in her car, sent

4    her to the hospital, emergency room, where you saw yesterday,

5    the pain scale, 9 out of 10, the doctor was lying on the stand.

6              You saw that she was treated.  You saw all the

7    exhibits.  And it wasn't prepared by defendants.  It was

8    prepared by myself because I have to prove to you that she

9    sustained very serious injuries.

10             Now, defense counsel used the word, the proximate

11   cause in relation to his client and he was partially right that

12   Mr. Diaz could not be the proximate cause, but there is a

13   difference between the proximate cause and a proximate cause

14   and the judge will explain the difference because in the charge

15   that he's going to read to you, he's going to say that any

16   proximate cause could be one of the reasons to sustain such

17   injury.

18             So, basically, what it means, it doesn't necessarily

19   have to be one reason.  It's enough that he's one of the

20   reasons, he doesn't have to be the reason.  So, for example,

21   all the doctors agreed, my client had some degenerations in her

22   spine.  But there was also a herniation.  All of them agreed

23   she has a herniation in her spine.  Some of them told you, her

24   treating physicians told you that she had radiculopathy in her

25   spine, neck and back, prior to surgeries and following the

89AMFROT                    Summation - Mr. Platta

1   surgeries.  What does it mean?  She still has numbness,

2   tingling sensations, pain in her spine radiating in to her

3   arms.  She can't act like we do.  Understand that we might not

4   be able to describe the pain, but the person who actually goes

5   for pain, she is the only one that can say that.

6           all these exhibits can only try to picture them, but

7   we actually have to feel for her in order to understand what

8   she is going through.  And the defendants, definitely Mr. Diaz,

9   didn't agree with her on February 14 when he smashed her.  He

10  didn't pay attention, he didn't care, what the heck, it wasn't

11  a big car, nothing happened to him.  As far as I can see.

12          Now, the defendants told you, defendants' counsel told

13  you many times that the prior accident, subsequent accidents,

14  were -- had anything to do with this accident and this injury.

15  Did he show you anything?  It is untrue for him to say that

16  it's for me to show you some kind of evidence that doesn't

17  exist.  I have showed you everything.  I believe that jurors

18  have to have full disclosure of documents in order to make

19  decision, whether they are good or bad.  Sometimes, like with

20  the employment records, I was objecting to that because of the

21  amounts that my client was making or paying and this is not

22  part of the lawsuit, but you will get the employment records

23  anyway so you can look at them.  You will see she was a

24  hard-working person.  She didn't stop working at the time of

25  the accident.  I told you at the beginning, she doesn't want to

430

89AMFROT                    Summation - Mr. Platta

1    be a burden.  She didn't bring any prior lawsuits.  She was

2    fine up until February 14.  And on that magic day, this

3    defendant made us all meet today in court.  And it wasn't my

4    client's idea.

5           I submit to you that none of us here in this courtroom

6    would want to go through what she went through during last year

7    and a half.  As much as it sounds crazy, for defense counsel

8    and his witnesses was to testify and say that everything that

9    she went through was because of something else.  If you look at

10   the MRI films, reports, that are in evidence, you can have a

11   look at them, you can clearly see that all the MRIs were

12   actually taken prior to the time of the accident.  And you can

13   review them yourself at the time of your deliberation.

14          This is, for example, the report of the MRI from

15   Standup MRI of Manhattan, dated 3/30 of '07, prior to any kind

16   of March 16 accident which she described to you what happened

17   then.  She didn't tell anyone that she needs further treatment.

18   She was treating only for February 17.  And I will tell you

19   why.  Let's think about it.  What do you do when you have an

20   accident?  You go to the emergency room, she was taken to

21   Cabrini by ambulance.  She was shaken.  I think it's pretty

22   normal.  She was also released a couple of hours later after

23   CAT scan of her head.  They were actually suspicious about what

24   happened in the car because of damage.

25          Now, if you think of that, she went afterwards to Dr.

89AMFROT                    Summation - Mr. Platta

1   Villafuerte, and you have the records to review.  The fact that

2   he didn't testify, how many doctors does plaintiff have to put

3   on the stand to make his or her case?  It's not about numbers.

4   You have the evidence to review.  There is full disclosure.

5   You can look at the records.

6          The jurors, in front of you, you can see the first

7   page of the report from Midtown Medical Practice, PC,

8   Dr. Villafuerte's office.  You see the date, February 23.  I

9   submit to you that Ms. Frometa actually seeked medical

10  attention against what the defendants' attorney told you.  She

11  seeked medical attention right away.  As soon as she felt, I

12  cannot go forward without treatment, she didn't go at the

13  beginning.  She said, I don't want to be a burden, I want to

14  have normal life, but I don't want to be a burden.

15         Now, this shows you, together with the MRI films,

16  before any other subsequent fenders benders, that what defense

17  counsel told you was actually done.  But I will submit to you

18  that at the end of my summation it's going to be up to you to

19  decide who was telling you truth, and I will submit to you that

20  I don't want you to listen to me or to defense counsel, but

21  listen yourself to what you heard on the stand yesterday or the

22  day before yesterday.  Counsel can say whatever they want, but

23  the actual evidence speaks for itself.  This is part of it.  It

24  shows you treatment was waived prior to anything subsequent

25  that happened to her in her life.  Can you penalize someone who

432

89AMFROT                    Summation - Mr. Platta

1    is going coming back to work?

2         When I was listening to my client's testimony, when

3    she talked about her being back to flight attendant work, her

4    eyes were bright.  This was something she wanted to do.  It was

5    her chance in life to stop dancing, to become someone that she

6    wanted.  She wanted to do flight attendant.  She wanted to fly

7    as much as she can.  She was flying until she had to take the

8    test, safety test for passengers.  She couldn't pass this test.

9    At the time when she came back to work she thought, well, I

10   think I can do that because it's easy, I can carry one flight

11   person, 16 maximum per plane, not heavy carriers, and she was

12   doing that for few days.

13        And the test came in, done.  She wasn't able to do

14   that again.  And I submit to you that you saw the films, the

15   MRIs, you saw the inside depictions of the surgeries.  This is

16   not artwork only.  Those doctors who were here, they testified.

17   They are the accurate representation of the actual procedure,

18   what it means to you.  It means that this is evidence.  We can

19   take them -- you can take them into your deliberation and I'll

20   ask you to do that.  You can review the pages that we actually

21   blew up.  Those doctors told this person who was preparing this

22   exhibit how to do that.  They exactly told them, yes, this is

23   the way I did it, this is the way I put the scalpel, this is

24   way I pulled the muscles from the pack, this is the way I

25   actually inserted instruments to remove the disk; before

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT                    Summation - Mr. Platta

1    removing the disk, to cut the spine, to cut the vertebra.

2         If you yourself being on the operation table and being

3    open from the back and there is a drill going to your spine to

4    make space for instruments, and this drug makes a hole, it will

5    never heel.  It's a hole that's going to stay there the rest of

6    her life.  The spine is not the same anymore.  The spine is

7    weak.  Now remember, not only the spine is weak, but the disk

8    that was removed, the disk that was causing the pain had to be

9    cut.  So that means that the disk space between the vertebra is

10   different now.  She is going to have a lot of problems in the

11   future.  She is going to need a lot of medical care and

12   attention.  That's why I decided to hire life care expert.

13   Yes, he was absolutely hired, but he was hired to put the

14   numbers together, not to give you an opinion about whether she

15   needs the treatment or not because his opinion was actually an

16   opinion of the doctors, not just one, and you've heard Dr. Davy

17   testifying to you why one doctor's opinion is not sufficient.

18   Because that plan would not be life care plan.  That would be

19   the life care plan of Dr. Babu or Dr. Crane, who said she

20   doesn't need anything.

21        Let's think for a second about Dr. Crane.  You've

22   heard all three of them testifying yesterday.  And Dr. Crane

23   didn't do a back surgery for the past ten years, yet he's an

24   expert on doing spinal surgeries.  Yet he can tell you that

25   striker device that was used to put a needle through my

89AMFROT                    Summation - Mr. Platta

1    client's throat to get to her spinal herniation was not

2    necessary, that this is not approved by the medical community.

3    Who is he to tell you that?  He didn't do surgery for the spine

4    for the last 10, 15 years, whatever his testimony was.

5         I submit to you that this striker device is actually

6    FDA approved.  It's completely fine to use it.  Doctors

7    commonly use that type of device.  In anesthesia, in pain

8    management, they do that.  The defendants want you to think

9    that something happened to my client during her treatment, or

10   that something happened to her prior to the accident or

11   subsequent to her accident.  I submit to you that these fine

12   attorneys, great attorneys from a great law firm, they didn't

13   show you a scintilla of evidence that they didn't find out for

14   year and a half to contradict my client's statements regarding

15   her injuries and proximate cause of the accident.

16        This defendant who is sitting right there, Mr. Diaz,

17   created on February 14 of '07, was the proximate cause, a

18   proximate cause which means, the degenerations in the spine,

19   they were there.  No one says anything else.  But the

20   herniation and symptomatic treatment and symptomatic pain

21   started from the accident on February 14, '07.  Why?  Because

22   there is nothing else.  It will be up to defendants to show

23   otherwise.  My case is basically to prosecute the evidence and

24   tell you what happened.  If they say something else happened, I

25   submit to you that they would have to show you what is

89AMFROT                    Summation - Mr. Platta

1    significant.

2              THE COURT:  Maybe you would like to go outside.

3              MR. MILLER:  I apologize.

4              MR. PLATTA:  I submit to you there was nothing else

5    that you have seen and it wasn't because of me.  I submit to

6    you that this firm, these attorneys, are smart enough to bring

7    any live person who can testify against my client, anybody,

8    anyone.  They will find the person, they will find a document.

9    You know what?  In this case they didn't actually have to do

10   that.  Because everybody was disclosed.  In the federal court

11   we have to put all the evidence in on the table, everything we

12   know, and this is what we have in our system.  When you go to

13   the deliberation room, please look at the records, please look

14   at the charts.  You have full access to all medical records,

15   anything that you need, but also remember defendants have to

16   put some kind of defense to this case, they have to present

17   their interests.  This is a company.  They have to protect the

18   company.  Because Mr. Diaz was employed by the company at the

19   time of the accident and it's actually the company who is

20   responsible for the accident, not himself.  He is not going to

21   go to jail.  Anything won't happen to him, and he knows it.  He

22   knows what he did to my client on February 14, don't you,

23   Mr. Diaz?

24             Going back for a moment to the treatment of my client,

25   let's start with Cabrini.  We have heard testimony yesterday

89AMFROT                    Summation - Mr. Platta

1    from the doctors, from Dr. Crane, that the pain was actually

2    mild.  I have shown you this portion of the report that

3    actually we are discussing damage and actual pain that my

4    client had following the accident.  And you saw the scale of

5    the pain, of her opinion, which was right here.  This discusses

6    loss of consciousness, which is apparently what the defendants

7    were disputing as well.  They told you, she liked her doctors,

8    about losing consciousness.  This is an official hospital

9    record, to the best.  They would be fair to you.  They will say

10   you know what.  They are different indications in the records,

11   but, yet, no, they come to you and tell you, you know what, she

12   didn't lose consciousness.  And they think that everybody

13   doesn't see this, and it wasn't made by me.  Imagine team

14   Platta did the work.  It was just hospital, a nurse, or doctor

15   who put this note.  And, surprisingly, it wasn't included as

16   part of defendants' ambulance call report.  You have to

17   remember one thing.  What do you feel when accident happens?

18   Do you really feel conscious?  Is your brain exactly the same

19   way after being hit by a 40,000 pound truck.  I submit to you,

20   I don't think so.

21          Going back to the pain issue, defendants told you

22   throughout the trial, pain was mild, which means basically

23   close to none.  Here again, I showed it to Dr. Crane -- I'm

24   sorry -- to one of the defense witnesses, and he couldn't

25   explain that.  Again, the same thing.  He had chosen one of the

89AMFROT                  Summation - Mr. Platta

1    records to say you know what, she had mild pain because it's

2    here.  I know it's nowhere else in the record that she has

3    mild.  Everywhere else it says she has a very high pain, 9 out

4    10.  I see this one notation, so I am going to tell the jury

5    and I am going to fool them.  Don't let them, and especially

6    defendant, fool you.

7          My client came back to Cabrini one more time and that

8    was on May 17.  You can see the date clearly here.  This is the

9    date of admission.  And May 17 happened to be also her surgery

10   date, the day when she was operated on by Dr. Ramesh Babu, and

11   you've heard this testimony.  He had no doubt that she needs

12   surgery.  He told you that he is not a treating doctor.  He's a

13   doctor of last resort.  What does it mean?  That just means

14   that he doesn't treat patients.  He operates on them.  And for

15   defendants to actually tell you that he saw her once before the

16   surgery, speechless.  This doctor was here.  And he told you

17   that what you see on the screen is the exact depiction of his

18   surgery.  This is what he saw.

19         When he went inside Ms. Frometa, he actually drilled,

20   he removed portion of the vertebra, he put instruments inside.

21   He extracted portions the disk, the one that was actually

22   injuring the nerve root.  This is why she didn't feel her right

23   leg.  This was actually consistent with the radiculopathy that

24   she had in her lower back which basically means she has

25   tingling sensation, pain, and weakness and numbness.  She

438

89AMFROT                    Summation - Mr. Platta

1    didn't feel her leg.  You heard her testimony.  She couldn't

2    walk, pretty much.  She had moments for 10, 15, 20, 40 minutes,

3    just not have her leg.  I don't know if any of us had this

4    feeling before.  It's very difficult to understand the second

5    person without knowing what it is exactly.

6            In order for her to actually go injure herself and

7    have portions of her own spine removed, that's not likely to be

8    coincidental to what Mr. Diaz did, 40,000 pound truck, no prior

9    lawsuits.  No doubt that this surgery was necessary.  Even

10   Dr. April, the alleged doctor who was supposed to talk to you

11   about life care plan, who had absolutely no experience in this

12   area.  He wasn't a life care planner.  He had no idea what he

13   was talking about.  He even couldn't even tell you that after

14   looking at both surgeries and not being able to see the client

15   once, because he didn't feel it's important, that these

16   injuries are not related.  He couldn't say that.  He said, I

17   cannot answer these questions.

18           And you remember from yesterday.  It was as

19   embarrassing to defendants as truthful.  At this last question

20   he actually was honest, he finally admitted, you know what, bad

21   things happen.  I didn't see her, I didn't operate her, I

22   didn't review her MRI film, and I saw -- you saw them running

23   with the records back and forth just to make sure that he can

24   testify about something.  And he was trying to do his best.  He

25   was hired for this one-time testimony.  He never treated the

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1    patient.  He never saw her.  He doesn't feel for her.  He

2    doesn't even know how much pain she has to go through in order

3    to go for such surgery.  He doesn't do surgery.  He is a

4    neurologist.

5         This was who was presented to you in order to defend

6    the case, the case of the real accident, the February 14

7    accident.  Now, the only way to defend it is to make yourself

8    doubt.  And this is what Mr. Miller was actually doing.  He was

9    screaming, having very loud voice when he was talking to you a

10   few minutes ago.  It's not about loudness.  It's about the

11   truth.  It's about reading the evidence.  And even giving

12   someone in this case, my client, Ms. Frometa, a fair share, a

13   fair life for the future.  She didn't ask for it.  She just

14   happened to be in the wrong place at the wrong time, not her

15   fault.  And the judge made a decision.  This defendant was

16   negligent at 100 percent.

17        Now, going forward, this is the next thing that

18   happened to Ms. Frometa.  The reason why I'm showing you right

19   after the surgery that Dr. Babu did is that she required that

20   even though she had the surgery, she had the surgery in May,

21   you can look at the dates for the steroid injections.  They all

22   happen in October, couple of months after.

23        What does it mean?  That means that even though he

24   removed a portion of the disk, even though he drilled in her

25   spine, he wasn't able to cure her completely.  The pain was

89AMFROT                    Summation - Mr. Platta

1    still there.  Now she feels her leg.  She does.  Thank God.

2    But she also feels pain.  And pain is the worst thing to

3    explain because we are not able to feel for her.  The pain that

4    she has to go through, because of this accident, we won't be

5    able to be fair to her.  We actually have to feel what the pain

6    means and it's very difficult to describe.  It's very easy for

7    defendants to say it was nothing, it was not related.

8          But actually to put yourself into the position of the

9    person who is injured, who had the drill in her spine, who had

10   an instrument that removed portions of her spine, that's a

11   different story.  I'm sure you would have doubts about going

12   through the surgery, the same as she had.  She didn't want

13   steroid injections in the beginning because she says, I don't

14   want needles.  That's why Dr. Kaisman didn't work for her.  She

15   said I'm not going for that, I don't want that.  I'm scared.

16   She actually run away from his office, as she told me.

17         The reason why Dr. Kaisman didn't testify, because

18   that's one of the points that Mr. Miller was nice enough to

19   point to you, that's called cumulative evidence.  Dr. Kaisman

20   is the same specialty as Dr. Davy.  They wouldn't be able to

21   testify together on the same trial.  And who was treating her

22   more, Dr. Davy or Dr. Kaisman?  Dr. Kaisman, she escaped from

23   his office.  I don't want needle.  I don't want anything.  Dr.

24   Davy got her after the surgery, when she actually couldn't take

25   it anymore, and she said, you know what, at this point it's

89AMFROT                    Summation - Mr. Platta

1    October, it's been many months for my accident.  Do whatever

2    you can to help me.  And he did.  He injected her with steroids

3    and they work only temporarily, but they brought her some help.

4    She will need that in the future as well.

5          After that, Dr. Davy did what he felt was the

6    appropriate thing to do, which is basically operate on her, and

7    he used the striker device, the famous striker device that none

8    of the defense doctors would now is appropriate.  Why?  What

9    else can they say?  It's an FDA-approved device, FDA-approved

10   procedure.  What else possibly can they say besides saying, you

11   know what, my colleague wouldn't agree.  Yes, your colleague

12   wouldn't agree because he's doing arthroscopic surgeries to

13   your foot, not to your spine.  How can he possibly have a

14   different opinion?

15         Let's look at this procedure.  The reason for that was

16   the herniation in her spine right here.  You saw the MRI films,

17   you saw the depiction of the herniation.  The herniation was

18   there and it was painful.  It was pressing on nerves and it was

19   creating a situation where my client had the same feeling in

20   her leg as in her arms.  She couldn't grab things.  She

21   couldn't be strong enough to actually help herself even around

22   the house.  I know it sounds sometimes incredible, but this one

23   person has to go through that for the rest of her life.  It's

24   not just today.

25         By the way, this procedure is also important for

442

89AMFROT                    Summation - Mr. Platta

1    defendants for one reason.  If you look at the date of this

2    procedure, which is right here, 12/13 of '07, it's definitely

3    before Christmas.  And for defense counsel to come in front of

4    you and tell you with a straight face that there was some kind

5    of team, it just doesn't work.  The surgery was done before I

6    even met Dr. Davy.

7             And I submit to you, whatever doctors did in this

8    case, they didn't do that because of me, because I'm just a

9    lawyer.  She is the patient.  The same as this is her day of

10   trial, the same as with her treatment.  I wasn't there on the

11   operation table, I wasn't there when she was injected with

12   steroid injections.  I wasn't even there when she got the

13   neurostimulator implant.  You know what, I wouldn't want to be

14   there because it's so painful.  If you imagine, this is the

15   example of the implant neurostimulator.  It was supposed to

16   help her.  At that time Dr. Kincaid, the life care planner, was

17   actually preparing his report.  We all wished her that it does

18   work because the only thing that is left afterwards is the

19   pump, the pump that Dr. Davy referred to as costing around

20   50,000 bucks.  And the refill of the medication for this pump,

21   for the future, is 50,000 a year.  Unfortunately, Ms. Frometa

22   doesn't have money right now to do that because no one pays

23   anymore her medical bills.  They were paid.  There was over

24   50,000 spent on her medical bills.  There is no more available

25   from her own carrier.  She can't ask for more because there is

89AMFROT                    Summation - Mr. Platta

1    nothing left.

2            It's up to you right now to decide if she can have

3    treatment.  If so, how significant treatment she had so far.  I

4    will ask you to allow her to continue that in the hope that she

5    does feel better one day.  She is not going to be like us.  She

6    is not going to feel the same way anymore.  And I think what

7    she went through shows it, that this kind of pain and suffering

8    is unique.  We don't have many cases like that where a person

9    actually gets struck with a very heavy truck and then has to

10   undergo all this treatment.  I don't know if you know any of

11   your friends would actually have that massive medical treatment

12   to help a single woman live her life.

13           It's really your day, it's really our day, and for me

14   as an attorney, to present you the case.  For you as jurors,

15   it's actually to make the decision.  Whatever your decision is

16   going to be, I will ask you to make this decision in a way that

17   you will feel comfortable after you come back to your home, to

18   your life, because you would know that you decided the life of

19   a person who is injured and that your decision is going to

20   stick to her for the rest of her life.  It's not that she can

21   come back here again.  She won't be able to.

22           Now, we know what the procedures she went through.

23   That was described by doctors, by exhibits, by presentation.

24   You probably know about medicine right now more than myself.

25   But what I want to talk about is, we have to know how can we

89AMFROT                    Summation - Mr. Platta

1    help her, and we can help her in a few ways.  We can help her

2    by allowing her treatment in the future.  That means costs.

3    That means that we have to make sure that she is secure and

4    that means, what Dr. Kincaid testified about, he said her life

5    expectancy is 42 years.  It's national standard.  In order for

6    her to reach that age she has to somehow support herself.

7    Right now she has family members.  They are helping her.  She

8    has her mother, who is an older lady, and she has a disabled

9    sister.  She can't count on any their help.  She only has a

10   aunt to help her and she does help her right now.  For how

11   long, we don't know.  Forever?  Probably not.  We don't know.

12       She doesn't have a source of income anymore, even

13   though she was trying to work after the accident.  Before she

14   brought a lawsuit, you've heard what the defense counsel told

15   you, she brought a lawsuit in May.  She was trying to work up

16   until that time.  She didn't.  It was impossible for her to

17   continue.  That's why she is here today.

18       Now I will ask you for one thing.  We have to somehow

19   put it back together.  We have to make sure that the person who

20   is injured by negligence of another person is going to be

21   responsible for this, that this client, that Ms. Frometa can

22   actually go forward with her life.  You heard the numbers from

23   Dr. Kincaid.  I admit to you, he was hired by me to put

24   together numbers from the doctors.

25       The defense counsel used the words hired gun.  I am

89AMFROT                    Summation - Mr. Platta

1    not going to comment on that.  I think that his term actually

2    applied better to his doctors than to Dr. Kincaid, who was

3    really hired to put numbers together.  He did.  He came up with

4    2.5 million.  It's a very large number.  But if you think of

5    it, it's $160 per day for her medical treatment until the rest

6    of her life.  It's $160 per day.

7            She doesn't have any medical coverage that she can

8    use.  She doesn't have pretty much anything.  She has this one

9    day of court today, nothing else.  $160 a day comes to a very

10   large number here.  But if you think that she has to pay 50,000

11   here or there.  In fact, for example, the pump that Dr. Davy

12   was talking about is not even included in the life care plan.

13   What does it mean?  The pump itself is 50,000.  Refill the

14   medicine is 50,000 a year.  That in itself is 2 million bucks

15   and I am not even mentioning it.  I'm just talking about what

16   we had presented to you through Dr. Kincaid, 2.5 million, 160

17   bucks a day for medical coverage.

18           I'll ask you one more thing.  Medical coverage is

19   important.  We all need that, especially when we get injured.

20   That is when we feel that we necessarily need to go to a doctor

21   and it's nice to have something that pays for us.  She doesn't

22   have it.  She doesn't have anyone to pay for her.  It's either

23   her or she doesn't get treatment.  After what she went through,

24   if she doesn't get treatment, I will leave it up to you to

25   think what actually happens to the person who had spinal

446

89AMFROT                    Summation - Mr. Platta

1    injuries.

2          Now, that's medical side of her injuries.  You can

3    also compensate her for pain and suffering, and you know she

4    went through a lot.  I don't have to repeat myself again.  You

5    know what she went through.  I will ask you to consider giving

6    her additional $70 per day for her past pain and suffering and

7    for the future.  That would come up to 43 years all together

8    and that would come up to $1 million.  It's 60 or $70 per day

9    for the rest of her life from the past to the future.  I will

10   leave it up to you if you agree with me or not.

11         Valuing someone's pain is very difficult.  Without

12   feeling the pain ourselves, we are not really usually

13   comfortable saying, one minute of pain is one dollar.  It's not

14   like that.  Sometimes pain, when you have to go for surgery,

15   when they have to drill in your spine, when they have to put a

16   needle in your throat, and they have to inject you many, many

17   times.  This is not the same kind of pain as headache, I

18   submit.  When you have a migraine, you just take pain pill.

19   She cannot take a pain pill.  It won't work.

20         Again, numbers are just numbers.  I will leave it up

21   to you.  I know that you're very educated and that you can come

22   up with your own numbers.  My suggestion to you is to

23   compensate her $1 million for her past and future pain and

24   suffering, if you find it applicable, and also 2.5 million for

25   her medical care.  That's crucial.  She cannot live without it.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT                    Summation - Mr. Platta

1          I will leave it up to you if you will decide to add

2     anything to that, for example, the cost of the pump.  I know

3     that you've heard the testimony, and I know that you were

4     paying attention throughout the trial.  And this is the day

5     when you will have to make a decision.  And please use all the

6     exhibits, use all that you've heard during the course of this

7     trial.  Don't depend on the words of attorneys.  Depend on the

8     words of the doctors.

9          Let me just go for one more second to the issue of

10    doctors.  You saw many doctors testifying on her behalf who are

11    treating doctors.  There was one defense doctor who examined

12    her, Dr. Crane.  Surprisingly, he said she is fine.  But in his

13    report, that you didn't see, he states that he cannot rule it

14    out, he cannot actually state that it's absolutely not related

15    to the accident.  It's most likely.  It's not the same as not

16    related to the accident.  He wasn't sure himself.  And you

17    heard during his testimony, he wasn't certain.  He couldn't

18    tell you exactly that it's not related injury.

19         Second doctor, Dr. Rothman, the radiologist, I

20    actually agreed with him about his findings because he told

21    you, he agreed with the doctors, with Dr. Babu and with other

22    treating physicians that she had herniations.  He said that.

23    He couldn't tell you precisely what happened to her, and he

24    couldn't tell you whether this is related because he never

25    examined her.  He never treated her.  He never operated on her.

89AMFROT                  Summation - Mr. Platta

1   When he saw the MRI films -- not the MRI -- the surgical films,

2   he told you that he cannot see it on the film when the surgeon

3   can see the spine.  These findings are only as good as

4   radiologist findings.  He's a great doctor.  I submit to you

5   he's fine.  He just couldn't tell you what a neurosurgeon, once

6   he cuts open your body, sees, and he was honest about that.

7           Who else did we have?  We had Dr. April, last witness

8   yesterday.  I think we all had interesting time with this

9   doctor.  He was actually the one honest at the end who said, I

10  cannot answer the question whether this is related or not.  I

11  don't know.  But he only said that after pointing out to him,

12  Doctor, you never saw this patient.  Doctor, did you operate on

13  her?  Did you read the MRI films?  No.  Nothing.  I just

14  reviewed the records.

15          He reviewed the records only one way.  Why?  Think

16  about what he said about pain.  It's mild.  Oh, she didn't lose

17  consciousness.  Well, look at the records.  The records

18  actually indicate something else.  And he wouldn't tell you,

19  you know what, well, the records actually speak for both.  I

20  cannot tell you exactly what happened because I wasn't there.

21  He would tell you, I know what happened, I'm a doctor.  I

22  didn't see her, but I know what happened.  I'm a hired gun to

23  testify, but I will tell you honestly, this injury is not

24  related to this case.  You heard the judge asking some

25  questions about that, and I think you all draw conclusions,

89AMFROT                    Summation - Mr. Platta

1   based on your Honor's questions, what the testimony was.  You

2   will have to decide the case based on the credibility as well,

3   not only my client's credibility, but also on the credibility

4   of the witnesses from the other side, who they showed you to

5   tell you that I'm wrong and that my client wasn't injured.

6           Was one of them credible?  Was one of them telling

7   you, you know what, I can certainly tell you that what she is

8   suffering from is not starting from February 14.  I submit to

9   you there is none.  I asked him, did you have records?  Yeah, I

10  send them records.  Did you ask to see the patient?  No, we

11  usually don't do that.  How can you possibly come here with a

12  straight face and tell us, you know what, she is not injured,

13  it's not because of this accident, and it is like that because

14  I tell you so, because all the medical records are saying

15  something else, but I tell you, because I was paid 5, 6,000,

16  whatever it was, to tell you that.  And it was sad to look at

17  those guys yesterday because they had to defend, they had to

18  say what they said because they were paid for their time.

19          Now, I want to point out to your attention a history,

20  and you heard testimony that a history of a patient is very

21  important, and I think everybody agrees with that.  Now we have

22  to divide between patient's history regarding her accident and

23  regarding her injuries.  And Ms. Frometa never denied to you,

24  she never said, I didn't have accidents.  She said to you, I

25  had fenders benders.  I never sued someone, but I had prior

89AMFROT                    Summation - Mr. Platta

1    fender benders.  We live in New York.  We could have an

2    accident today.  We could be in her shoes today or we could

3    have a fender bender and we will be like, you know what, there

4    is nothing there, not a big deal.

5            Now, defense counsel was telling you, oh, my God, she

6    had all these accidents.  No prior history, no prior treatment

7    for anything.  Not even MRI.  And usually when you have pain in

8    your back, like in this case, you go for MRI, right?  And do

9    you think for a second, for one split second, that this law

10   firm would not do their research, that they would actually not

11   spend money and time to find MRI film?  I submit to you it's

12   very easy.  You get this social security number and you're on

13   the record and you find out, very easy.  Did they show you one

14   piece of evidence?  I will leave this answer to you.

15           I will just repeat one more thing.  The artwork that I

16   presented to you is the actual evidence.  You can use it, you

17   can look at that, and it's the evidence.  Basically, this is

18   what happened, this is depiction of her injuries, depiction of

19   her MRIs, and you can treat this the same way as medical

20   records.  There was no difference.  The judge admitted this

21   into evidence, you can look at that and compare and do whatever

22   you would like with this.

23           Now, to respond to defendants' allegations of not

24   bringing ambulance people in and police officer here.  If I

25   could, I would.  But we would stay here for a couple of weeks

451

89AMFROT                    Summation - Mr. Platta

1    if we call every single person that treated my client, every

2    physical therapist, every chiropractor, police officer, every

3    single person that treated her.  And your Honor wouldn't allow

4    most of this testimony because that would be repetitive.  It

5    would be the same thing spoken over and over again.

6         You saw during the testimony of Ms. Frometa's doctors

7    that some of them were talking about the same things.  They

8    were neurologists, neurosurgeons, and pain management.  These

9    were the three key doctors who were treating her.  That's what

10   I wanted you to actually see through the doctors who treated

11   her the most.  I didn't bother to call physical therapist,

12   because he didn't go inside the spine.  She wouldn't be able to

13   tell you that there was this bulging disk or herniation that I

14   pulled out.

15        Now, you've heard also from defense counsel that 95

16   percent of the herniations are healing themselves.  And Dr.

17   Krishna actually testified about that.  And he testified about

18   that not in court here during this session, but he testified

19   about that before, and I will point it to your attention.

20        MR. COFFEY:  Objection.

21        THE COURT:  Mr. Platta, you are already twice the time

22   you promised --

23        MR. PLATTA:  I'm finishing, your Honor.

24        THE COURT:  I'll sustain the objection.  Take it off

25   the screen.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT                    Summation - Mr. Platta

1            MR. PLATTA:  I submit to you that Dr. Krishna actually

2    explained that situation easily.  When someone is very active

3    and he or she does sports and has one herniation that's very

4    unlikely that's degenerative herniation, you can have the

5    degenerative changes in your spine, doesn't mean that it

6    creates Herniation right away.  95 percent of herniations heal

7    if they are just on one level.  Here, you don't have one level

8    of herniations.  The disks were injured on a couple of levels,

9    especially on the neck.  The lower back was seriously injured.

10   That's why she required an open surgery, not just the surgery

11   that Dr. Davy did, but an open surgery with drills, with

12   instruments, and with scalpel.

13           One of my final remarks, please look at the records.

14   The testimony of Dr. Kincaid, as to my recollection, and his

15   report that I have in front of me was that the cost of it is

16   14,000 per year -- 14,000 in total per her lifetime.  It was

17   approximately 1400 per year.  So it's not exactly 18,000.  I

18   know that someone mentioned this during the trial, but let's

19   not go crazy, seriously.  You have all the records.  Please

20   just review them.  Take your time.

21           Again, I would like to thank you for your time.  You

22   have been very patient and you have been very concerned about

23   this case.  And it is your time now.  It's your time to

24   deliberate, it's your time to take and make decisions.  Please

25   make sure that when you make your decisions you can actually

453

89AMFROT                    Summation - Mr. Platta

1   come back home and say, I did something right.  And whatever

2   that means, be fair to my client, not to me.

3            Thank you very much.  Thank you, your Honor.  Thank

4   you, counsel.

5            THE COURT:  Very well.  You can eat for an hour and

6   then we will see you at 2:00, everybody.

7            (Recess)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

454

89AMFROT

```
 1                          AFTERNOON SESSION

 2                              2:10 p.m.

 3           (Jury present)

 4           THE COURT:  Ladies and gentlemen, this is the last

 5     phase of, I guess, any trial, certainly civil trials, and I

 6     guess criminal as well.  And I am going to read it to you

 7     because while you have heard many of these charges given to you

 8     extemporaneously, not that they have not been done perfectly, I

 9     feel more confident reading it to you and knowing that it's the

10     law, or at least what the lawyers and I have concluded is the

11     law.

12           Now that the evidence in this case has been presented

13     and the attorneys for the parties have concluded their closing

14     arguments, it is my responsibility to -- if you don't hear me

15     you let me know.  It's rarely my problem -- pay close attention

16     and I will be as clear as possible.  My instructions are in

17     three parts.

18           First:  I will give you instructions regarding the

19     general rules that define and govern the duties of a jury in a

20     civil case;

21           Second:  I will instruct you as to the legal elements

22     of the causes of action alleged by the plaintiff and the

23     defendant in this action.

24           Finally, I will give you instructions regarding the

25     general rules governing your deliberations as jurors.
```

89AMFROT                    Charge

1          It is your responsibility to find the facts from all

2     the evidence in this case.  You are the sole judges of the

3     facts, not counsel and not I.  I want to impress upon you again

4     the importance of that role.  It is for you and you alone to

5     pass upon the weight of the evidence, to resolve such conflicts

6     as may have appeared in the evidence, and to draw such

7     inferences as you deem to be reasonable and warranted from the

8     evidence or lack of evidence.

9          With respect to any questions concerning the facts, it

10    is your recollection of that evidence and yours alone that

11    governs.

12         You are to conduct your deliberations as a juror in an

13    atmosphere of complete fairness and impartiality, without bias

14    for or against the plaintiff or the defendant.  This case

15    should be considered and decided by you as an action between

16    parties of equal standing in the community.  No party is

17    entitled to sympathy or favor.

18         It would be improper for you to consider any personal

19    feelings you may have about one of the parties' race, religion,

20    national origin, sex, or age.  It would be equally improper for

21    you to allow any feelings you might have about the nature of

22    the claim influence you in any way.

23         The parties in this case are entitled to a trial free

24    from prejudice.  You must reach your verdict through a fair and

25    impartial consideration of the evidence.

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT                    Charge

1          You have now heard all of the evidence in the case.

2     Keep in mind that while it is your duty to accept the law from

3     me, you must apply the facts in the way you determine them.

4     Again, you are the exclusive judges of the facts.

5          You should not single out any instruction as alone

6     stating the law by which the case should be judged, but you

7     should consider my instructions as a whole when you retire to

8     deliberate.

9          Finally, on this issue, you should not, any of you, be

10    concerned about the wisdom of any rule that I state.

11    Regardless of any opinion that you may have as to what the law

12    may be, or ought to be, it would violate your sworn or affirmed

13    duty to base a verdict upon any other view of the law than that

14    which I give you.  Neither you nor I have the right to follow

15    our predilections about what the law should be.  We must both

16    follow the law as it is and as I charge it to you.

17         Remember, you are the sole and exclusive judges of the

18    facts.  You pass upon the weight of the evidence, you determine

19    the credibility of the witnesses, you resolve conflicts as

20    there may be in the testimony, and you draw whatever reasonable

21    inferences you decide to draw from the facts as you have

22    determined them.

23         I shall later discuss with you how to think about the

24    credibility, or believability, of the witnesses.

25         In determining the facts, you must rely upon your own

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT                    Charge

1     recollection of the evidence.  Anything that counsel may have

2     said while questioning witnesses or during argument is not to

3     be substituted for your own recollection and evaluation of the

4     evidence.  With respect to a fact matter, nothing I may have

5     said during the trial, or may say during these instructions,

6     should be taken in substitution for your own independent

7     recollection.

8              Because you are the sole and exclusive judges of the

9     facts, I do not mean to indicate any opinion as to the facts or

10    what your verdict should be.  Indeed, I have no power to tell

11    you what your verdict should be.  If I allude to a fact and

12    should your recollection differ from mine, once again, it is

13    your recollection that governs.

14             During the trial I have been called upon to make

15    rulings on various questions.  Those rulings are not evidence

16    and need not be considered by you.  Procedural matters are

17    matters of law and although you may have been curious about

18    them, you should not consider them.

19             The rulings I have made during the trial are not any

20    indication of my views of what your decision should be.

21             I also ask you to draw no inferences from the fact

22    that upon occasion I may have asked questions of certain

23    witnesses.  Such questions were only intended for clarification

24    or to explain matters and certainly were not intended to

25    suggest any opinion on my part as to the verdict you should

89AMFROT                    Charge

1   render or whether any of the witnesses may have been more

2   credible than any other of the witnesses.

3          Your job is to consider only the evidence, and find

4   facts from what you consider to be the believable and credible

5   evidence, and apply the law as I give it to you.  Your verdict

6   will be determined by the conclusions you reach, no matter whom

7   the verdict helps or hurts.  Sympathy and speculation should

8   play no part in your decision.

9          The burden of proof for the plaintiff's claim is on

10  the plaintiff to prove each essential element of his claim by a

11  preponderance -- I guess it's her claim -- by a preponderance

12  of the evidence.  You are most likely familiar with the

13  standard of beyond a reasonable doubt, which is the burden of

14  proof in a criminal case.  That standard does not apply to a

15  civil case such as this, and you should therefore put it far

16  from your mind.

17         To establish a preponderance of the evidence means to

18  prove that something is more likely so than not so.  A

19  preponderance of the evidence means the greater weight of the

20  evidence.  It refers to the quality and persuasiveness of the

21  credible evidence on an issue where it is evenly divided

22  between the parties; that is, equally probably that one side is

23  right as it is that the other side is right, then you must

24  decide that issue against the party having the burden of proof.

25  That is because the party who has to shoulder the burden of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT                         Charge

1    proof must prove more than simple quality of evidence.  The

2    party must prove its claims by a preponderance of the evidence.

3    On the other hand, the party that has to shoulder the burden of

4    proof need prove no more than a preponderance.  So long as you

5    find that the scales tip, however slightly, in favor of the

6    plaintiff, that what she claims is more likely true than not

7    true, then the plaintiff's claim will have been proved by a

8    preponderance of the evidence.

9            In determining whether any fact has been proved by a

10   preponderance of the evidence in the case, you may consider the

11   testimony of all the witnesses, regardless of who may have

12   called them, and all exhibits received into evidence,

13   regardless of who may have introduced them.

14           The evidence upon which you are to decide what the

15   facts are in this case comes from the sworn testimony of

16   witnesses, including deposition testimony, both on direct and

17   cross-examination, and regardless of who called the witness,

18   and from exhibits that the Court received in evidence, and from

19   stipulations.  A stipulation of a fact is an agreement among

20   the parties that a certain fact is true.  You must regard such

21   agreed facts as true.

22           There were a number of stipulations.  They never were

23   read to you.  In fact, both parties knew what they were.  I

24   guess they went along as if they didn't have to read them

25   independently to you, and you really don't have to think of any

89AMFROT                    Charge

1    stipulations as a separate part of the evidence because you

2    didn't see or hear any.

3            There is also a problem with respect to the exhibits.

4    While they are all marked, or at least were originally, they

5    sort of came in helter skelter.  So if you want an exhibit, try

6    and identify what that exhibit is, because if you were to

7    remember, which is not that likely, P-18, you really are not

8    sure whether P-18 is equally available to you.  So whatever you

9    want we will provide to you, but if you give us information

10   about the exhibit you're looking for, I suppose that would make

11   it easier, and it might tell me the ones I kept out that you

12   can't see.

13           What is not evidence.  Certain things are not evidence

14   and are to be disregarded in deciding what the facts are.  They

15   include arguments or statements by lawyers, including openings

16   and summations, objections to questions, testimony that has

17   been excluded, stricken, or that you have been instructed to

18   disregard, and anything you may have seen or heard outside the

19   courtroom is not evidence.

20           In making your determination, you may consider

21   evidence which is either direct or circumstantial.

22           Direct evidence is that which a witness testifies that

23   the witness has perceived.  Direct evidence may also be in the

24   form of an exhibit admitted into evidence.

25           Circumstantial evidence is proof of a claim of facts

461

89AMFROT                    Charge

1    and circumstances from which other inferences may be drawn.
2    You are allowed to make reasonable inferences from particular
3    facts that are established by direct evidence, and that is
4    circumstantial evidence.
5         The law does not distinguish between direct and
6    circumstantial evidence.  You may give equal weight to both.
7    The question in the case is whether, based upon all the
8    evidence, both direct and circumstantial, the party with the
9    burden has proved its case by a preponderance of the evidence.
10        I gave you an example at the preliminary charge about
11   what circumstantial evidence is.  I don't really think I am
12   going to go through my subway story again.
13        As you can see, the matter of drawing inferences from
14   facts in evidence is not a matter of guesswork or speculation.
15   An inference is a logical, factual conclusion that you might
16   reasonably draw from other facts that have been proved.  You
17   are permitted to draw inferences, but are not required to do
18   so, either from direct or circumstantial evidence.  In drawing
19   inferences you should exercise your common sense.
20        Many material facts, such as state of mind, are rarely
21   susceptible of proof by direct evidence.  Usually, such facts
22   are established by circumstantial evidence.  Circumstantial
23   evidence is of no less value than direct evidence for in either
24   case you must be convinced that the party with the burden of
25   proof has proved its case by a preponderance of the evidence.

462

89AMFROT                    Charge

1          There are times when different inferences may be drawn

2     from facts, whether they are proved by direct or circumstantial

3     evidence.  The plaintiff may ask you to draw one set of

4     inferences.  The defendant may ask you to draw another.  It is

5     for you, and for you alone, to decide what inferences you will

6     draw.

7          You had an opportunity to observe all of the

8     witnesses.  It is now your job to decide how believable each

9     witness was in his or her testimony.  You are the sole judges

10    of the credibility of each witness, and of the importance of

11    his or her testimony.

12         It must be clear to you by now that you are being

13    called upon to resolve various factual issues, in the face of

14    the different pictures painted by the plaintiff and the

15    defendant which cannot be reconciled without your help.  You

16    will now have to decide where the truth lies, and a vital part

17    of your decision will involve making judgments about the

18    testimony of the witnesses.  In making those judgments, you

19    should carefully scrutinize all of the testimony of each

20    witness, the circumstances under which each witness testified,

21    and any other matters in evidence which may help you to decide

22    which witnesses were telling the you the truth, and which ones

23    were not, and the importance of each witness' testimony.

24         It is your determination as to a witness' credibility

25    that counts.  Nonetheless, the law has provided some

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

463

89AMFROT                    Charge

1    guidelines.  For instance, you should consider the witness'

2    demeanor.  Was the witness candid, frank, and forthright?  Or

3    did the witness seem as if he or she was hiding something,

4    being evasive, or suspect in some way?  How did the way the

5    witness testified on direct examination compare with how the

6    witness testified on cross?  Was the witness consistent in his

7    or her testimony, or did he or she contradict himself or

8    herself?  Did the witness appear to know what he or she was

9    talking about, and did the witness strike you as someone who

10   was trying to report his or her knowledge accurately?

11         Your decision whether or not to believe a witness may

12   also depend on whether, or to the extent to which, the witness'

13   testimony is corroborated or supported by other evidence in the

14   case.

15         Even if the witness was impartial, you should consider

16   whether the witness had an opportunity to observe the facts he

17   or she testified about.  Ask yourselves whether the witness'

18   recollection of the facts stands up in light of all the other

19   evidence.

20         In other words, what you must try to do in deciding

21   credibility is to size a person up in light of his demeanor,

22   the explanations given, and in light of all the other evidence

23   in the case, or the lack of evidence in the case, just as you

24   would in any important matter where you were trying to decide

25   if a person is truthful, straightforward, and accurate.  In

89AMFROT                    Charge

1    deciding the question of credibility, remember that you should

2    use your common sense, your good judgment, your life

3    experience.

4              Inconsistencies or discrepancies in the testimony of a

5    witness, or between the testimony of different witnesses, may

6    or may not cause you to discredit such testimony.  Two or more

7    persons witnessing an accident or a transaction may see or hear

8    it differently.  In weighing the effect of a discrepancy,

9    always consider whether it pertains to a matter of importance

10   or an unimportant or immaterial detail, and whether the

11   discrepancy results from innocent error or intentional

12   falsehood.

13             If a person is shown to have knowingly testified

14   falsely concerning any important or material matter, you have a

15   right to distrust the testimony of such an individual

16   concerning other matters.  You may reject all of the testimony

17   of that witness or give it such weight and credibility as you

18   think is deserved.

19             A witness may be inaccurate, contradictory, or even

20   untruthful in some respects and yet may be entirely credible in

21   the essence of his or her testimony.  It is for you to say

22   whether his or her testimony in this trial is truthful in whole

23   or in part, and to give it such weight as you believe it

24   deserves.

25             A witness may be discredited or impeached by

89AMFROT                    Charge

1    contradictory evidence from other witnesses, or by evidence

2    that in a prior time the witness had said or done something, or

3    failed to say or do something, which is inconsistent with the

4    witness' present testimony.

5         You are not to consider evidence of a prior

6    inconsistent statement as affirmative evidence in determining

7    the acts complained of.  Any evidence of a prior inconsistent

8    statement was placed before you for the more limited purpose of

9    helping you decide whether to believe the trial testimony of a

10   witness who contradicted a prior statement.  If you believe any

11   witness has been impeached and thus discredited, it is your

12   exclusive province to give the testimony of that witness such

13   credibility, if any, as you may think it deserves.

14        In evaluating the credibility of the witnesses, you

15   may take into account any evidence that the witness who

16   testified may benefit in some way from the outcome of this

17   case.  Such an interest in the outcome may sway the witness to

18   testify in a way that advances his or her own interests.

19   Therefore, if you find that any witness whose testimony you are

20   considering may have an interest in the outcome of this trial,

21   you should bear that factor in mind when evaluating the

22   credibility of his or her testimony.

23        This is not to suggest that every witness who has an

24   interest in the outcome of this case will testify falsely, or

25   conversely, that witnesses with no apparent interest in the

89AMFROT                    Charge

1    case will always tell you the truth.  It is for you to decide

2    what extent, if at all, the witnesses' interest has affected or

3    colored his or her testimony.

4         Keep in mind, too, that the test is not which side

5    brings the greater number of witnesses or presents the greater

6    quantity of evidence, but which witnesses and which evidence

7    appeal to your minds as being the most accurate and otherwise

8    trustworthy.  In other words, it is the quality, not the

9    quantity, of the evidence that counts.

10        You have heard from more than one expert witness.  An

11   expert witness is a witness who has special training or

12   expertise in a given field and is permitted to express opinions

13   based on observed or assumed facts to aid you in deciding the

14   issues in the case.

15        The opinions stated by each expert were based on

16   particular facts, as the expert obtained knowledge of them and

17   testified to them before you, or as the attorneys who

18   questioned each expert asked him to assume certain facts.  Keep

19   in mind, like any other witness, you may reject an expert's

20   opinion if you find the facts to be different from those which

21   form the basis of his opinion.  His opinion is not gospel.

22        You may also reject an opinion, if, after careful

23   consideration of all the evidence in the case, expert and

24   other, you disagree with that opinion.  In other words, you are

25   not required to accept an expert's opinion to the exclusion of

89AMFROT                    Charge

1    the facts and circumstances disclosed by other testimony.  Such

2    an opinion is subject to the same rules concerning reliability

3    of the testimony of any other witness.  It is given to assist

4    you in reaching a proper conclusion.  It is entitled to such

5    weight as you find the expert's qualifications in the field

6    warrant, and must be considered by you, but it is not

7    controlling upon your judgment.

8            The law does not require any party to call as

9    witnesses all persons who may have been present at any time or

10   place involved in the case, or who may appear to have some

11   knowledge of the matters in issue at the trial.  Keep in mind,

12   with respect to witnesses, they are equally available to both

13   sides.  Put another way, either side was able to call any

14   witness it chose to call.

15           When a corporation is involved, of course, it may act

16   only through natural persons, agents, or employees.  I don't

17   think this is applicable for us.  Happily, that's the end of

18   the boilerplate.

19           I will now instruct you on the law applicable to the

20   claims in this case.  The plaintiff in this case is Adonna

21   Frometa; the defendants, Mr. Mario Diaz-Diaz and All American

22   Haulers & Recycling.  All American Haulers & Recycling have

23   conceded that they are liable for the vehicle accident that

24   took place on February 14.  At the time of the accident,

25   defendant Mario Diaz-Diaz was driving a sanitation truck in the

468

89AMFROT                    Charge

1    course of his employment with defendant All American Haulers &
2    Recycling.
3           What you must now decide are, first, whether the
4    accident was a proximate cause of Ms. Frometa's injuries and,
5    if so, the sum of money that will justly and fairly compensate
6    her for all losses resulting from the injuries she sustained.
7           Ms. Frometa has the burden of proving, by a
8    preponderance of the evidence, that her damages were
9    proximately caused by the accident that occurred on February
10   14, 2007.  The accident is a proximate cause of an injury if it
11   was a substantial factor in bringing about the injury, that is,
12   if it had such an effect in producing the injury that
13   reasonable people would regard it as a cause of the injury.
14   There may be more than one cause of an injury, but to be
15   substantial it cannot be slight or trivial.
16          The fact that Ms. Frometa may have a physical
17   condition, such as some amounts of degeneration of the spine,
18   which makes her more susceptible to injury than a person who
19   does not have any spinal degeneration, does not relieve the
20   defendant of liability for all injuries sustained as a result
21   of the accident.  Put another way, the defendant takes the
22   plaintiff as they find her.  The defendants are liable even
23   though those injuries are greater than those that would have
24   been sustained by a normal healthy person under the same
25   circumstances.

89AMFROT                    Charge

 1          Ms. Frometa is entitled to recover for her reasonable

 2     expenditures for medicines and medical services, and for any

 3     other reasonable and necessary expense incurred as a result of

 4     the accident involved in this case.  She may recover for

 5     necessary and reasonable medical and other expenses incurred to

 6     date and such expenses that she will incur in the future.

 7     Ms. Frometa may prove the amount of her future expenses with

 8     reasonable certainty and that such expenses are reasonable and

 9     necessary.  They need not be proven to a mathematical

10     certainty.  You may decide the amounts of such medical and

11     other expenses that have resulted, or will result, from the

12     accident, so that I can enter a judgment in the proper amount.

13          In order for Ms. Frometa to recover damages for any

14     pain and suffering that were caused by the accident, she must

15     prove, by a preponderance of the evidence, that she has

16     sustained a serious injury, as that term is defined by New York

17     law.  There are several types of injuries that qualify as a

18     serious injury.  Your verdict sheet will ask you to decide

19     whether Ms. Frometa has proved that her injury qualifies for

20     one or more of these four types of serious injury.  I should

21     mention to you, but you will see it in a moment, that the

22     verdict sheet has got a number of questions for you to answer.

23     It sort of defines some of what we have been talking about

24     here.  So it hopefully will be helpful to you.  She does not

25     need to prove that her injury fits into all four categories.

1     If her injury qualifies for one of the categories of serious

2     injury, she may recover damages for any pain and suffering that

3     were caused by the accident.

4          The first category of serious injury that Ms. Frometa

5     claims she has suffered is the permanent loss of the use of a

6     body organ, member, function, or system.  To find a permanent

7     loss, you must find that the loss of the organ, member, system,

8     or function is total.  It is not sufficient for you to find

9     that the organ, member, system or function operates in some

10    limited way.

11         The second category of serious injury that Ms. Frometa

12    claims she has suffered is the significant limitation of use of

13    a body function or system.  A limitation of use of a body

14    function or system means that the function or system does not

15    operate at all or operates only in some limited way.  It is not

16    necessary for you to find that there has been a total loss of

17    the body function or system or that the limitation of use is

18    permanent.  However, the limitation of use must be significant,

19    meaning that the loss is important or meaningful.  A minor,

20    mild, or slight limitation of use is not significant.

21         The third category of serious injury that Ms. Frometa

22    claims she has suffered is the permanent consequential

23    limitation of use of a body organ or member.  A limitation of

24    use of a body organ or member means that the body organ or

25    member does not operate at all or operates only in some limited

89AMFROT                    Charge

1    way.  It is not necessary for you to find that there has been a

2    total loss of the use of the body organ or member.  The

3    limitation of use must be consequential, which means that it is

4    significant, important, or of consequence.  A minor, mild, or

5    slight limitation of use is not significant, important, or of

6    consequence.

7          The fourth category of serious injury that Ms. Frometa

8    claims she has suffered is a medically determined injury or

9    impairment of a nonpermanent nature that prevented her from

10   performing substantially all of the material acts that

11   constituted her usual and customary daily activity for not less

12   than 90 days during the 180 days immediately following the

13   accident on February 14, 2007.  A medically determined injury

14   is one that is supported by testimony by a doctor.

15         Remember, you need only answer one of these four

16   questions yes on your verdict sheet for Ms. Frometa to recover

17   damages for any pain and suffering that were caused by the

18   accident.

19         They are all spelled out on your verdict sheet, so you

20   don't have to remember them, those four.

21         If you find that Ms. Frometa has sustained a serious

22   injury in at least one of the four categories that I have

23   described, then you may award her a sum of money that will

24   justly and fairly compensate her for any conscious pain and

25   suffering that was caused by the accident of February 14, 2007.

472

89AMFROT                         Charge

1  Conscious pain and suffering means pain and suffering for which

2  there was some level of awareness by Ms. Frometa.

3         In determining the amount, if any, to be awarded to

4  Ms. Frometa for pain and suffering, you may take into

5  consideration the effect that her injuries have had on her

6  ability to enjoy life.  Loss of enjoyment of life involves the

7  loss of the ability to perform daily tasks, to participate in

8  the activities which were a part of the person's life before

9  the injury, and to experience the pleasures of life.

10         Ms. Frometa is also entitled to recover for any future

11  pain and suffering that were caused by the accident.  In this

12  regard, you should take into consideration the period of time

13  that the injuries are expected to continue.  If you find that

14  the injuries are permanent, you should take into consideration

15  the period of time that Ms. Frometa can be expected to live.

16  In accordance with statistical life expectancy tables,

17  Ms. Frometa has a life expectancy of 82 years.

18         Such a table, however, provides nothing more than a

19  statistical average.  It neither guarantees that Ms. Frometa

20  will live an additional 42 years or means that she will not

21  live for a longer period of time.  The life expectancy figure I

22  have given you is not binding upon you, but may be considered

23  by you together with your own experience and the evidence you

24  have heard concerning the condition of Ms. Frometa's health,

25  her habits, employment and activities, or lack thereof, in

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT                    Charge

1    deciding what her present life expectancy is.

2         You may also award Ms. Frometa a sum of money that

3    will justly and fairly compensate her for any mental suffering,

4    emotional and psychological injury, and any physical

5    consequences resulting from the emotional distress that was

6    reasonably caused by the accident.

7         I should tell you that frequently that what happens is

8    that the first portion is read and then I tell you, as I'm

9    telling you now, that I read you the second portion on damages

10   simply because if, in fact, you were only to look at the first

11   portion or hear only the first part of my deliberations, you

12   would have to come back out and listen to the charge on

13   damages, and it seems unnatural to do that.  So it's all

14   charged at the same time.

15        That brings us to the third and final part of these

16   instructions.

17        This case will be decided on the basis of the answers

18   that you give to certain questions which will be -- which you

19   will find on your verdict sheet.  As you will note from reading

20   the questions, you may not need to answer certain questions at

21   all depending on your answer to one or more preceding

22   questions.

23        In this court, while a jury of six can deliberate and

24   reach a verdict, if there are more than six, which there are

25   here, they are not considered alternates, but are full-fledged

89AMFROT                          Charge

1    jurors.  In this case, all eight jurors will deliberate.  It is

2    also the rule in this court that the jury must be unanimous.

3    When all of you have reached an answer, the foreperson of the

4    jury will write the answer in the space provided on the verdict

5    sheet.  When you answer the requisite questions, the foreperson

6    will sign the verdict sheet and signal the marshal that you are

7    ready to report your verdict to the Court.  The foreperson will

8    then be taken through the verdict sheet by my courtroom deputy.

9         Do not assume from the questions or from the wording

10   of the questions or from my instructions about them what the

11   answers should be or any view I might have about what the

12   answers should be.  Again, I have no power to tell you what the

13   answers should be.

14        It is your duty as jurors to consult with one another

15   and to deliberate with a view to reaching an agreement.  Each

16   of you must decide the case for himself or herself, but you

17   should do so only after a consideration of the case with your

18   fellow jurors, and you should not hesitate to change an opinion

19   when convinced that it is erroneous.  You are not bound to

20   surrender your honest convictions concerning the effect or

21   weight of the evidence for the mere purpose of returning a

22   verdict based on the opinion of other jurors.  Discuss and

23   weigh your respective opinions dispassionately, without regard

24   to prejudice or favor for either party, and adopt that

25   conclusion which in your good conscience appears to be in

89AMFROT                    Charge

1   accordance with the truth.

2          Once you get into the jury room, the foreperson, juror

3   no. 1, unless you agree on another, will be responsible for

4   signing all communications to the Court and for handing them to

5   the marshal during your deliberations.

6          If during your deliberations you want to see any of

7   the exhibits, you may request that they be brought into the

8   jury room.  If you want any of the testimony read, you must

9   also request that.  Please remember that it is not always easy

10  to locate what you might want, so be as specific as you

11  possibly can.  In requesting portions of the testimony, if you

12  find that necessary, let me know the witness, the subject

13  matter, and, if possible and appropriate, direct or

14  cross-examination, whether it is direct or cross-examination.

15         In addition, you may request to see any portion or all

16  of my instructions on the law.

17         Your requests for exhibits or testimony, or for my

18  charge; in fact, any communication with the Court, should be

19  made to me in writing, signed by your foreperson, and given to

20  one of the marshals.  In any event, do not tell me or anyone

21  else how the jury stands on any issue until a unanimous verdict

22  has been reached.

23         Members of the jury, I am now going to ask the lawyers

24  to come to the side bar.  If you can just remain seated for

25  another moment, we will see if there are any additions or

476

89AMFROT                    Charge

 1  corrections, and to not discuss the case while you're sitting

 2  in the jury box.

 3          (At the side bar)

 4          THE COURT:  Anything else from the plaintiff?

 5          MR. PLATTA:  No, your Honor.

 6          MR. COFFEY:  No objections.

 7          THE COURT:  Very good.

 8          (In open court)

 9          THE COURT:  There are no additions or corrections.

10  Take a verdict sheet and I will ask the marshal to swear you

11  and the case will be yours.

12          (Marshal sworn)

13          THE COURT:  Here is a verdict sheet, unless you have

14  one.  It's yours.

15          (At 2:45 p.m., the jury retired to deliberate)

16          THE COURT:  I will be available and, if I were you, I

17  would hang around for a little while, at least, and we will see

18  what develops.

19          MR. COFFEY:  Your Honor, if we could, I want to put

20  one thing on the record.  At this time my client has authorized

21  me to extend the settlement offer in the amount of $500,000 to

22  the plaintiff.

23          THE COURT:  It is now on the record.  I presume that

24  your adversary would like to talk about it with his client, but

25  if you are going to take the offer, Mr. Platta, you'll have to

89AMFROT

1    get the reporter to record it for posterity.  Otherwise, we

2    will just assume it's been rejected.

3              MR. PLATTA:  Thank you, your Honor.

4              THE COURT:  See you later.  Me and the reporter.

5              (Recess pending verdict)

6              THE COURT:  Please agree upon the exhibits that we are

7    going to let in.  We don't let in the stuff you never touch or

8    no one saw on the witness stand.  Put together those others

9    that were admitted.  If you need a chart, because you never

10   took down my rulings, my clerk will be able to find it for you

11   right behind me somewhere on the bench.

12             (Recess pending verdict)

13             THE COURT:  There are two items that I understand were

14   not agreed to between the plaintiff and the defendant.  First,

15   let me read to Steve the jury note which says:  Please provide

16   these documents:  1.  Dr. Villafuerte's record of seeing the

17   patient physical assessment; 2.  Original accident report from

18   2/14/07; 3.  ER and EMT documentation (all hospital

19   documentation); 4.  Employment documentation form for applying

20   for a new job as a flight attendant; 5.  Flight log; 6.  Time

21   log from plaintiff's dance employer, Rick's Cabaret.

22             So far as I can understand it, the police report was

23   Plaintiff's 14 and it was talked about and it was admissible.

24   So I am not sure what there is to do without -- other than turn

25   it over.  If you look at your chart, you'll see it's P-14 and

89AMFROT

```
 1   it doesn't seem to be any problem here.  At least there wasn't
 2   any problem that I heard from anybody like the defendant.
 3              MR. COFFEY:  We have no objection.
 4              THE COURT:  That takes care -- was it your objection?
 5              MR. PLATTA:  It was my objection, that's correct.  The
 6   reason for objection is that I don't object to the document
 7   itself.  I want them to see that.  It's just I think that the
 8   portion of the liability description, the way the accident
 9   happened and the description of the police officer should not
10   be there.
11              THE COURT:  Start over.
12              MR. PLATTA:  Judge, I'm not objecting to this
13   document.  I'm asking for a redaction of the portion that
14   discusses liability, which is basically the diagram, as well as
15   the description of the accident done by police officer.  That's
16   the only redaction that I would like to do and nothing else.
17              THE COURT:  Why would I do that.
18              MR. PLATTA:  Because liability was decided and you
19   previously stated that you don't want them to look at documents
20   that will discuss liability in this case.
21              THE COURT:  Would what?
22              MR. PLATTA:  I believe at some point there was a
23   decision or something issue regarding liability testimony in
24   this case, and you said that you don't want any liability
25   issues coming up again.  And this is the description of the
```

89AMFROT

1    accident as well as the diagram goes directly as to liability

2    case, not to damages case.

3            THE COURT:  I think they got that picture clearly.  We

4    told them in the charge, we told them at the beginning, we told

5    them at the end.

6            MR. PLATTA:  Thank you, your Honor.

7            THE COURT:  Anyhow, the record will note your

8    objection.  That goes.  And the other item is where?  Midtown

9    Medical Practice, Dr. Villafuerte.  What's the problem with

10   this?

11           MR. MILLER:  Your Honor, it was defense's objection.

12   There was no witness that testified with that document.  It was

13   only shown at closing on the screen by plaintiff's counsel.

14   There is no witness to put it through.

15           THE COURT:  My view is a little different.  My view is

16   we are not allowing anything but the plaintiff's description of

17   the psychological problems, if any, and so whether or not we

18   had --

19           MR. PLATTA:  Your Honor, it's not psychological.  It's

20   a physical therapy place where she went for the first time

21   after the accident.  It has nothing to do with --

22           THE COURT:  Why does it say psychiatric evaluations?

23   Maybe it says physiatric?

24           MR. PLATTA:  That's correct.

25           THE COURT:  Then I have to look at it more carefully.

89AMFROT

 1          MR. MILLER:  The objection is there is no witness that

 2  testified regarding to it and all the information on there is,

 3  therefore, hearsay.

 4          MR. PLATTA:  Your Honor -- and Dr. Krishna actually

 5  testified about these records, as well as the records were

 6  presented to the jury at the time of my closing argument.  They

 7  were projected on the screen.

 8          THE COURT:  Midtown Medical Practice, is that part of

 9  the empire that we heard about?

10          MR. PLATTA:  No, your Honor.

11          THE COURT:  What do you think is wrong with this?  It

12  was mentioned --

13          MR. MILLER:  It was never testified to, your Honor.

14  We had a right to cross-examine any witness that was going to

15  testify in regards to that document.  There is not one witness

16  that testified to that document, and all the writings in them

17  and findings are hearsay without the witness testifying.

18          MR. PLATTA:  Your Honor, Dr. Krishna was actually

19  testifying about these records and the records were shown to

20  the jury at the time of my closing argument.

21          MR. MILLER:  Shown to the jury, your Honor, is not a

22  vehicle to bring in evidence.  And if I'm mistaken, Dr. Krishna

23  testified to it, I apologize.  If counsel has a cite and

24  location on a daily, I'll be happy to withdraw my objection.

25          THE COURT:  This is signed by Villafuerte, anyway.  We

481

89AMFROT

1   never heard from him, right?

2          MR. PLATTA:  No, your Honor.  He was not subpoenaed to

3   the Court.

4          This is the part of the record that your Honor ruled

5   in the very beginning of the case as admitted into evidence.

6          THE COURT:  Was admissible into evidence.

7          MR. PLATTA:  That's correct.

8          THE COURT:  Do you have a number for it?  I don't

9   think so.  I think what the defendants say is significant, too.

10  As I told you, as I was exiting here, I'm glad to give the jury

11  anything that we actually saw or talked about or felt, but I

12  don't remember this testimony and I certainly never saw it

13  before.

14         MR. PLATTA:  Dr. Krishna actually testified as to the

15  records because he mentioned during his testimony that my

16  client went to this physical therapy place in the beginning.

17  My client also testified about going to Dr. Villafuerte on many

18  occasions, as well as the records were actually -- the records,

19  15 through 24 of plaintiff's exhibits were admitted into

20  evidence as per your prior ruling.  No. 16 was medical records

21  from Midtown Medical Practice, which is the same place as

22  Dr. Villafuerte.

23         THE COURT:  It was admitted without objection, as a

24  matter of fact.  It seems to me it makes it kind of difficult

25  to keep out.  Go ahead.

89AMFROT

1          MR. MILLER:  Your Honor, records are records.  This is

2     a narrative report from a physician that did not take the

3     stand, nor did any witness state they relied upon this report

4     in their testimony.

5          THE COURT:  I know.  But it was given to you and you

6     didn't object to its admissibility.

7          MR. MILLER:  Per your Honor's rules, you told us that

8     there has to be a vehicle through a witness to bring it

9     through.

10          THE COURT:  All it has to be is mentioned.

11          MR. MILLER:  This report was not mentioned in anyone's

12     testimony.  It was only mentioned --

13          THE COURT:  He is saying to me it was.

14          MR. MILLER:  Plaintiff's closing was the only time it

15     was mentioned.

16          THE COURT:  I thought you said that's not the case.

17     We have no transcript, so it's you guys we have to believe.  If

18     you each have a totally different view, then I guess I have to

19     decide.

20          What is your thought?  Where was it mentioned?

21          MR. PLATTA:  It was mentioned by Dr. Krishna during

22     his testimony about the records of the Midtown Medical, as well

23     the dates of treatment, and also by my client on numerous

24     occasions during direct and cross-examination.

25          THE COURT:  I'm letting it in over the objection of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT

1    the defendant.  I assume everything else is done.

2           MR. PLATTA:  Your Honor, also, I would like to at this

3    point extend an offer of a high-low settlement.

4           THE COURT:  Counter offer.

5           MR. PLATTA:  That's correct.  Of 500 to a million to

6    defendants in this case.

7           THE COURT:  You're asking them if they would like to

8    double their offer?

9           MR. PLATTA:  No.  I'm asking for them for a high-low

10   negotiation, which is basically 500 to 1 million.

11          THE COURT:  I don't get it.

12          THE DEPUTY CLERK:  He wants anywhere from 500 to a

13   million --

14          THE COURT:  We are going to have an auction.

15          MR. PLATTA:  No, your Honor.  The idea is, I want to

16   enter into high and low, which is basically if I lose the case,

17   I get 500,000.  If I win, maximum is one million.

18          THE COURT:  Isn't this something that you're supposed

19   to resolve with your adversary rather than me?

20          MR. PLATTA:  That's correct.  I just wanted to put

21   that on the record.

22          THE COURT:  Are you going to respond to that?

23          MR. COFFEY:  We note it, your Honor, and thank you

24   very much.

25          (Recess pending verdict)

                 SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

89AMFROT

 1          THE COURT:  Gentlemen, I guess, did you read the note

 2     to them?

 3          THE DEPUTY CLERK:  They both read it.

 4          THE COURT:  Let me read it to Steve.

 5          THE DEPUTY CLERK:  F was the first one.  This is G.

 6          THE COURT:  Plaintiff's direct testimony done by

 7     Mr. Platta and two physical therapy records.  Unless you have a

 8     better idea or Steven has lost his voice, we probably will

 9     bring him out and let him listen.

10          MR. MILLER:  Your Honor, there is an objection to the

11     physical therapy records.  The first set that's to your Honor's

12     left, I agree, those are the ones with the physical therapy.

13     Those are fine.  I have no problems with those.  It's the other

14     set, your Honor, that's not from the physical therapy

15     establishment, but they just asked for.  That's

16     Dr. Villafuerte's records that Mr. Platta thinks is a physical

17     therapy record as well.  That's my objection to the second

18     sentence.

19          THE COURT:  Why don't I look at them while we listen.

20     There is the handwritten notes that you have an objection to,

21     is that right?

22          MR. MILLER:  Yes, your Honor.  Only because they are

23     not from the physical therapy facility.

24          THE COURT:  He has it in rough.  If you all think,

25     rather than sit here for an hour and a half, we can give it to

485

89AMFROT

 1    them.  Take an hour.  We will give it to them in an hour, then

 2    we don't have to do much but decide on this issue.

 3          Let me tell them what's going to happen here.  Where

 4    is the note?  You got to keep the note.  You know I can't.

 5    Let's get them in here.

 6          MR. PLATTA:  Your Honor, I would like to point out one

 7    more thing.  The records that you have for physical therapy

 8    that were agreed upon by all the parties, there was actually an

 9    updated version that was submitted to the Court per subpoena

10    and I pointed to defense counsel, I would prefer to use the

11    version that was subpoenaed to the Court instead of the one

12    that I presented because the one that I presented is basically

13    the one that I had in my file and it's not updated.

14          THE COURT:  Whichever one you introduce into evidence

15    or brought to me to determine its admissibility is the one we

16    are going to use.  We are not going to start with new ones.  If

17    that's the one you use, that's fine.  If this is the one you

18    use, that's fine.  Whichever it is, it's right on the exhibit

19    list.

20          MR. PLATTA:  Your Honor, these were the records

21    brought by Dr. Krishna, actually, and that's why I would prefer

22    to use notes.

23          THE COURT:  I'm telling you what you are going to use.

24    I'm not asking you.

25          MR. COFFEY:  Your Honor, we only had the ones that

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

486

89AMFROT

1   were submitted in the joint pretrial.

2          THE COURT:  That's this one.  That's what we are going

3   to let in.

4          MR. COFFEY:  Thank you.

5          THE COURT:  We will look at these other notes in the

6   meantime.

7          MR. PLATTA:  Your Honor, the only thing is the

8   pretrial order was done a few months ago and that's why --

9          THE COURT:  That's the breaks.  You should have

10  brought them to my attention.  I have the feeling that you are

11  trying this case backwards, Mr. Platta, that whatever occurs to

12  you as we go along, you decide we want to take note of.  It

13  doesn't work that way.  These progress notes, are they in

14  evidence?

15         MR. PLATTA:  They are in evidence, that's correct.

16         THE COURT:  They are in evidence or they were marked

17  and looked at by me and concluded as to their admissibility,

18  and they are on the list that I gave you at the beginning of

19  the trial.

20         MR. PLATTA:  That's correct, Judge.

21         THE COURT:  Can you help me with the number or letter?

22         MR. PLATTA:  Sure.  No. 21, medical records from

23  Westchester Medical Care, PC.

24         THE COURT:  I think those are probably the ones that

25  I've allowed to go in, that there was no objection to their

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

487

89AMFROT

1    admissibility.  My view still is that we are going to use the
2    ones that were submitted at the time you submitted your
3    exhibits to me.  We are not going to play catchup.
4            Are they ready?
5            THE DEPUTY CLERK:  Yes.  Jury entering.
6        (Jury present)
7            THE COURT:  We have worked out a compromise with
8    respect to your second note.  Since there is no transcript of
9    that, rather than your sitting here listening to Steve's dulcet
10   poem for an hour and a half, he has it on rough computer and he
11   is going to transpose it onto paper.  But it will probably take
12   about an hour, so meanwhile we will give you the physical
13   therapy records.  You may continue your deliberations.  Just
14   don't expect the transcript for a little while.
15       (Recess pending verdict)
16           THE COURT:  The third note says:  Two jurors have
17   school obligations tonight and must leave by 4:45 p.m.  If we
18   do not reach a verdict by tonight, we will come back tomorrow
19   to continue.  May we be adjourned at 4:45.  Yes.  Thank you.
20   That's all she wrote.
21       (Jury present)
22           THE COURT:  It's sad to see you go so early, but I
23   have this note and I certainly am not depriving mothers of
24   going to a child's school.  So I'm going to let you go now and
25   ask you or direct you to return tomorrow morning.  We will by

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

89AMFROT

1    that time have provided you with the transcript.  And 9:30 is a

2    good time and we might even provide you with donuts and coffee,

3    if we can get Dennis to do that.  But the fact of the matter is

4    that you cannot start deliberating until all of you are here.

5    You can't have three or four of you talking about the case

6    while the other three or four of you are on your way in.  So I

7    am going to excuse you now until 9:30 tomorrow morning but ask

8    that you all be here, as you've been, so I am sure you will be

9    again, and let you go now.  You're excused.

10           (Jury not present)

11           THE COURT:  That saves me some trips up and down.  We

12   will see you in the morning.

13           (Adjourned to Thursday, September 11, 2008, at 9:30

14   a.m.)

15

16

17

18

19

20

21

22

23

24

25